**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| CAREY COURTWRIGHT, | ) | |
| Individually and on behalf of K.C., a Minor, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 2:24-cv-4055 |
| | ) | |
| Epic Games, Inc., Roblox Corporation, | ) | |
| Mojang Studios, Microsoft Corp., Meta | ) | |
| Platforms f/k/a Facebook, Inc., Google | ) | |
| LLC, Another Axiom, Inc., Rec Room, | ) | |
| Inc., VRChat Inc., Banana Analytics, LLC, | ) | |
| InnerSloth, LLC, PlayEveryWare, Inc., and | ) | |
| JANE & JOHN DOE I-XX, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Carey Courtwright, Individually and on behalf of K.C., a Minor, hereby file their *Complaint* against the Defendants—Epic Games, Inc., Roblox Corporation, Mojang Studios, Microsoft Corp., Meta Platforms, Inc. f/k/a Facebook, Inc., Google LLC, Another Axiom, Inc., Rec Room, Inc., VRChat Inc., Banana Analytics, LLC, InnerSloth, LLC, PlayEveryWare, Inc., and Jane & John Doe I-XX—notifying each Defendant of Plaintiffs' claims for relief as available under Missouri Law. In support thereof, Plaintiffs allege and state:

### I.  NATURE OF THE ACTION

1.  Video game addiction, also called internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school, and work.

2.     Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering stop interacting with friends and/or family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.     Video game addiction causes rifts between minors and young adults with gaming-addiction and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.     Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.     Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.     The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*i.e.*, minor game players) addicted to the Defendants' video game products in order to maximize Defendants' profits.

7.     Defendants manufactured, published, marketed, and sold video games and gaming products, including those played by K.C., which Defendants had specifically developed and designed to cause the addiction experienced by K.C. and other users.

8.     Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.     Defendants rely on microtransactions to increase their profits from individual games.

10.     Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors and young adults.

11.     Defendants make their games addictive, in part, by encouraging long-term, extended game play despite knowledge that such extended play causes physical harm to the human brain – and particularly to a minor's developing brain.

12.     Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game products is their own bottom line.

13.     By making their games addictive, Defendants are able to maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game products or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

14.     "Microtransactions" often occur as a result of Defendants' use of "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times they are subjected to Defendants' deceptive and harmful conduct and more likely to spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

15.     By keeping minors and young adults playing longer—and spending more money in the game in the process—Defendants are causing physical and mental harm to users while consistently increasing their revenue.

16.     By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these young users age.

17.     Defendants are exploiting consumers, particularly minors and young adults, through the use of unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

18.     Video game addiction impacts thousands of youths and their families across the country, including in Missouri.

19.     Plaintiffs are one of those families who have been negatively impacted by the addiction and harm caused by each of Defendants' products.

20.     Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused K.C.'s brain damage and gaming addiction, along with Plaintiffs' other damages as described herein.

21.     As a result of that gaming addiction and harm caused by Defendants' products, K.C. specifically has experienced brain damage, a drop in grades to the point of failing, aggression, depression, anxiety, withdrawal symptoms when not playing, withdrawal from life activities, changes in eating pattern, distress, anger, poor hygiene, and physical pain in their hands, eyes, and back.

22.     K.C has been referred to behavioral health treatment and has begun the process of seeking medical treatment.

23.     As a result of the gaming addiction and harm proximately caused by Defendants' misconduct, K.C. has been referred to a behavioral health facility and requires an Individualized Education Plan ("IEP") at school.

24.     As a result of K.C.'s gaming addiction and the harm proximately caused by Defendants' misconduct, Ms. Courtright has personally witnessed and been affected by K.C.'s gamer's rage and withdrawal symptoms. Ms. Courtright has personally experienced emotional distress, pain, suffering, mental anguish, and loss of money as a proximate result of Defendants' misconduct.

25.     Plaintiffs have been injured and harmed as a proximate result of Defendants' actions and misconduct; for that they are entitled to compensation and other damages under Missouri law.

26.     Defendants, individually and collectively, have willfully and knowingly engaged in fraudulent, deceptive, unfair, immoral, outrageous, wanton, and reckless behavior that damaged and continues to harm not only Plaintiffs, but countless other Missourians and citizens of the world. For this they should be punished and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

## II.     PARTIES

27.     K.C. a minor, is and at all times relevant to this action, was a citizen and resident of the State of Missouri whose principal place of residence being in Moniteau County, Missouri.

28.     K.C. is 12 years old at the time of filing of this lawsuit.

29.     K.C. began playing video games at 6 years old.

30.     K.C. has continued to play video games at an increasing and uncontrollable pace since that time.

31.     K.C. specifically plays Fortnite, Roblox, Minecraft, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us and has been playing each of these games for more than three years. K.C. plays each of these games for several hours a day and continues to play through the night.

32. K.C. plays these games using multiple video game products—but specifically plays them on: Xbox One, Xbox Series S, Android phone, and/or Meta Quest.

33. K.C. has purchased or downloaded games from the Xbox Store and Meta Store, and subscribes to or has subscribed to Fortnite Battle Pass, Xbox Game Pass, and Meta Quest+, which provides access to the games identified herein as well as Xbox and Meta's online services.

34. Plaintiff Carey Courtright is, and at all times relevant to this action was, a citizen and resident of the State of Missouri whose principal place of residence is in Moniteau County, Missouri.

35. Ms. Courtright is the parent of K.C. and represents K.C.'s interests in this lawsuit.

36. Ms. Courtright also seeks redress on her own behalf for loss of society and companionship, as well as for economic injuries and losses sustained as a result of K.C.'s brain damage and gaming addiction proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, and for actual damages and injuries she personally sustained as a result of Defendants' deceptive, outrageous, fraudulent acts.

37. Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

38. Epic Games is authorized to do and does business in the State of Missouri, and its registered agent for service of process is 120 S Central Ave., Clayton, MO 63105.

39. Epic Games is a video game and software developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game products, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

40. Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, CA 94403.

41. Roblox Corp. is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video game, Roblox, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

42. Defendant Microsoft Corp. ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052.

43. Microsoft is authorized to and does business in the State of Missouri, and its registered agent for service of process in Missouri is 221 Bolivar St., Jefferson City, MO 65101.

44. At all times material hereto, Microsoft developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox Series X either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs, and developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold subscriptions to Xbox Game Pass to members of the general public within the State of Arkansas, including to Plaintiffs.

45. At all times material hereto, Microsoft, in conjunction with its video game design and development studio division, Xbox Game Studios, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video game series, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

46.     Defendant Mojang Studios is Swedish Company with its principal place of business in Stockholm, Sweden.

47.     At all times material hereto, Mojang Studios designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Minecraft video series, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

48.     Mojang Studios is a wholly owned subsidiary of Microsoft, who acquired Mojang Studios and the Minecraft intellectual property for $2.5 billion in September 2014, and Microsoft is responsible for any damages that may be assessed based on Mojang Studios's wrongdoing in connection with its Minecraft video game product.

49.     Defendant Another Axiom, Inc. ("Axiom") is a Delaware corporation with its principal place of business at 303 Twin Dolphin Drive, Suite 600, Redwood City, CA 94065.

50.     At all times material hereto, Axiom developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product Gorilla Tag directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

51.     Defendant Rec Room, Inc. ("RRI") is a Delaware corporation with its principal place of business at 300 Elliot Ave W, #450, Seattle, WA 98119.

52.     At all times material hereto, RRI developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product Rec Room directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

53. Defendant VRChat Inc. is a Delaware corporation with its principal place of business at 548 Market Street # 93053, San Francisco, CA 94104.

54. At all times material hereto, VRChat Inc. designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product VRChat either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

55. VRChat Inc. is authorized to do and does business in the State of Missouri, and VRChat Inc.'s registered agent for service of process is CT Corporation System, 120 S Central Ave, Clayton, MO 63105.

56. Defendant Banana Analytics, LLC ("Banana Analytics") is a limited liability company with its principal place of business at 1155 W SR 434, Ste # 176, Longwood, FL 32750. The members of Banana Analytics are Florida residents.

57. At all times material hereto, Banana Analytics designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product Campuchin either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

58. Defendant InnerSloth LLC ("InnerSloth") is a Washington limited liability company with its principal place of business at 7345 164th Avenue NE, Suite I45-1316, Redmond WA, 98052.

59. At all times material hereto, InnerSloth designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product Among Us either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

60. Defendant PlayEveryWare, Inc. ("PlayEveryWare") is a Washington corporation with its principal place of business at 5601 6th Avenue S, Suite 378, Seattle, WA 98108.

61. At all times material hereto, PlayEveryWare designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product Among Us either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

62. Defendants InnerSloth and PlayEveryWare acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Among Us series with all the addictive features and technologies contained therein.

63. Defendant Meta Platforms, Inc. f/k/a Facebook, Inc. ("Meta") is a Delaware corporation with its principal place of business at 1601 Willow Road, Menlo Park, CA 94025.

64. Meta is authorized to do and does business in the State of Missouri, and Meta's registered agent for service of process is 221 Boliver St., Jefferson City, MO 61501.

65. At all times material hereto, Meta developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product Meta Quest directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

66. In 2014, shortly after Oculus VR demonstrated a prototype of its virtual reality headset, Meta acquired the company for $2 billion in cash and stock. Since then, Oculus VR has been rebranded as Reality Labs, a business and research division of Meta. As such, Meta is responsible for any damages caused by Reality Labs f/k/a Oculus VR.

67.     Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Pkwy., Mountain View, CA 94043. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business at 1600 Amphitheatre Pkwy., Mountain View, CA 94043, and is a wholly owned subsidiary of the publicly traded company Alphabet Inc. Google LLC is the primary operating subsidiary of Alphabet Inc.

68.     Google is authorized to do and does business in the State of Missouri, and Google's registered agent for service of process is 221 Boliver St., Jefferson City, MO 61501.

69.     At all times material hereto, Google designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, and/or supplied the Android Operating System used in the Meta Quest headsets, as well as the Google Play app, either directly or indirectly, to members of the public within the State of Missouri, including to Plaintiffs.

70.     Defendants Meta and Google acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Meta Quest products with all the addictive features and technologies contained therein.

71.     Meta and Google acted in concert with Axiom, RRI, VRChat Inc., and Banana Analytics to distribute, market, supply, and/or sell the Gorilla Tag, Rec Room, VRChat, Inc., and Capuchin video games and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

72.     Google acted in concert with Roblox Corp., InnerSloth, and PlayEveryWare to distribute, market, supply, and/or sell the Roblox and Among Us video games and all in-game downloadable products and in-game purchases contained therein to increase Google's revenue at the expense of Missouri consumers, including to Plaintiffs.

73.     Microsoft acted in concert with Epic Games, Mojang Studios, InnerSloth, and PlayEveryWare to distribute, market, supply, and/or sell Fortnite, Minecraft, and Among Us and all in-game downloadable content and in-game purchases contained therein in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

74.     Defendants Jane & John Doe I-XX are individuals, corporations, or entities as yet unidentified to Plaintiffs who were engaged in the research, development, manufacture, design, testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions—and who introduced such products into interstate commerce or marketed such products with knowledge and intent that such products be sold in the State of Missouri—and who also may be liable for some or all of Plaintiffs' injuries and damages as described herein. Despite reasonable and diligent inquiries by Plaintiffs, the identity of said tortfeasor(s) has not been determined as of this date and it is necessary to conduct discovery in order to determine the identity of said tortfeasor(s). If a John Doe Tortfeasor is identified for one or more causes of action, Plaintiffs will amend this Complaint accordingly.

75.     Upon information and belief, each Defendant was aware—or should have been aware—that game designers, developers, and publishers, including the other Defendants named herein, were engaging in the unlawful, deceptive, negligent, outrageous, immoral, and reckless behavior identified herein.

76. Upon information and belief, Roblox Corporation, Epic Games, Inc., Axiom, RRI, VRChat Inc., Banana Analytics, InnerSloth, PlayEveryWare, Microsoft Corp., Google, Meta, and Jane & John Doe I-XX acted in concert and entered into licensing agreements to utilize the same patents to keep users, including minors like K.C., playing longer and dependent on (i.e., addicted) to Defendants' products.

77. At all times material hereto, each Defendant targeted consumers/purchasers, including minors like K.C., to (1) purchase and/or play its video games and (2) to purchase in-game items or perks in exchange for real money, known as "microtransactions," through in-game advertising and "fake" avatar friends.

78. Each Defendant—with knowledge of K.C.'s age and Missouri residency—targeted K.C. and induced K.C. to enter into microtransactions.

79. Upon information and belief, each Defendant—with knowledge of K.C.'s age and Missouri residency, allowed third parties to target K.C. and induce K.C. into microtransactions within Defendants' products.

## III. <u>JURISDICTION AND VENUE</u>

71. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs of the *Complaint*.

72. This *Complaint* brings forth claims for relief arising under the laws of the State of Missouri, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce, Plaintiffs have suffered and continue to suffer both injuries and damages, as described herein, within the State of Missouri that exceed the sum or value of $75,000, exclusive of interest and costs.

73.     This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

74.     This Court has personal jurisdiction over each Defendant because each routinely conducts business in Missouri and has sufficient minimum contacts in Missouri to have intentionally availed itself to this jurisdiction by marketing video game products and transacting business in the State of Missouri.

75.     At all relevant times, each Defendant was present and transacted, solicited and conducted business in the State of Missouri through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

76.     Defendants are conclusively presumed to have been doing business in this State and are subject to Missouri's long arm jurisdiction.

77.     At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Missouri and throughout the United States.

78.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## IV.     <u>GENERAL ALLEGATIONS</u>

### A.  The Rise of Video Games

79.     A "game" is a closed, formal system that engages players in structured conflict and resolves its uncertainty in unequal outcome.

80.     Video games are closed in the fact that once engaged in the game, the player sets

aside their rules for daily life and accepts the rules of the game as the status quo.

81.     A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

82.     Unlike traditional arcade-style games, online video games require active, lengthy participation, during which players are exposed to psychological techniques designed to control, manipulate and exploit minors' developing brains to increase game playing time and encourage in-game purchases.

83.     Such manipulation and exploitation are possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board.

84.     The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

85.     The industry is yet young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality platforms.

86.     Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized through the sale of their games over a period of time which resulted in a long and slow method of earning profits.

87.     A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

88.     Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games that can take hundreds of hours to beat, there is a staggering amount of gameplay available to users in modern video games.

89.     The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

90.     The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

91.     In 2023, the video game industry's revenue was $365.6 billion globally.

92.     With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases. Most of these purchases have been made by minors, including D.G.

93.     The explosive growth of the video game industry has been fueled by patented "monetization schemes" that target minors who are induced to make several in-game purchases, or "microtransactions," of downloadable products.

94.     Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or the use of psychological mechanisms employed within the games for consumers or parents to make informed decisions about the appropriateness of games.

95.     In order to entice minors to make such in-game purchases, video game developers and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money on microtransactions.

**B.  Microtransactions**

96.     Instances where players are able to spend real money for in-game items or perks are known as "microtransactions" (sometimes abbreviated "mtx").

97.     The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly in order to meaningfully advance the game.

98.     Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

99.     Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

100.    Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

101.    While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

102.    Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

103.     In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

104.    Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

105.    Developers and publishers can also use microtransactions to lock potentially

significant product upgrades and "easter eggs" designed to extend gameplay and increase a player's dopamine levels behind paywalls.

106.    Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

107.    The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

108.    This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

109.    This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

110.    Microtransactions were designed to use operant conditioning to ensure the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

111.    For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking will drive a player to make microtransaction purchases.

112.    Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

113.    Microtransactions are not only benefiting the gaming industry publishers and developers; the products that allow the microtransactions take a cut of the revenue from each

purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their products.

114. While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

115. Each Defendant knows this, or should be aware of this, because they have purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

## C. The Monetization Schemes Built into Video Games

116. Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

117. The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

118. Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

119. Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

    a. The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

b. "Chasing": encouraging players to keep playing to get back any money they just lost;

c. "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

d. "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

e. "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; or

f. The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

120.   The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

121.   Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

122.   Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game purchasing.

123.   Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game.

This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

124.    Games linked to a game player's social network pages also gather information about players and Defendants use this information to target products and microtransactions to users based on that player's unique interests and preferences.

125.    As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.,* spending or playing longer).

126.    The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm considers the player's available funds and cost sensitivity to certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

127.    As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

128.    Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals and which lack basic transparency to the player, may have the potential to exploit certain types of vulnerable players under certain conditions.

129.    These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual

money being spent and continue spending more and more.

130.    A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, pay-to-win models, and rubber-banding.

**i.    Loot Boxes**

131.    A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

132.    Through purchasing a loot box, the player acquires a seemingly random assortment of items.

133.    The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

134.    Loot boxes require no player skill and have a randomly determined outcome (*i.e.*, prize).

135.    Loot boxes are essentially a lottery that provide a way for gaming developers, publishers, and even game platforms to increase revenue through underage gambling.

136.    It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

137.    After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare items have incredibly low probabilities such as 0.08%.

138.    Loot boxes still have the same designs, opening of animations, and more features

to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

139. Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

140. Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

**ii. Rubber-Banding**

141. Another example of a monetization scheme is "rubber-banding."

142. Games have long employed rubber-banding to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

143. Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

144. In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

145. If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

146. Such technical sophistication in these purchasing systems aims to reduce the

Case 2:24-cv-04055-BCW   Document 1   Filed 04/10/24   Page 23 of 236

player's uncertainty or reluctance regarding purchasing decisions.

### iii. Pay-To-Win

147.    Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.ins

148.    Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

149.    For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by ordinary, non-paying players.

150.    Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

### D. Patents Target Minors to Increase In-Game Spending

151.    Several video game developers and publishers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

152.    Game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

153.    Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

    a.  U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character." Such an offer is referred to by Luchene as an "upsell message" and "can

be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

b. U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

c. U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d. U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e. U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a

message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

f.  U.S. Patent No. 8,702,523 B2, assigned to Microsoft Corporation, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with the patent:

    i.  Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

    ii.  The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

g.  U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an online game" based on

"the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h.  U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a player to keep their "avatar" charged by earning points by scanning codes on toys, through continued game play, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to play continuously as long as the player earns points playing the game, which is enhanced to allow the player to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

i.  U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.  U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter

virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k.   U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l.   U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m.   U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an

amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n. U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o. U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p. International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, and send selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful

attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

154. There was once a time when such lopsided consumer video game monetization-related inventions would have been patent ineligible. However, because of the introduction of these patents, game developers and publishers can further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

155. The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

156. It is common practice for developers and publishers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

**E. These Predatory Monetization Schemes Attract "Whales" to Defendants' Games**

157. What players and parents, including Plaintiffs, often do not understand is that their gaming experience is not accidental, but rather carefully engineered by the game's manufacturers.

158. In every game, there are several hundred, or maybe even thousands, of heavy players who spend much more money in the game than the other players.

159. Companies employ tactics specifically to gain heavy users—or "whales" or "VIPs."—and to induce them into spending more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

160. Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

161.    To target those who may be likely to spend additional money in the game, game developers and publishers, like Defendants, will monitor players and collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

162.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

**F.  Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted**

163.    In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, feedback loops, continuously adding new product content, and using tactics to ensure users are creating habits in their gameplay.

164.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

165.    For instance, Activision Blizzard, Inc. holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[1]

166.    Upon information and belief, video game developers and publishers, including but not limited to Epic Games, Roblox Corp., Axiom, and RRI, and video game product developers and manufacturers, including but not limited to Meta, Google, Xiaomi, Lenovo, and Microsoft,

---

[1]    *See* Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

license this patented technology from Activision, which allows the licensee, including all Defendants, to control users' experiences within the game.

167. Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

168. Feedback loops are systems where the game reacts to how well the player is doing in order to make the games more rewarding, or for tougher games, more challenging.

169. Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

170. There are two kinds of feedback loops: positive and negative.

171. Positive feedback loops mean that when you're doing well, the game rewards you with things to help you do even better.

172. Negative feedback loops, on the other hand, add a challenge to a game when you are doing too well.

173. Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

174. By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

175. A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed by the use of negative feedback loops.

176. When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

177.    In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players playing longer.

178.    Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

179.    Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

180.    Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

181.    Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

182.    By constantly adding downloadable content or product upgrades to their video game products, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the game.

**G.  Dark Patterns and Drip Pricing Have Allowed Defendants to Further Exploit Users**

183.    For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find-and-read disclosures, and confusing cancellation policies, to get consumers to part with their money or data.

184.    The term "dark patterns" was coined in 2010 by user design specialist Harry

Brignull to describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have otherwise made.

185. The purpose behind "dark patterns' is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions.

186. Research shows that "dark patterns" are highly effective at influencing consumer behavior.

187. The use of these manipulative design practices, or "dark patterns," has only grown in scale and sophistication as more and more commerce has moved online, thereby creating ever greater challenges for consumers.

188. Further challenging consumers is the common practice of using multiple "dark patterns" in combination, rather than in isolation.

189. "Dark patterns" tend to have even stronger effects when they are combined, so they are rarely used in isolation.

190. "Dark patterns" have a compounding effect, thereby increasing the impact of each and exacerbating the harm to the consumer.

191. The use of manipulative design techniques, including "dark patterns," in the digital world can pose heightened risks to consumers. For example, the pervasive nature of data collection techniques, allows companies to gather massive amounts of information about consumers' identities and online behavior, enabling businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.

192. Companies that market online can experiment with digital dark patterns more

easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior. For example, online a company can easily and quickly rearrange products to mimic the consumers' behaviors, but also can easily test new marketing practices and digital dark patterns on consumers, deceiving consumers or manipulating them into taking unwitting or detrimental actions.

193. Some dark patterns manipulate consumer choice by inducing false beliefs- such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level.

194. Other dark patterns operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

195. Free-to-play or "freemium" games are an example of games that fail to disclose to a minor that a game they purchase is not the entire game.

196. Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process.

197. Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction.

198. Microtransactions built into many video games by design are a form of drip-pricing.

199. Each Defendant uses, or has used at relevant times, "dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of their respective gaming products.

### H. Cloud Gaming Enhances Defendants' Predatory Activities

200.    Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

201.    Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

202.    Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

203.    Cloud gaming platforms allow users to stream any game available on the platform at any time.

204.    Cloud gaming eliminates the need for users to purchase expensive computer hardware or install games directly onto a local game system.

205.    This means players have easy access to hundreds or even thousands of games at one time.

206.    What's more, the catalogue of games on streaming platforms is ever-changing and evolving.

207.    The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming platform, by ensuring they always have something new and different to play.

### I. Defendants' Predatory Schemes Created a Generation of Gaming Addicts

208.    The feedback loops, other psychological properties, and cloud gaming platforms are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game

content and/or loot boxes based upon psychological behavioral analyses that employ addiction methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, platforms, and predatory monetization schemes work together to addict players to the games.

209.    During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[2]

210.    In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[3]

211.    Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, and occupational responsibilities.

212.    IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

213.    Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they

---

[2] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis*. 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).
[3] *Id.*

may spend long stretches of time playing—without food or sleep.

214.    IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative consequences.

215.    The main features of gaming disorder are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

216.    The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

217.    Gaming disorder is the only behavioral addiction recognized in the DSM-5.

218.    The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

219.    Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

220.    The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

221.    For instance, IGD may be an impulse control disorder like compulsive gambling.

222.    The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in

previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

223.    These nine criteria are also outlined in the DSM-5.

224.    Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to asess internet gaming disorder.

225.    The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

226.    The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

227.    The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

228.    The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

229.    Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

230.    The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

231.    Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic

review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

232.    These statistics are even higher for minors: 8.5% of youths aged between 8 and 18 suffer from gaming disorder.

233.    Comorbidity studies also indicate that individuals with ADHD may have an increased susceptibility to developing gaming disorder.

**J.    Effects of Video Games on Adolescent Brains**

234.    Research has shown prolonged gaming damages the prefrontal cortex, causing a loss of grey matter, lower cognitive function, and inability to regulate impulse control.

235.    Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

236.    Clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

237.    In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the U.S.

238.    Empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

239.    Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

240.    Other studies have shown excessive use of videogames leads to more negative

consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

241. The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

242. The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

243. This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

244. Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions, perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[4]

245.    Brain activation studies have shown that videogame playing involved changes in reward and loss of control, and that gaming pictures activate regions similar to those activated by cue-exposure to drugs.

246.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure.



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[5]

247.    Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

248.    One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

249.    Research has shown that a minor with a diagnosis of ADHD, autism, or ODD is at

---

[4] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).
[5] *Id.*

a higher risk of video game addiction, worsening of ability to control impulsivity, and brain damage.

250.    Research has shown that while video games may foster creativity in children, such benefits are outweighed by the negative aspects of addiction, which develop quickly in children and neurodivergent individuals exposed to video games for extended periods of time.

251.    Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

252.    These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

253.    As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

254.    As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

255.    By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiffs seek to hold them accountable.

**K.  K.C.'s Addiction, Injuries, and Damages**

256.    K.C. is a 12-year-old individual addicted to video games; specifically, K.C. is addicted to playing Fortnite, Roblox, Minecraft, Gorilla Tag, and Rec Room.

257. K.C. plays using multiple game products, including on Android phone, Xbox One, Xbox Series S, and Meta Quest.

258. In the past, K.C. has subscribed to both Xbox Game Pass Core and Xbox Game Pass Ultimate.

259. Despite parental efforts to limit game time—efforts made astonishingly difficult, if not impossible, by the absence of parental controls within each Defendant's product, including but not limited to the absence of time-limit restrictions in Defendants' products, and Defendants' allowance of cross-sharing and cross-platform play using Defendants' products without providing parents' notice of this design defect or the ability to have control their child's use of the product, K.C. spends several hours per day using Defendants' products to play video games.

260. K.C. cannot refrain from gameplay and/or spending money while using Defendants' products.

261. K.C. has spent hundreds, if not thousands, of hours, in total or collectively, using Defendants' products and playing video games.

262. K.C. has spent large sums of money and/or used gift cards to purchase in-game transactions and downloadable products available in and accessible through Defendants' products.

263. K.C.'s inability to stop using Defendants' products has caused them to hide their use and sneak use during the night when they should be sleeping.

264. K.C. has experienced the following as a result of the brain damage, gaming addiction and harm caused by Defendants' products: a drop in grades, aggression, depression, anxiety, withdrawal symptoms when not playing, withdrawal from life activities, changes in eating pattern, distress, anger, poor hygiene, and physical pain in their hands, eyes, and back.

265.     As a result, K.C. has an IEP plan at school and has been referred for behavioral health testing and treatments.

266.     Ms. Courtright has lost hope in her ability to control K.C.'s game playing time and worries about K.C.'s mental and physical condition when attempting to take games away from K.C.

267.     Ms. Courtright has experienced mental anguish, emotional distress, pain, suffering, and financial loss as a result of each Defendant's intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, as described herein—and is reasonably likely to continue to experience those injuries in the future due to the permanent impact of Defendants' wrongs on Plaintiffs.

268.     As a result of K.C.'s gaming addiction and the harm proximately caused by each Defendant's intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts, Ms. Courtright has experienced loss of society and companionship—and has been financially damaged due to K.C.'s addiction and uncontrollable in-game spending.

**L.  Defendants' Conduct Specifically Led to Plaintiffs' Damages**

269.     Each Defendant is aware that its video games are harmful to minors and young adults because each Defendant specifically designed its products to addict and prey upon those users' developing brains.

270.     To this avail, each Defendant employs behavioral psychologists and/or neuroscientists to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

271.     Due to the psychological aspects of the games, many of Defendants' products have been banned in other countries to avoid the harm to children that all Defendants are causing daily

in the United States.

272.    No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including Plaintiffs.

**M. Defendants' Products Used by K.C.**

**<u>Fortnite</u>**

273.    Fortnite is an online video game and game platform designed, developed and published by Epic Games.

274.    Fortnite, first released by Epic Games in 2017, is available to public to play in six distinct game mode versions: *Fortnite: Save the World, Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*.

275.    *Fortnite: Save the World*, released as a paid early access game in 2017 and as a premium game in 2020, is a player-versus-environment, cooperative hybrid tower defense-shooter and survival game in which up to four players collaborate fight off zombie-like creatures and defend objects with traps and fortifications they can build.

276.    In *Fortnite: Save the World*, players work together on missions while fighting off zombie-like creatures and avoiding the effects of an encroaching cataclysmic storm, and, based on the success of the missions, players are awarded a number of in-game items, which includes but is not limited to hero characters, weapon and trap schematics, and survivor rewards, which can be leveled up through gained experience, to improve gameplay.

277.    *Fortnite Battle Royale,* released in 2017 as a free game supported by microtransactions, is a player-versus-player, battle royale game that a user—playing alone, in a duo, or in a 3-4 player squad—fights against up to 100 other players to be the last person (or team) alive.

278.     In *Fortnite Battle Royale,* after being airdropped weaponless from a "Battle Bus" into the game's map, game players must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other players—all while the safe area of the map shrinks down in size due to an incoming toxic storm.

279.     *Fortnite Creative*, released in 2018, is a survival sandbox game mode that allows users to create games such as battle arenas, racecourses, and platforming challenges; gives users complete freedom to "spawn" or create any item from *Fortnite Battle Royale* on a personal island; and supports Unreal Editor for Fortnite so that players can edit worlds using Fortnite assets.

280.     *Lego Fortnite*, released in December 2023 and developed by Epic Games with the Lego Group, is a survival sandbox game that provides game players the opportunity to play as Lego Minifig versions of characters as they collect materials, build various buildings, craft various weapons and tools, and fight monsters.

281.     *Rocket Racing,* released in December 2023 and developed by Epic Games with Psyonix as a spin-off title to *Rocket League*, is a Fortnite game mode that allows players to race vehicles, gaining speed boosts from special lanes sections or by drifting, as well as the ability to jump and racing on vertical and inverted surfaces, while avoiding obstacles on the course.

282.     *Fortnite Festival*, released in December 2023 and developed by Epic Games with Harmonix, is a rhythm game in which the user can either play (a) the "Main Stage" hitting notes in a rhythm as either Lead, Guitar/Bass, Drums, or Vocals, or (b) the "Jam Stage" cooperating with other players to make remixes using any part of any song built into the game design.

283.     *Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes interface with Fortnite's battle pass system, include microtransactions, and offer new rewards associated with each distinct game mode.

284.     All Fortnite game modes, while offering different content, share the same general gameplay design and are powered by the same game engine (Unreal Engine)—all of which have been internally developed and made available by Epic Games.

285.     Each Fortnite game mode uses similar graphics, art assets, and game mechanics designed and developed by Epic Games.

286.     *Fortnite: Save the World* is a pay-to-play video game product that is available for play on PlayStation 4, Xbox One, and personal computers running macOS or Windows.[6]

287.     All other Fortnite versions—*Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*—are free-to-play video game products available for play on all available gaming consoles, including Sony's PlayStation 4 and PlayStation 5, Microsoft's Xbox One and Xbox Series X/S, and Nintendo's Switch.

288.     The *Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes also can be played on Android and iOS mobile devices, as well as personal computers running macOS or Windows.[7]

289.     *Fortnite Battle Royale,* and the other Fortnite game modes, can be downloaded and played for free through Microsoft's Xbox Cloud Gaming without need for a Xbox Game Pass subscription:

---

[6] In 2020, due to legal battles between Epic Games and Apple, Inc., the macOS client of *Fortnite: Save the World* remained downloadable and players who had downloaded the game for play using a macOS client could still play then game, however, it would not be updated.  Since May of 2022, *Fortnite: Save the World* has been available for play via Xbox Cloud Gaming and GeForce Now on macOS devices.

[7] In 2020, the iOS and Android clients of *Fortnite Battle Royale* were removed by Apple, Inc. and Google, LLC—and became unavailable on certain mobile phones—as a result of legal battles between those companies and Epic Games. The game remained playable if it had already been downloaded on mobile devices running either an iOS or Android client.

YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS. [8]

290.     Fortnite is also available to download for free on multiple video game products with the Epic Games Store app or Valve's Steam app.

291.     All Fortnite game modes are cross-platform play compatible, but to use that option, product users are required to have an Epic Games account for cross-saving between platforms.

292.     All Fortnite game modes are monetized through the use of V-Bucks, an in-game currency that can be purchased with real-world funds.

293.     In *Fortnite: Save the World,* V-Bucks also can be earned through completing missions and other achievements.

294.     In *Fortnite: Save the World,* V-Bucks can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

295.     In all other Fortnite game modes, including *Fortnite Battle Royale*, V-Bucks can be used to buy cosmetic items like character models.

296.     In *Fortnite Battle Royale,* V-Bucks can be used to purchase a battle pass, which is a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a *Battle Royale* season.

---

[8] https://www.fortnite.com/mobile/xbox-cloud-gaming

297.    Epic Games developed Fortnite games to make sure that the players keep coming back and playing Fortnite.

298.    In the first two weeks of the release of *Fortnite Battle Royale*, there were over 10 million people playing the game.

299.    In June of 2018, less than a year after the release of *Fortnite: Save the World, Fortnite Battle Royale,* and *Fortnite Creative*, there were more than 125 million Fortnite players and Epic Games's monthly earnings totaled hundreds of millions of dollars.

300.    From 2017-2019, Fortnite video games had generated over $9 billion in gross revenue through microtransactions and in-game purchases.

301.    In 2021 alone, Fortnite generated $5.8 billion in revenue.

302.    Fortnite has an average of 239 million monthly players, and a potential peak of 15 million players in a day.

303.    Fortnite gained immense popularity because of its clever manipulation of human psychology.

304.    The team that developed Fortnite included psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop a game that was as addictive as possible.

305.    One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what stopped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

306. The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

307. In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

308. Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule"—the idea that randomized small wins will continue to draw in users.

309. With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

310. Additionally, the design of Fortnite purposefully keeps players drawn in. For instance, the bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

311. Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more—an intentional design through which Epic Games ensures that Fortnite players never once get bored during gameplay.

312. To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well.

313. Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:



314.     Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

315.     These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

316.     Upon information and belief, Epic Games has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Fortnite games.

317.     Epic Games has failed to disclose the risks of harm purposefully built into its game.

318.     Epic Games does not disclose any of the psychological tactics or addictive features it purposefully includes in Fortnite to any of its users.

319.     Several studies have concluded that Fortnite is more addictive than heroin and other illegal drugs.

---

[9] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

320.    Epic Games does not warn the public that its Fortnite game products are addictive and likely to cause brain damage, particularly in minors and neurodivergent individuals, when used as intended.

321.    Epic Games touts its game as "educational" and markets it for use in the classroom, including but not limited to offering "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



322.    Engaging—and addicting—children early and in environments such as their classroom serves only to increase Epic Games's revenue through continued play of young users, at the expense of these users' mental and physical health.

323.    Epic Games does not adequately inform users of the inherent risks involved with using and playing any Fortnite video game product.

324.    None of the game modes in the Fortnite game series includes a warning that the game was designed to addict and harm users.

---

[10] https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

**Minecraft**

325.     Minecraft is a 3D sandbox video game first developed and published by Mojang Studios, who made the video game available to the public in 2009, prior to a full release on November 18, 2011.

326.     Minecraft can be played on PC, various gaming consoles, and mobile devices.

327.     Since the first full release of Minecraft in 2011, the video game has been continuously updated with many major and minor product update, including but not limited to gameplay-altering mechanics, new product content and items, microtransactions, and tweaks to existing product features, which are available free to users who have purchased the game.

328.     In May of 2012, Mojang Studios and Microsoft, acting through its video game design and publishing studio, Xbox Game Studios, released Minecraft for play on Xbox 360 and as the flagship game to play with friends via Microsoft's new Xbox Live feature.

329.     The Xbox 360 version of Minecraft, like the product versions that came later for play on other gaming consoles or updated Xbox consoles, differed from the personal computer version of Minecraft in many ways, including but not limited to a newly designed crafting system, the control interface, in-game tutorials, split-screen multiplayer, and the ability to play with friends over the internet.

330.     With the introduction of Minecraft as a video game product for play on gaming consoles likeXbox 360, the Minecraft Defendants introduced microtransactions and made in-product downloadable content available for purchase.

331.     All Minecraft versions since 2012 have been designed to include microtransactions and on-going product updates to enhance game play and keep players engaged in the product.

332.     In December of 2013, Mojang Studios and Sony Interactive Entertainment, LLC released Minecraft for play on PlayStation 3.

-54-

333. Microsoft acquired Mojang Studios and all product rights to Minecraft in 2014.

334. That same year, Minecraft was made available for play on Xbox One and PlayStation 4.

335. In 2015, Minecraft was made available for play on the Wii U, which is a gaming console product designed, manufactured, and sold by Nintendo of America, Inc.

336. In May of 2017, Minecraft was made available to play on the Nintendo Switch, and then in September of 2017 for Nintendo 3DS.

337. On September 20, 2017, the Minecraft Defendants released a *Better Together Update* for Xbox One, Windows 10, VR, and mobile versions, which enabled cross-platform play between those products and became known as the *Bedrock Edition* of Minecraft.

338. The *Bedrock Edition* was also provided as a product update to the Nintendo Switch version of Minecraft in 2017, thereby enabling cross-platform play between the Nintendo Switch, Xbox One, virtual reality gaming headsets, mobile devices, and personal computers.

339. In December of 2019, the PlayStation 4 version of Minecraft was updated to become part of the *Bedrock Edition*, thereby enabling cross-platform play for users with a Xbox Live account.

340. The *Bedrock Edition* of Minecraft is the most commonly available and played version of the product, allowing cross-platform play with Microsoft's Xbox One and Xbox Series X/S, Sony's PlayStation 4 and PlayStation 5, Nintendo's Switch, personal computers, mobile phones, and virtual reality gaming headsets.

341. Minecraft is the best-selling video game to date, with over 300 million copies of its games sold.

342. Minecraft has over 163 million monthly active players.

343.     Regardless of version or platform, Minecraft gameplay is designed with no required goals to accomplish thereby allowing players extensions freedom in exploring virtually infinite terrain within a blocky, procedurally generated, three-dimensional world.

344.     While there are no set goals, Minecraft does include an achievement system and can earn "advancements" in the *Java Edition,* "trophies" when playing on PlayStation consoles, and "achievements" in *Bedrock Edition* and when playing on Xbox consoles.

345.     Minecraft players can discover and extract raw materials, craft tools and items, and build structures and machines; however, the core gameplay revolves around picking up and placing block-objects in a 3D grid.

346.     In Minecraft, the game world is virtually infinite on a horizontal plane and procedurally generated based on a players exploration, using a map seed that is obtained from the system clock at the time of world creation.

347.     Although a single video game product, Minecraft gameplay can be different each and every time a player logs in to play.

348.     Minecraft includes multiple game modes for a variety of gameplay, including but not limited to, survival mode, in which players must acquire resources to build in the world and maintain health, and creative mode, in which players have unlimited resources and access to flight.

349.     Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world.

350.     When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard."

351.     Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play.

352. Each player's main task in Minecraft is to survive all the problems using specific resources.

353. When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling.

354. The Minecraft Defendants designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world, which combined with the technologies and algorithms built into the game product prays upon the chemical reward receptors of user's brains to create addictive engagement.

355. These versions also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

356. On certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games. These notifications pop up on screen whether players are already playing Minecraft or not.

357. These interactive features serve only to lure players to spend more time in the game.

358. Once a player succeeds with one stage, they move on to the next one. Essentially, Minecraft can last for eternity if the player is not strong-willed enough to stop playing.

359. Minors and players with neurodivergent diagnoses, such as ADHD, can become easily hyper focused and addicted to building worlds within Minecraft.

360. The Minecraft Defendants were aware of these propensities, and specifically developed their games along with psychologists and neuroscientists, to include addictive psychological traits.

361.    At the expense of users' mental and physical well-being, the Minecraft Defendants fail to inform the public, users, or parents about the risk of addiction and other negative consequences that can arise from gameplay.

362.    The Minecraft Defendants touts the game as educational and market it to educators for use in the classroom:

## GET MINECRAFT EDUCATION FOR YOUR CLASSROOM

Engage students in game-based learning across the curriculum. Minecraft Education is a game-based platform that inspires creative, inclusive learning through play. Explore blocky words that unlock new ways to take on any subject or challenge. **Download Minecraft Education** to get started with a free demo.

[11]

363.    The Minecraft Defendants offer teachers ready-built lessons and curriculums centered around their game:

---

[11] https://education.minecraft.net/en-us



RESOURCES

Explore 500+ lessons, immersive worlds, challenges, and curriculum all at your fingertips.

**Learn More**

[12]

364. The Minecraft educational game products offered by the Minecraft Defendants to teachers and parents are built of the *Bedrock Edition* codebase and can be played on personal computers and tablets.

365. The Minecraft Defendants do not adequately inform users of the inherent risks involved with using and playing Minecraft or that the game was designed to addict and harm users.

366. The Minecraft Defendants are aware that the more time a user plays the game, the more likely they are to continue purchasing in-game product upgrades.

367. The Minecraft Defendants intend to introduce and addict as many users as possible to increase their own profits as these users continue playing—and spending—as they grow.

368. The Minecraft Defendants have profited from the release of their addictive video game product to the public. For instance, in 2021, the Minecraft video game generated approximately $380 million across all different gaming platforms.

---

[12] https://education.minecraft.net/en-us

**Roblox**

369.    Roblox is an online video game, developed and published by Roblox Corp., formally released for use by consumers in September of 2006.

370.    Roblox Corp.'s "mission" for Roblox is have a billion people actively using and playing its game each day:



371.    Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; however, with the release of Roblox for play on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of people (particularly minors) grew exponentially.

372.    Roblox Corp. also saw an accelerated increase in the numbers of consumers downloading and playing Roblox as a result of the Covid-19 pandemic.

373.    As of August of 2020, Roblox had over 164 million monthly active users, with more than half of those users being American children under age 16.

374.    The numbers of consumers, particularly minors, using and playing Roblox continued to grow in 2023, when Roblox Corp. released versions of its Roblox product for play on Sony's PlayStation 4 and the virtual reality gaming headsets, Meta Quest 2 and Meta Quest Pro.

---

[13] https://corp.roblox.com/

375.     Roblox Corp. markets Roblox as accessible on any device and, as of 2024, has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:



376.     Currently, Roblox has over 66 million daily active users and over 217 million monthly active users, with more than 50% of consumers playing Roblox being under age 13.

377.     Roblox Corp. describes Roblox as an online, social gaming platform and game creation system that allows users to play games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio.

378.     Roblox Corp. designed the game-creation aspect of its product to allow players to create their own Roblox video games, as well as purchasable, one-time "game passes" and "developer products" microtransactions, for play and purchase by other Roblox users, including minors.

379.     Roblox Corp. designed the social-gaming aspect of its product to allow players to play Roblox games (or experiences) created by other users, which includes allowing players to

---

[14] https://corp.roblox.com/

buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

380.    Roblox is free to play; however, Roblox is designed to encourage in-game purchases and product upgrade microtransactions, which can be purchased using Robux, the game's virtual currency.

381.    Robux can be obtained (a) purchased with real currency; (b) received a part of a recurring stipend given to users with a Roblox Premium membership; and (c) earned from selling "game passes" or developer products" to other Roblox players.[15]

382.    Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

383.    For instance, corresponding with the increase of Roblox players due to the Covid-19 pandemic, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had been increased by 107% from its 2020, which had themselves been an 111% increase over 2019.

384.    Roblox Corp. specifically designed Roblox with certain addictive properties—at the risk of children's mental and physical health—to profit from product user's extended, long-term gameplay and corresponding in-game spending.

385.    Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their game includes the best psychological traits and technologies for player retention and addiction.

386.    Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, players can create games and maps for other users to try and play,

---

[15] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

making it a challenge in and of its own. Through research and product development, Roblox Corp. learned that when playing games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the game player's brain to seek these dopamine hits on a more regular or compulsive basis leading to abuse, addictive behavior, and video game addiction.

387.  Additionally, the variety within Roblox ensures that users are never bored and want to stop playing the game; there are always new challenges, maps, and characters to try, making the game feel like an ever-evolving entity that never stops providing entertainment.

388.  The ability for users to create their own games and challenges, combined with users' ability to spend real-world funds to change their avatar's image and abilities, makes sure that the gaming experience is different for players each time they log in.

389.  Such constant variety keeps players "hooked," or coming back daily and playing for hours.

390.  Roblox's "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

391.  Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in order to advance in the game, resulting in addicted and incompetent users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

392.   Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the game was designed to addict and harm users

393.   Though it is equipped with the knowledge of the addictive risks inherent in its game, Roblox Corp. has failed to inform the public, users, or parents of such risks.

394.   Roblox Corp. describes its game as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's imagination can thrive."[16]

395.    Roblox Corp. even markets itself to educators, encouraging the use of Roblox in learning environments:



396.   While marketing its video game as an educational tool to benefit minors and neurodivergent individuals, Roblox Corp. does not disclose the psychology and addictive characteristics behind Roblox's design or that Roblox contains numerous addictive principles that are negatively impacting minors' and young adults' livelihoods, including their ability to learn and engage in critical thinking.

**Microsoft Xbox One, Series S, Xbox Network, and Xbox Live**

397.   Xbox is a video gaming brand, owned and operated by Microsoft, that consists of

---

[16] https://corporate.roblox.com/faq/
[17] https://education.roblox.com/

Xbox gaming consoles, as well as video games and online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

398. Microsoft designs, develops, manufactures, produces, supplies, and sells Xbox video game consoles—and markets all Microsoft video game products—to the consumers across the world, and specifically in Missouri and to Plaintiffs.

399. Microsoft has manufactured and released five versions of its Xbox consoles: Xbox (1st Generation), Xbox 360 (2nd Generation), Xbox One (3rd Generation), Xbox Series X (4th Generation), and Xbox Series S (4th Generation).

400. Microsoft released the original Xbox was released in North America in 2001, and a year later launched its integrated Xbox Live product to allow players to play video games online.

401. When it was released in 2002, Xbox Live required a subscription for use but was a wild success due to features, including but not limited to, a "buddy list" and access to popular online video games like Halo 2.

402. Microsoft released Xbox 360 in 2005, and with that release, launched an upgraded Xbox Live product that included, *inter alia*, a limited "Free" or "Silver" tier that allows users to play online video games for free.

403. Microsoft released upgraded and revised versions of its Xbox 360 console, the Xbox 360 S, and Xbox 360 E, which provided hardware and software updates to the product.

404. Microsoft released Xbox One in North America in 2015.

405. In marketing Xbox One, Microsoft emphasized the console's internet-based features, including but not limited to the ability to record and stream gameplay, and the ability to integrate with a set-top box to watch television.

406. Microsoft also released upgraded and revised versions of Xbox One, known as Xbox One S and Xbox One X, which provided hardware and software upgrades to the product.

407. Microsoft released its fourth generation of Xbox consoles—Xbox Series X and Xbox Series S—in North America in 2020, with each model designed to be family playable.

408. Each Xbox console provides users the ability to play video games, using a hard copy of the video game, a digital copy downloaded from Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live) and/or using Xbox Game Pass Cloud Gaming.

409. Microsoft developed and maintains the Xbox Store— a product-platform through which users can purchase thousands of games to be stored on their console through digital download--for use with its Xbox consoles.

410. When a user purchases and downloads a game from either store, regardless of whether that is a first-party video game or third-party video game, all design elements and downloadable content for said games is stored on the users' Xbox console and, if connected to the Internet, will receive product updates released by the game developer.

411. Microsoft markets the Xbox Store as "safer for the whole family" to use:



412.    Xbox Network is an online multiplayer gaming service created and operated by Microsoft for use with its Xbox consoles and includes the Xbox Store and Xbox Game Pass Cloud Gaming.

413.    Xbox Network is available as both a free and a paid subscription-based product, known as Xbox Game Pass.

414.    Xbox Game Pass Core, formerly Xbox Live Gold, is a paid tiered subscription service offered by Microsoft that provides users access to online games, multiplayer abilities, and other features.

415.    Xbox Game Pass Ultimate, the highest tier of paid subscriptions at $17 per month, provides product users the same benefits as the other tiers, but also provides users access to Xbox Game Pass Cloud Gaming (hereinafter "Xbox Cloud Gaming").

416.    Xbox Cloud Gaming is Microsoft's Xbox cloud gaming service.

417.    Xbox Cloud Gaming was initially released in beta testing in November of 2019, and launched for Xbox Game Pass Ultimate subscribers on September 15, 2020.

418.    Xbox Cloud Gaming operates by linking the device to a remote server in the cloud.

---

18 https://www.xbox.com/en-US/microsoft-store

419.    Gameplay is saved in the cloud and can be accessed and played from numerous devices at any given location.

420.    In fact, Xbox Cloud Gaming allows for gameplay from a number of devices—no longer is a console required. Games can be accessed instead from the content library of Xbox Cloud Gaming includes thousands of games spanning every game rating category:



421.    This means that anyone with an Xbox Cloud Gaming account can access and play any game on their Xbox console, computer, or mobile device.

422.    The games in the Xbox Cloud Gaming library are extensive and everchanging, which keeps players coming back to either finish a game before it disappears or check for new and exciting game options to play:

[19] https://www.xbox.com/en-US/browse/games



423. Once a game is downloaded to the user's Xbox console or made available on the Xbox Network, Microsoft provides video game developers and publishers a framework to initiate and process in-game purchases and microtransactions through the Xbox Store and Xbox Cloud Gaming.

424. This framework enables game developers to sell microtransactions and/or loot boxes through Microsoft's video game products, described herein.

425. In exchange, Microsoft keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

426. Microsoft specifically designed its Xbox video game products to attract users to purchase games and in-game products therein—regardless of the content such games may include.

---

[20] https://www.xbox.com/en-us/games?xr=shellnav

427.    Xbox Game Pass Ultimate also offers users daily, weekly, and monthly "quests" that can be completed for varying amounts of Microsoft Reward points:

## How it works

Xbox Game Pass Ultimate and Console plan members can earn Microsoft Rewards points by playing games from the Xbox Game Pass library. Here's how to get started.

# 1.

**Browse current Quests**

Check out current Quests on your Xbox console in the Xbox Game Pass section or on your Xbox Game Pass mobile app. New Quests are added every day.

# 2.

**Participate in Quests**

Find the list of Quests in the Xbox Game Pass membership area on your Xbox console or on the Xbox Game Pass mobile app. You will receive an instant notification when your Quest is ready to be turned in.

# 3.

**Claim and track your points**

Go to the Xbox Game Pass area on your Xbox console or on your Xbox Game Pass mobile app to claim and track your points.

# 4.

**Redeem points**

Head to the Microsoft Rewards app to spend your points! Redeem points for Xbox gift cards and use for in-game content, games, devices, movies, apps accessories and more.

[21]

428.    The ease of access, quest challenges, and constantly evolving game library draws players in, and keeps them coming back.

429.    Over 20 million people have played video games using Xbox Cloud Gaming.

430.    Xbox Cloud Gaming allows these users to connect with each other by including a feature to add and interact with friends, called "Xbox Social."

431.    This social media-esque feature permits users to add friends to a Friends list and then see what games your friends are playing and/or invite them to join your game:

---

[21] https://www.xbox.com/en-US/xbox-game-pass/quests



432. The Xbox Network, including but not limited to Xbox Cloud Gaming, is designed to allow Xbox users and video game players to chat with each other individually or in groups.

433. To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

434. Minors and young adults are therefore encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

---

22 https://support.xbox.com/en-US/help/friends-social-activity/share-socialize/use-xbox-game-bar-to-play-and-chat-with-friends

435. Upon information and belief, Microsoft hires behavioral psychologists and neuroscientists to design its Xbox consoles, Xbox Network (and all products and features thereof), its video games, and marketing in the best way possible to attract users, especially minors, young adults, and neurodivergent individuals.

436. Microsoft is aware that several of the video games available for play on the Xbox, and available for download in the Xbox Store and Xbox Cloud Streaming, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

437. Microsoft does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon---were designed to addict and harm users.

**Meta Quest**

438. The Oculus and Meta Quest headsets are virtual reality ("VR") head-mounted displays or "goggles" that completely cover the eyes for an immersive 3D experience and pair with two touch controllers to control gameplay.

439. The Oculus Rift prototype, developed by Oculus VR, was first demonstrated at a tech convention in June 2012.

440. Before the Oculus headset was released to consumers, Oculus VR was acquired by Meta for $2 billion and became a division of Meta called Reality Labs.

441. Since 2016, seven versions of the Oculus (or Meta) headset have been released for consumers to purchase.

442. The first consumer version of Oculus Rift, the Oculus Rift CV1, was released in March 2016. The Oculus Rift was the first virtual reality headset to provide a realistic experience at an accessible price.

443. Its successor, the Oculus Rift S was released in May 2019. The Rift S was manufactured by Xiaomi Corporation.



444. The Rift S tracks the position of itself and its controllers in 3D space using a system known as Oculus Insight, which uses the 5 cameras on the head-mounted display to track points in the environment and infrared LEDs on the controllers, information from accelerometers in both the display and the controllers, and computer vision to predict what path the display and controllers are most likely to take.

445. Both Oculus Rift brand headsets require a PC to operate.

446. The Oculus Go, released May 1, 2018, was the first generation of Meta's VR headsets and the first standalone VR headset. The Oculus Go was manufactured by Lenovo Group Ltd.

---

[23] https://www.wired.com/review/oculus-rift-s-review/

447. Because the Oculus Go is an all-in-one headset, it contains all the necessary components to provide virtual reality experiences and does not need to be tethered to an external device to use.

448. On May 21, 2019, the Oculus Quest was released, followed by the release of the Oculus Quest 2 on October 13, 2020.

449. The Oculus Quest 2 was later rebranded as the Meta Quest 2 in 2022. That same year, the Meta Quest Pro was also released. The Meta Quest 3 followed in October 2023.

450. Each of the seven Oculus/Meta headset iterations was developed by Reality Labs.

451. The standalone VR headsets—the Oculus Go, Quest, Quest 2, and Quest Pro—are operated with an Android operating system. Google is the developer and owner of the Android operating system.

452. While the Oculus Go uses the Android mobile operating system, it also requires the Oculus application to be downloaded on a mobile phone running iOS or Android.

453. The Oculus Go provides a field of view of about 101 degrees and 12.67 pixels per degree. Input is provided with a wireless controller that functions much like a laser pointer.

454. The headset and controller of the Oculus Go utilize non-positional 3-degrees-of-freedom tracking, making it capable of seated or static-standing activities but unsuitable for roomscale applications.

455. The Oculus Quest supports positional tracking with six degrees of freedom, using internal sensors and an array of cameras in the front of the headset rather than external sensors.

456. Oculus Quest utilizes an "inside-out" tracking system known as "Oculus Insight." Based on the concept of simultaneous localization and mapping ("SLAM"), infrared diodes on the Oculus Touch controllers are tracked via four wide-angle cameras built into the front of the

headset. This is combined with accelerometer input from the controllers and headset, as well as AI algorithms to predict the path of motion when the controllers are outside of the cameras' fields of view.

457. While the Oculus Quest can run as a standalone headset through its internal Android operating system, it can also operate through "Oculus Link" software, which allows the Quest to be connected to a computer via USB, enabling use with Oculus Rift-compatible software and games.

458. The Quest 2 (first released as the Oculus Quest 2 in 2020, and later rebranded as the Meta Quest 2 in 2022), is an evolution of the original Oculus Quest with a similar design, but with a lighter weight, updated internal specifications, a display with a higher refresh rate, and per-eye resolution, and updated Oculus Touch controllers with improved battery life.



24

[24] https://www.meta.com/quest/products/quest-2/?utm_source=gg&utm_medium=pla&utm_campaign=19822518373&utm_term=&utm_content=&utm_

459. Like the Oculus Quest, the Quest 2 can operate as a standalone VR device, but can also run on a PC with Oculus Rift-compatible software.

460. The Meta Quest Pro is a mixed reality headset differentiated from the Quest 2 by thinner lenses, high resolution cameras for mixed reality, integrated face and eye tracking, and updated controllers with on-board motion tracking.

461. Mixed reality is a blend of physical and digital worlds, going beyond screen-bound experiences by offering instinctual interactions with data in our living spaces. One example of mixed reality are augmented reality filters used on Instagram or other social media sites that transform faces with different effects.

462. For its mixed reality functions, the Meta Quest Pro uses high-resolution color cameras, as opposed to the lower-resolution, grayscale cameras on the Quest. The headset, which is more visor-like than other Quest headsets, also contains internal sensors that are used for eye and face tracking, primarily for use by avatars.



25

ad=&utm_location=9022636&utm_location2=&utm_placement=&utm_device=c&utm_matchtype=&utm_feed=&utm_adposition=&utm_product=899-00451-01&gad_source=1&gclid=CjwKCAjw17qvBhBrEiwA1rU9w0ZrvSGb5y_uLMt274OzmS9_3apbtFrkvVTGd_XzAozkYed9LtLq5RoCCDUQAvD_BwE&gclsrc=aw.ds
25 https://www.meta.com/quest/quest-pro/

463.    The latest Meta headset release, the Quest 3, is an evolution of the Quest 2, combined with elements of the Meta Quest Pro.  It uses thinner lenses, similar to the Quest Pro, and the face of the headset is adorned with three "pills" containing sensors and cameras.  The two outer pills each contain a monochrome camera used for positional tracking, and a color camera used for mixed reality passthrough.  The center pill contains a depth sensor, which is used in combination with other sensors to sense the user's surroundings for boundaries and mixed reality experiences.

464.    The Quest 3 includes "Touch Plus" controllers, similar in design to the Quest Pro "Touch Pro" controllers, and replace the infrared sensor ring with infrared sensors in the body of the controller, augmented by internal sensors and input from the headset's hand tracking.

465.    The Quest 3 is backward compatible with all Quest 2 software, and can also use the "Quest Link" feature to function as a VR headset for a personal computer, connected via cable or wirelessly via "Air Link."

466.    Regardless of the version of headset used, the VR technologies in Oculus/Meta headsets are highly addicting to users.

467.    Objective data suggests that VR has a stronger addiction trend versus traditional media.

468.    Over PC gaming alone, VR content has been shown to be 44% more addictive.

469.    When multi-user social factors are introduced in immersive VR mediums, the addiction tendency trends even higher.

470.    Many behavioral studies believe that immersive VR experiences provide intense psychological rewards that could eventually lead to problematic compulsive use by users.

471.    In fact, VR users tend to alienate from their lives and escape by pursuing a pleasant virtual life.

472.    Each Oculus or Meta Quest headset has been designed specifically to allow users to escape reality for hours at a time in Meta's virtual metaverse.

473.    Upon information and belief, Meta and Google hire behavioral psychologists and neuroscientists to design its VR headsets and market its products in the best way possible to attract users, especially minors and young adults.

474.    Through the Meta Store (formerly the Oculus Store), users of any Oculus or Meta Quest headset are able to obtain a number of immersive games—many of which are free to play but involve numerous microtransactions and other in-game purchases.

475.    In many of these games, users can connect with other users in multiplayer universes.



476.    Once a game is downloaded, Meta provides a framework for "in-app billing" to initiate and process transactions for in-game purchases.

---

26 https://www.meta.com/experiences/section/866029525057219

477.     Meta requires video game developers to use Meta's In-App Purchase Integration system for in-game purchases and to comply with Meta's Developer App Policies.

478.     Meta takes a 30% cut of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions.

479.     Meta also offers a Meta Quest+ subscription service for $8 per month (or $5 per month if paid annually), which provides access to two VR apps selected by Meta each month. Once claimed, these apps are available in a user's App Library as long as they are subscribed to Meta Quest+.

480.     This app-monetization framework enables Meta to profit from video game developers and publishers' use of addictive designs and psychological tactics—in addition to the addictive properties of the headsets themselves.

481.     Meta and Google are aware that its Oculus and Meta Quest headsets and the games available thereon contain addictive designs that pose an unreasonable risk of harm to users (particularly minors and neurodivergent individuals); yet, Meta and Google market the headsets to users and continues to profit from each sale.

482.     Neither Meta nor Google adequately inform users of the inherent risks involved with using the Meta Quest headsets or that the headsets and the Meta Store—along with the games available thereon—were designed to addict and harm users.

**Google Play**

483.     Google designed, developed, published, markets, and supplies the Google Play app, also known as the Google Play Store or Play Store and formerly Android Market, to consumers throughout the world, including in Missouri.

484.     Google Play was launched on March 6, 2012.

485.     Google Play serves as a digital media store and makes applications, including video games, available for to consumers for download either for free or at a cost.

486.     Through Google Play, Google provides a product-platform for users to download video games and play them on Android mobile devices:



487.     Roblox and Fortnite are available in the Google Play app.

488.     Once a gaming app or game is downloaded, Google distributes the game and provides a framework for "in-app billing" to initiate and process transactions.

489.     To encourage developers to make their video games available to consumers on Google Play, Google markets Google Play to game developers as a video game store that supports a variety of monetization strategies, including paid distribution, in-app products, subscriptions, and ad-based models.

490.     Google requires video game developers to use Google Play's payment system for in-game purchases and to comply with Google's Developer Policies.

---

27 https://play.google.com/store/games?device=phone

491.     Google takes a percentage of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions.  More specifically, from 2012-2016, Google took 30% of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions.  From 2016 to the present, Google takes 15% of all such revenue.

492.     This app-monetization framework enables Google to profit from video game developers and publishers use of addictive designs and psychological tactics, including but not limited to the sale of microtransactions, loot boxes, and/or in-app subscription services in games available through Google Play.

493.     Google specifically designed Google Play to attract users to purchase games and spend money on in-game microtransactions—regardless of the content or subject matter of the video game.

494.     Upon information and belief, Google hires behavioral psychologists and neuroscientists to design Google Play and market its product in the best way possible to attract users, especially minors and young adults.

495.     Google is aware that several of the games on available on Google Play contain addictive designs that pose an unreasonable risk of harm to users (particularly minors and neurodivergent individuals); yet, Google markets these games for download and profits from those users.

496.     Google does not adequately inform users of the inherent risks involved with using Google Play or that Google Play—along with the games being played thereon—were designed to addict and harm users.

**Gorilla Tag**

497.     Gorilla Tag is a virtual reality ("VR") game playable on VR headsets.

498.    Using the VR headsets, players in Gorilla Tag can run, jump, and climb using their hand-held controllers.



499.    The game has four primary game motes and three match-making game queues for default, minigames, and competitive play.

500.    The default game mode in Gorilla Tag is called "Infection"; this mode is similar to a game of tag and anyone tagged by an infected gorilla also becomes infected.

501.    The "Casual" game mode is primarily for socializing or private lobbies for players to congregate.

502.    Another game mode, called "Hunt," involves players tracking their secret target using a special hunt watch, while at the same time avoiding being hunted.

503.    The final game mode, "Paint Brawl," involves two teams, each trying to eliminate all players on the other team by bursting balloons with slingshots.

504.    Gorilla Tag attracts users with its clean movements, simple controls, and easy-to-understand gameplay, all of which are combined to make the game fun for players and easy to master.

505.    Gorilla Tag also features limited-time items for purchase, as well as season events to play during limited times.

---

[28] https://www.meta.com/experiences/4979055762136823/



506.    While Gorilla Tag is free-to-play, it offers numerous microtransactions of cosmetic items.

507.    Between the game's release in March 2021 through January 2023, Gorilla Tag earned Axiom $26 million in revenue.

508.    Gorilla Tag has 5 million players worldwide; in fact, it had over 21,000 players in the first week of the game's launch.

509.    In 2021, the Upload VR Awards named Gorilla Tag as the Best Competitive Multiplayer game.

510.    The game's popularity is no surprise, considering VR games are 44% more addictive than PC gaming and other traditional media—especially when the games include multi-user social aspects, like Gorilla Tag.

511.    The immersive VR experiences provide intense psychological rewards to users that keep them coming back to the game.

512.    Gorilla Tag was designed specifically to allow users to escape reality for hours at a time.

---

[29] https://www.gorillatagvr.com/blog

513.     Upon information and belief, Axiom hired behavioral psychologists and neuroscientists to design Gorilla Tag game and market its products in the best way possible to encourage longer periods of play and higher amounts of spending.

514.     Axiom is aware that its Gorilla Tag game contains addictive designs that pose an unreasonable risk of harm to users (particularly minors and neurodivergent individuals); yet, Axiom markets the game and its microtransactions to users and continues to profit from each sale.

515.     Axiom does not adequately inform users of the inherent risks involved with playing Gorilla Tag game or that Gorilla Tag was designed to addict and harm users.

**Rec Room**

516.     Rec Room is a virtual reality ("VR") multiplayer online game involving multiple game modes.

517.     Rec Room was developed and published by RRI, and was first released in 2016.

518.     While Rec Room can be played on mobile devices, PCs, or consoles, it is also supported by VR headsets.  In VR mode, the game uses full 3D motion via the motion capture system of a VR headset and the motion controllers are used to pick up and handle objects in the game world.

519.     Rec Room is cross-playable across all available platforms.

520.     The Rec Room website indicates that the game has over 82 million lifetime users from across the globe, and markets the product as "the social app you play like a video game!"

Come and join the club!



30

521.    Rec Room consists of a hub room, called the "Rec Center," with doors that lead to various games called "Rec Room Originals" and user-generated rooms featured by Rec Room.

522.    Some of the Rec Room Originals include first-person shooter games, a battle royale game, a cooperative action-adventure game, various action-based quests, and various sports games.

523.    In addition to playing the already-existing games in Rec Room, players can also use the "Maker Pen," a tool resembling a hot glue gun, to create things in rooms.  Using the Maker Pen, creators can "build everything from puppies to helicopters to entire worlds!"

524.    There are "millions of player created rooms" for players to explore.

525.    Players can also code in "Circuits," Rec Room's visual programming language.

526.    Although Rec Room is free to play, players can pay for a monthly subscription called Rec Room Plus, which grants several features, including the ability to sell user-generated content.

527.    Subscribers who sell their own creations do so for "tokens," Rec Room's in-game currency, which can be exchanged for real-life money.

528.    Tokens can also be used to purchase cosmetic items and consumables in the Merch Booth.

---

30 https://recroom.com/



529.    With these purchases, users can customize and dress their Rec Room avatar in various ways.

530.    As well as "tokens," Rec Room also allows users to create their own "Room Currency" and lock items in their rooms that can only be unlocked by using the room's Room Currency.

---

[31] https://rec-room.fandom.com/wiki/Rec_Center



32

531.    The game's popularity is no surprise, considering VR games are 44% more addictive than PC gaming and other traditional media—especially when the games include multi-user social aspects, like Rec Room.

532.    The immersive VR experiences provide intense psychological rewards to users that keep them coming back to the game.

533.    Rec Room was designed specifically to allow users to escape reality for hours at a time.

534.    Upon information and belief, RRI hired behavioral psychologists and neuroscientists to design the Rec Room game and market its products in the best way possible to encourage longer periods of play and higher amounts of spending.

---

[32] https://recroom.com/roomcurrencies

535. RRI is aware that its Rec Room game contains addictive designs that pose an unreasonable risk of harm to users (particularly minors and neurodivergent individuals); yet, RRI markets the game and its microtransactions to users and continues to profit from each sale.

536. RRI does not adequately inform users of the inherent risks involved with playing the Rec Room game or that Rec Room was designed to addict and harm users.

**VRChat**

537. VRChat is an online virtual world product designed, developed, published, sold, and otherwise made available by VRChat Inc. for play and use to Missouri citizens, including Plaintiffs.

538. VRChat allows users to create 3D avatars and interact with other user-created 3D avatars and worlds, and/or create their own avatars and worlds.



**Getting Started**

For new and experienced creators.

**Worlds**

Build simple to complex experiences and hangouts.

**Avatars**

Express yourself with a wide range of customization. [33]

539. VRChat is primarily designed for use with virtual reality ("VR") headsets, but is usable without VR in a "desktop" mode or in an Android app for touchscreen devices.

---

[33] https://creators.vrchat.com/

540. VRChat was first released as a prototype on January 16, 2014, and was later released to Steam on February 1, 2017. VRChat was released to Oculus Quest in December of 2018 and to Android in August of 2023.

541. VRChat has an estimated 71,000 daily players and an estimated 8.2 million total users.

542. The gameplay of VRChat is made up of thousands of connected worlds in which players can interact with each other through virtual avatars.

543. Both the avatars and worlds are created and uploaded by the users using a software development kit released alongside the game.

544. Per its website, "VRChat offers an endless collection of social VR experiences by giving the power of creation to its community."

| Make Friends | Create Worlds | Custom Avatars | Join the Community |
|---|---|---|---|
| Play and create with people from all over the world. | Using our Unity SDK, you can bring your imagination to life. | Change up your look, it's like cosplay but in VR! | VRChat is community driven. Help shape the VRChat universe. |

34

545. VRChat touts itself as a beneficial game that allows users to learn, make friends, and enjoy varied means of expression:

---

34 https://hello.vrchat.com/

# Why You Should Join VRChat

- Interact with people all over the world

- Experiment with identity by trying new avatars

- Many users report that VRChat has helped overcome social anxiety

- Create long lasting friendships

- Express yourself

- Build worlds and invite people to them

- Play and have fun [35]

546.    While playing VRChat, users can view the number of people in a world when choosing where to go within the game.  Once in a room, users can then use their microphones to speak with other users.

547.    VRChat hosts a number of events and conventions in its virtual world. Some of these events, like the Sanrio Virtual Festival 2024, are in conjunction with licensed brands to attract more users.

---

[35] https://hello.vrchat.com/



548. VRChat also offers a recurring subscription, called VRChat Plus, which provides subscribers with an "enhanced" experience for a monthly or annual fee. Currently, VRChat Plus is $9.99 per month or $99.99 per year.

549. Subscribers to VRChat Plus receive custom user icons, increased storage slots for avatars, "increased trust" from VRChat, a "supporter" badge to display on their profile, and enhanced invite messages allowing users to send invitations to others that include photos.

550. Users can also purchase VRChat credits, which can be used in the VRChat Marketplace to purchase avatars from other creators.

551. VRChat allows creators to monetize their creations through the "Creator Economy," which provides creators with Earned Credits when another user purchases content developed by that creator.

552. VRChat charges transaction fees of approximately 15.3% of any sale of content.

---

[36] https://v-fes.sanrio.co.jp/

553. Creators who are part of the Creator Economy are eligible to request a payout of Earned Credits to real-world funds, at a rate of $0.005 U.S. Dollars per Earned Credit. Payout requests can take up to 30 days to process. VRChat may also charge a payout transaction fee depending on payout method chosen.

554. VRChat Inc. is aware that VRChat includes significant psychological aspects to encourage continuous game play and eventually lead to addiction—especially of minors, young adults, and neurodivergent individuals.

555. Upon information and belief, VRChat Inc. specifically designed VRChat in concert with psychologists and neuroscientists to discover the best addictive aspects to include in their games.

556. Upon information and belief, VRChat Inc. has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in VRChat.

557. Though VRChat Inc. knows of the addictive features and technology included in its games, it does not inform their users of the risks inherent with playing this game, nor does it adequately inform users of the inherent risks involved with using and playing VRChat or that the game is designed to be addictive and harm users.

**Capuchin**

558. Capuchin is an online virtual world product designed, developed, published, sold, and otherwise made available by Banana Analytics for play and use to Missouri citizens, including Plaintiffs.

559. Capuchin is an immersive virtual reality ("VR") game for Meta Quest headsets that draws inspiration from the popular title "Gorilla Tag."



560.    Capuchin includes many thrilling and social VR experiences for users to experience while interacting with the game.

561.    In Capuchin, players embody monkey avatars and navigate diverse maps using their arms and hand movements or gestures. This distinctive method of movement enhances the immersive nature of the game.

562.    Capuchin emphasizes social connection and allows players to engage with fellow players through chat and interaction in real time.

563.    Players can also earn or purchase "bananas" which are used as in-game currency in Capuchin. Bananas can be used in the game's virtual shop, which has a variety of hats, outfits, and other cosmetic items for users to personalize their characters.

564.    The ability to personalize a user's in-game character allows for a diverse and visually appealing community, while also adding a more entertaining aspect to the game.

565.    Capuchin includes a challenge aspect to the game, where players have to avoid being eaten by monster capuchins at each level.

---

[37] https://www.meta.com/experiences/5409297455797322/#?

566.     Banana Analytics is aware that Capuchin includes significant psychological aspects to encourage continuous game play and eventually lead to addiction—especially of minors, young adults, and neurodivergent individuals.

567.     Upon information and belief, Banana Analytics specifically designed Capuchin in concert with psychologists and neuroscientists to discover the best addictive aspects to include in their games, and/or based their game design on that of another game that included features designed in concert with psychologists and neuroscientists to be as addictive as possible.

568.     Upon information and belief, Banana Analytics has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in Capuchin.

569.     Though Banana Analytics knows of the addictive features and technology included in its games, it does not inform their users of the risks inherent with playing this game, nor does it adequately inform users of the inherent risks involved with using and playing Capuchin or that the game is designed to be addictive and harm users.

**<u>Among Us</u>**

570.     Among Us is an online multiplayer game developed and published by InnerSloth and ported to console devices by PlayEveryWare (collectively, the "Among Us Defendants").

571.     Among Us was originally released in 2018 for iOS and Android devices and for Windows later the same year. In December 2020, it was available for the Nintendo Switch, with PlayStation 4, PlayStation 5, Xbox One, and Xbox Series X/S availability the following December. A virtual reality adaptation called Among US VR was released in November 2022.

572.     Among Us has been a popular video game. By September 2020, InnerSloth reported that the game had more than 100 million downloads. InnerSloth further stated that the game had 60 million daily active users.

573.    Among Us is a space-themed, multiplayer social deduction game in which players attempt to uncover other players' hidden roles or team allegiance. The involves four to fifteen players, each of whom has a role as either a "Crewmate" or "Impostor."

574.    Crewmates must complete assigned tasks on the game map and attempt to identify and eject the Impostors. The Impostors attempt to kill the Crewmates, implicate innocent Crewmates, and work to conceal their roles as Impostors and to sabotage tasks undertaken by the Crewmates.

575.    The Crewmates win if they successfully eject all Impostors or complete all assigned tasks. The Impostors win if they kill or eject all Crewmates or successfully sabotage a critical system on the map.



[38] https://www.innersloth.com/games/among-us/

576. Among Us includes certain social media aspects among players, such as friend lists and interactive chats. This creates a type of feedback loop that also motivates players to continue playing.

577. In order to determine the Imposters, players can call a group meeting in the game, during which players discuss—via the in-game text chat or an external voice chat application such as Discord—who they believe to be Imposters.



578. There are currently five "Maps" or locations in which the Among Us game is set and played.

579. Each version of Among Us is based on the same underlying design and incorporates largely similar product components, with variations mostly with respect to the version's storyline.

---

[39] https://www.innersloth.com/games/among-us/#images-5

580.    Among Us employs several in-game currencies which can be used to purchase items in the shop such as skins, hats, and other items.

581.    One currency are "Beans." Beans are obtained through gameplay. Beans are awarded to a player by completing tasks, winning rounds, and other in-game achievements. The amount of Beans may be increased through a multiplier bonus which is earned by leveling up. A player receives Beans only at the end of a game. If the player leaves before the end of a game, he does not receive any Beans.

582.    "Stars" are another currency; however star cannot be earned, they must be purchased using real money. Stars are used to purchase "Cosmicubes," which are interactive bundles containing cosmetics—hats, skins, nameplates, visors, or pets—that a player can use to customize their character.

583.    The third in-game currency is "Pods." Pods are used to purchase cosmetics within a particular Cosmicube. Pods are earned at the end of a round.

584.    The use of these in-game currencies are a positive feedback loop that rewards continued game play and encourages addiction, especially with regard to minors and neurodivergent individuals.

585.    Combining addictive feedback loops with fast-paced play, satisfying graphics and sounds, and other dopamine lifts make Among Us additive to players, particularly minors and neurodivergent individuals.

586.    The Among Us Defendants are aware that Among Us includes—and was designed with—specific psychological aspects to encourage continuous gameplay and eventually lead to addiction, especially to minors and neurodivergent individuals.

587.     Upon information and belief, the Among Us Defendants specifically designed Among Us in concert with psychologists and neuroscientists to include addictive features.

588.     Upon information and belief, the Among Us Defendants have licensed patented addictive technologies from other video game developers and included those addictive technologies in Among Us.

589.     Though the Among Us Defendants know of the addictive features and technology included in the Among Us games, they do not inform users of the risks inherent with playing this game, nor do they adequately inform users that the game is designed to be addictive and harm users.

**K.C.'s Access to Defendants' Products**

590.     Defendants market their gaming products, including Fortnite and Roblox, and their respective subscription services and in-game transactions, to minors.

591.     K.C. is such a minor to whom Defendants directed their marketing efforts and to whom Defendants sold their gaming products.

592.     K.C.—as a minor—lacked the capacity to contract, and thus Plaintiffs expressly disaffirm any contract K.C. may have made with any of the Defendants, or that Defendants may claim K.C. made with them before reaching the age of majority.

593.     K.C.'s continued use of Defendants' products is compulsive and due to addiction and in no way was an affirmation of any contract.

594.     After consumers purchase Defendants' gaming products, Defendants condition users' access to their gaming products on accepting terms and conditions—and failure by users to accept and to continue to accept any new terms and conditions results in a loss of access to the purchased product. Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties.

Accordingly, any terms to which Plaintiffs agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

595.    Defendants' products were designed to addict K.C. to the products, which proximately caused K.C.'s mental and physical health issues; therefore, Defendants' terms and conditions and any other purported contracts are void as against public policy as an individual cannot consent to harming a minor.

## V.    TOLLING OF STATUTE OF LIMITATIONS

596.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though fully set forth herein.

597.    Through the exercise of reasonable diligence, Plaintiffs could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

598.    Plaintiffs did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year.

599.    Due to the highly technical nature of the Defendants' products, Plaintiffs were unable to independently discover that Defendants' products caused their injuries until within the last year.

600.    Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

601.    Defendants' fraudulent concealment has tolled the running of any statute of limitations.

602.     Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

603.     Defendants knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

604.     Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

605.     Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their products to children and teens—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

606.     Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

607.     For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.     CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT
### (Against all Defendants)

608.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

609.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

610.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

611.    Each of the Defendant's respective products are marketed and advertised to minors and young adults.

612.    Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harm from those products. More specifically:

a.    Epic Games designed Fortnite to be as addictive as possible and with psychologically addictive features and tricks to ensnare game players, including but not limited to, designing the game to include a "near miss" effect, loot boxes, random rewards, bright and vibrant colors, and continual gameplay variety;

b.    Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

c.    The Minecraft Defendants designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and

traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

d. Microsoft designed its Xbox Once with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, to take advantage of the chemical reward system of users' brains, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users;

e. Meta and Google designed the Oculus and Meta Quest headsets with psychologically addictive features, including but not limited to immersive VR experiences that provide intense psychological rewards;

f. Google designed the Google Play app to house addictive gaming products and to take advantage of the chemical reward system in users' brains, in order to profit from users' purchases of addictive materials on Google Play;

g. Axiom designed Gorilla Tag with psychologically addictive features, including but not limited to multiple game modes, multiplayer engagement, and immersive VR experiences that provide intense psychological rewards;

h. RRI designed Rec Room with psychologically addictive features, including but not limited to varied gameplay, creative opportunities, and immersive VR experiences that provide intense psychological rewards.

i. VRChat Inc. designed VRChat with psychologically addictive features, including but not limited to varied gameplay, expressive cosmetic items, social interaction, and opportunities to monetize creations;

j. Banana Analytics designed Capuchin with psychologically addictive features, including but not limited to enhanced social aspects, exciting challenges, and ability to customize user characters; and

k. InnerSloth and PlayEveryWare designed Among Us with psychologically addictive features, including but not limited to addictive feedback loops, fast-paced play, satisfying graphics and sounds, and other dopamine lifts.

613. The defects in the design of each of the Defendant's respective products existed prior to the release of these products to K.C. and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to K.C. via download or URL access (in regards to digital game copies and cloud gaming).

614. K.C. used these products as intended, and each Defendant knew or, by the exercise of reasonable care, should have known that K.C. would use these products without Plaintiffs inspecting them for their addictive nature.

615. Each Defendant designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

a.  Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

b.  Roblox Corporation designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

c.  The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

d.  Microsoft designed Xbox One, Xbox Series S and the Xbox Network, including Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young adult users continually purchase addictive video game products for play on Xbox consoles;

e.  Meta and Google designed the Oculus and Meta Quest headsets in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals and that users continually purchase addictive video game products for play on Oculus and Meta VR headsets;

f.  Google designed the Google Play app in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video game products;

g.  Axiom designed Gorilla Tag in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

h.  RRI designed Rec Room in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

i.  VRChat Inc. designed VRChat in conjunction with psychologists, neuroscientists, and other behavioral experts—and with designers and developers of other addictive video game products—to ensure the addiction of minors, young adults, and neurodivergent individuals;

j.  Banana Analytics designed Capuchin in conjunction with psychologists, neuroscientists, and other behavioral experts—and with designers and developers of other addictive video game products—to ensure the addiction of minors, young adults, and neurodivergent individuals; and

k.  InnerSloth and PlayEveryWare designed Among Us in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals.

616.  Each of the Defendant's respective products are defective in design and unreasonably dangerous for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

617.     Youth, including K.C., and young adults are among the ordinary consumers of each of the Defendant's products.

618.     Minors and young consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

619.     Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent risk of danger; specifically, a risk of brain damage, abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

620.     Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including K.C., who used the products without any substantial change in the products' condition.

621.     The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

622. Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

a. Choosing not to use "addictive" patents identified herein in the game design;

b. Redesigning gaming software to limit rather than promote addictive engagement;

c. Implementing robust age verification;

d. Implementing effective parental controls;

e. Implementing effective parental notifications;

f. Warning of health effects of use and extended use upon sign-up or log-in;

g. Implementing default protective limits to the length and frequency of gaming sessions;

h. Implementing opt-in restrictions to the length and frequency of gaming sessions;

i. Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

j. Implementing blocks to use during certain times of day (such as during school hours or late at night);

k. Implementing limits on number of games playable per day;

l. Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m. Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

n.  Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o.  Others as set forth herein.

623.   Alternative designs were available that would reduce minors' addictive and compulsive engagement with each of the Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

624.   K.C. used Defendants' products as intended or in reasonably foreseeable ways.

625.   As a direct and proximate result of their use of Defendants' defectively designed products, K.C. sustained physical and mental injuries, emotional distress, pain and suffering, mental anguish, and economic injuries and damages.

626.    K.C.'s injuries and damages were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion, and distribution, especially considering each of the Defendant's conduct—described herein—of specifically designing their respect products to be addictive.

627.   The defective design of the products used by K.C. was a substantial factor in causing harm to K.C.

628.   As a direct and proximate result of Defendants' respective products' defective design, K.C. sustained brain damage, became addicted to video games, loss of cognitive function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain and suffering, and mental anguish.

629. K.C. was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and Plaintiffs suffered economic damages as a result thereof.

630. The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to K.C.

631. Plaintiffs' damages proximately caused by Defendants' defective design are K.C.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; K.C.'s inability to attend school; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to K.C.'s physical and mental injuries. K.C.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

632. Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

633. The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

634. The nature of the intentional and fraudulent acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, K.C. continues to use Defendants' respective products. While K.C. uses Defendants' respective products, Plaintiffs will not be able to independently verify whether Defendants' respective

products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

635. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN
### (Against All Defendants)

636. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

637. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

638. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

639. Each of the Defendant's respective products are also marketed and advertised to minors, young adults, and neurodivergent individuals.

640. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

641. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

642. Each of the Defendants sold and distributed its respective products to K.C. in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth as described herein, including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

643. Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they cause brain damage and encourage unhealthy, addictive engagement, and compulsive use.

644. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

645. Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

a. Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

b. Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

c. The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming gameplay to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

d. New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e. The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f. The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

646. Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

647. Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, Plaintiffs would have heeded the warnings and/or instructions.

648. Each Defendant's failure to adequately warn Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

649. As a direct and proximate result of each Defendant's failure to warn, K.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

650. Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

651. Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

652. The nature of the fraudulent and unlawful acts that created safety concerns for K.C. are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, K.C. continues to use Defendants' respective products. When K.C. uses Defendants' respective products, Plaintiffs will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

653. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire

want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including K.C., and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## STRICT LIABILITY – FAILURE TO INSTRUCT
### (Pleaded in the Alternative)
### (Against All Defendants)

654. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

655. Plaintiffs plead this claim in the alternative.

656. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

657. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

658. Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

659. Each of the Defendants sold and distributed its respective products to K.C. in a defective and unreasonably dangerous condition by failing to provide reasonable and adequate instructions with respect to the conditions and methods of the product's safe use when a risk of abuse, addiction, and compulsive use by youth was reasonably foreseeable in its use, unless the

danger is known to the user or is reasonably discoverable by them.

660. Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

661. Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

    a. Epic Games designed Fortnite with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    b. Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c. The Minecraft Defendants designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a

minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. Microsoft designed its Xbox One and Xbox Series S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. Meta and Google defectively designed the Oculus and Meta Quest headsets to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement and pushed users to make purchases through the Meta Store, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Google designed, developed, published, marketed, and supplied Google Play to

consumers as a product to purchase, download, and house addictive gaming products and pushed users to make purchases through Google Play, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.  Axiom defectively designed Gorilla Tag to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

h.  RRI defectively designed Rec Room to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

i.  VRChat Inc. designed VRChat to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior,

withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

j.  Banana Analytics designed Capuchin to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

a.  InnerSloth and PlayEveryWare defectively designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

662.   Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to K.C.

663.   Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and

dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

664. Defendants' products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to instruct users with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harms built into each Defendant's respective products.

665. Ordinary users would not have recognized the potential risks of Defendants' products when used in a manner reasonably foreseeable to each of the Defendants.

666. A reasonable company under the same or similar circumstances as each of the Defendants would have used provided adequate instructions to consumers, including minor users and parents like Plaintiffs.

667. At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

668. Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiffs would have followed such instructions.

669. Each Defendant's failure to adequately instruct Plaintiffs regarding the risks of each of the Defendant's respective products and the need to alter K.C.'s game play to avoid such risks was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

670. As a direct and proximate result of each Defendant's failure to instruct, K.C. has required and will require more healthcare and services and did incur medical, health, incidental,

and related expenses, as described herein.

671.    Defendants are strictly liable due to each Defendant's failure to instruct regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, as described herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

672.    The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

673.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conduct in making their games addictive, K.C. continues to use Defendants' respective products. When K.C. uses Defendants' respective products, Plaintiffs will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

674.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including K.C., and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

**COUNT IV**
**NEGLIGENCE – DESIGN**
**(Against All Defendants)**

675.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

676. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

677. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

678. Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

679. Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth in a reasonably foreseeable manner. More specifically:

  a. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

  b. Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and

injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  The Minecraft Defendants designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

d.  Microsoft designed its Xbox One and Xbox Series S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  Meta and Google designed the Oculus and Meta Quest headsets to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, and the Meta Store to be used with its VR headsets and as a product to house and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by minors

and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  Google designed Google Play to sell, supply, and house addictive gaming products and pushed users to purchase video games through Google Play, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.  Axiom designed Gorilla Tag to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

h.  RRI designed Rec Room to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

i.  VRChat Inc. designed VRChat to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual)

to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

j. Banana Analytics designed Capuchin to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

k. InnerSloth and PlayEveryWare designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

680. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products

at the time of the products' development, design, marketing, promotion, advertising, and distribution to K.C.

681.     Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include brain damage, abuse, addiction, and compulsive use in youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

682.     Each Defendant knew that minors like K.C. would use its respective products.

683.     Despite this knowledge, each Defendant failed to warn users, including Plaintiffs, of their respective product's dangerous propensity.

684.     K.C. was a foreseeable user of the Defendants' respective products.

685.     Each Defendant had a non-delegable duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

686.     Each Defendant owed this duty to design, publish, supply, and sell reasonably safe products to users, including K.C.

687.     Each Defendant breached this duty. These breaches include, but are not limited to:

   a.   Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

   b.   Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are

addictive and harmful to youth, who are particularly unable to appreciate the risks posed by the products;

c.  Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

d.  Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

e.  Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in youth, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

g.  Otherwise failing to use ordinary care in the design of the products.

688.  Alternative designs that would reduce the addictive features of Defendants' respective products were available, would have effectively served the same purpose as each of the Defendant's defectively designed products, and would have reduced the gravity and severity of danger Defendants' respective products posed minors such as K.C.

689.  A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

690. At all relevant times, K.C. used Defendants' respective products in the manner in which they were intended by Defendants to be used.

691. As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs were harmed.

692. Defendants' design of their respective products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

693. As a direct and proximate result of each of the Defendant's breached duties, K.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

694. As a direct and proximate result of each of the Defendant's breached duties, Plaintiffs have suffered—and continue to suffer—economic loss and damages, as described herein.

695. Defendants negligently designed their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT V
## NEGLIGENCE – FAILURE TO WARN
### (Against All Defendants)

696. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

697. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox

Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

698.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

699.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

700.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

   a.    Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain in order to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

   b.    Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  The Minecraft Defendants designed Minecraft with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d.  Microsoft designed its Xbox One and Xbox Series S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases through the product, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e.  Meta and Google designed the Oculus and Meta Quest headsets to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f.  Google designed Google Play as a product for consumers to buy, download, and house addictive video gaming products and, in conjunction therewith, pushed users to make purchases through Google Play through the use of algorithms and other psychology-based technologies to take advantage of the chemical reward system in a minor or neurodivergent user's brain, while knowing that abuse, addiction, and compulsive use by such individuals can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g.  Axiom designed Gorilla Tag to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

h.  RRI designed Rec Room to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

i.  VRChat Inc. designed VRChat to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and

compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

j. Banana Analytics designed Capuchin to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

k. InnerSloth and PlayEveryWare designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

701. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to K.C.

702. Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as K.C. would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

703. Each Defendant knew that minors, including K.C., would use its respective products.

704. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

705. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

706. Had Plaintiffs received proper or adequate warnings about the risks of Defendants' respective products, Plaintiffs would have heeded such warnings.

707. Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

708. Each Defendant owed this duty to users including K.C.

709. Each Defendant breached this duty owed to K.C., a foreseeable user. These breaches include, but are not limited to:

a. Failing to warn users that Defendants' respective products cause brain damage, addiction, compulsive use, and/or other simultaneous physical and mental injuries; and

b. Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product.

710. A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

711. At all relevant times, each Defendant could have provided adequate warnings to prevent the harm and injuries described herein.

712. Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiffs would have heeded such warnings.

713. As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

714. Each Defendant negligently failed to warn consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VI
## NEGLIGENCE – FAILURE TO INSTRUCT
### (Against All Defendants)
### (Pleaded in the Alternative)

715.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

716.    Plaintiffs plead this Count in the alternative.

717.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

718.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

719.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

720.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth. More specifically:

     a.    Epic Games designed Fortnite to take advantage of the chemical reward system of a product user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal

Case 2:24-cv-04055-BCW   Document 1   Filed 04/10/24   Page 134 of 236

symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. The Minecraft Defendants designed Minecraft to include addictive psychological traits, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

d. Microsoft designed its Xbox One and Xbox Series S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases through the product, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

e. Meta and Google defectively designed the Oculus and Meta Quest headsets to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement and pushed users to make purchases through the Meta Store, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Google designed the Google Play app as a product for consumers to buy, download, and house addictive video gaming products and, in conjunction therewith, pushed users to make purchases through Google Play, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g. Axiom designed Gorilla Tag to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

h. RRI designed Rec Room to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors

and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

i.  VRChat Inc. designed VRChat to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

j.  Banana Analytics designed Capuchin to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

k.  InnerSloth and PlayEveryWare designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms,

social isolation, negative consequences on cognitive processes, and other harmful effects.

721.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to K.C.

722.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to K.C.

723.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

724.    Each Defendant had a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use, as the risks and dangers are unknown and not reasonably discoverable by users.

725.    Each Defendant breached its duty by failing to provide reasonable and adequate instructions to K.C. a foreseeable user. More specifically, Defendants did not give any instructions

with respect to the addictive conditions of their respective products or on methods of safe use to avoid the risks and harm built into each Defendants' respective gaming products.

726. A reasonable company under the same or similar circumstances as each Defendant would have provided adequate instructions to consumers, including minor users and their parents and/or guardians.

727. At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

728. Had Plaintiffs received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, Plaintiffs would have followed such instructions.

729. As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate instructions, Plaintiffs were harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient instructions was a substantial factor in causing harm to Plaintiffs.

730. As a direct and proximate result of each Defendant's failure to instruct, K.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

731. Plaintiffs have also incurred economic losses, in the tune of thousands of dollars spent by K.C. while using Defendants' products that they would not have incurred but for the addictive and harmful propensities of Defendants' gaming products.

732. Each Defendant negligently failed to instruct consumers, including Plaintiffs, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and

Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VII
## NEGLIGENCE PER SE
## (Against All Defendants)

733. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

734. The United States Congress has enacted the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, to protect minors who use the Internet.

735. Federal regulations, specifically 16 C.F.R. § 312 *et seq.*, have been put in place to effectuate COPPA's purposes and which establish certain obligations for operators of websites and online services that are intended to inform parents and guardians about the collection of their children's personal information.

736. COPPA requires operators of online services and websites directed to children under 13 to notify parents about the personal information they collect and to obtain verifiable parental consent before collecting and using any personal information collected from children. 16 C.F.R. § 312.4(a).

737. The parental notice required by COPPA "must be clearly and understandably written, complete, and must contain no unrelated, confusing, or contradictory materials." 16 C.F.R. § 312.4(a).

738. COPPA requires operators to make reasonable efforts to ensure that a parent of a child receives direct notice of the operator's practices with regard to the collection, use, or disclosure of personal information from children before collecting personal information from children. 16 C.F.R. § 312.4(b).

739. COPPA requires operators of online services and websites to collect a child's telephone number, as opposed to online contact information, without first obtaining verifiable parental consent. 16 C.F.R. § 312.5(c)(1) and (6).

740. COPPA requires operators to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that each Defendant collects personal information from children. 16 C.F.R. § 312.4(d).

741. A violation of COPPA, including the regulations enacted to enforce that law, constitutes an unfair or deceptive act or practice in or affecting commerce. *See* 15 U.S.C. § 6502(c); 15 U.S.C. § 45(a)(1).

742. Avatars generated from a child's image, and biometric and health information, are covered by COPPA when collected with other personal data.

743. Each Defendant is an "operator" as defined by 16 C.F.R. § 312.2 and, therefore, subject to the laws and regulations established by COPPA.

744. Each of the Defendants collects or uses personal information from children under the age of 13—including K.C.—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

745. Each Defendant has actual knowledge that it collects personal information directly from users of its respective websites or online services.

746. Each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

   a. Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents that described each Defendant's respective practices regarding the collection, use, or disclosure of

children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

b.  Failing to make reasonable efforts, taking into account available technology, to ensure parents received such notice on their websites and applications so that parents could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

c.  Failing to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

747.  Epic Games, in connection with its Fortnite video game product, violated COPPA and those violations include, but are not limited to:

a.  Deploying design tricks, known as dark patterns, to dupe millions of players (including minors like K.C.) into making unintentional purchases in its Fortnite game;

b.  Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases;

c.  Collecting personal data from children, including K.C., without first obtaining parents' verifiable consent despite being aware that many children were playing Fortnite;

d.  Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests;

e.  Utilizing default settings that enable live on-by-default text and voice communications for users and these default settings harm children and teens—and violate COPPA because these default settings, along with Epic Games's role in

matching children and teens with strangers to play Fortnite together, harmed children and teens, exposing children and teens to bullying, threats, harassment, and other dangerous and psychologically traumatizing issues such as suicide while on Fortnite;

f. Tricking users, including minors like K.C., into making purchases while playing Fortnite. More specifically, Epic Games has deployed a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases. Fortnite's counterintuitive, inconsistent, and confusing button configuration led players to incur unwanted charges based on the press of a single button. For example, players could be charged while attempting to wake the game from sleep mode, while the game was in a loading screen, or by pressing an adjacent button while attempting simply to preview an item. These tactics led to hundreds of millions of dollars in unauthorized charges for consumers;

g. Charging account holders, including Plaintiffs, without authorization and allowed minors, including K.C., to purchase in-game content without parental consent;

h. Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the content they have purchased, which can total thousands of dollars and, even when Epic Games agreed to unlock an account, consumers were warned that they could be banned for life if they disputed any future charges; and

i. Purposefully obscuring cancel and refund features to make them more difficult to find.

748.     Epic Games's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

749.     Roblox Corp., in connection with its Roblox online game platform and game creation system, violated COPPA and those violations include, but are not limited to:

    a.  Using a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints— as uniquely identifying as a fingerprint—to track the user and their gaming patterns;

    b.  Allowing advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising daily;

    c.  Failing to adequately disclose to children when advertising is present withing experiences and videos on Roblox; and

    d.  Failing to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

750.     Roblox Corp.'s COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

751. The Minecraft Defendants, in connection with Minecraft, violated COPPA and those violations include, but are not limited to:

    a. Collecting and maintaining personal information from minors without parental consent. For example, when learned that certain users were children after they provided their birthdates in the first step of the account creation process but went on to request phone numbers from the children, before seeking to involve a parent;

    b. Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

    c. Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

        i. Collecting personal information, from the child in violation of COPPA and then suggesting that the child seek parental involvement—this limited notice of the Minecraft Defendants information practices failed to ensure parents received adequate notice about the Minecraft Defendants' collection, use, and disclosure practices concerning children's personal information;

        ii. Failing to include the information required by 16 C.F.R. § 312.4(b);

        iii. Failing in the direct notice to describe the Minecraft Defendants' collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement"); and

        iv. Not disclosing in the direct notice to parents that the Minecraft Defendants intended to collect such personal information as images that could contain

a child's likeness;

d. Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that the Minecraft Defendants collect personal information from children;

e. Failing to include a complete Privacy Statement was incomplete. More specifically, until at least 2019, the Minecraft Defendants' Privacy Statement contained a section entitled "Collection of data from children"; however, this section did not describe what personal information was collected from children or the Minecraft Defendants' use and disclosure practices for personal information collected from children as required---and instead the section discussed Microsoft's information practices regarding Microsoft products and children generically.

752. The Minecraft Defendants COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

753. Microsoft, in connection with its Xbox game consoles and Xbox Network, including but not limited to its Xbox One, Xbox Series S, Xbox Store, and Xbox Game Pass, violated COPPA and those violations include, but are not limited to:

a. Collecting personal information from children who signed up to its Xbox gaming system without notifying their parents or obtaining their parents' consent, and by illegally retaining children's personal information;

b. Allowing children, after creating an account on Xbox, to create a profile that will

include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user, which Microsoft then combines with a unique persistent identifier it creates for each account holder, even children, to share with third-party game and app developers;

c. Allowing—by default—all users, including children to play third-party games and apps while using Xbox Game Pass, requiring parents to take additional steps to opt out if they do not want their children to access them; and

d. Using the data collected on minor children less than 13 years old to use a patented system of analyzing gamer behavior, tracking kids with their respective gamer tag, and used a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or internet gaming disorder.

754. Microsoft's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors—including K.C.—and to design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

755. Meta and Google, in connection with the Oculus and Meta Quest VR headsets and the Android operating system built therein, violated COPPA and those violations include, but are not limited to:

a. Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses;

IP addresses, web and app browsing activity, device usage, profile inferences, and precise location;

b.  Collecting and maintaining biometric material, including photographs, audio recordings, and video footage;

c.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

d.  Collecting minors' information from third-party accounts;

e.  Automatically collecting minors' information through tracking technologies;

f.  Sharing minors' information with third parties and business partners; and

g.  Failing to provide through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to minors' personal information and instead hiding links containing information related to the collection of minors' personal information in fine print of privacy policies.

756.  Meta and Google's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

757.  Google, in connection with Google Play, violated COPPA and those violations include, but are not limited to:

a.  Employing dark patterns in video gaming apps, *e.g.,* Roblox, including, but not limited to, tricking minors into paying for goods or services that they did not want

or intend to buy, whether the transaction involves single charges or recurring charges;

b. Using dark patterns to entice minors, including K.C., into microtransactions without parental consent or consent of the account holder. For example, once the account holder downloaded the app and children began playing the game, purchases are disguised as play money whereby a child is prompted to use or acquire seemingly fictitious currency, but in reality the child is making an in-app purchase using real money and, unbeknownst to the account holder or child, the child is making multiple real purchases, ranging from $0.99 to $99.99 each, by simply tapping buttons to advance or obtain prizes within the game;

c. Collecting personal information from children who created a Google account without notifying their parents or obtaining their parents' consent, and by illegally retaining children's personal information;

d. Automatically collecting and storing information about services used by children, queries entered by children, and YouTube videos watched by children; and

e. Collecting and retaining children's voice and audio information.

758. Google's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

759. Axiom, in connection with Gorilla Tag, violated COPPA and those violations include, but are not limited to:

a. Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, web and app browsing activity, device usage, profile inferences, and precise location;

b. Collecting and maintaining biometric material, including photographs, audio recordings, and video footage;

c. Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

d. Automatically collecting minors' information through tracking technologies;

e. Sharing minors' information with third parties and business partners; and

f. Failing to provide through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to minors' personal information.

760. Axiom's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

761. RRI, in connection with Rec Room, violated COPPA and those violations include, but are not limited to:

a. Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, web and app browsing activity, device usage, profile inferences, and precise location;

b.  Collecting and maintaining biometric material, including photographs, audio recordings, and video footage;

c.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

d.  Collecting minors' information from third-party accounts;

e.  Automatically collecting minors' information through tracking technologies;

f.  Sharing minors' information with third parties and business partners; and

g.  Failing to provide through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to minors' personal information and instead making parents take affirmative steps to request the deletion of their children's personal information.

762.  RRI's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

763.  VRChat Inc., in connection with VRChat violated COPPA and those violations include, but are not limited to:

a.  Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, usage information, profile inferences, in-game communications, and precise location;

b.  Failing to provide notice and obtain verifiable parental consent before

collecting personal information from children;

c. Collecting and maintaining biometric material, including photographs, audio recordings, movement information, eye tracking, and video footage;

d. Collecting minors' information from third-party accounts;

e. Automatically collecting minors' information through tracking technologies;

f. Sharing minors' information with third parties and business partners;

g. Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

   i. Collecting personal information, from the child in violation of COPPA, and then suggesting that parents concerned with the collection of their children's information should contact them via their website;

   ii. Collected and released information about minors to third parties, as well as third party vendors, agents, employees, developers, agents and/or representatives without parental consent;

   iii. Failing to include the information required by 16 C.F.R. § 312.4(b);

   iv. Failing to describe Defendants' collection and use practices with regard to personal information collected from children; and

   v. Not disclosing to parents that Defendants intended to collect such personal information as images that could contain a child's likeness; and

h. Failing to include a required disclosure in Defendants' Privacy Policy explaining what personal information was collected from children or explaining Defendants' use and disclosure practices for personal information collected from children as required—and instead generically discussing information

practices regarding Defendants' products and children using vague and ambiguous language.

764.     VRChat Inc.' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

765.     Banana Analytics, in connection with Capuchin, violated COPPA and those violations include, but are not limited to:

i.     Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, usage information, profile inferences, in-game communications, and precise location;

j.     Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

k.     Collecting and maintaining biometric material, including photographs, audio recordings, movement information, eye tracking, and video footage;

l.     Collecting minors' information from third-party accounts;

m.     Automatically collecting minors' information through tracking technologies;

n.     Sharing minors' information with third parties and business partners;

o.     Utilizing a deficient post-collection notice and verifiable parental consent process, including but not limited to:

vi. Collecting personal information, from the child in violation of COPPA, and not providing a clear method for the removal of such information;

vii. Collecting and releasing information about minors to third parties, as well as third party vendors, agents, employees, developers, agents and/or representatives without parental consent;

viii. Failing to include the information required by 16 C.F.R. § 312.4(b); and

ix. Failing to describe Defendants' collection and use practices with regard to personal information collected from children; and

p. Failing to include a required disclosure in Defendants' Privacy Policy explaining what personal information was collected from children or explaining Defendants' use and disclosure practices for personal information collected from children as required—and instead generically disclaiming the collection of children's personal information.

766. Banana Analytics' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

767. InnerSloth and PlayEveryWare, in connection with Among Us, violated COPPA and those violations include, but are not limited to:

a. Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, usage information, profile inferences, in-game

communications, and precise location;

b.  Failing to provide notice and obtain verifiable parental consent before collecting personal information from children;

c.  Collecting and maintaining biometric material, including photographs, audio recordings, movement information, eye tracking, and video footage;

d.  Automatically collecting minors' information through tracking technologies;

e.  Sharing minors' information with third parties and business partners; and

f.  Utilizing a deficient post-collection notice and verifiable parental consent process;

768.  InnerSloth and PlayEveryWare's COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

769.  Missouri has enacted the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 407.010 *et seq.,* to protect Missourians from unfair or deceptive acts or practices in connection with the sale or advertisement of any merchandise in trade and commerce.

770.  Each Defendant was required to comply with the MMPA in connection with the sale and advertisement of Defendants' video game products used by Harper Glasscock.

771.  For purposes of the MMPA, "merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, or services." Mo. Rev. Stat. § 407.010(4).

772.  Under the MMPA, "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment,

suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce …, in or from the state of Missouri, is declared to be an unlawful practice" regardless of whether the unlawful practice was "committed before, during, or after the sale, advertisement or solicitation." Mo. Rev. Stat. § 407.020(1).

773.    Under the MMPA, "any person who willfully and knowingly engages in any act, use, employment or practice declared to be unlawful by [the MMPA] with the intent to defraud shall be guilty of a class E felony." Mo. Rev. Stat. § 407.020(3).

774.    Each Defendant's video game products, as identified and described herein, are "merchandise" under the MMPA.

775.    Each Defendant has violated the MMPA in connection with the sale and advertisement of its video game products, as identified and described herein, including but not limited to the following:

    a.    Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services;

    b.    Advertising the goods or services with the intent not to sell them as advertised;

    c.    Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

    d.    Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, including Harper Glasscock, rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

e. Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products, specifically:

    i. Epic Games designed Fortnite with numerous psychological tricks and addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

    ii. Roblox Corp. designed Roblox with addictive properties, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

    iii. The Minecraft Defendants designed Minecraft to include addictive features and psychological tactics to take advantage of the chemical reward receptors in user's brains, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent users can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

    iv. Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming as products to house addictive gaming products and pushed users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth, young adults and neurodivergent users—including X.X.—can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

v. Meta and Google designed the Oculus and Meta Quest headsets with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

vi. Google designed Google Play with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

vii. Axiom designed Gorilla Tag with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

viii. RRI designed Rec Room with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

ix. VRChat Inc. designed VRChat with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, but failed to inform the public, users, or parents of minor users, including Plaintiffs, that its products pose significant risk of harm;

x. Banana Analytics designed Capuchin with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to injury, but failed to inform the public, users, or parents of minor users, including Plaintiffs, that its products pose significant risk of harm; and

xi. InnerSloth and PlayEveryWare designed Among Us with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

f. Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, specifically:

i. Epic Games knew that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Epic Games marketed Fortnite as "educational" and safe for use by all (inside and outside the classroom);

ii. Roblox Corp. knew that Roblox contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive

design and risk of injury associated with its video game product and
foreseeable use thereof;

iii. The Minecraft Defendants knew that Minecraft contained an inherent risk
of abuse, addiction, and compulsive use by youth and the harms that arise
therefrom, but instead of disclosing such harms, the Minecraft Defendants
marketed Minecraft for play by minors, as "educational," and for use in the
classroom;

iv. Microsoft knew that its Xbox consoles, Xbox Network, Xbox Store, Xbox
Game Pass Ultimate, and Xbox Cloud Gaming products contained an
inherent risk of abuse, addiction, and compulsive use by youth, young
adults, and neurodivergent users—including K.C.—and the harms that arise
therefrom, but do not disclose such harms anywhere and instead market its
products for play by such users;

v. Meta and Google each knew that its Oculus and Meta Quest headsets
contained an inherent risk of abuse, addiction, and compulsive use by youth
and the harms that arise therefrom, but do not disclose such harms anywhere
and instead market its products for play by youth;

vi. Google knew that Google Play contained an inherent risk of abuse,
addiction, and compulsive use by youth and the harms that arise therefrom,
but instead of disclosing such harms, Google targeted video game
developers to put their products on Google Play and marketed those
products on Google Play as safe for use and without warning of risk of harm,
and marketed Google Play as safe for use by all, including minors;

vii. Axiom each knew that its Gorilla Tag game contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by youth;

viii. RRI each knew that its Rec Room game contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by youth;

ix. VRChat Inc. knew that VRChat contained an inherent risk of abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals and the harms that arise therefrom, but instead of disclosing such harms, VRChat Inc. marketed VRChat as safe for play and without warning of the addictive design and risk of injury associated with the products;

x. Banana Analytics knew that Capuchin contained an inherent risk of abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals and the harms that arise therefrom, but instead of disclosing such harms, Banana Analytics marketed Capuchin as safe for play and without warning of the addictive design and risk of injury associated with the products; and

xi. InnerSloth and PlayEveryWare knew that its Among Us contained an inherent risk of abuse, addiction, and compulsive use by youth and the

harms that arise therefrom, but instead of disclosing such harms, InnerSloth and PlayEveryWare marketed Among Us as safe for play by youth;

g.  Using dark patterns and other unfair and deceptive practices to entice minors, including Harper Glasscock, into in-game purchases and microtransactions, as described above;

h.  Using dark patterns and other unfair and deceptive practices that allow or allowed minors to make in-game purchases and microtransactions without parental consent or account holder consent;

i.  Knowingly making a false representation as to the characteristics, components, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services as safe for their intended use, while knowing that those products and services had been designed to be addictive;

j.  Advertising their goods or services as safe for use by minors with the intent to sell them with addictive features built in;

k.  Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

l.  Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, including Harper Glasscock, rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

m.  Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth; and

n.    Otherwise failing to disclose the use of addictive-patented technology and unlawful gaming tactics or devices within each Defendant's respective products.

776.    Defendants have violated statutory and regulatory law, as identified above, and with each statutory violation, each Defendant proximately caused injury and damage to Plaintiffs. This damage includes the injuries and harms to Plaintiffs described above, including but not limited to K.C. addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's statutory violations, K.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

777.    Plaintiffs are within the class of persons that these statutes and regulations are intended to protect—and Plaintiffs' injuries and damages are the type of harm that these statutes and regulations are intended to prevent—therefore, each Defendant is *per se* negligent for violating COPPA and the MMPA.

**COUNT VIII**
**NEGLIGENCE - ORDINARY**
**(Against All Defendants)**

778.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

779.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

780.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

781.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

782.    Each Defendant owed K.C. a duty to act as a reasonably careful company would under the circumstances.

783.    Each Defendant has breached the duties owed to K.C.

784.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

785.    A reasonably careful company would protect K.C. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

786.    A reasonably careful company would not invite, encourage, or facilitate youth, such as K.C., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

787.    A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

     a.    Epic Games failed to disclose that it designed the Fortnite games with numerous psychological tricks to take advantage of the chemical reward system of a user's

brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

b.  Roblox Corp. failed to disclose it designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c.  The Minecraft Defendants failed to disclose that they designed Minecraft to include addictive features and psychological tactics to increase gameplay and product use, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage injury and, as such, the products pose significant risk of harm;

d.  Microsoft failed to disclose that it designed its Xbox One and Xbox Series S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that

abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

e.  Meta and Google failed to disclose that it designed the Oculus and Meta Quest headsets to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement and pushed users to make purchases through the Meta Store, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

f.  Google failed to disclose that it designed the Google Play app as a product for consumers to buy, download, and house addictive video gaming products and, in conjunction therewith, push addictive video game products to users, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm;

g.  Axiom failed to disclose that it designed Gorilla Tag to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm; and

h.  RRI failed to disclose that it designed Rec Room to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive

use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

i.  VRChat Inc. failed to disclose that they designed VRChat to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users (*i.e.*, minors, young adults, and neurodivergent individuals) can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

j.  Banana Analytics failed to disclose that they designed Capuchin to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users (*i.e.*, minors, young adults, and neurodivergent individuals) can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm; and

k.  InnerSloth and PlayEveryWare failed to disclose that it designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

788.    K.C. was a foreseeable user of the Defendants' respective products.

789.    Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of K.C.'s use of Defendants' respective products.

790.    Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious when used by youth such as K.C. in a reasonably foreseeable manner. More specifically, each Defendant should have known this because each designed their respective gaming products with addictive features, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

791.    At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth such as K.C. which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

792.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users of its respective products, such as K.C., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

793. Each Defendant's conduct was closely connected to K.C.'s injuries and Plaintiffs' damages, which were highly certain to occur.

794. Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed K.C.

795. Each Defendant is also required to comply with the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*, and the corresponding federal regulations, 16 C.F.R. § 312 *et seq.*.

796. COPPA protects minors who use the internet and requires each Defendant to utilize a heightened duty of care for users under the age of 13 due to the recognized safety risks pose to such users from interactive online products like Defendants' respective gaming products. *See, e.g.,* 16 C.F.R. §§ 312.4, 312.5.

797. Each of the Defendants collects or uses personal information from children under the age of 13—including K.C.—through its respective products that are directed to (or that each Defendant has actual knowledge were used by) children.

798. Each Defendant has actual knowledge that it collects personal information, including but not limited to avatars generated from a child's image, biometric and health information, and geolocations, directly from users of its respective websites or online services.

799. Each Defendant utilizes data collected users' personal information to design and develop new products and microtransactions, and also uses the collected personal information with algorithms and other patented technologies to target product users.

800. Each Defendant has collected or used personal information from children younger than age 13 in violation of COPPA by, at least:

a. Failing to provide through their respective websites and apps a clear, understandable, and complete direct notice to parents or guardians that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c);

b. Failing to make reasonable efforts, and/or take into account available technology, to ensure parents or guardians received such notice on their websites and applications so that parents or guardians could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); and

c. Failing to obtain verifiable parental or guardian consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1).

801.   Epic Games, in connection with its Fortnite video game product, violated COPPA as set forth above.

802.   Roblox Corp., in connection with Roblox, violated COPPA as set forth above.

803.   The Minecraft Defendants, in connection with Minecraft, violated COPPA as set forth above.

804.   Microsoft, in connection with its Xbox game consoles and Xbox Network, including but not limited to its Xbox One, Xbox Series S, Xbox Store and Xbox Game Pass, violated COPPA as set forth above.

805.   Meta and Google, in connection with the Oculus and Meta Quest VR headsets and the Android operating system built therein, violated COPPA as set forth above.

806.   Google, in connection with Google Play, violated COPPA as set forth above.

807.   Axiom, in connection with Gorilla Tag, violated COPPA as set forth above.

808.    RRI, in connection with Rec Room, violated COPPA as set forth above.

809.    VRChat Inc., in connection with VRChat, violated COPPA as set forth above.

810.    Banana Analytics, in connection with Capuchin, violated COPPA as set forth above.

811.    InnerSloth and PlayEveryWare, in connection with Among Us, violated COPPA as set forth above.

812.    Each Defendants' COPPA violations harmed and damaged Plaintiffs because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minor into buying microtransactions or unknowingly make in-game purchases using the game patens and other illegal dark patterns.

813.    Each Defendant also owes a duty to not to engage in any unlawful practice including any act, use or employment of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce. *See* Mo. Rev. Stat. § 407.020.

814.    Each Defendant engaged in unlawful acts and practices as described in Mo. Rev. Stat. § 407.020.1 in connection with the design, development, publishing, marketing, and sale of their respective gaming products, as identified and described herein.

815.    Each Defendant also owes a duty to not to engage in unconscionable acts or practice in business, commerce, or trade. *See* Ark. Code. Ann. § 4-88-101, *et seq.*

816.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions

about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

817. Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a. Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including K.C.;

b. Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including K.C. including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including K.C.;

d. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including K.C.;

e. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including K.C.; including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including K.C.;

g. Developing, patenting, and licensing unreasonably dangerous features and algorithms for video game products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, like K.C.;

h. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users; and

i. Facilitating use of their respective products by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols.

818. Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance,

operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

    a. Failing to implement effective protocols to block users under the age of 13;

    b. Failing to implement effective parental controls;

    c. Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

    d. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content, product upgrades, and/or microtransactions;

    e. Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

    f. Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

819. Each Defendant further breached the duty owed to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

820. Each Defendant also breached its duty owed under Mo. Rev. Stat. § 407.020 *et seq.* not to engage in unconscionable or deceptive business acts or practices.

821. A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a

manner that is safer for and more protective of youth users like K.C.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

822.    As a direct and proximate result of each Defendant's breach of one or more of its duties, K.C. has been injured and Plaintiffs were harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

823.    Each Defendant's breach of one or more of its duties is a proximate cause of K.C.'s injuries and the damages sustained by Plaintiffs.

824.    As a direct and proximate result of each of the Defendant's breach of duties, K.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

825.    Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT IX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

826.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

827.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video

game products used by K.C: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

828.    As described herein, each of the Defendants intentionally designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

    a.   Epic Games designed Fortnite to be as addictive as possible, employing numerous psychological tricks, tactics, and technologies to ensnare users into extended, compulsive, abusive, and addictive use of its product, including but not limited to, designing the game to include a "near miss" effect, random rewards, bright and vibrant colors, and continual gameplay variety;

    b.   Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

    c.   The Minecraft Defendants designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

    d.   Microsoft designed its Xbox One and Xbox Series S with addictive features and for use with addictive video game products, and designed its Xbox Network, including

Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users;

e. Meta and Google designed the Oculus and Meta Quest headsets to be as addictive as possible and to include various addictive tactics, including but not limited to immersive VR experiences that provide intense psychological rewards;

f. Google designed Google Play as a product for consumers to buy, download, and house addictive video gaming products and to take advantage of the chemical reward system of a user's brain to push users to make purchases through Google Play, and Google targeted video game developers to put their addictive gaming products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors;

g. Axiom designed Gorilla Tag to be as addictive as possible and to include various addictive tactics, including but not limited to multiple game modes, multiplayer engagement, and immersive VR experiences that provide intense psychological rewards;

h.  RRI designed Rec Room to be as addictive as possible and to include various addictive tactics, including but not limited to varied gameplay, creative opportunities, and immersive VR experiences that provide intense psychological rewards;

i.  VRChat Inc. designed VRChat to be as addictive as possible and to include various addictive tactics, including but not limited to varied gameplay, expressive cosmetic items, social interaction, and opportunities to monetize creations;

j.  Banana Analytics designed Capuchin to be as addictive as possible and to include various addictive tactics, including but not limited to enhanced social aspects, exciting challenges, and ability to customize user characters; and

k.  InnerSloth and PlayEveryWare designed Among Us to be as addictive as possible and to include various addictive tactics, including but not limited to addictive feedback loops, fast-paced play, satisfying graphics and sounds, and other dopamine lifts.

829.  Each Defendant intentionally designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a.  Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

b.  Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

c. The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d. Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young adult users continually purchase addictive video game products for play on Xbox consoles;

e. Meta and Google designed the Oculus and Meta Quest headsets in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

f. Google designed Google Play in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

g. Axiom designed Gorilla Tag in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

h. RRI designed Rec Room in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

i. VRChat Inc. designed VRChat in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

j. Banana Analytics designed Capuchin in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals; and

k. InnerSloth and PlayEveryWare designed Among Us in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals.

830. Defendants intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors, like K.C.; to use each Defendants' respective product and intended for users, like K.C.; to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

831. Each Defendant knew that extended use of video games, *i.e.,* their products, could cause addiction.

832. Each Defendant intentionally did not warn users, prospective users, or their parents/guardians of the addictive components of their games and gaming products.

833. Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors and neurodivergent individuals—was extreme and outrageous, is beyond all possible bounds of decency, and utterly intolerable in a civilized community.

834. Each Defendant knew, like K.C., would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off of users, including K.C., after initial purchase or download.

835. Each Defendant knew that when users, like K.C., became addicted to Defendants' respective products due to the addictive and defective qualities thereof, that parents and families, like Plaintiffs, would be forced to deal with an uncontrollable video game addiction in their child and the harmful effects of such addiction.

836. Each Defendant intended to inflict emotional distress (*e.g.*, causing addiction) on users, like K.C., and should have known product users and their families, like Plaintiffs, would suffer emotional distress as a result of Defendants' conduct.

837. Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct. More specifically, K.C.'s family has endured K.C.'s bouts of gamer's rage and emotional disturbances which have resulted in referral to a behavioral health facility and have required an IEP.

838. Such conduct in intentionally creating products to addict and abuse children and cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

839. No reasonable person would be expected to endure such emotional distress suffered by Plaintiffs as a result of each Defendant's conduct.

840. As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, K.C. has experienced extreme emotional distress including aggression, depression, anxiety, withdrawal symptoms when not playing, withdrawal from life activities, changes in eating pattern, anger, and inability to function without supportive services at grade level, and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

841.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Ms. Courtright has experienced extreme emotional distress, pain, suffering, and mental anguish, including having to witness K.C. suffer from addiction, pain, and mental distress caused by Defendants' outrageous conduct.

842.    As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

843.    Further, each Defendant's outrageous conduct, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount---imposed by the jury at trial---sufficient to punish the Defendants and deter others from like conduct.

## COUNT X
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
#### (Against All Defendants)
#### (Alternative Pleading)

844.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

845.    Plaintiffs plead this in the alternative.

846.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox

Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

847. Each Defendant owed K.C. a duty to act as a reasonably careful company would under the circumstances.

848. A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

849. A reasonably careful company would protect K.C. from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

850. A reasonably careful company would not invite, encourage, or facilitate youth, including K.C., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

851. A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant defectively designed its respective products to be addictive to young adults and minors, including K.C., who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

   a. Epic Games designed Fortnite to be as addictive as possible, employing numerous psychological tricks, tactics, and technologies to ensnare users into extended, compulsive, abusive, and addictive use of its product, including but not limited to, designing the game to include a "near miss" effect, random rewards, bright and vibrant colors, and continual gameplay variety;

b. Roblox Corp. designed Roblox with psychologically addictive properties and technologies, including but not limited to ever-changing gameplay, microtransactions, social aspects, and the use of algorithms to target players to purchase numerous characters, skins, and other in-game products;

c. The Minecraft Defendants designed Minecraft to be as addictive as possible, employing numerous psychological tricks, tactics, and technologies to ensnare users into extended, compulsive, abusive, and addictive use of its product, including but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects;

d. Microsoft defectively designed its Xbox One and Xbox Series S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass, Xbox Store, and Xbox Cloud Gaming with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products—addictive features which include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users;

e. Meta and Google designed the Oculus and Meta Quest headsets to be as addictive as possible and to include various addictive tactics, including but not limited to immersive VR experiences that provide intense psychological rewards;

f. Google designed Google Play as a product for consumers to buy, download, and house addictive video gaming products and to take advantage of the chemical reward system of a user's brain to push users to make purchases through Google Play;

g. Axiom designed Gorilla Tag to be as addictive as possible and to include various addictive tactics, including but not limited to multiple game modes, multiplayer engagement, and immersive VR experiences that provide intense psychological rewards;

h. RRI designed Rec Room to be as addictive as possible and to include various addictive tactics, including but not limited to varied gameplay, creative opportunities, and immersive VR experiences that provide intense psychological rewards;

i. VRChat Inc. designed VRChat to be as addictive as possible and to include various addictive tactics, including but not limited to varied gameplay, expressive cosmetic items, social interaction, and opportunities to monetize creations;

j. Banana Analytics designed Capuchin to be as addictive as possible and to include various addictive tactics, including but not limited to enhanced social aspects, exciting challenges, and ability to customize user characters; and

k. InnerSloth and PlayEveryWare designed Among Us to be as addictive as possible and to include various addictive tactics, including but not limited to addictive feedback loops, fast-paced play, satisfying graphics and sounds, and other dopamine lifts.

852. Each Defendant defectively designed its respective products to take advantage of

the chemical reward system of users' brains (especially young users including X.X.) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a. Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent users;

b. Roblox Corporation designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users;

c. The Minecraft Defendants designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor users;

d. Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young adult users continually purchase addictive video game products for play on Xbox consoles;

e. Meta and Google designed the Oculus and Meta Quest headsets in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals and that users continually purchase addictive video game products for play on Oculus and Meta VR headsets;

f. Google designed Google Play in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video game products;

g.  Axiom designed Gorilla Tag in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

h.  RRI designed Rec Room in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals;

i.  VRChat Inc. designed VRChat in conjunction with psychologists, neuroscientists, and other behavioral experts—and with designers and developers of other addictive video game products—to ensure the addiction of minors, young adults, and neurodivergent individuals;

j.  Banana Analytics designed Capuchin in conjunction with psychologists, neuroscientists, and other behavioral experts—and with designers and developers of other addictive video game products—to ensure the addiction of minors, young adults, and neurodivergent individuals; and

k.  InnerSloth and PlayEveryWare designed Among Us in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and neurodivergent individuals.

853.  K.C. was a foreseeable user of the Defendants' respective products.

854.  Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of K.C.'s use of Defendants' respective products.

855.  Defendants' products, including Fortnite and Roblox, are psychologically and neurologically addictive when used in their intended manner by their intended audience; and Defendants reasonably should have known that when used as intend by minors, including K.C., to

use each Defendants' respective product and for users, including K.C., to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

856. Each Defendant knew that users, including K.C. would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and made them addictive to these vulnerable consumers so Defendants can continue to profit off of users, including K.C., after initial purchase or download.

857. At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth, including K.C. which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

858. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth users, including K.C., of its respective products, including K.C., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

859. Each Defendant has breached the duties owed to K.C.

860. Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its

respective products. Those breaches include:

    a. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including K.C.;

    b. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth users, including K.C., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, including K.C.; and

    d. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users, including K.C.

861. Each Defendant has breached its duties of care owed to Plaintiffs through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a. Failing to implement effective protocols to block users under the age of 13;

b. Failing to implement effective parental controls;

c. Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

d. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth on in-game downloadable content and/or microtransactions;

e. Failing to implement reasonably available means to limit or deter use of products by youth during ordinary times for school or sleep; and

f. Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth users.

862. A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth users, including K.C.; yet Defendants did not do this. This was a breach of duties owed to Plaintiffs.

863. Each Defendant's conduct was closely connected to Plaintiffs' emotional distress, which was highly certain to occur.

864. As a direct and proximate result of each Defendant's breach of one or more of its duties, Plaintiffs have sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

865.     As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, K.C. has experienced extreme emotional distress, including aggression, depression, anxiety, withdrawal symptoms when not playing, withdrawal from life activities, changes in eating pattern, anger, and inability to function without supportive services at grade level, and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

866.     As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, Ms. Courtright has experienced extreme emotional distress, including extreme emotional distress, pain, suffering, and mental anguish, including having to witness K.C. suffer from addiction, pain, and mental distress caused by Defendants' outrageous conduct.

867.     As a direct and proximate result of each Defendant's outrage, Plaintiffs have been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

868.     Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

**COUNT XI**
**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
**MO. REV. STAT. § 407.010 *et seq.***
**(Against All Defendants)**

869.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

870.     At all relevant times, each Defendant was engaged in the business of designing,

developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

871.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

872.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

873.    It is unlawful for any Defendant to engage in methods, acts, or practices that involve deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in or from the state of Missouri, as these are unlawful practices under the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. 407.010 et seq.

874.    Each Defendant engaged in deceptive, unfair, and unlawful trade practices in connection with the sale and advertisements of its gaming product, identified herein. Those violations include but are not limited to the following:

      a.  Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services;

      b.  Advertising the goods or services with the intent not to sell them as advertised;

      c.  Employing bait-and-switch advertising consisting of an attractive but insincere

offer to sell a product or service which the seller in truth does not intend or desire to sell;

d. Knowingly taking advantage of consumers who is reasonably unable to protect their interest because of their age;

e. Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

f. Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, like Harper Glasscock, rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

g. Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products, specifically:

i. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

ii. Roblox Corp. designed Roblox to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent

individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

iii. The Minecraft Defendants designed Minecraft with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its video game products pose significant risk of harm;

iv. Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming as products to play and to house addictive gaming products—and pushed users to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent users, including K.C. can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm;

v. Meta and Google designed the Oculus and Meta Quest headsets to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement and pushed users to make purchases through the Meta Store, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

vi. Google designed Google Play to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

vii. Axiom designed Gorilla Tag to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

viii. RRI designed Rec Room to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

ix. VRChat Inc. designed VRChat to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e..*, minors, young adults, and neurodivergent individuals, can lead to brain damage,

abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

x. Banana Analytics designed Capuchin to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e..*, minors, young adults, and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

xi. InnerSloth and PlayEveryWare designed Among Us to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

h. Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, young adults, and neurodivergent people, specifically:

i. Epic Games knew that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, instead Epic Games

marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

ii. Roblox Corp. knew that Roblox contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video game product and foreseeable use thereof;

iii. The Minecraft Defendants knew that Minecraft contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, the Minecraft Defendants marketed Minecraft as "educational" and safe for use and play by minors (inside and outside the classroom).

iv. Microsoft knew that its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming products contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent users—and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its products for play by such users;

v. Meta and Google knew that the Oculus and Meta Quest headsets contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, Meta and Google marketed the Oculus and Meta Quest headsets

to youth;

vi.      Google knew that Google Play contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom from playing video games available on Google Play, as described herein, but instead of disclosing such harms, Google targeted video game developers to put their products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors;

vii.     Axiom knew that Gorilla Tag contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, Axiom marketed Gorilla Tag to youth;

viii.    RRI knew that Rec Room contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, RRI marketed Rec Room to youth;

ix.      VRChat Inc. knew that VRChat contained an inherent risk of abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals and the harms that arise therefrom, but instead of disclosing such harms, VRChat Inc. marketed VRChat as safe for play and without warning of the addictive design and risk of injury associated with the products;

x.       Banana Analytics knew that Capuchin contained an inherent risk of abuse, addiction, and compulsive use by minors, young adults, and

neurodivergent individuals and the harms that arise therefrom, but instead of disclosing such harms, Banana Analytics marketed Capuchin as safe for play and without warning of the addictive design and risk of injury associated with the products; and

xi. InnerSloth and PlayEveryWare knew that Among Us contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, InnerSloth and PlayEveryWare marketed Among Us as safe for play by youth;

i. Using dark patterns and other unfair and deceptive practices to entice minors and young adults, including Harper Glasscock, into in-game purchases and microtransactions, as described above;

j. Using dark patterns and other unfair and deceptive practices that allow or allowed minors and young adults to make in-game purchases and microtransactions without parental consent or account holder consent;

k. Knowingly making a false representation as to the characteristics, components, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services as safe for their intended use, while knowing that those products and services had been designed to be addictive;

l. Advertising their goods or services as safe for use by minors with the intent to sell them with addictive features built in;

m. Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within

each Defendant's respective product;

n. Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, including Harper Glasscock, rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

o. Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, young adults, and neurodivergent individuals; and

p. Otherwise failing to disclose the use of addictive-patented technology and unlawful gaming tactics or devices within each Defendant's respective products.

875. Each Defendant engaged in the aforementioned unlawful or deceptive trade practices in the in the course of business and in connection with the sale of goods or services to Missouri consumers, including Plaintiff.

876. Each Defendant also violated the MMPA by offering misleading or deceptive prize promotions, including but not limited to:

a. Representing directly or by implication that players, including K.C., will have an increased chance of receiving a prize by making multiple or duplicate purchases, payments, or donations, or by entering a game, drawing, sweepstakes, or other contest more than one time, unless the representation is true;

b. Representing directly or by implication that users, like K.C., are being notified a second or final time of the opportunity to receive or compete for a prize unless the representation is true;

c. Representing directly or by implication that a prize notice is urgent, or otherwise

convey an impression of the urgency by use of description, narrative copy, phrasing on an envelope, or similar method unless there is a limited time period in which the recipient must take some action to claim or be eligible to receive a prize, and the date by which such action is required appears in immediate proximity to each representation of urgency and in the same type size and boldness as each representation of urgency; and

d. Offering misleading or deceptive prize promotions through its respective games, including but not limited to, timed quests, battle passes or packs, and loot boxes, that encourage users like K.C. to continually keep making in-game purchases.

877. Defendants' actions detailed herein constitute deceptive, unfair and unlawful acts and trade practices in violation of the MMPA and are actions that would mislead a reasonable consumer.

878. Plaintiffs acted as reasonable consumers would in light of all of the circumstances, purchasing and using the Defendants' products in the ways reasonably anticipated and expected by Defendants.

879. Defendants' deceptive, unfair and unlawful acts as alleged herein are of the kind and nature that would cause a reasonable person to enter into the transactions that resulted in damages to Plaintiff.

880. Plaintiffs relied to their detriment on Defendant's deceptive and unconscionable acts, including Defendants' respective misrepresentations and deceptions, in deciding to use and how to use Defendants' gaming products.

881. As a proximate result of each Defendant's deceptive, unfair and unlawful trade practices, described above, Plaintiffs suffered actual and ascertainable financial loss. This loss

includes but is not limited to, money spent on microtransactions and Plaintiffs have unnecessarily paid and/or have become liable to pay and will continue to pay and/or be liable to pay for medical aid, medical treatment, and medications.

882.    Had each Defendant not engaged in the respective unfair, deceptive, and abusive conduct described herein, Plaintiffs would not have used each Defendant's respective products and would not have suffered financial loss.

883.    Each Defendant violated the MMPA in the manner described herein and, as a result of Defendants' countless violations of the MMPA, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for their actual and ascertainable financial loss and reasonable attorney's fees incurred in connection with prosecuting this claim.

884.    Each Defendant engaged in unconscionable and deceptive trade practices, as described above, which was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, outrageous, unlawful, and displayed a flagrant disregard of, and an entire want of care and conscious and depraved indifference to, the consequences of its conduct, including to the health, safety, and welfare of its customers. This misconduct warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

**COUNT XII**
**DECEIT/FRAUDULENT MISREPRESENTATION**
**(Against All Defendants)**

885.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

886.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing,

advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

887.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

888.    Each Defendant made representations of material facts about their respective products, while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

889.    These false representations involve misstatements about the safety of each Defendant's product identified herein and include, but are not limited to:

    a.    Epic Games misrepresented Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals, including K.C., while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible;

    b.    Roblox Corp. misrepresented the Roblox games as safe for use by minors, young adults and neurodivergent individuals, while knowing they had been designed and developed with addictive psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that Roblox poses significant risk of harm to users;

c.  The Minecraft Defendants misrepresented the Minecraft games as safe for use by minors and young adults, while knowing they had been designed and developed with addictive psychological features to keep users playing Minecraft more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury, such that Minecraft poses significant risk of harm to users;

d.  Microsoft misrepresented that its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming were safe for use by minors, young adults, and neurodivergent people, while knowing that it was designed and developed with addictive features to keep such users using Microsoft's video game products, playing video games, and purchasing addictive content, and while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury, such that Microsoft's video game products pose significant risk of harm to users, including K.C.;

e.  Meta and Google misrepresented the Oculus and Meta Quest headsets as safe for use by minors and neurodivergent individuals, including K.C., while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, and knowing that it had designed and developed the Oculus and Meta Quest headsets to be as addictive as possible;

f.  Google misrepresented that Google Play was safe for use by minors and young adults, while knowing that it was designed and developed with addictive features to keep users purchasing addictive purchase addictive video game products, and

while knowing that abuse, addiction, and compulsive use by youth can lead to injury, such that its products pose significant risk of harm to users, like K.C.

g. Axiom misrepresented Gorilla Tag as safe for use by minors and neurodivergent individuals, including K.C., while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, and knowing that it had designed and developed Gorilla Tag to be as addictive as possible;

h. RRI misrepresented Rec Room as safe for use by minors and neurodivergent individuals, including K.C., while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to injury, and knowing that it had designed and developed Rec Room to be as addictive as possible;

i. VRChat Inc. misrepresented VRChat as safe for use by minors, young adults, and neurodivergent individuals, including K.C., while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to injury, and knowing that they had designed and developed their products to be as addictive as possible;

j. Banana Analytics misrepresented Capuchin as safe for use by minors, young adults, and neurodivergent individuals, including K.C., while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to injury, and knowing that they had designed and developed their products to be as addictive as possible; and

k. InnerSloth and PlayEveryWare misrepresented Among Us as safe for use by minors and neurodivergent individuals, including K.C., while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to

injury, and knowing that it had designed and developed Among Us to be as addictive as possible.

890. Each Defendant knew their games posed risk to minors, like K.C., based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing users, like K.C., to purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

891. Each Defendant also knowingly and recklessly misled the public—particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use. These misrepresentations of material fact include, but are not limited to:

a. Epic Games marketed Fortnite as educational and safe for use by minors, young adults, and neurodivergent individuals (in and outside the classroom), despite knowing that its Fortnite games contained an inherent risk of abuse, addiction, and compulsive use by such users leading to brain damage and other damages that arise therefrom, and that have been experienced by K.C.;

b. Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video game product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by K.C.;

c. The Minecraft Defendants marketed Minecraft as "educational" and for use in the classroom despite knowing that its Minecraft games contained an inherent risk of

abuse, addiction, and compulsive use by youth and the harms that arise therefrom, and that have been experienced by K.C.;

d.  Microsoft knew that its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming products, as well as the Fortnite game contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent people, and the harms that arise therefrom, but intentionally marketed  its products for use by such individuals and directed its misstatements towards users of Fortnite and other games designed, developed and utilizing the patents and technology described herein;

e.  Meta and Google marketed the Oculus and Meta Quest headsets to youth, despite knowing that the Oculus and Meta Quest headsets contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth and neurodivergent people, and the harms that arise therefrom and that have been experienced by K.C.;

f.  Google knew that Google Play, as well as and the Roblox game, contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals, and the harms that arise therefrom—but  intentionally marketed Google Play for use by the general public, including minors, and directed its misstatements towards users of Roblox and other games designed, developed and utilizing the patents and technology described herein;

g.  Axiom marketed Gorilla Tag to youth, despite knowing that Gorilla Tag contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth and neurodivergent people, and the harms that arise therefrom and that have been experienced by K.C.;

h. RRI marketed Rec Room to youth, despite knowing that Rec Room contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth and neurodivergent people, and the harms that arise therefrom and that have been experienced by K.C.;

i. VRChat Inc. marketed VRChat as safe for play and without warning of the addictive design and risk of injury associated with the products, despite knowing that VRChat contained an inherent risk of abuse, addiction, and compulsive use by foreseeable users and the harms that arise therefrom, and that have been experienced by K.C.;

j. Banana Analytics marketed Capuchin as safe for play and without warning of the addictive design and risk of injury associated with the products, despite knowing that Capuchin contained an inherent risk of abuse, addiction, and compulsive use by foreseeable users and the harms that arise therefrom, and that have been experienced by K.C.; and

k. InnerSloth and PlayEveryWare marketed Among Us as safe for play by youth, despite knowing that Among Us contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth and neurodivergent people, and the harms that arise therefrom and that have been experienced by K.C.

892. By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

893. Each Defendant knew that its misstatements and false representations, as identified herein, were material.

894. The misrepresentations described herein were made to Plaintiffs—particularly to K.C.—prior to their purchase of each Defendant's product and to K.C. while K.C. was using Defendants' products as intended.

895. Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

896. Plaintiffs relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

897. Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content upgrades or in-game transactions in each Defendant's product was justifiable.

898. As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* Defendants' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

899. As a direct and proximate result of each of the Defendant's material misrepresentations and false statements (*e.g.,* Defendants' deceit), Plaintiffs have been damaged.

Such damage includes K.C.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; K.C.'s inability to attend school at grade level without support services; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to K.C.'s physical and mental injuries. K.C.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

900. Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

901. Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XIII
## DECEIT/FRAUDULENT OMISSION OR NONDISCLOSURE
### (Against All Defendants)

902. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

903. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox

Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

904.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

905.    Each Defendant could have disclosed the defective condition of its respective products to the public and advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

906.    Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its respective products.

907.    Each Defendant intentionally omitted or knowingly did not disclose material facts about their respective products, or their collective use of patents designed to addict players to Defendants' products. For instance,

      a.   Epic Games did not inform the public, users, or parents, including Plaintiffs, that Fortnite poses significant risk of harm due to Epic Games's decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury;

      b.   Roblox Corp. did not inform the public that it designed Roblox games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to injury;

c.  The Minecraft Defendants did not inform the public that they designed Minecraft games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth can lead to brain damage and injury;

d.  Microsoft did not inform the public that it designed its Xbox consoles and its Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming products with addictive features, or that these products could be used to download addictive games and content, despite knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury;

e.  Meta and Google did not inform the public, users, or parents, including Plaintiffs, that the Oculus and Meta Quest headsets poses significant risk of harm due to Meta and Google's decision to design the Oculus and Meta Quest headsets to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury;

f.  Google did not inform the public, parents, or users, including Plaintiffs, that it designed Google Play with addictive features, or that this product could be used to download addictive games and products, despite knowing that abuse, addiction, and compulsive use of these games and products by minors and neurodivergent individuals can lead to injury;

g.  Axiom did not inform the public, users, or parents, including Plaintiffs, that Gorilla Tag poses significant risk of harm due to Axiom's decision to design Gorilla Tag

to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury;

h.   RRI did not inform the public, users, or parents, including Plaintiffs, that Rec Room poses significant risk of harm due to RRI's decision to design Rec Room to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury;

i.   VRChat Inc. did not inform the public, users, or parents of minor users, including Plaintiffs, that VRChat pose significant risk of harm due to VRChat Inc.' decision to design their products to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to brain damage and injury;

j.   Banana Analytics did not inform the public, users, or parents of minor users, including Plaintiffs, that Capuchin pose significant risk of harm due to Banana Analytics' decision to design their products to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to brain damage and injury; and

k.   InnerSloth and PlayEveryWare did not inform the public, users, or parents, including Plaintiffs, that Among Us poses significant risk of harm due to InnerSloth and PlayEveryWare's decision to design Among Us to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury.

908.   Each Defendant knew of the risks associated with their respective products based on internal research and external studies known to the industry and each Defendant; yet,

intentionally omitted and failed to disclose those findings, to induce youth, including K.C., to continue using their respective products.

909. Each Defendant knew that its omissions and nondisclosures were material.

910. A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

911. If Defendants had not omitted material facts regarding the safety of their products, Plaintiffs would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game or content upgrades or in-game transactions in each Defendant's product.

912. As a direct and proximate result of each Defendant's material omissions and intentional nondisclosures, Plaintiffs had no reason to believe that each Defendant's products were unsafe for children to use.

913. As a direct and proximate result of each Defendant's material omissions and nondisclosures, Plaintiffs have been damaged. More specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions and nondisclosure, and that deceitful conduct is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

914. Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages

in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

**COUNT XIV**
**FRAUDULENT CONCEALMENT**
**(Against All Defendants)**

915. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

916. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

917. As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, particularly minors and young adults.

918. Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

    a. Epic Games designed Fortnite with numerous psychological tricks to be as addictive as possible and to take advantage of the chemical reward system of a product user's brain, while knowing that abuse, addiction, and compulsive use by such users (particularly minors and neurodivergent people) can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

Case 2:24-cv-04055-BCW   Document 1   Filed 04/10/24   Page 215 of 236

b. Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent people can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

c. Mojang Studios and Microsoft designed the Minecraft games with addictive psychological features to take advantage of the chemical reward system in user's brains and keep users playing more often and longer, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury, but concealed this information from the public and product users, including Plaintiffs;

d. Microsoft designed its Xbox One and Xbox Series S with addictive features and for use with addictive video game products, and designed its Xbox Network, including Xbox Game Pass, with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public, product users, and parents, including Plaintiffs;

e. Meta and Google designed the Oculus and Meta Quest headsets with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth

and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiffs;

f.  Google designed Google Play with addictive features and as a product for consumers to buy, download, and house addictive video gaming products—while knowing that abuse, addiction, and compulsive use of such products by minors and neurodivergent individuals can lead to injury—but concealed this information from the public, parents, and product users, including Plaintiffs;

g.  Axiom designed Gorilla Tag with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiffs;

h.  RRI designed Rec Room with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiffs;

i.  VRChat Inc. designed VRChat with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by minors,

young adults, and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the public and product users, including Plaintiffs;

j.  Banana Analytics designed Capuchin with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the public and product users, including Plaintiffs; and

k.  InnerSloth and PlayEveryWare designed Among Us with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiffs.

919.  Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce youth, including K.C., to continue using its respective products and avoid losing users and revenue.

920.  Each Defendant's silence and nondisclosures of material information about the risks associated with their products was made under facts and circumstances where each Defendant was under a duty to speak about those risks to Plaintiff and others, because Defendants had superior

knowledge or information about their products and the risks of their products that was not reasonably available to Plaintiff or other consumers, because such information was kept or considered confidential by each Defendant.

921.    Plaintiffs used ordinary diligence in purchasing and using Defendants' products, but they could not, through ordinary diligence, have discovered the true facts known only to Defendants about the deceptive features of their products and the risks of using such products to Plaintiff.

922.    Each Defendant knew that its concealment was material.

923.    Each Defendant intended its concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

924.    A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

925.    If Defendants had not concealed material facts about the safety of their respective products, including but not limited to concealing that the products had been designed to be addictive, then Plaintiffs would not have purchased, downloaded played, continued to use, and/or purchased downloadable game content or in-game product transactions in each Defendant's product.

926.    As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each

Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

927. As a direct and proximate result of each Defendant's concealment of material information, K.C. has been injured and Plaintiffs have sustained damages, as described herein.

928. Each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore, an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

929. Defendants' fraudulent concealment tolls any applicable statute of limitations.

## COUNT XV
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)
### (Pleaded in the Alternative)

930. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

931. Plaintiffs plead this in the alternative.

932. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by K.C.: Fortnite, Roblox, Minecraft, Xbox One, Xbox Series S, Xbox Network, Xbox Game Pass, Meta Quest, Google Play, Gorilla Tag, Rec Room, VRChat, Capuchin, and Among Us .

933.     Each Defendant---and all designers, developers, manufacturers, publishers, and suppliers of video gaming products---had a duty to communicate accurate information and to make truthful statements of material fact to the public. This duty includes but is not limited to telling Plaintiffs the truth about the addictive design and dangerous condition of Defendants' products and that those products posed serious health risks to users, particularly youth.

934.     As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its respective products pose serious health risks to users, particularly minors, including K.C..; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiffs, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiffs that its products were safe or even beneficial for children to use:

   a.   Epic Games misrepresented Fortnite as safe for use by minors, young adults, and neurodivergent individuals, even marketing the games as "educational" and for use in classrooms, despite knowing that, due Fortnite's product design, the video game contains an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

   b.   Roblox Corp. misrepresented Roblox as safe for use by minors and young adults, even marketing the games as "educational" and safe for use by all, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to injury;

   c.   The Minecraft Defendants misrepresented Minecraft as safe for use by minors and

young adults, even marketing the games as "educational" and for use in classrooms, despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals that can lead to brain damage and injury;

d.   Microsoft misrepresented its Xbox consoles and its Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming products, as well as Fortnite, as safe for use by minors, young adults, and neurodivergent individuals, even marketing the products toward such users, despite knowing that, due to their own design, Microsoft's video game products contain an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals that can lead to brain damage and injury;

e.   Meta and Google misrepresented the Oculus and Meta Quest headsets as safe for use by minors and young adults, even marketing the Oculus and Meta Quest headsets to youth, despite knowing that, due to its own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

f.   Google misrepresented Google Play, as well as and Roblox, as safe for use by minors and young adults, even marketing those video game products on Google Play as safe for use despite knowing that, due to their own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

g.   Axiom misrepresented Gorilla Tag as safe for use by minors and young adults, even marketing Gorilla Tag to youth, despite knowing that, due to its own design, the

games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

h.  RRI misrepresented Rec Room as safe for use by minors and young adults, even marketing Rec Room to youth, despite knowing that, due to its own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury;

i.  VRChat Inc. misrepresented VRChat as safe for use by minors, young adults, and neurodivergent individuals, despite knowing that, due to VRChat Inc.' design and development of their products, the games contained an inherent risk of abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage and injury;

j.  Banana Analytics misrepresented Capuchin as safe for use by minors, young adults, and neurodivergent individuals, despite knowing that, due to Banana Analytics' design and development of their products, the games contained an inherent risk of abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage and injury; and

k.  InnerSloth and PlayEveryWare misrepresented Among Us as safe for use by minors and young adults, even marketing Among Us as safe for play by youth, despite knowing that, due to its own design, the games contained an inherent risk of abuse, addiction, and compulsive use by youth that can lead to brain damage and injury.

935.    Each Defendant made these false statements and misrepresentations with intent to induce Plaintiffs (and the general public) to purchase and use their respective products believing them to be safe for use as intended, and to continue to use their product and make in-game

purchases and microtransactions.

936.  Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiffs and the public.

937.  Defendants' false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiffs to purchase and use Defendants' products—and Ms. Courtright relied upon Defendants' false statements and misrepresentations in allowing K.C. to use Defendants' games and gaming products. Likewise, K.C. relied on Defendants' false statements and misrepresentations in conjunction with in-game purchases and Defendants' deceptive microtransaction mechanisms, including the use of fake "friends" and dark patterns to induce K.C. into spending money on Defendants' video game products.

938.  Plaintiffs' reliance on Defendants' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

939.  Plaintiffs have been damaged because of the false statements of each Defendant and Plaintiffs' reliance on each Defendant's statements. This damage includes the injuries and harms to Plaintiffs, described above, including but not limited to K.C.'s addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's material

misrepresentations, K.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

940. Plaintiffs would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of Defendants' gaming products.

**COUNT XVI**
**CIVIL CONSPIRACY**
**(Against All Defendants)**

941. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

942. A civil conspiracy occurs when two or more persons have combined to accomplish a purpose that is unlawful or oppressive, or to accomplish some purpose (that is not in itself unlawful, impressive, or immoral) by unlawful, oppressive, or immoral means to the injury of another. Such a conspiracy occurred here.

943. Defendants conspired to addict users, including K.C., to Defendants' gaming products.

944. As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like K.C., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by K.C. and other users.

945. Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like K.C., addicted to Defendants' products.

946.     More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like K.C., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

947.     As described herein, Epic Games knowingly conspired and otherwise acted in concert with Microsoft to violate the MMPA, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Missouri's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

948.     In particular, Epic Games and Microsoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Fortnite video game product, and that addicted and harmed K.C.

949.     As described herein, Roblox Corp. knowingly conspired and otherwise acted in concert with Google to violate the MMPA, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Missouri's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

950.     In particular, Roblox Corp. and Google agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise,

promote, control, sell, supply, lease, distribute, and benefit from their harmful Roblox video game product, and that addicted and harmed K.C.

951.    As described herein, the Minecraft Defendants knowingly conspired and otherwise acted in concert with each other to design a video game product that is addictive and harmful to users, and with Microsoft and Google to violate the MMPA, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Missouri's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

952.    In particular, the Minecraft Defendants, Microsoft, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from Minecraft, a harmful video game product that addicted and harmed K.C.

953.    As described herein, Meta and Google knowingly conspired and otherwise acted in concert to violate the MMPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Missouri's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

954.    In particular, Meta and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise,

promote, control, sell, supply, lease, distribute, and benefit from the harmful the Oculus and Meta Quest headsets that addicted and harmed K.C.

955.    As described herein, Axiom, Meta, and Google knowingly conspired and otherwise acted in concert to violate the MMPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Missouri's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

956.    In particular, Axiom, Meta, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Gorilla Tag that addicted and harmed K.C.

957.    As described herein, RRI, Meta, and Google knowingly conspired and otherwise acted in concert to violate the MMPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, to violate Missouri's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs.

958.    In particular, RRI, Meta, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Rec Room that addicted and harmed K.C.

959.    As described herein, VRChat Inc., Meta, and Google knowingly conspired and otherwise acted in concert to violate the MMPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into microtransactions and other purchases, design VRChat to be addictive to minors, young adults, and neurodivergent individuals, and to otherwise engage in the wrongful, deceitful, and tortious acts identified herein.

960.    In particular, VRChat Inc., Meta, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful VRChat product that was addictive to and harmed K.C.

961.    As described herein, Banana Analytics, Meta, and Google knowingly conspired and otherwise acted in concert to violate the MMPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into microtransactions and other purchases, design Capuchin to be addictive to minors, young adults, and neurodivergent individuals, and to otherwise engage in the wrongful, deceitful, and tortious acts identified herein.

962.    In particular, Banana Analytics, Meta, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Capuchin product that was addictive to and harmed K.C.

963.    As described herein, the Among Us Defendants, Google, and Microsoft knowingly conspired and otherwise acted in concert to violate the MMPA, fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, fraudulently induce Plaintiffs to enter into contracts for purchase, and design Among Us to addict minors and young adults.

964.    In particular, the Among Us Defendants, Google, and Microsoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Among Us that addicted and harmed K.C.

965.    Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including K.C., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

966.    Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including K.C.

967.    These conspiracies allowed Defendants to maximize profits, all while causing significant harm to users, like Plaintiffs.

968.    Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

969.    Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

970. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products.

971. As a proximate result of Defendants' conspiring to make their games addicting, Plaintiffs continue to suffer injuries and damages as K.C. is unable to stop using Defendants' respective products as a result of their addiction, Defendants' defective product designs, and Defendants' failure to warn consumers, like Plaintiffs, about the harmful and addictive qualities and components of those video game products.

## COUNT XVII
## IN-CONCERT LIABILITY
### (Against All Defendants)

972. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as though set forth fully herein.

973. In-concert, or shared, liability arises where one party acts in concert with another tortfeasor.

974. As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like K.C., with unfair and deceptive trade practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by K.C. and other users.

975. Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors like K.C., addicted to Defendants' products.

976. More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors like K.C., with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

977. Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

978. Each Defendant knew of the risk of abuse, addiction, and compulsive use by youth, including K.C., arising from the harmful technologies and tactics contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other Defendants to do the same.

979. Additionally, Microsoft, Google, and Meta acted in concert with Epic Games, Roblox Corp., Axiom, and RRI to place addictive games and technology on their platforms and encourage the purchase and use of such products by minors, young adults, and neurodivergent individuals.

980. Microsoft, Google, and Meta do not place any restrictions on game developers collecting and tracking game playing behavior, game stimulus to trigger purchasing microtransactions, or amount of time a player, who is a minor, including K.C., can spend playing games.

981. Each Defendant thus assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

982. Such concerted conduct allowed Defendants to maximize profits, all while causing significant harm to users, including Plaintiffs.

983. Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

984. Plaintiffs' injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

985. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using Defendants' products.

986. As a proximate result of Defendants' conspiring to make their games addicting, K.C. continues to suffer injuries and is unable to stop using Defendants' respective products as a result of K.C.'s addiction, Defendants' defective design and Defendants' failure to warn consumers, including Plaintiffs, about the addictive qualities and components of those products.

987. Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused K.C.'s addiction and Plaintiffs' damages, as described herein.

988. For these reasons, Defendants have shared liability for Plaintiffs' injuries and damages.

## COUNT XVIII
## LOSS OF CONSORTIUM
### (Against All Defendants)

989. Plaintiffs reallege and incorporate by reference each of the preceding paragraphs above as though set forth fully herein.

990. Consortium may be generally defined as the comfort, society, affection, services, and other indefinable elements reasonably expected from the injured person.

991. As a direct and proximate result of the aforesaid careless, intentional, negligent, deceptive, fraudulent, reckless, willful, immoral, and unlawful acts on the part of each Defendant,

and by reason of the personal injuries sustained by K.C., Ms. Courtright has sustained damages—including great mental anguish and emotional distress—and may sustain such damages in the future by reason of K.C.'s injuries and a resulting loss of K.C's services, society, love, companionship, and familial relationship with K.C. that Ms. Courtright once enjoyed.

### VII.    PRAYER FOR RELIEF

Plaintiffs Carey Courtright, individually and on behalf of K.C., a minor, respectfully request judgment in their favor and against each of the Defendants to the full extent of the law, as follows:

a. For an award of compensatory damages for K.C. in an amount to be determined at trial on the following elements of damage:

    i. The nature, extent, duration, and permanency of K.C.'s injuries;

    ii. The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

    iii. The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

    iv. The pain, suffering, and mental anguish experienced in the past;

    v. The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

    vi. The present value of any loss of ability to earn in the future;

    vii. Any scars, disfigurement, and visible results of K.C.'s injuries;

viii.  The reasonable expense of any necessary help in K.C.'s home which has been required as a result of K.C.'s injuries;

ix.  The present value of any necessary help in K.C.'s home reasonably certain to be required in the future;

x.  K.C's inability to attend school;

xi.  Actual financial loss; and

xii.  Any other actual pecuniary loss or future financial loss proximately caused by Defendants.

b.  For an award of compensatory damages for Ms. Courtright, in an amount to be determined at trial, to fairly compensate Ms. Courtright for pain, suffering, mental anguish, emotional distress, actual financial loss, and the reasonable value of any loss of the services, society, companionship, and familial relationship Ms. Courtright once enjoyed with K.C.;

c.  For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

d.  For an award of statutory damages in an amount to be determined at trial;

e.  For an award of punitive damages in an amount to be proven at trial;

f.  For an award of costs and attorneys' fees, as allowable by law;

g.  For pre-judgment and post-judgment interest, as allowable by law; and

h.  For such other and further relief as this Court may deem just and proper.

## VIII.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted, this 10th day of April, 2024,

Plaintiffs Carey Courtright,
Individually and on behalf of K.C., a minor,

**WAGSTAFF & CARTMELL LLP**

By: *_/s/ Eric D. Barton_*
Tyler W. Hudson      MO Bar # 53585
Eric D. Barton      MO Bar # 53619
Melody R. Dickson      MO Bar # 61865
4740 Grand Ave., Ste. 300
Kansas City, MO 64112
Tel.: 816-701-1100
Fax: 816-531-2372
thudson@wcllp.com
ebarton@wcllp.com
mdickson@wcllp.com

**BULLOCK WARD MASON LLC**
Breean "BW" Walas*
Tina Bullock*
Danielle Ward Mason*
3350 Riverwood Pkwy, Suite 1900
Atlanta, GA 30339
Tel: (833) 296-5291
bwalas@bwmlaw.com
tina@bwmlaw.com
danielle@bwmlaw.com

**THOMPSON STAM PLLC**
Charles M. Stam*
Thompson Stam PLLC
717 Texas Avenue, Suite 1200
Houston, Texas 77002
Telephone: 713.823.3347
Email: charles@thompsonstam.com

**Attorneys for Plaintiffs**

*motions to appear pro hac vice
forthcoming*