## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| CAREY COURTRIGHT,<br>individually and on behalf of K.C., a Minor, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.: 2:24-cv-04055-BCW |
| EPIC GAMES, INC.,<br>ROBLOX CORPORATION,<br>MOJANG AB,<br>MICROSOFT CORPORATION,<br>META PLATFORMS, INC.,<br>GOOGLE LLC,<br>ANOTHER AXIOM, INC.,<br>REC ROOM, INC.,<br>VRCHAT INC.,<br>BANANA ANALYTICS, LLC, AND<br>JANE & JOHN DOE I-XX, | ) ) ) ) ) ) ) ) ) ) ) ) | JUDGE BRIAN C. WIMES |
| Defendants. | ) | |

## AMENDED AND SUPPLEMENTAL COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff Carey Courtright, individually and on behalf of K.C., a minor, (hereinafter collectively "Plaintiffs") hereby brings this action for personal injuries against Defendants Epic Games, Inc., Roblox Corporation, Mojang AB, Microsoft Corporation, Meta Platforms, Inc., Google LLC, Another Axiom, Inc., Rec Room, Inc., VRChat, Inc., Banana Analytics, LLC, and Jane & John Doe I-XX (hereinafter collectively "**DEFENDANTS**") to recover damages sustained

1

by Plaintiffs because of **DEFENDANTS**' defective and unreasonably dangerous video gaming products, and files this *Amended and Supplemental Complaint and Demand for Jury Trial* notifying each Defendant of Plaintiffs' claims for relief pursuant to and as available under Missouri law. In support thereof, Plaintiffs allege and state:

## INTRODUCTION

1. This action seeks to hold **DEFENDANTS** accountable for causing and contributing to a health crisis, nothing short of a global epidemic, of minors suffering from an addiction[1] or disordered compulsion to use the **DEFENDANTS**' addictive and unreasonably dangerous video gaming products.

2. **DEFENDANTS** designed, developed, marketed, manufactured, sold, failed to warn, failed to instruct about, distributed, tested, patented, licensed, assembled, packaged, labeled, prepared, supplied and/or otherwise provided accessibility for consumers to use video gaming products (hereinafter generally referred to as "placing into the stream of commerce").

3. The video gaming products used by K.C. at issue here are:

---

[1] Addiction involves six core components: (1) Salience—the activity dominates thinking and behavior; (2) Mood modification—the activity modifies/improves mood; (3) Tolerance—increasing amounts of the activity are required to achieve previous effects; (4) Withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) Conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) Relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

2

Minecraft, Fortnite, Roblox, Rec Room, VR Chat, Gorilla Tag, and Capuchin along with the devices, mechanisms, and systems through which those products were and/or are used Xbox One, Xbox Series S, smartphone via Google Play, and/or Oculus Quest 2.0) and inclusive of each product's patent-protected technologies of addictive design features and the mechanisms systems, and/or devices through which minors use, access, and consume these products including Xbox Game Pass, Xbox Store, Xbox Network, Fortnite Battle Pass, MetaQuest+, and/or Meta Store (hereinafter collectively referred to as "Products").

4. **DEFENDANTS** designed the Products to create and sustain addiction and/or a disordered compulsion to use the Products and play video games.

5. The addiction and/or disordered compulsion to use the Products is a profound harm that triggers an extraordinary sequela of catastrophic and life-altering injuries to the user and their families.

6. **DEFENDANTS'** Products are defective and unreasonably dangerous in that they were specifically designed (whether negligently and/or intentionally) to create, cause, and sustain addictive use of the Products and that do cause users, specifically minors, to become psychologically addicted to using or to develop a disordered compulsion to use the Products.

7. **DEFENDANTS** failed to provide any warning to users or their

3

caregivers of the harm posed by using the Products, resulting in extraordinary detriment to users and their caregivers, including Plaintiffs herein.

8. The harm manifests in physical, emotional, mental, and financial damage to users and their families, and such harm was experienced by Plaintiffs as a result of K.C.'s use of **DEFENDANTS'** Products.

9. The defective and unreasonable dangerous nature of the Products extraordinarily benefits **DEFENDANTS** financially; to wit, **DEFENDANTS** have implemented in-game monetization schemes, particularly microtransactions, which are fueled by operant conditioning and other methodologies designed to target users' dopamine receptors.

10. **DEFENDANTS'** design microtransactions and other in-game monetization systems to take advantage of users, particularly minors, dopamine receptors and still developing brain, and the design of **DEFENDANTS'** Products incorporate and utilize operant conditioning, artificial intelligence, and other methodologies intended to trigger the user's desire to hyperfocus on using the Products more frequently and extensively, thereby spending increasing amounts of real money within the Products.

11. **DEFENDANTS'** defective Products are intended to and do cause compulsive, addictive use of the Products and the in-game microtransactions work in tandem with those addictive design features to generate real money for the **DEFENDANTS**.

4

12. The **DEFENDANTS**' decision has resulted in a considerable and growing population of minors who, to the extreme detriment of their still-developing brains, have developed an addiction or disordered need to use **DEFENDANTS**' Products.

13. Addicted and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[2] The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include: (1) Preoccupation with playing and/or using video games; (2) Withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) Tolerance - the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) Loss of Control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) Giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) Continuing to play and use video games despite negative or problematic consequences; (7) Deceiving family members or others about the amount of time spent playing

---

[2] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

and/or using video games; (8) Using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) Jeopardized school or work performance or relationships due to playing and/or using video games.

14.    As of 2022, video game addiction or "gaming disorder"—disordered use of and/or play with video gaming products—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[3] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

15.    The rapid spread of video game addiction was and is proximately caused by the **DEFENDANTS**' concerted effort to cause consumers, and particularly minors, to develop an addiction or disordered compulsion to using

---

[3] Other disorders found in that subcategory include alcoholism and gambling addiction.

the **DEFENDANTS**' Products in order to maximize **DEFENDANTS**' profits.

16.    **DEFENDANTS** placed into the stream of commerce certain Products that were intentionally designed to be as addictive as possible to those who use them, particularly to minors. **DEFENDANTS** did so despite having actual and/or constructive knowledge of the risk of harm their Products posed to users and their families, because of the addictive design features.

17.    K.C. and other similarly situated users did not start using the Products here at issue with any knowledge or reason to think they could ever develop an addiction or disordered compulsion to use them. Nor, of course, did Carey Courtright and other parents similarly situated, have any such knowledge or reason to think the same when their children began using **DEFENDANTS**' Products.

18.    The **DEFENDANTS** acted with the intent to cause minors who used their Products, including K.C., to develop such an addiction or disordered compulsion, and had knowledge that such an addiction or disordered use would likely occur since **DEFENDANTS** purposely developed their Products to incorporate addictive design features, artificial intelligence, dark patterns, and patented systems that cause the user to develop an addiction or disordered compulsion to use them.

19.    The **DEFENDANTS**' intent was realized: K.C. developed an

7

addiction and disordered compulsion to use **DEFENDANTS'** Products and, as a result, the **DEFENDANTS** generated profits from their wrongful and tortious actions.

20.     **DEFENDANTS'** actions and deception, as described herein, arise from quintessential corporate greed, resulting from a conscious and deliberate decision borne from engaging in ruthless cost-benefit analysis, such that **DEFENDANTS** placed profits over the health and well-being of consumers, including K.C., to whom **DEFENDANTS** aggressively market their defective Products.

## NATURE OF THE ACTION

21.     Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

22.     Plaintiffs' injuries and damages, as described herein, are legally and proximately caused by the **DEFENDANTS**' participation in placing their defective, unreasonably dangerous Products into the stream of commerce, and include but are not limited to: (a) K.C.'s video gaming addiction; compulsive and disordered use of **DEFENDANTS'** Products; brain damage and injury, including loss of cognitive function and delayed executive development; sleep deprivation; drop in grades; removal from the football team due to a drop-in grades caused by all-night use of the Products; trouble focusing and being off task during school hours; severe emotional distress; diminished social

8

interactions outside of online gaming interactions; loss of friends at school; impulse issues that cause problems in relationships; disrespectful and dishonest behavior including stealing, lying and hiding product usage; social isolation; change in eating patterns; inability to limit product usage and video game play time; physical pain in hands, eyes, and back; poor hygiene; and withdrawal symptoms (e.g. gamer's rage, cursing, anger, depression, physical outbursts, and harm to others and oneself; and (b) Carey Courtright's mental anguish, emotional distress, suffering, and financial losses.

23.    This action seeks to hold the **DEFENDANTS** accountable for placing into the stream of commerce Products which were defective and unreasonably dangerous in that they were designed and intended to cause users, specifically minors, to develop an addiction or disordered compulsion to using them.

24.    The **DEFENDANTS'** defective and unreasonably dangerous Products are used by millions of minors many of whom, like K.C., began playing as minors and either have developed an addiction or disordered desire to using the Products or are at severe risk of developing that injury. Their addiction is like any other; it consumes the life of an addict and harms the addict's loved ones. The Products cannot be removed or restricted from the person addicted to using them without risking that the person will engage in self-harming behaviors or otherwise suffer physical, mental, and emotional

withdrawal symptoms that require professional intervention and support.

25.     This action arises from the **DEFENDANTS**' brazen resolve to deny, in the face of abundant scientific evidence to the contrary, that their Products pose a risk of danger to the user; to wit, the **DEFENDANTS** have always known that representing their Products as safe was untrue because they purposefully caused the Products to be designed with addictive qualities and features with the intention of causing users to want and need to use the Products more and more.

26.     This is an action for personal injuries rooted, in part, in strict product liability based upon defective design, failure to warn, and failure to instruct. The **DEFENDANTS'** Products are defective in that they were negligently and intentionally designed to cause an intense dopamine release in the user that is similar in magnitude to that experienced by drug use or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between one's nerve cells in the brain, as well as between one's brain and the rest of one's body. Dopamine serves as the brain's all-important "reward center" and plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors and particularly true in minors,

whose brains are still developing.

27.     The repetitive release of dopamine that was designed to and does occur in users (especially minors and neurodivergent users) of the Products when used as intended, create and reinforce dysregulated or dopaminergic neural pathways that propel the user to hyperfocus on using the products, first at an increasing rate and then with a compulsive desire until the desire to use the products is addictive or disordered.

28.     Dysregulated neural pathways caused by using the Products in a reasonably foreseeable way trigger addictive, compulsive, and impulsive behaviors in users both when using the Products and when not using the Products; to with, **DEFENDANTS'** Products  cause life-altering impulsivity and inhibitory control behaviors that result in a myriad of physical, mental, and emotional disorders, and other injuries, including other addictions, withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage or negative consequences to cognitive processes, attention disorders, severe depression, and other harmful effects, all to the severe detriment and damage to the user; where, as here, the user is a minor child, the user's caretakers / family suffer severe emotional detriment and pecuniary damage.

29.     **DEFENDANTS** intentionally design their Products to be addictive by incorporating and utilizing traditional game theory tactics,

operant conditioning (e.g., dark patterns, skinner boxes, feedback loops, rubber-banding), artificial intelligence, and reward systems, along with patented designs containing addictive features, systems, mechanisms, and shared technology, in their video gaming product designs to ensure consumers continue to use and engage in "microtransaction" spending within the **DEFENDANTS**' Products.

30. **DEFENDANTS** rely on microtransactions to increase their profits from their Products.

31. "Microtransactions" are not random, but are the result of **DEFENDANTS**' use of patented technologies, algorithms, computer-generated "friends," targeted advertisements, or other deceptive tactics built into **DEFENDANTS**' Products. By designing their Products to be addictive, **DEFENDANTS** ensure that users, like K.C., will be exposed to and subjected to **DEFENDANTS**' deceptive conduct and harmful "microtransactions."

32. The design defects of the Products were present in the products when they left the hands of the **DEFENDANTS**, were not reasonably safe for ordinary consumers to use, and were particularly unsafe for minors, because they contained addictive features intended to cause the user to want and then need to use the products more and more, until the user develops an addiction or disordered compulsion to use the products.

33. The warning defects of the Products is reflected in the complete

12

absence of any warnings directed to minor users and/or their caregivers regarding the risk of severe harm from using the products in a reasonably foreseeable manner, including severe physical, mental, and emotional injuries and harm caused by addicted and disordered use thereof, all of which were known to the **DEFENDANTS** at the time they placed the products into the stream of commerce, and which were unknown to the intended and foreseeable users and their parents, including Plaintiffs herein. There is no warning to anyone about the risks described herein that are posed by the **DEFENDANTS**' Products. Nor are there any instructions on how to safely use **DEFENDANTS'** Products to avoid the risks and harms described herein.

34.     This is an action for personal injuries rooted, in part, in negligence arising from the **DEFENDANTS**' participation in placing their defective, unreasonable dangerous Products into the stream of commerce and into the hands of K.C., and without warning of the dangers associated with using the Products for their intended and reasonably foreseeable purpose, risks for which the **DEFENDANTS** had a duty to disclose to the consuming public but which they did not disclose, and which resulted in causing serious injuries and damages to Plaintiffs.

35.     The **DEFENDANTS** knew, or in the exercise of ordinary care should have known, that their products would be harmful to a significant percentage of minors who used them because those products were intentionally

designed to incorporate and employ addictive design features. The **DEFENDANTS**, despite that actual or constructive knowledge, failed to (by choosing to not) redesign their products to ameliorate the potential harms posed by the products, and failed to warn users or instruct the parents of users who are minors and neurodivergent children of the risks posed by the Products.

36. This is an action for personal injuries rooted, in part, in common law negligence, including negligence *per se*, arising from the **DEFENDANTS'** breach of their duty to either warn or otherwise disclose to consumers the dangers posed by their Products, a duty which is heightened with respect to minors, and their duty to otherwise act as a reasonable company would under like circumstances. The **DEFENDANTS** either knew or should have foreseen the likelihood of risk of harm posed by the dangers of using their products, and the breach of their duty to disclose or warn of those dangers and the **DEFENDANTS'** breach of their duty of ordinary care to foreseeable users caused severe harm to Plaintiffs.

37. This is an action for personal injuries rooted, in part, in the tort of intentional infliction of emotional distress arising from the **DEFENDANTS'** outrageous and extreme misconduct in designing their Products to be addictive and, therefore, cause mental distress to users who become addicted to or develop a compulsive disorder to using **DEFENDANTS'** Products and cause extreme mental distress to parents whose children become addicts as a result

14

of using **DEFENDANTS'** Products.

38.     This is an action for violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010 *et seq.*, arising from **DEFENDANTS'** use of deceptive, unfair, and unlawful trade practices in connection with the sale and advertisement of the Products, which mislead Plaintiffs and caused them financial harm.

39.     This is an action for personal injuries rooted, in part, in the intentional tort of deceit, including fraudulent misrepresentation, fraudulent omission and nondisclosure, and fraudulent concealment, as well as the tort of negligent misrepresentation. The **DEFENDANTS** made materials omissions of fact designed to lull potential users of their products, and caregivers of potential minor users, to have no concern in using **DEFENDANTS'** products and to trust that the Products were safe to use when done so in a reasonably foreseeable manner.

40.     The **DEFENDANTS** placed user safety below their own profits and made untrue expressions of fact or suggestion of fact which Plaintiffs and the public relied upon, expressions **DEFENDANTS** knew were untrue and did not believe to be true and had no reasonable ground for believing to be true.

41.     The **DEFENDANTS** suppressed and concealed facts regarding the dangers posed by their products they knew or should have known to be true and which they had a duty to disclose to Plaintiffs and those similarly situated.

15

42.    The **DEFENDANTS** expressly and impliedly represented to members of the general public, including purchasers and users of the products, including Plaintiffs herein, that their products were of merchantable quality and safe for foreseeable use. Plaintiffs relied upon those representations in purchasing and/or using the Products and Carey Courtright relied upon **DEFENDANTS'** misrepresentations regarding the safety and educational benefit of the Products in allowing K.C. to use those Products, when all the while the **DEFENDANTS** knew that their representations and expressions of product safety were untrue.

43.    This is an action for personal injuries rooted, in part, in the torts of civil conspiracy and in-concert liability arising from the **DEFENDANTS'** knowledge that the other **DEFENDANTS**, and each of them, did commit or were committing the wrongful tortious acts alleged herein, agreed to and did commit the wrongful tortious acts alleged herein in concert with one another and/or pursuant to a common design, gave substantial assistance and encouragement to one another to engage in such conduct which, separately considered, constituted a breach of duty to the Plaintiffs.

44.    The **DEFENDANTS**, in pursuing a common plan or design to commit the tortious acts as alleged herein, and in actively participating in the tortious acts, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the wrongdoer, thereby ratified or adopted the other

16

**DEFENDANTS**' acts done for their collective benefit, and as such each of the **DEFENDANTS** is equally liable for each of the other **DEFENDANTS**' tortious acts or failures to act.

45.     The video game addiction, or gaming disorder, and injuries caused by using **DEFENDANTS**' Products impacts thousands of product users and their families across the United States, including in Missouri and including Plaintiffs.

46.     Plaintiffs have been injured and harmed as a proximate result of **DEFENDANTS**' actions and misconduct, and for that Plaintiffs are entitled to compensation and other damages under Missouri law; to wit, as herein alleged, **DEFENDANTS**' defective products and tortious conduct were the actual and proximate cause in the injuries and damages Plaintiffs sustained.

## THE PARTIES

47.     Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

### ***The Defendants***

48.     **DEFENDANTS** are corporations and/or limited liability companies and/or legal partnerships and/or entities incorporated, organized, and existing under and by virtue of the laws of the State of Missouri, or the laws of some other state and/or foreign jurisdiction, and which have the authority to do business in this State, and/or are doing business in this State.

17

49.    At all relevant times, each Defendant was or is the parent, subsidiary (wholly or partially owned by, successor, successor in business, successor in product line or a portion thereof, or the whole or partial owner of or member of an entity that that designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Products, specifically including those used by K.C., which the **DEFENDANTS** put into the stream commerce in a defective condition, that could, and did cause K.C.'s disordered and addicted use of the Products, injuries, and severe damages. Said entities shall hereinafter collectively be called "alternate entities."

50.    Each of the **DEFENDANTS** and their alternate entities are liable to Plaintiffs for placing the Products into the stream of commerce and into K.C.'s hands to their severe injury, detriment, and damage and also because the **DEFENDANTS** and their alternate entities either knew, or should have known, were aware or should have been aware, that the products were defective and unreasonably dangerous in that they incorporated addictive design features that can cause the user to suffer a myriad of severe physical, mental, and emotional injuries to users, particularly minors.

51.    Each of the **DEFENDANTS** and their alternate entities is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business,

18

predecessor in product line or a portion thereof, parent, subsidiary, alter-ego, whole of partial owner, or wholly or partially owned entity, or entity that it as a member of, or funded, that designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the defective Products that caused K.C.'s injuries.

52. The **DEFENDANTS**, individually and in concert with one another, participated, whether negligently or intentionally, in placing into the stream of commerce and to members of the general public within the State of Missouri, and into the hands of K.C., the dangerous and defectively designed Products as herein alleged.

53. Upon information and belief, **DEFENDANTS** acted in concert and entered into licensing agreements to utilize the same patented systems, mechanisms, designs, and developer tools to keep users, including minors like K.C., playing longer and dependent on (i.e., addicted) to **DEFENDANTS'** Products.

54. Upon information and belief, and at all times herein mentioned, each of the **DEFENDANTS**, except as otherwise alleged, was the agent, servant, employee and/or joint venturer of the other **DEFENDANTS**, and each of them, and at all said times, each of the **DEFENDANTS** was acting in the full course and scope of said agency, service, employment and/or joint venture.

55. Upon information and belief, the **DEFENDANTS** committed the

wrongful tortious acts alleged herein individually and agreed to and did commit the wrongful, tortious acts alleged herein in concert with one another, *i.e.*, the other **DEFENDANTS**, and/or pursuant to a common design with the other **DEFENDANTS** and/or with the knowledge that the conduct of one or more of the other **DEFENDANTS** constituted a breach of a duty and gave substantial assistance or encouragement to said others to engage in such conduct, and/or gave substantial assistance to the others in accomplishing a tortious result with each of the other **DEFENDANTS'** individual conduct which, separately considered, constitutes breach of duty to the Plaintiffs.

56.     The **DEFENDANTS**, in pursuing a common plan or design to commit a tortious act, in actively participating in a tortious act, and in lending aid or encouragement to the wrongdoing, and/or in cooperating with the wrongdoer, thereby ratified or adopted the other **DEFENDANTS'** acts done for their collective benefit, and as such is equally liable for each of the named other **DEFENDANTS'** tortious acts or failures to act.

### ***Defendant Epic Games, Inc.***

57.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd., Cary, North Carolina 27518. Epic Games is authorized to do business and does business in the State of Missouri, and its registered agent for service of process is 120 C T Corporation System, S. Central Ave., Clayton, Missouri 63105.

20

58.     Epic Games is a video game developer and publisher[4] who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Fortnite video gaming products, either directly or indirectly, to members of the general public within the State of Missouri, including Plaintiffs.

59.     At all times relevant hereto, Epic Games acted in concert with Defendants Microsoft Corporation and Google LLC to design, distribute, market, supply, and/or sell its Fortnite video gaming products, including all in-game microtransactions, downloadable products, and upgrades contained therein, in an effort to increase its and the other **DEFENDANTS'** revenue at the expense of consumers, including Plaintiffs.

### ***Defendant Roblox Corporation***

60.     Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 910 Park Pl., San Mateo, California 94403.

61.     Roblox Corp. is a video game developer and publisher who, at all

---

[4] A video game publisher is a company that publishes and distributes video games that have been developed either internally by the publisher or externally by a video game developer; often the financier behind the development of the video game, video game publishers pay third-party developers to externally develop a video game product, pay an internal staff of developers and/or internal studio team to develop the video game for the video game publisher.

times material hereto, designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its video gaming product, Roblox, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

62. At all relevant times, Roblox Corp. acted in concert with Defendants Microsoft Corporation and Google LLC to design, develop, distribute, market, supply, and/or sell Roblox, and all in-game downloadable products and upgrades and in-game purchases contained therein, here at issue in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of consumers, including Plaintiffs.

### ***Defendant Mojang AB***

63. Defendant Mojang AB ("Mojang") is a Swedish Company with its principal place of business in Stockholm, Sweden. Mojang is a wholly owned subsidiary of Microsoft, who acquired Mojang and the Minecraft intellectual property for $2.5 billion in September 2014, and Microsoft is responsible for any damages that may be assessed based on Mojang's wrongdoing in connection with Minecraft.

64. At all times material hereto, Mojang designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Minecraft video gaming products, either

directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

65. At all times relevant hereto, Mojang acted in concert with Defendant Microsoft Corporation in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling Minecraft video gaming products designed with and containing addictive features, technologies, and design mechanisms to consumers in Missouri, including Plaintiffs, for use with Xbox consoles and other devices.

### ***Defendant Microsoft Corporation***

66. Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA 98052. Microsoft is authorized to do business and does business in the State of Missouri, and its registered agent for service of process is CSC-Lawyers Incorporating Service Company, 221 Bollivar St., Jefferson City, Missouri 65101.

67. At all times material hereto, Microsoft (independently and/or in collaboration with its video game design and development studio division, Xbox Game Studios and/or Mojang) designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, published, distributed, marketed, supplied, and/or sold Minecraft video gaming products either

23

directly or indirectly to members of the general public within the State of Missouri, including to Plaintiffs.

68. At all relevant times, Microsoft acted in concert with Defendants Mojang and Google to distribute, market, supply, and/or sell Minecraft for use with Xbox consoles and smartphones to consumers in Missouri, including Plaintiffs, knowing that those Products were designed with and contain addictive features, technologies, and design mechanisms but concealing the same, in an effort to increase Microsoft and the other **DEFENDANTS**' revenue at the expense of Plaintiffs and other Missouri consumers.

69. At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox video game consoles, including Xbox One and Xbox Series S, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

70. Microsoft, in addition, and at all times material hereto, designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the Xbox Store (or Microsoft Store), Xbox Network, Xbox Live, Xbox Game Pass, and Xbox Cloud Gaming, which are available product features designed for use with the Xbox gaming console system or with personal computers and mobile devices operating a Microsoft Windows system, including to members of the general public within

24

the State of Missouri and including to Plaintiffs.

71. At all relevant times, Microsoft acted in concert with Defendants Epic Games, Roblox Corp., and Rec Room, Inc. to design, develop, distribute, market, supply, and/or sell Fortnite, Roblox, and Rec Room, respectively, to consumers in Missouri, including Plaintiffs, knowing that those Products were designed with and contain addictive features, technologies, and design mechanisms but concealing the same, in an effort to increase Microsoft and the other **DEFENDANTS**' revenue at the expense of Plaintiffs and other Missouri consumers.

### ***Defendant Rec Room, Inc.***

72. Defendant Rec Room, Inc. ("RRI") is a Delaware corporation with its principal place of business at 300 Elliot Ave W, #450, Seattle, Washington 98119.

73. At all times material hereto, RRI developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product Rec Room, directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

74. At all relevant times, RRI acted in concert with Defendants Microsoft, Google LLC, and Meta Platforms, Inc. to design, develop, distribute, market, supply, and/or sell Rec Room to consumers in Missouri, including

25

Plaintiffs, knowing that Rec Room was designed with and contains addictive features, technologies, and design mechanisms but concealing the same, in an effort to increase RRI and the other **DEFENDANTS**' revenue at the expense of Plaintiffs and other Missouri consumers.

### ***Defendant Meta Platforms Inc.***

75.     Defendant Meta Platforms ("Meta") is a Delaware corporation with its principal place of business at 1601 Willow Road, Menlo Park, CA 94025. Meta is authorized to do and does business in the State of Missouri, and its registered agent for service of process is CSC-Lawyers Incorporating Service Company, 221 Boliver St., Jefferson City, MO 61501.

76.     At all times material hereto, Meta (independently and/or in collaboration with its business and research division, Reality Labs formerly Oculus VR) developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold virtual reality ("VR") gaming headsets (e.g. Oculus Quest, Meta Quest (collectively and hereinafter "Oculus Quest"), directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

77.     Meta acquired Oculus VR in 2014, shortly after Oculus VR demonstrated a prototype of its virtual reality headset, and rebranded Oculus VR as Reality Labs. As such, Meta is responsible for any damages caused by Reality Labs and/or Oculus VR.

26

78. At all relevant times, Meta acted in concert with Defendants RRI, Another Axiom, Inc., VRChat, Inc., and Banana Analytics, LLC to design, develop, distribute, market, supply, and/or sell Rec Room, Gorilla Tag, VRChat, and Capuchin, respectively, to consumers in Missouri, including Plaintiffs, for use with Ocular Quest knowing that those Products were designed with and contain addictive features, technologies, and design mechanisms but concealing the same, in an effort to increase Meta and the other **DEFENDANTS**' revenue at the expense of Plaintiffs and other Missouri consumers.

79. At all relevant times, Meta acted in concert with Defendant Google LLC to design, develop, test, patent, assemble, manufacture, package, label, prepare, distribute, market, supply, and/or sell Oculus Quest gaming headsets, and Meta Quest video gaming products (e.g. Meta Store, MetaQuest+) with addictive design features, mechanisms, and technologies in an effort to increase both Defendants' revenue at the expense of Plaintiffs and other Missouri consumers.

### *Defendant VRChat, Inc.*

80. Defendant VRChat, Inc. is a Delaware corporation with its principal place of business at 548 Market Street # 93053, San Francisco, California 94104. VRChat Inc. is authorized to do and does business in the State of Missouri, and its registered agent for service of process is CT

Corporation System, 120 S Central Ave, Clayton, Missouri 63105.

81.   At all times material hereto, VRChat Inc. designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product, VRChat, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

82.   At all relevant times, VRChat, Inc. acted in concert with Defendant Meta to design, develop, distribute, market, supply, and/or sell VRChat with addictive features, mechanisms, microtransactions, and technologies for use on and with Oculus Quest in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of Missouri consumers, including Plaintiffs.

### *Defendant Another Axiom, Inc.*

83.   Defendant Another Axiom, Inc. ("Axiom") is a Delaware corporation with its principal place of business at 303 Twin Dolphin Drive, Suite 600, Redwood City, California 94065.

84.   At all times material hereto, Axiom developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product, Gorilla Tag, directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

28

85.    At all relevant times, Axiom acted in concert with Defendant Meta to design, develop, distribute, market, supply, and/or sell Gorilla Tag with addictive features, microtransactions, mechanisms, and technologies for use on and with Oculus Quest in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of Missouri consumers, including Plaintiffs.

### *Defendant Banana Analytics LLC*

86.    Defendant Banana Analytics LLC  ("Banana Analytics") is a limited liability company with its principal place of business at 1155 W SR 434, Ste # 176, Longwood, Florida 32750. The members of Banana Analytics are Florida residents.

87.    At all times material hereto, Banana Analytics designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming product, Capuchin, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiffs.

88.    At all relevant times, Banana Analytics acted in concert with Defendant Meta to design, develop, distribute, market, supply, and/or sell Capuchin with addictive features, microtransactions, mechanisms, and technologies for use on and with Oculus Quest in an effort to increase its and the other **DEFENDANTS**' revenue at the expense of Missouri consumers,

including Plaintiffs.

### ***Defendant Google LLC***

89.     Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California. The sole member of Google is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California, which is a wholly subsidiary of the publicly traded company Alphabet Inc.. Google is the primary operating subsidiary of Alphabet Inc. Google is authorized to do and does business in the State of Missouri, and its registered agent for service of process is CSC-Lawyers Incorporating Service Company, 221 Boliver St., Jefferson City, Missouri 61501.

90.     At all times material hereto, Google designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, and/or supplied the Android Operating System used in the Oculus Quest gaming headsets, either directly or indirectly, to members of the public within the State of Missouri, including to Plaintiffs.

91.     At all relevant times, Google acted in concert with Defendant Meta to design, develop, test, patent, assemble, manufacture, package, label, prepare, distribute, market, supply, and/or sell Oculus Quest gaming headsets, and Meta Quest video gaming products (e.g. Meta Store, MetaQuest+) with addictive design features, mechanisms, and technologies in an effort to

30

increase both Defendants' revenue at the expense of Plaintiffs and other Missouri consumers.

92.    At all times material hereto, Google designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied Google Play for use with smartphones running an Android-based operating system, either directly or indirectly, to members of the public within the State of Missouri, including to Plaintiffs herein.

93.    At all relevant times, Google acted in concert with Defendants Epic Games, Roblox Corp., and RRI to design, develop, distribute, market, supply, and/or sell Fortnite, Roblox, and Rec Room, respectively, to consumers in Missouri, including Plaintiffs, knowing that those Products were designed with and contain addictive features, technologies, and design mechanisms but concealing the same, in an effort to increase Google and the other Defendants' revenue at the expense of Plaintiffs and other Missouri consumers.

### *Jane & John Doe I-XX*

94.    Jane and John Doe I-XX (hereinafter "Doe Defendant") are individuals, corporations, companies, or alternate entities as yet unidentified to Plaintiffs who were engaged in the research, development, manufacture, design, testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions—and who introduced such products into interstate commerce or marketed such products with knowledge and intent

31

that such products be sold in the State of Missouri—and who also may be liable for some or all of Plaintiffs' injuries and damages as described herein.

95.     Plaintiffs, upon information and belief, allege that each Defendant designated herein as a Doe Defendant is responsible, negligently or in some other actionable manner, for the defective products and conduct herein alleged, for the injuries and damages proximately caused thereby to Plaintiffs. Despite reasonable and diligent inquiries by Plaintiffs, the identity of said tortfeasor(s) has not been determined as of this date and it is necessary to conduct discovery in order to determine the identity of said tortfeasor(s). If a Doe Defendant tortfeasor is identified for one or more causes of action, Plaintiffs will amend this Complaint accordingly.

### *The Plaintiffs*

#### *Plaintiff Carey Courtright*

96.     Plaintiff Carey Courtright is, and at all times relevant to this action was, a citizen and resident of the State of Missouri, whose principal place of residence is in Moniteau County, Missouri.

97.     Carey Courtright is the parent of Plaintiff K.C. and represents K.C.'s interests in this lawsuit.

98.     Carey Courtright also seeks redress on her own behalf for actual damages, mental anguish, emotional distress, injuries, and financial loss she personally sustained as result of and which were proximately caused by

**DEFENDANTS'** intentional, negligent, unlawful, outrageous, deceptive, fraudulent, willful, immoral, and reckless acts and conduct with respect to their Products, as well as for loss of K.C.'s society and companionship due to the injuries sustained by K.C. as a result of using **DEFENDANTS'** Products.

### *Plaintiff K.C.*

99.   Plaintiff K.C. is, and at all times relevant to this action was, a citizen and resident of the State of Missouri, whose principal place of residence is in Moniteau County, Missouri. K.C. was twelve years old at the time of filing of the original Complaint.

100.   K.C. began playing video games and using **DEFENDANTS'** Products at approximately six (6) years old, and, since that time, has used and/or continues to use the Products at an increasing, uncontrollable, compulsive, and/or addictive pace. K.C. has been injured and damaged—and continues to be injured and damaged—as a result of K.C.'s use of **DEFENDANTS'** Products and the addiction caused by K.C.'s use of **DEFENDANTS**' defective Products.

## JURISDICTION AND VENUE

101.   Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

102.   This *Amended and Supplemental Complaint and Demand for Jury Trial* brings forth claims for relief arising under the laws of the State of

33

Missouri, including but not limited to allegations that as a direct and proximate result of **DEFENDANTS** placing the defective Products into the stream of commerce, Plaintiffs have suffered and continue to suffer both injuries and damages, as described herein, within the State of Missouri that exceed the sum or value of $75,000, exclusive of interest and costs.

103. This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

104. This Court has personal jurisdiction over each **DEFENDANT** because each routinely conducts business in Missouri and has sufficient minimum contacts in Missouri to have intentionally availed itself to this jurisdiction by marketing Products and transacting business in the State of Missouri.

105. At all relevant times, each **DEFENDANT** was present and transacted, solicited, and substantially conducted business in the State of Missouri through their employees, agents, sales representatives, and/or alternate entities, and derived substantial revenue from such business.

106. At all times material hereto, each **DEFENDANT** targeted Missouri consumers, including Plaintiffs, to (1) purchase, play and/or use its Products and/or (2) to purchase in-game items or perks in exchange for real money by using operant conditioning, in-game advertising, "fake" avatar

friends, and other deceptive tactics and systems.

107. At all relevant times, each **DEFENDANT**—with knowledge of K.C.'s age and Plaintiffs' Missouri residency—targeted Plaintiffs to purchase and/or use **DEFENDANTS**' Products; utilized deceptive and addictive mechanisms within the **DEFENDANTS**' product design to create addictive use in minors based on personal metrics and data illegally, improperly, and/or deceptively obtained from K.C. and other minors; and deceptively induced K.C. to enter into microtransactions or otherwise stay engaged in using the Products, including but not limited to using artificial intelligence and other matchmaking mechanisms in their product design to put the user in a situation whereby they will use the product longer and/or spend real money to continue using the product as intended.

108. Upon information and belief, and at all relevant times, each **DEFENDANT** —with knowledge of K.C.'s age and Missouri residency— provided third parties with product development tools, allowed third parties access to data obtained through and from Missouri consumers' use of **DEFENDANTS**' Products, allowed third parties to target Plaintiffs, and particularly K.C., to use **DEFENDANTS**' Products with deceptive and addictive mechanisms within the **DEFENDANTS**' video gaming product design to create addictive use in minors based on personal metrics and data obtained from minors including K.C., and deceptively induced K.C. to enter

35

into microtransactions or otherwise stay engaged in using the Products, including but not limited to using artificial intelligence and other matchmaking mechanisms in their product design to put the user in a situation whereby they will use the product longer and/or spend real money to continue using the product as intended.

109.   **DEFENDANTS** are conclusively presumed to have been doing business in this State and are subject to Missouri's long arm jurisdiction.

110.   At all relevant times, **DEFENDANTS** expected or should have expected that their acts and omissions would have consequences within Missouri and throughout the United States.

111.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiffs are all residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## GENERAL ALLEGATIONS

112.   Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

### *The Video Gaming Industry*

113.  A "video game" is a device or system that engages users in interaction with an interface or input device that generates visual feedback from a display device, and which stores recorded data or instructions generated by the user and, by processing that data and instructions, creates an interactive game capable of being used, played, and viewed via systems such as computers, consoles, or other technologies; this definition of a "video game" applies to the **DEFENDANTS'** products.

114.  Gaming consoles, smartphones, tablets, and personal computers are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

115.  Early video game companies created games and sold them mostly through cartridges, discs, or other "physical" or "hard copy" formats to be played on devices like a gaming console or computer. The costs of developing the game, and generating profits therefrom, were realized through the sale of the games over a period of time, and it was a long and slow method of generating profit.

116.  Today, video games may be available for purchase in hard copy formats but primarily are accessible via digital download through "app stores," online gaming networks, and cloud gaming servers for use and play on gaming consoles, computers, mobile phones, and tablets. Each video game utilizes the

37

same gameplay mechanisms, designs, and technologies in its development and design regardless of whether the product is used via physical disc, digital download, online gaming network, and/or through a cloud gaming service.

117. Cloud gaming, or gaming on demand, is a type of online video gaming product that allows users to download and/or stream video games for use on a user's console, smartphone, tablet, or personal computer without need for the physical disc; to wit, cloud gaming provides users unfettered access to an unlimited number of video games and allows users to play a single video game (e.g., Roblox, Fortnite, Rec Room) across multiple devices.

118. Unlike early video games that were used and accessed (like traditional arcade video games) via a one-time, one-purchase and/or intermittent, non-continuous format, the more sophisticated high-tech video games of today —games that are designed to be used in conjunction with gaming consoles, mobile devices, computers, and tablets, —necessitate, if not require, a lengthy and ongoing if not continuous active participation during which time users are exposed to psychological techniques intentionally designed to control, manipulate and exploit the user's brain, and a minor's developing brain, to trigger an intense desire to engage in increased game usage time and, therewith, in-game downloads and purchases.

119. Upon information and belief, Minecraft, Fortnite, Roblox, Rec Room, VRChat, Gorilla Tag, and Capuchin incorporate and utilize the same

gameplay mechanisms, designs, artificial intelligence, systems, and technologies in each product's development and design regardless of what device is being used and regardless of whether a user obtains and/or accesses the product for use via a physical disc, digital download, online gaming network, and/or through a cloud gaming service.

120. Gaming consoles, gaming headsets, and smartphones—and each device's associated video gaming products—are designed and developed to work in conjunction with and to enhance the design mechanics of the video games being played thereon.

121. Upon information and belief, Microsoft incorporates and utilizes the same addictive mechanisms, designs, artificial intelligence, systems, and technologies in the development and design of its Xbox consoles, Xbox Network Xbox Game Pass, and Xbox Store as those used by Epic Games, Mojang, Roblox Corp., and RRI; to wit, Microsoft provides third-parties and provided those named Defendants with the tools, specifications, and requirements of compatibility and integration of those entities' video game products with Xbox devices and cloud gaming products.

122. Upon information and belief, Meta incorporates and utilizes the same addictive mechanisms, designs, artificial intelligence, systems, and technologies in the development and design of its Oculus Quest gaming headsets, Meta Store, and MetaQuest+ as those used by RRI, Axiom, VRChat

Inc., and Banana Analytics; to wit, Meta provides third-parties and provided those named Defendants with the tools, specifications, and requirements of compatibility and integration of those entities' video game products with Oculus Quest devices and cloud gaming products.

123.   Upon information and belief, Google incorporates and utilizes the same addictive mechanisms, designs, artificial intelligence, systems, and technologies in the development and design of Oculus Quest gaming headsets and Google Play as RRI, Axiom, VRChat Inc., Banana Analytics, Epic Games, and Roblox; to wit, Google provides third-parties and provided those named Defendants with the tools, specifications, and requirements of compatibility and integration of those entities' video game products with devices using an Android-based operating system.

### *Monetization Schemes: Operant Conditioning and Microtransactions*

124.   The **DEFENDANTS'** placed into the stream of commerce Products designed to allow, encourage, and target people to use the products. Those products were incorporated with psychologically addictive features, properties, and technologies, including but not limited to operant conditioning, ever-changing gameplay, microtransactions, social aspects, patented systems, illegally and/or improperly obtained personal information, and the use of algorithms to target users to purchase in-game downloads and other in-game products.

40

125. Microtransactions are a critically important part of the patented technologies of design features used in the **DEFENDANTS'** Products: microtransactions are intended to generate profit at the expense of the health of the users.

126. Microtransactions are intentionally inextricably tethered to the operant conditioning mechanisms and design incorporated into the Products that create, cause, trigger and reinforce a disordered, addictive, and compulsive use of the products at an increasing rate; to wit, the more someone, particularly a minor, uses **DEFENDANTS**' Products that include addictive design features borne from operant conditioning systems, the more that user engages in microtransactions which generates real revenue for the **DEFENDANTS.**

127. The tremendous growth of the video gaming industry is in large part due to the advent of in-game purchasing microtransactions and monetization schemes that work in tandem with addictive operant conditioning design features. The latter is intended to and does cause compulsive, addictive use of the Products, and the former capitalizes upon the user's addicted or disordered use of the products to generate money for the **DEFENDANTS**.

128. There is no meaningful disclosure of the inclusion of addictive mechanisms and microtransactions in the **DEFENDANTS'** Products at the

time they are purchased so as to allow prospective users or their caregivers to make informed decisions as to whether using the products is desirable, appropriate, safe, or worth the potential risk.

129.  Microtransactions first appeared in 2006 but did not prove to be a good profit-making model until devices, particularly mobile devices, became more powerful and access to the internet became more readily available such that users could access video games almost anywhere.

130.  Microtransactions may be presented to users during gameplay through a custom store interface placed inside the game for which the items are being sold, in a device's "app store" and/or on a devices cloud gaming network, or otherwise marketed by the **DEFENDANTS** as an upgrade, reward, or special event related to a video gaming product.

131.  Microtransactions, unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are a non-essential component of Products that the **DEFENDANTS** plan microtransactions with great intention.

132.  The **DEFENDANTS'** design and marketing strategy is rooted, in part, in the theory that the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user. The microtransaction model is rooted in if

not dependent upon the patented technologies of addictive design features that are incorporated into the Products, all of which are concealed from users to ensure revenue earned by the Products remain recurring for as long as the product is available for use. When the user has an addiction or disordered compulsion to using the products, the reoccurrence of revenue via microtransactions from the products is all but assured. The **DEFENDANTS** did or do license or own patented technologies of addictive design features incorporated into their Products.

133. Microtransactions were intentionally and specifically designed to work in tandem with the design of operant conditioning methodology, technique, and strategy, ensure and compound the impulsive behavior of users within the closed gaming environment and the pressure that drives in-game purchases. For example, placing a time limitation on a microtransaction offer may push a user to impulsively buy an item. Similarly, a user's desire to be the first among a group of friends to buy an in-game premium item or achieve a ranking may drive a user to make microtransaction purchases.

134. Microtransactions in video games are predatory monetization schemes that are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until users are committed, both psychologically and financially. Those schemes—all of which the **DEFENDANTS** knowingly incorporate into the design features of their

43

Products—use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated use and increased spending by users, especially in populations like minors and neurodivergent users who are especially vulnerable to these tactics and which serve to deepen their disordered or addicted use. Such tactics may involve, either singularly or in combination, limited disclosure of the products, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

135. The **DEFENDANTS** utilize many strategies to enhance and exploit the already predatory monetization tactics incorporated into the Products. Such strategies include: (a) The "near miss": convincing players via exciting animation, for instance, that they were very close to winning; (b) "Chasing": encouraging players to keep playing to get back any money they just lost; (c) "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window; (d) "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately; (e) "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; and (f) The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

44

136. An additional aspect of the predatory monetization of the **DEFENDANTS**' Products is the collection and use of individual user data to manipulate the nature and presentation of in-game purchasing offers in ways that maximize the likelihood of the user spending money.

137. The **DEFENDANTS**' Products are designed to be and are capable of tracking various user metrics and adjusting their design in automated ways to elicit in-game purchasing, including utilizing a minor user's illegally obtained and improperly retained personal information and biometric data to target the user and exploit their personal data.

138. Such schemes exploit an information asymmetry between user and the **DEFENDANTS'** Products in that the game system knows more about the user of the products than the user can know about the Products. This allows the gaming industry, which includes **DEFENDANTS**, to use its knowledge of the user's game-related preferences, available funds, and/or playing and spending habits to present in-game downloads and purchase offers that are predetermined to maximize the likelihood of eliciting the user's expenditure of real money.

139. When use of the **DEFENDANTS'** Products is linked to a user's social network pages, the **DEFENDANTS** are able to and do gather additional information about the user and then employ that information to target products and microtransactions to those users based upon their interests and

45

preferences. The prices of in-game items may be determined by factors that are not disclosed to the users because the algorithm used is capable of considering an individual user's available funds and cost sensitivity to certain items. In this way, the products incentivize continuous spending by the user.

140. The **DEFENDANTS** and third parties use information collected from users, including K.C. and others like them, in their video gaming product design and in the marketing of their Products—yet **DEFENDANTS** do not disclose and conceal these acts from those consumers, including Plaintiffs.

141. Systems that dynamically adjust in-game item prices and value based on such individual user analytics, which were implemented by product developers primarily to serve monetary goals and which lack basic transparency to the user, and which also have the potential to exploit certain types of vulnerable players under certain conditions. These systems are critical to the **DEFENDANTS'** revenue, such continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for users who are minors to fail to understand the value of the actual money being spent which allows for more easeful and further if not continuous and chronic spending of real money.

142. A few specific examples of such predatory monetization schemes incorporated into the **DEFENDANTS'** Products include but are not limited to loot boxes, rubber-banding, pay-to-win models, reward systems, fear-of-

46

missing-out or timed events, artificial intelligence and bots, and dark patterns embedded in the product design.

143.  A "loot box" is an in-game reward system that can be purchased repeatedly—with real money, of course—to obtain a random selection of virtual items. Loot boxes could contain items that give users an advantage in the game, or cosmetic or aesthetic items that can be used to customize characters or weapons. Loot boxes are essentially a lottery that provides a way for gaming developers to increase revenue through underage gambling. It is common knowledge that gambling addiction is a severe issue that carries big risk in playing lottery-style games, so combining such gambling aspects with the psychologically addictive traits of video games makes for a highly dangerous scheme to which users are highly susceptible and will easily succumb. Loot boxes are ultimately controlled by the gaming developers as well as the **DEFENDANTS** herein, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered and incorporated in the design of the video games. Loot boxes result in high revenues for the **DEFENDANTS** because instead of a one-time purchase for the desired item, users may and typically do buy multiple boxes.

144.  Rubber-banding is a monetization scheme used to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the user's skill level by, for example, matching computer opponents to a given user's skill

47

level. The **DEFENDANTS** rely upon the principle of rubber-banding with microtransactions to ensure that the products' financial requirements are adjusted to match the user's desire and capacity to use. If an item costs too much, the users of monetized games cannot strategize to win and instead must decide between making in-game purchases or not using the products at all, or potentially playing without paying, but doing so with significantly diminished in-game capability, all of which generate feelings of frustration in the user, particularly a person with disordered or addicted use; such technical sophistication in these purchasing systems aims to reduce the user's uncertainty or reluctance when faced with purchasing decisions.

145.   Pay-To-Win is a monetization scheme that is intended to and does incentivize users to use the Products more. Users who are willing to shell out more money get a disproportionate advantage over other users, particularly if the items cannot be obtained for free. For example, users who pay money in microtransactions may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by non-paying users. Games with such imbalances may prevent the non-paying users from progressing or remaining competitive.

146.   Dark patterns describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause

them harm—and that they would or may not have otherwise made. The purpose behind "dark patterns' is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions; therefore, the use of "dark patterns" in product design and marketing are highly effective at influencing consumer behavior.

147. The use of manipulative design techniques, including "dark patterns," in the digital world pose heightened risks to consumers, particularly minors. For example, the pervasive nature of **DEFENDANTS**' data collection techniques allows them to gather massive amounts of information about consumers' identities and online behavior, enabling them to adapt their product design and leverage advertisements to target a particular demographic or even a particular consumer's interests.

148. **DEFENDANTS** use dark patterns to manipulate consumer choice in a number of ways, such as by inducing false beliefs such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level, by hiding or obscuring material information from consumers, and/or by burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

149. Free-to-play or "freemium" games are another example of the use of dark pattern mechanisms in **DEFENDANTS**' product design because **DEFENDANTS** do not disclose to consumers that to experience the video

49

gaming product as intended the user will need to purchase or earn (through extended game play) product upgrades. Thus, while video gameplay is ostensibly "free", the spending of real money is integral to the ability of a player, like K.C., to use the Products for their full intended purpose and the microtransactions on which that money is spent are an integral part of the inextricable tether between operant conditioning and addictive behaviors that generate revenue for the **DEFENDANTS**.

150. Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process. Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction. Microtransactions built into many video games by design are a form of drip-pricing.

151. Each Defendant uses, or has used at relevant times, dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of the **DEFENDANTS**' Products.

152. The **DEFENDANTS**' use of microtransactions, individually and in concert with one another, is carried out with such efficiency that it resembles a choreographed collaboration. The **DEFENDANTS**' target users with in-game downloadable products to purchase by using algorithms and design

50

features incorporated into the Products which, in turn, results in profit to the game developers, product publishers/distributors, and/or entities manufacturing Products intended for use with the defective video games, likewise **DEFENDANTS** herein. In addition, and simultaneously, **DEFENDANTS** herein collect data from users to target the additional video gaming products based on the user's gameplay and personal preferences inside and outside the game, to wit the user's game play, social interactions, age, name, image, likeness and other biometric data, and the like, are relied upon.

153.    The human population most vulnerable to the combination of **DEFENDANTS'** microtransaction methodology and addictive operant conditioning design features are users who are minors. The **DEFENDANTS** know this and purposefully designed the Products to exploit that vulnerable population, which includes K.C., to their extreme injury, detriment, and financial loss.

154.    The **DEFENDANTS** have earned extraordinary financial revenue from minors, including K.C., as a result of placing the addictive Products into the stream of commerce.

155.    The **DEFENDANTS** knew or were aware, or should have known and should have been aware, that the Products were dangerous and harmful to users, particularly minors and neurodivergent users, when used as intended and in a reasonably foreseeable manner.

51

156. The **DEFENDANTS** intentionally caused and designed the Products to cause users with still developing brains to become addicted or disordered in their desire to use the products. To that avail, upon information and belief, the **DEFENDANTS** employed behavioral psychologists and/or neuroscientists to develop products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the products for longer and longer periods of time.

157. The microtransactions and other technologies, designs, features, mechanisms, algorithms, and artificial systems and other systems the **DEFENDANTS** incorporated into the Products was done so in a manner such that users (and, when users are minors, their caretakers) do not understand and have no way of understanding that their use of the products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the **DEFENDANTS**.

### *Patented Technology: Ideas and Inventions of Addictive Design Features Used in the Products*

158. In previous years, lopsided consumer video game monetization-related inventions, such as those identified herein, were patent ineligible. That period of time has since passed. There are now patents that protect ideas and inventions of designs features that are incorporated into video games that are

intentionally designed to cause addictive and disordered use of the products that specifically target one's brains, and particularly the brains of minors and neurodivergent users.

159. The **DEFENDANTS** agreed to and did develop, individually and in concert with one another, and/or made available for or did purchase or license, or otherwise caused to be incorporated into their Products one or more of this type of patented addictive design feature.

160. The addictive design features incorporated into **DEFENDANTS'** products causes severe and irreversible injuries, harm, and damages to our society's most vulnerable members, *i.e.*, minors, all the while lining the **DEFENDANTS'** pockets with outrageous financial profit.

161. Several video gaming product developers have been granted patents of inventions and ideas that are designs that include addictive features and qualities which the **DEFENDANTS** intentionally incorporated into their Products which contribute to high-risk consumer behavior as alleged herein.

162. The **DEFENDANTS'** individual and/or collective agreement— whether tacit, implicit, or explicit—to place into the stream of commerce Products that are mass-marketed to consumers, and particularly to minors and neurodivergent users, that incorporate patented technologies of addictive design features engineered to specifically target the brains of users, serves as the ground zero through which the **DEFENDANTS'** participation in placing

53

the Products into the stream of commerce causes users to develop an addiction or disordered use of their products, a use which generates more and more real money for the **DEFENDANTS**. In so doing, the **DEFENDANTS** have engineered a process that allows them to generate gross amounts of money from users, specifically including children, who have developed an addicted or disordered use that the **DEFENDANTS** intended to cause, all to the severe harm to the user and the user's inner circle.

163. The fact that one entity may "hold" a patent on a certain or specific idea or invention of monetized technology, *i.e.*, here the addictive design features of operant conditioning combined with microtransactions, does not mean that said design or a similar design or scheme cannot be incorporated into the Products of another entity, including the **DEFENDANTS'** Products. It is common practice for gaming developers, specifically including **DEFENDANTS**, to utilize technology patented by other entities by entering into licensing agreements with the entity holding the patent, or to buy the rights to the patent outright.

164. The patented addictive design features incorporated into the **DEFENDANTS'** Products makes those products progressively more stimulative which significantly maximizes usage time and, consequently, increases a user's disordered use and/or addiction to using the products. For instance, feedback loops continuously add new in-game downloadable products

54

and upgrades and use tactics to ensure users are creating habits in their gameplay such as by incorporating systems that allow the product to react to how well the user is using it in order to make the products more rewarding, or for the products that are more difficult in skill level to use, more challenging. In this way, a user's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core challenges presented by using the product is curtailed by negative feedback loops.

165. By using feedback loops and other addictive mechanisms in their product design, **DEFENDANTS** enhance the user's experience by maintaining a consistent level of challenge throughout one's use of the Products while still rewarding the user for their achievements, thereby making the user desire to use the products more and more until they develop an addicted or disordered compulsion to so use and, naturally and inevitably, to spend more and more money as they continue their use.

166. The feedback loops, in addition to other the psychological properties and operant conditioning features and methodologies, artificial intelligence, algorithms and other systems that are used by the **DEFENDANTS** in their product design and/or at play when the user uses the Products are designed to keep users continuously engaged.

167. Those patented addicted invention and ideas of addictive design features and other systems that are incorporated into or otherwise working in

conjunction with the Products are able to study the skill level and behavior of the user, including and even across social media platforms and website use outside of the Products. This results in the user being bombarded with solicitations to purchase additional, downloadable game components, in-game features or events, loot boxes, or other video gaming product upgrades based upon psychological behavioral analyses that employ addiction methodology to seduce the user, particularly minors, to increase usage time and stay using. In that way, the feedback loops, and other operant conditioning techniques and predatory monetization schemes, work together with the user's engagement and use of the Products and other online services and devices to cause more and more use by users, all to the user's own detriment, and to the financial benefit to the **DEFENDANTS**.

168.    The **DEFENDANTS**' decision and participation, individually and in concert, to place into the stream of commerce their intentionally addictive products has resulted in an extreme uptick of video gaming addicts and extreme gamers.

169.    The **DEFENDANTS**' participation in placing into the stream of commerce the Products that incorporate patented addictive design features are intended to and do contribute to high-risk consumer behavior. Entities that hold, develop, license or otherwise have an ability to incorporate patented technologies of addictive design features into the Products, including

56

DEFENDANTS herein, often seek to keep their intellectual property and/or the use of such intellectual property confidential. There are thus very few objective, transparent, or complete accounts of the precise nature of the monetization schemes employed in their Products. Nevertheless, several patents shed light on the innovative video game monetization inventions and ideas intended to lure and addict users of Products, and which are upon information and belief incorporated into the design and development of DEFENDANTS' products. By way of example:

a.  U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that targets users unable to complete a game scenario and encourages the user to make in-game purchases when they face such a difficult scenario. This patented design mechanism is an "upsell message" and "can be, for example, for an item that is useful in overcoming the difficulty the player has encountered" Or "kill[ing] a particular monster … or player character."

b.  U.S. Patent No. 20160005270-A1, assigned to Activision Publishing, Inc. is a "matchmaking" patent that uses historical player data and analytics to create a system for driving microtransactions in a multi-player game. This "matchmaking" patent is used in video gaming products, like **DEFENDANTS'**

Products at issue here, and can be summarized as a "system and method … that drives microtransactions in multiplayer video games. The system may include a "microtransaction arrange match" to influence game-related purchases. For instance, the system may match a more expert/marquee player with a junior player to encourage the junior player to make game-related purchases of items possessed/used by the marquee player. A junior player may wish to emulate the marquee player by obtaining weapons or other items used by the marquee player." The system for driving microtransactions comprises of a host computer having one or more physical processors programmed with computer program instructions that, when executed by the one or more physical processors, cause the host computer to: identify an in-game item that is relevant to a first player, but not yet possessed by the first player for gameplay in a multi-player game; identify a second player that possesses the in-game item; and match the first player and the second player to play in a gameplay session to encourage purchase of the in- game item by the first player, wherein the matching is based on: (i) the relevance of the in-game item to the first player, and (ii) the possession of the in-game item by the second player. This system is further programmed to

58

determine that the first player has purchased the in-game item in relation to the gameplay session; determine a subsequent gameplay session that caters to use of the in-game item; and match the first player to play in the subsequent gameplay session to encourage future purchases.

c.  U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc. describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on their or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

d.  U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc. modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

59

e. U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

f. U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

g. U.S. Patent No. 8,702,523 B2, assigned to Microsoft, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with Microsoft's patent:

60

i.      Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

ii.      The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

h.      U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users; to wit, the system determines "prices for a protection extension in an online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

i.      U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc.,

encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a user to keep their "avatar" charged by earning points by scanning codes on toys, through continued game use, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to use continuously as long as the user earns points playing the game, which is enhanced to allow the user to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

j.     U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content

62

recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

k.   U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

l.   U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game devices by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

m.  U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

n.  U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

o.  U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

p.  U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides

64

"[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

q. International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, selects a resource that is usable by the player to complete the objective based on those resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

65

170. In addition to the above, each Product's functionality and performance is based in part upon algorithms intended to and which do manipulate the type of use a person using the product has. For instance, video game developers hold patents, which the **DEFENDANTS** license to use and incorporate into the Products, which provide a framework of artificial intelligence to monitor, analyze, and control the usage and to increase usage time and to fuel microtransactions.[5]

171. Upon information and belief, the **DEFENDANTS**, and each of them, own and/or license one or more of the above technology patents, and/or others patents similar thereto, and incorporated said technology into the Products with the intention of causing that patented technology to work as intended: to wit, to incorporate design features that cause addictive or disordered use of the Products to cause the user to want to use more and more in a disordered compulsive unhealthful manner and to drive the microtransaction engagement that inevitably occurs with that use.

172. At all times material hereto, the **DEFENDANTS** targeted consumers/purchasers, including minors and neurodivergent users and specifically including K.C., to use the Products and to engage via

---

[5] *See, e.g.,* JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (identifying patents assigned to Activision Publishing, Inc., which are utilized in the Products at issue here). Microsoft purchased Activision Blizzard, Inc., including Activision Publishing, Inc. and all other subsidiaries of Activision Blizzard, on October 13, 2023.

microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

173. It is common practice for manufacturers, developers, and suppliers of Products, like **DEFENDANTS**, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buying the rights to the patent outright.

174. Users and parents, including Plaintiffs, do not know or understand that their video gaming experience is not accidental but carefully engineered by the game manufacturers, designers, developers, and suppliers to effect, impact, and addict users regardless of the substance of the content of the video game being played.

175. Companies employ tactics and mechanism embedded in the product design to track users spending and usage habits, and to induce them into spending money on microtransactions. For instance, when a targeted user gets stuck in the game, they are given a bonus to continue because it is better for **DEFENDANTS** to occasionally give users free things than for the players to stop paying to continue using the video gaming product.

176. Video gaming product manufacturers, developers, and suppliers (e.g. **DEFENDANTS**) monitor users and collect user information based on game play, product usage, and the user's social networks. **DEFENDANTS** and third-parties target these users with advertisements or offers in an effort to

increase their revenue at the expense of the user.

177.   Microtransactions, many of which are generated as a result of the incorporation of addictive monetization schemes contained and incorporated in the design of the **DEFENDANTS'** Products, make up 30% of the total revenue earned across the video gaming industry. The revenue is split between the developer of the game itself (e.g., Mojang/Microsoft, Epic Games, Roblox Corp., RRI, VRChat Inc., Axiom, or Banana Analytics) and the developer of the systems, devices, and mechanisms which allow users to access and play the Products (e.g., Microsoft, Meta, and/or Google) pursuant to licensing or other contractual agreements.

178.   In addition to microtransactions, **DEFENDANTS'** Products include several additional features to keep players engaged and playing longer, including the use of artificial intelligence, algorithms, feedback loops, reward systems, dark patterns, rubber banding, skinner boxes, loot boxes, drip-pricing, and other operant conditioning systems and mechanisms, including the patented technologies identified herein and shared technologies of other **DEFENDANTS** and other video gaming product developers to control the users experience and cause addictive behavior in users.

179.   The operant conditioning mechanisms, artificial intelligence, algorithms, feedback loops, and cloud-based gaming products are designed to keep users continuously engaged, while the game patents are designed to study

68

the skill level and behavior of the minor, even across social media platforms outside the video gaming product being used, so the game can bombard the minor with solicitations and campaigns to engage in microtransactions and to download and/or purchase additional addictive video gaming products, including the Products at issue herein.

180. Each of the **DEFENDANTS**, with knowledge of K.C.'s age and Missouri residency, targeted K.C. and induced them into microtransactions during their use of the Products via and as a result of the addictive design features incorporated into the products. As a result of K.C.'s use of the **DEFENDANTS'** Products and **DEFENDANTS'** deceptive acts and omissions, Plaintiffs were injured and damaged as herein alleged.

### ***The Products at Issue Here***

181. The purpose and functionality of the Products is to provide a tangible mechanism for digital, interactive play, skill building, amusement, and thus consumption, just like any other toy, game, or gadget used or played by minors.

182. The purpose and functionality of the patented technologies of addictive design features incorporated into the **DEFENDANTS'** Products— *i.e.*, an invention or idea of addictive design culminating in the design features incorporated in the Products—is to allow the **DEFENDANTS** to develop and place into the stream of commerce Products that cause a user to develop an

69

addictive or compulsive need to use the products which, in turn, generates revenue for the **DEFENDANTS**.

183. The **DEFENDANTS'** defective and unreasonably dangerous Products used by K.C. were designed to and do include the patent-protected technologies and addictive design features, as well as mechanisms and systems of operant conditioning (along with illegally retained and/or obtained personal information of the users), described herein.

### ***Fortnite and Fortnite Battle Pass: Epic Games***

184. Fortnite, a video game designed, developed, and supplied to the general public by Epic Games, was first released in 2017.

185. In less than two years after the product's release in 2017, Fortnite had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue. On average, Fortnite has 239 million monthly users and, at peak usage or during "event" product releases, Fortnite has averaged approximately 15 million players in a day.

186. Fortnite is available for use in six distinct game mode versions, *Fortnite: Save the World, Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*, all of which share and utilize the same general game design, software engine, AI, algorithms, and proprietary systems, along with using similar graphics, art assets, and game

70

mechanics.

187. *Fortnite: Save the World*, released as a paid early access game in 2017 and as a premium game in 2020, is a player-versus-environment, cooperative hybrid tower defense-shooter and survival game in which up to four players collaborate fight off zombie-like creatures and defend objects with traps and fortifications they can build.

188. In *Fortnite: Save the World*, players work together on missions while fighting off zombie-like creatures and avoiding the effects of an encroaching cataclysmic storm, and, based on the success of the missions, players are awarded a number of in-game items, which includes but is not limited to hero characters, weapon and trap schematics, and survivor rewards, which can be leveled up through gained experience, to improve gameplay.

189. *Fortnite Battle Royale,* released in 2017 as a free game supported by microtransactions, is a player-versus-player, battle royale game that a user—playing alone, in a duo, or in a 3-4 player squad—fights against up to 100 other players to be the last person (or team) alive.

190. In *Fortnite Battle Royale,* after being airdropped weaponless from a "Battle Bus" into the game's map, game players must scavenge for weapons, items, resources, and vehicles while trying to stay alive and attack and eliminate other players—all while the safe area of the map shrinks down in size due to an incoming toxic storm.

71

191. *Fortnite Creative*, released in 2018, is a survival sandbox game mode that allows users to create games such as battle arenas, racecourses, and platforming challenges; gives users complete freedom to "spawn" or create any item from *Fortnite Battle Royale* on a personal island; and supports Unreal Editor for Fortnite so that players can edit worlds using Fortnite assets.

192. *Lego Fortnite*, released in December 2023 and developed by Epic Games with the Lego Group, is a survival sandbox game that provides game players the opportunity to play as Lego Minifig versions of characters as they collect materials, build various buildings, craft various weapons and tools, and fight monsters.

193. *Rocket Racing,* released in December 2023 and developed by Epic Games with Psyonix as a spin-off title to *Rocket League*, is a Fortnite game mode that allows players to race vehicles, gaining speed boosts from special lanes sections or by drifting, as well as the ability to jump and racing on vertical and inverted surfaces, while avoiding obstacles on the course.

194. *Fortnite Festival*, released in December 2023 and developed by Epic Games with Harmonix, is a rhythm game in which the user can either play (a) the "Main Stage" hitting notes in a rhythm as either Lead, Guitar/Bass, Drums, or Vocals, or (b) the "Jam Stage" cooperating with other players to make remixes using any part of any song built into the game design.

195. *Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes

72

interface with Fortnite's Battle Pass system, include microtransactions, and offer new rewards associated with each distinct game mode.

196. All Fortnite game modes, while offering different content, share the same general gameplay design and are powered by the same game engine (Unreal Engine)—all of which have been internally developed and made available by Epic Games.

197. Each Fortnite game mode uses similar graphics, art assets, and game mechanics designed and developed by Epic Games.

198. *Fortnite: Save the World* is a pay-to-play video game product that is available for play on PlayStation 4, Xbox One, and personal computers running macOS or Windows.[6] All other Fortnite versions—*Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival*— are free-to-play video game products available for play on all available gaming consoles, including Microsoft's Xbox One and Xbox Series X/S. The *Fortnite Battle Royale, Fortnite Creative, Lego Fortnite, Rocket Racing,* and *Fortnite Festival* game modes also can be played on Android and iOS mobile devices, as well as personal computers running macOS or Windows.[7]

---

[6] In 2020, due to legal battles between Epic Games and Apple, Inc., the macOS client of *Fortnite: Save the World* remained downloadable and players who had downloaded the game for play using a macOS client could still play then game, however, it would not be updated. Since May of 2022, *Fortnite: Save the World* has been available for play via Xbox Cloud Gaming and GeForce Now on macOS devices.

[7] In 2020, the iOS and Android clients of *Fortnite Battle Royale* were removed by Apple, Inc. and Google, LLC—and became unavailable on certain mobile phones—as a result of legal

199.   *Fortnite Battle Royale,* and the other Fortnite game modes, can be downloaded and played for free through Microsoft's Xbox Cloud Gaming without need for a Xbox Game Pass subscription:

> **YOU DO NOT NEED AN XBOX GAME PASS PAID SUBSCRIPTION TO PLAY FORTNITE THROUGH XBOX CLOUD GAMING. ALL YOU NEED IS A FREE MICROSOFT ACCOUNT, HIGH-SPEED INTERNET CONNECTION, AND COMPATIBLE DEVICE. ONCE YOU'RE READY, GO TO XBOX.COM/PLAY TO START PLAYING WITH MOBILE TOUCH CONTROLS OR A SUPPORTED CONTROLLER. SEE OUR FAQ BELOW FOR MORE DETAILS.** [8]

200.   All version of Fortnite are also available for free download and use across all other gaming consoles, mobile phones via Google Play and Apple, Inc.'s App Store, and through Epic Games own cloud gaming network and Fortnite Battle Pass.

201.   All Fortnite versions are cross-platform play compatible, but to use that option, product users are required to have a Fortnite Battle Pass account for cross-saving between devices.

202.   Epic Games monetizes its Fortnite products through the use of V-Bucks: in-game currency that can be purchased with real-world funds or

---

battles between those companies and Epic Games. The game remained playable if it had already been downloaded on mobile devices running either an iOS or Android client.
[8] https://www.fortnite.com/mobile/xbox-cloud-gaming

earned through completing missions and other achievements in *Save the World*.

203. Epic Games markets the sale of V-Bucks directly to the consuming public, both digitally and as physical gift cards to be purchased using real money.

204. V-Bucks in *Save the World* can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items, while V-Bucks in *Battle Royale* and the other Fortnite versions can be used to buy cosmetic items like character models or a Fortnite Battle Pass, a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a Battle Royale season.

205. The addictive properties and design features in Fortnite are so dangerous to users, and especially minor users, that several health and behavioral centers across the country have started to published resources for parents specifically warning about Fortnite addiction.

206. Despite these third-party express warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into Fortnite video gaming products.

207. Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the products more and more.

208. The team that developed Fortnite includes psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop products that were addictive as possible.

209. Further, upon information and belief, Epic Games has licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in designing and developing Fortnite video gaming products.

210. One tactic Epic Games used with respect to the Fortnite game products is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Simplistically explained, this occurs when the user loses a round of the game, the product ensures that user loses by only a slight margin, which compels them to play another round because they were so close to winning before. When users lose, they rationalize their defeat and often tell themselves that what stopped them from winning was the smallest mistake. As a result, users want to use the products more, just one more round, but they end up using the product more and more, not just once more. The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a round to feel the high of a win. This strategy lies in getting users *close* to the feeling of winning, because when the user is close to winning, the user feel the same buzz and release of dopamine and go on to play another and then more and more rounds. And, in addition, when the user does

76

win a round, the user wins a lot of perks, giving them an increase in dopamine and the adrenaline rush to keeping using the product. Thus, in the hopes of increasing their rank in the Fortnite products through wins, users continue to use, often and increasingly without any pause, break, or rest.

211.　Fortnite game products use random reward tactics, including something referred to within the field of psychology as the "variable interval schedule" which is the idea that randomized small wins will continue to draw in users to use the products more and more. With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

212.　The design of the Fortnite game products keep users drawn in. The bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale type products.

213.　Similarly, the mechanics of the Fortnite game products inject elements of variety, allowing users to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more. In designing and incorporating such mechanics and features, Epic Games ensures that users never once get bored while using the Fortnite products.

214.　To keep users even more engaged and using the Fortnite game product, Epic Games often rolls out updates that keep users busy with engaging and fresh features, new maps, live events, and the latest trends. Such

77

updates can also remove minor glitches that may be problematic to users as well.

215.   Fortnite game products also keep users coming back for more and more use by giving "Daily Quest" assignments that users can complete to earn V-bucks:



9

216.   Users will thus continually log into the Fortnite game product to complete these quests and earn V-bucks for in-game spending.

217.   These features, combined with the ease of accessibility and crossplay capabilities, cause and sustain addiction in users and particularly minors because they require users to be constantly engaged with Fortnite while simultaneously providing those users a product that can be used anywhere at any time.

---

9 https://fortnite.fandom.com/wiki/Quests_(Battle_Royale)

78

218. Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its products. Instead, Epic Games touts its Fortnite game products as "educational" and markets them for use in the classroom.

219. On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:



[10]

220. Engaging—and addicting—users who are children early and under the guise of education increases Epic Games's revenue through continued use of its Fortnite products to young users, at the expense of these users' mental and physical health.

221. Fortnite gained immense popularity because of its clever

---

[10]https://dev.epicgames.com/documentation/en-us/fortnite-creative/education-in-fortnite-creative

manipulation of human psychology and because Epic Games developed Fortnite video game products to make sure that players become addicted to or consumed with playing Fortnite—and spending money therein.

222. Epic Games designed Fortnite with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

223. Epic Games designed Fortnite to be as addictive as possible and with psychologically addictive features and tricks to ensnare game players, including but not limited to, designing the game to include a "near miss" effect, loot boxes, random rewards, bright and vibrant colors, and continual gameplay variety.

224. Epic Games designed Fortnite in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

225. Epic Games failed to disclose the risks of harm purposefully built into its game.

226. Epic Games does not disclose any of the psychological tactics or

80

addictive features it purposefully includes in Fortnite to any of its users.

227.  Epic Games does not adequately inform, or inform at all, users of the inherent risks involved with using Fortnite game products, specifically including that Fortnite was designed to addict users to their extreme harm and detriment.

228.  Epic Games failed to disclose that it designed the Fortnite video gaming products with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, e.g., minors, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

229.  Epic Games knew that its Fortnite video gaming products contained an inherent risk of abuse, addiction, and compulsive use by minors and neurodivergent users and the harms that arise therefrom, but instead of disclosing such harms, instead Epic Games marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

230.  Epic Games misrepresented Fortnite as educational and safe for use by minors, including Plaintiff,, while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as

81

possible.

231. None of Epic Games's Fortnite video gaming products include a warning that the game was designed to addict and harm users.

232. Epic Games did not inform and concealed from the public, including Plaintiff, that Fortnite video gaming products pose significant risk of harm to users due to Epic Games's decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to brain damage and injury in those individuals.

233. Epic Games, in connection with its Fortnite video gaming products, engaged and/or engages in the following conduct: (a) Deploying design tricks, known as dark patterns, to dupe millions of players (including Plaintiff) into making unintentional purchases in its Fortnite game; (b) Failing to notify parents that children had open access to in-game purchases and to obtain consent prior to processing purchases; (c) Collecting personal data from children, including Plaintiff, without first obtaining parents' verifiable consent despite being aware that many children were playing Fortnite; (d) Requiring parents who requested that their children's personal information be deleted to jump through unreasonable hoops, and sometimes failed to honor such requests; (e) Utilizing default settings that enable live on-by-default text and voice communications for users and these default settings harm children and

82

teens—and violate state and federal law because these default settings, along with Epic Games's role in matching children and teens with strangers to play Fortnite together, harmed children and teens, exposing children and teens to bullying, threats, harassment, sexploitation and other dangerous and psychologically traumatizing issues such as suicide while on Fortnite; (f) Tricking users, including Plaintiff, into making purchases while playing Fortnite; (g) Deploying a variety of dark patterns aimed at getting consumers of all ages to make unintended in-game purchases; (h) Using counterintuitive, inconsistent, and confusing button configuration led players to incur unwanted charges based on the press of a single button. For example, players could be charged while attempting to wake the game from sleep mode, while the game was in a loading screen, or by pressing an adjacent button while attempting simply to preview an item, leading to hundreds of millions of dollars in unauthorized charges for consumers; (i) Charging account holders, including Plaintiff, without authorization and allowed minors, including Plaintiff, to make in-game or in-product purchases without parental consent; (j) Locking the accounts of customers who disputed unauthorized charges with their credit card companies; thereby revoking access to all the products they have purchased, which can total thousands of dollars and, even when Epic Games agreed to unlock an account, consumers were warned that they could be banned for life if they disputed any future charges; and (k) Purposefully

83

obscuring cancel and refund features to make them more difficult to find.

234. Epic Games, independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like K.C., into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *Roblox: Roblox Corp.*

235. Roblox is an online video game, designed, developed, published, and supplied by Roblox Corp., formally released for use by consumers in September of 2006.

236. Between its 2006 release and 2015, Roblox was only available for play on personal computers and mobile phones; but with the release of Roblox for use on Microsoft's Xbox One gaming console in November of 2015 and the Oculus Rift virtual reality gaming headset in April 2016, the numbers of Roblox users (particularly minors) grew exponentially.

84

237. Roblox Corp. now markets Roblox as accessible on any device and has released Roblox for use and play on personal computers, video gaming consoles, mobile phones, tablets, and virtual reality video gaming headsets:



238. Roblox Corp. saw an accelerated increase in the numbers of consumers who downloaded and used Roblox during the onset of the Covid-19 pandemic. As of August of 2020, Roblox Corp. had over 164 million monthly active users with more than half of those users being American children under the age of 16.

239. The numbers of consumers, particularly minors, using Roblox continues to grow as Roblox Corp. makes its products available for use on more devices. Currently, Roblox Corp. has over 66 million daily active users and over 217 million monthly active users; more than 50% of consumers playing Roblox are under the age of 13.

240. Roblox Corp.'s "mission" for Roblox is to have a billion people

---

[11] https://corp.roblox.com/

85

actively using its video gaming products each day.

241.   Roblox Corp. describes Roblox as an online social gaming platform and game creation system that allows users to use games (or "experiences") built within Roblox and to program their own games (or "experiences") using Roblox Corp.'s proprietary engine, Roblox Studio, such that Roblox Corp. provides users all tools necessary to "experience" and "build" their gameplay. Roblox Corp. also provides users video and written tutorials and instructions on how to use Roblox Corp.'s software, systems, tools, and a variety of "building" topics, including the use of monetization strategies and other proprietary game development mechanisms, to create and program the games that become part of Roblox.

242.   Roblox Corp. designed the game-creation aspect of its product to allow users to create their own Roblox video games, as well as to allow users to engage in purchasable, one-time "game passes" and "developer products" microtransactions, for use and purchase by other Roblox users, including, of course, minor children.

243.   Roblox Corp. profits off of each user-created game generated and developed using Roblox Corp.'s Roblox Studio and other developer tools containing the addictive mechanisms and artificial intelligence described herein, by supplying them to consumers, including minors like K.C., as a single video gaming product.

244. Roblox Corp. designed the social-gaming aspect of its product to allow users to use Roblox games created by other users, which includes allowing users to buy, sell, and create virtual items, accessories, and limited-availability products for use in gameplay.

245. Roblox is free to use, but by design encourages in-game purchases and product upgrade microtransactions which are purchased using "Robux", the product's virtual currency. Robux can be obtained in several ways: (a) purchased with real currency; (b) received as part of a recurring stipend that users with a Roblox Premium membership receive; and (c) earned from selling "game passes" or developer products" to other Roblox users.[12]

246. Roblox Corp. markets the sale of Robux directly to the consuming public, both digitally and as physical gift cards to be purchased using real money.

247. Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increase. For instance, corresponding with the Covid-19 pandemic triggered increase of Roblox users, Roblox Corp. earned $2.2 billion in revenue from Roblox in 2022—a 16% increase from 2021 earnings, which had already increased by 107% from 2020, and which had been an 111% increase over 2019.

---

[12] In the latter instance, should the user choose to exchange Robux acquired from purchases made by other Roblox players for real world currency, Roblox Corp. retains a percentage of the revenue.

248.   Roblox Corp. designed Roblox to include addictive features rooted in operant conditioning and microtransactions —at the risk of children's mental and physical health—to profit from the user's extended, long-term gameplay and corresponding in-game spending.

249.   Roblox Corp. hired psychologists and scientists to work with software engineers and game developers to ensure that their products included the best psychological traits and technologies for user retention and addiction.

250.   Roblox Corp. used numerous addictive principles and technologies in Roblox's design. For example, in Roblox, users can create games and maps for other users to try and use, a challenge in and of its own. Through research and product development, Roblox Corp. learned that when using games and completing challenges like this, a user's brain releases dopamine—the neurotransmitter in the brain that enables an individual to feel happiness and pleasure—and triggers the user's brain to seek those dopamine hits on a more regular and then compulsive basis that leads directly into abuse, addictive behavior, and addicted and/or disordered use of video gaming products.

251.   The variety within Roblox ensures that users are never bored nor grow tired of the product because that might cause users to want to stop using the product; there are always new challenges, maps, and characters to try out, which makes using the product feel like an ever-evolving entity that never stops providing entertainment.

88

252. The ability for users to create their own games and challenges, combined with users' ability to spend real-world money to change their avatar's image and abilities, ensures that using the product / playing the game feels different for users each time they use. Such constant variety in the experience felt by the user keeps users "hooked," coming back daily to use the product for hours.

253. Roblox's "social gaming" design allows users to interact with friends or other users within the game—and creates a competitive environment whereby players are presented with microtransactions and in-game product purchases and pressured to spend money to keep up with their Roblox friends and competitors.

254. Roblox Corp. makes in-game spending as easy as possible, and designed Roblox with addictive features to target minors and encourage them to engage in microtransactions in order to advance in the game, resulting in addicted users quickly spend large sums of money inside the game without their parents, guardians, or other family members' knowledge or consent.

255. Roblox Corp. does not adequately inform users of the inherent risks involved with using and playing Roblox or that the product was designed to make users play more and more to their potential harm.

256. Roblox Corp. knew its product incorporated addictive designs that posed risks of causing users to develop dangerous and disordered use and

overuse of the product, to the detriment and harm to the user, and chose to not inform the consuming public at large, users, or parents of minor children who are users, of such risks.

257.    Roblox Corp. describes and markets its product as an educational tool for children: "Roblox provides a fun, supportive, and educational space where your child's imagination can thrive."[13] Roblox Corp. even encourages the use of Roblox in learning environments:



[14]

258.    While marketing its product as an educational tool beneficial to minors, Roblox Corp. at no point discloses the harms posed by its product or the psychology and addictive characteristics and design features of Roblox's design or that Roblox contains numerous addictive principles that can negatively impact minors' livelihoods, including their ability to learn and

---

[13] https://corporate.roblox.com/faq/
[14] https://education.roblox.com/

engage in critical thinking.

259.    Roblox Corp., in connection with Roblox, engages in the following conduct: (a) Uses a "voice chat" feature that requires users, including minors, to submit uniquely identifying scans of their face to utilize the feature under the guise of "age verification" when Roblox Corp. is using sophisticated artificial intelligence to create faceprints—as uniquely identifying as a fingerprint—to track the user and their gaming patterns; (b) Allows first-party and third-party advertising to be surreptitiously interlaced with organic content in a multitude of ways, while knowing millions of young children are exposed to that advertising daily; (c) Fails to adequately disclose to children when advertising is present with experiences and videos on Roblox; and (d) Fails to ensure that social media influencers clearly and conspicuously disclose their material connections to Roblox in a manner that is understandable to children.

260.    Roblox Corp., independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

91

261. Roblox Corp. designed Roblox in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

262. Roblox Corp. designed Roblox with addictive properties to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, compulsive use, and addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

263. Roblox Corp. designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to brain damage and injuries, but concealed this information from the public and product users, including Plaintiffs.

264. Roblox Corp. did not inform the public that it designed Roblox with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors can lead to injury.

265. Roblox Corp. misrepresented Roblox as safe for use by minors, while knowing they had been designed and developed with addictive

92

psychological features to keep users playing Roblox more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by minors can lead to injury, such that Roblox poses significant risk of harm to users.

266. Roblox Corp. marketed Roblox as safe for all ages and as an educational tool without warning of the addictive design and risk of injury associated with its video gaming product and foreseeable use thereof, despite knowing that Roblox contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, and that have been experienced by K.C. and other minors using **DEFENDANTS'** Products.

### ***Minecraft: Mojang and Microsoft***

267. Minecraft is a 3D sandbox video game first developed and published by Mojang, who made the video game available to the public in 2009, prior to a full release on November 18, 2011.

268. Minecraft can be played on PC, various gaming consoles, and mobile devices.

269. Since the first full release in 2011, Minecraft has been continuously updated with many major and minor product update, including but not limited to gameplay-altering mechanics, new product content and items, microtransactions, and tweaks to existing product features, which are available free to users who have purchased the game.

93

270. In May of 2012, Mojang and Microsoft, acting through its video game design and publishing studio, Xbox Game Studios, released Minecraft for play on Xbox 360 and as the flagship game to play with friends via Microsoft's new Xbox Live feature. Mojang and Microsoft also introduced microtransactions and made in-product downloadable products and content available for purchase at the same time.

271. Since 2012, all Minecraft products (including Minecraft Education Edition) have used a specially-designed crafting system and control interface, along with integrated in-game tutorials, split-screen multiplayer, the ability to play with friends over the internet, and microtransactions to keep users engaged and playing Minecraft.

272. Microsoft acquired Mojang and all product rights to Minecraft in 2014, and made Minecraft available for play on Xbox One and PlayStation 4.

273. On September 20, 2017, Mojang and Microsoft released a *Better Together Update* for Xbox One, Windows 10, VR, and mobile versions, which enabled cross-platform or cross-device play between those products and became known as the *Bedrock Edition* of Minecraft. The *Bedrock Edition* was also provided as a product update to the Nintendo Switch version of Minecraft in 2017, thereby enabling cross-platform use between the Nintendo Switch, Xbox One, virtual reality gaming headsets, mobile devices, and personal computers. In December of 2019, the PlayStation 4 version of Minecraft was

94

updated to become part of the *Bedrock Edition*, thereby enabling cross-platform play for users with Xbox Live accounts.

274. The *Bedrock Edition* of Minecraft is the most commonly available and played version of the product because a user can play Minecraft via gaming consoles, personal computers, mobile phones, tablets, and virtual reality gaming headsets at any time and in any setting.

275. Minecraft is the best-selling video game to date, with over 300 million copies of its games sold and over 163 million monthly active players.

276. Regardless of the Minecraft version or device being used, Minecraft gameplay is designed with no required goals to accomplish thereby allowing players extensive freedom in exploring virtually infinite terrain within a blocky, procedurally generated, three-dimensional world.

277. While there are no set goals, Minecraft does include an achievement system and can earn "advancements" in the *Java Edition,* "trophies" when playing on PlayStation consoles, and "achievements" in *Bedrock Edition* and when playing on Xbox consoles.

278. In Minecraft, the game world is virtually infinite on a horizontal plane and procedurally generated based on a players' exploration, using a map seed that is obtained from the system clock at the time of world creation. Minecraft users can discover and extract raw materials, craft tools and items, and build structures and machines; however, the core gameplay revolves

95

around picking up and placing block-objects in a 3D grid.

279. Minecraft includes multiple game modes for a variety of gameplay, including but not limited to, survival mode, in which players must acquire resources to build in the world and maintain health, and creative mode, in which players have unlimited resources and access to flight. Depending on the chosen game mode, players can fight hostile mobs or cooperate or compete against other players in the same world. When starting a new world, players must choose one of five game modes, as well as one of four difficulties, ranging from "Peaceful" to "Hard." Thus, although a single video gaming product, Minecraft gameplay can be different each and every time a player logs in to play.

280. The main task in Minecraft is to survive all the problems using specific resources. When a player uses the given resources to protect their territory and advance in the game, the player feels like they have accomplished something and can easily get addicted to that feeling. Because of this basic game design, Minecraft is easy for any player to play because it does not have a lengthy instruction manual or demo of the game to learn how to play, and therefore is a video game marketed to users from a very young age.

281. Mojang and Microsoft designed Minecraft with multiplayer options, allowing players to interact and communicate with each other in the game world, which combined with the technologies and algorithms built into

96

the game product prays upon the chemical reward receptors of user's brains to create addictive engagement. These versions also allow children to enter and engage with others in dangerous "chat room" features throughout the game.

282. Minecraft's interactive features serve only to lure players to spend more time in the game. For example, on certain devices, Minecraft pushes constant notifications about new features, skins for avatars, and new objects in the games. These notifications pop up on screen whether players are already playing Minecraft or not.

283. Because of its game design, Minecraft can last for eternity if the player is not strong-willed enough to stop playing; to wit, once a player succeeds with one stage, they move on to the next one and are rewarded if they continue to stay engaged and playing Minecraft.

284. Minors and users with neurodivergent diagnoses, such as ADHD, can become easily hyper focused and addicted to building worlds within Minecraft, and Mojang and Microsoft were aware of these propensities, and specifically developed Minecraft products to include addictive psychological traits.

285. Mojang and Microsoft knew that Minecraft contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Mojang and Microsoft marketed and market Minecraft, and specifically Minecraft Education Edition,

as "educational" and a safe learning tool for minors to use inside and outside the classroom:

**GET MINECRAFT EDUCATION FOR YOUR CLASSROOM**

Engage students in game-based learning across the curriculum. Minecraft Education is a game-based platform that inspires creative, inclusive learning through play. Explore blocky words that unlock new ways to take on any subject or challenge. **Download Minecraft Education** to get started with a free demo.

[15]

286.   Mojang and Microsoft market Minecraft an educational learning tool even though the product uses and contains addictive mechanisms, design features, algorithms, and operant conditioning systems in its design.

287.   At the expense of users' mental and physical well-being, Mojang and Microsoft fail to adequately inform users of the inherent risks involved with using Minecraft products or that Minecraft was designed to addict and harm users.

288.   Mojang and Microsoft designed Minecraft in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

289.   Mojang   and   Microsoft   designed   Minecraft   with   numerous

---

[15] https://education.minecraft.net/en-us

psychological tricks to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

290.   Mojang and Microsoft designed Minecraft to take advantage of the chemical receptors in product user's brains and with addictive psychological features and traits to make the video game as addictive as possible, including, but not limited to, designing and developing a virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects.

291.   Mojang and Microsoft intend to introduce and addict as many Minecraft users as possible to increase their own profits as these users continue playing—and spending—as they age, and that intention has been realized with Mojang and Microsoft generating approximately $380 million from Minecraft in 2021 alone.

292.   Mojang and Microsoft are aware that the more time a user plays the game, the more likely they are to become addicted, continue using Minecraft, and continue spending money on microtransactions and in-game

product upgrades.

293.   Mojang and Microsoft do not inform the public, users, or parents about the risk of addiction and other negative consequences that can arise from product usage.

294.   Mojang and Microsoft failed to disclose that they designed Minecraft to include addictive features and psychological tactics to increase gameplay and product use, while knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.* minors, can lead to brain damage injury and, as such, the products pose significant risk of harm.

295.   Mojang and Microsoft misrepresented the Minecraft games as safe for use by minors, while knowing they had been designed and developed with addictive psychological features to keep users playing Minecraft more often and for longer periods of time, and while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, such that Minecraft poses significant risk of harm to users.

296.   Mojang and Microsoft did not inform, did not warn, and concealed from the public that they designed Minecraft games with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury.

297.   Mojang and Microsoft in connection with Minecraft, engaged in the

100

following conduct: (a) Collecting and maintaining personal information from minors without parental consent. For example, when learned that certain users were children after they provided their birthdates in the first step of the account creation process but went on to request phone numbers from the children, before seeking to involve a parent; (b) Failing to provide notice and obtain verifiable parental consent before collecting personal information from children; (c) Utilizing a deficient post-collection notice and verifiable parental consent process; (d) Collecting personal information, from the children in violation of state and federal law, and then suggesting that the children seek parental involvement—this limited notice of Mojang and Microsoft's information practices failed to ensure parents received adequate notice about **DEFENDANTS**' collection, use, and disclosure practices concerning children's personal information; (e) Failing to include the information required by 16 C.F.R. § 312.4(b); (f) Failing in the direct notice to describe **DEFENDANTS**' collection and use practices with regard to personal information collected from children and instead directed parents to the company's online notice of its information practices (the "Privacy Statement"); (g) Not disclosing in the direct notice to parents that Mojang and Microsoft intended to collect such personal information as images that could contain a child's likeness; (h) Failing to post a prominent and clearly labeled link to an online privacy notice in various places, including at each point that Mojang, Microsoft, alternate entities, and

101

other third parties collect personal information from children; and (i) Failing to include a complete Privacy Statement was incomplete; to wit, until at least 2019, the Minecraft Privacy Statement contained a section entitled "Collection of data from children"; however, this section did not describe what personal information was collected from children or Mojang's, Microsoft's, alternate entities', and other third parties' use and disclosure practices for personal information collected from children as required—and instead the section discussed Microsoft's information practices regarding Microsoft products and children generically.

298. Mojang and Microsoft have independently and in concert with each other and third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like K.C., into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *Rec Room: RRI*

71. Rec Room is a VR multiplayer online game, developed and released in 2016 by RRI, that can be played on mobile devices, personal computers, gaming consoles, and VR gaming headsets such that Rec Room is cross-playable across all available gaming devices.

72. RRI designed Rec Room to be used in multiple ways or modes. In VR mode, the game uses full 3D motion via the motion capture system of a VR headset and the motion controllers are used to pick up and handle objects in the game world.

73. Rec Room has over 82 million lifetime users from across the globe, and markets the product as "the social app you play like a video game!"[16]

74. Rec Room consists of a hub room, called the "Rec Center," with doors that lead to various games called "Rec Room Originals", and millions of user-generated rooms featured by Rec Room and which are created using developer tools provided to users by RRI.

75. Some of the Rec Room Originals include first-person shooter games, a battle royale game, a cooperative action-adventure game, various action-based quests, and various sports games, all of which use the same systems, technologies, and mechanisms in their product design.

76. In addition to playing the already-existing games in Rec Room, RRI designed Rec Room to include the "Maker Pen," a tool resembling a hot glue gun, to create an infinite number of objects to use while playing Rec Room.

77. Players can also code in "Circuits" using RRI's visual programming language, which is built into Rec Room and provided to users by RRI.

---

[16] https://recroom.com/

103

78.    Although Rec Room is free to play, players can pay for a monthly subscription called Rec Room Plus, which grants several features, including the ability to sell user-generated products like those created using Maker Pen, Circuits, or other developer tools, mechanism, and systems.

79.    Subscribers who sell their own products do so for "tokens," Rec Room's in-game currency, which can be exchanged for real-life money.

80.    Tokens can also be used to purchase cosmetic items, consumables, and other product upgrades in the Merch Booth:

<sup>17</sup>

81.    With these purchases, users can customize and dress their Rec Room avatar in various ways.

82.    As well as "tokens," Rec Room also allows users to create their own "Room Currency" and lock items in their rooms that can only be unlocked by using the room's Room Currency:

---

<sup>17</sup> https://rec-room.fandom.com/wiki/Rec_Center



83.     Rec Room's simplistic game design and easy gameplay is designed to entice users, and particularly minors, to spend countless hours engaged with and using Rec Room.

84.     Rec Room's immersive VR game design provides intense psychological rewards to users that keep them coming back to the game.

85.     Rec Room was designed specifically to allow users to escape reality for hours at a time.

86.     Rec Room was designed to reward the dopamine receptors in user's brains and take advantage of the user's complete immersion in a multi-user, virtual world, to create compulsive and disordered use through the use of microtransactions in combination with patented predatory, deceptive, and addictive mechanisms and systems, and to cause addiction in users and particularly in minors.

---

[18] https://recroom.com/roomcurrencies

87.     Rec Room users who play via a VR gaming headset like Oculus Quest are 44% more likely to become addicted to video gaming and/or develop gaming disorder.

88.     Upon information and belief, RRI hired behavioral psychologists, mental health therapist, neuroscientists to design and market Rec Room in the best way possible to attract minor users, to encourage longer periods of play, and to cause users to engage in higher amounts of spending while using the product.

89.     Upon information and belief, RRI designed Rec Room in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors using the product.

90.     RRI designed Rec Room with psychologically addictive features, including but not limited to varied gameplay, creative opportunities, microtransactions, multi-user engagement, and an immersive VR game design that provide intense psychological rewards, with the intent that Rec Room be addictive and cause compulsive and/or disordered use in product users.

91.     RRI designed Rec Room to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, e.g., minors, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

106

92. RRI designed Rec Room to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, including but not limited to brain damage, cognitive and emotional impairment, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

93. RRI designed Rec Room with addictive features, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm.

94. RRI knew that Rec Room contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, RRI marketed Rec Room to minors.

95. RRI each knew that its Rec Room game contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by minors.

96. RRI failed to disclose that it designed Rec Room to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, e.g. minors, can lead to brain damage, abuse,

107

compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

97.    RRI is aware that its Rec Room game contains addictive designs that pose an unreasonable risk of harm to users (particularly minors); yet, RRI markets the game and its microtransactions to users and continues to profit from each sale.

98.    RRI does not adequately inform users of the inherent risks involved with playing the Rec Room game or that Rec Room was designed to addict and harm users.

99.    RRI marketed Rec Room to minors, despite knowing that Rec Room contained an inherent risk of brain damage, abuse, addiction, and compulsive use by such users and the harms that arise therefrom and that K.C. has experienced.

100.    RRI misrepresented Rec Room as safe for use by minors, including K.C., while knowing that abuse, addiction, and compulsive use by minors can lead to injury, and knowing that it had designed and developed Rec Room to be as addictive as possible.

101.    RRI marketed Rec Room to minors and their families and, in so doing, misrepresented Rec Room as safe for use by minors, even marketing Rec Room to minors, despite knowing that, due to its own design, the games contained an inherent risk of abuse, addiction, and compulsive use by minors

108

that can lead to brain damage, impaired cognitive and emotional development, and other injury.

102. RRI did not inform the public, users, or parents, including Plaintiffs, that Rec Room poses significant risk of harm due to RRI's decision to design Rec Room to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury.

103. RRI designed Rec Room with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury—but concealed this information from the public and product users, including Plaintiffs.

104. RRI, in connection with Rec Room, engaged and/or engages in the following conduct: (a) Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, web and app browsing activity, device usage, profile inferences, and precise location; (b) Collecting and maintaining biometric material, including photographs, audio recordings, and video footage; (c) Failing to provide notice and obtain verifiable parental consent before collecting personal information from children; (d) Collecting minors' information from third-party accounts; (e) Automatically collecting

109

minors' information through tracking technologies; (f) Sharing minors' information with third parties and business partners; and (g) Failing to provide through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to minors' personal information and instead making parents take affirmative steps to request the deletion of their children's personal information.

105.    RRI's conduct harmed and damaged Plaintiffs because, inter alia, these data and information wrongfully and illegally collected was used to analyze the gaming and purchasing behavior of minors (including K.C.) and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *Xbox One, Xbox Series S, Xbox Game Pass and Xbox Network: Microsoft*

299.    Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as video games and online video gaming through the Xbox network, Xbox Game Pass, and Xbox Cloud Gaming.

300.    Microsoft designs, develops, manufactures, produces, supplies, and sells Xbox video game consoles—and markets all Microsoft video game products—to the consumers across the world, and specifically in Missouri and

to Plaintiffs.

301. Microsoft has manufactured and released five versions of its Xbox consoles: Xbox (1st Generation), Xbox 360 (2nd Generation), Xbox One (3rd Generation), Xbox Series X (4th Generation), and Xbox Series S (4th Generation).

302. Microsoft released the original Xbox was released in North America in 2001, and a year later launched its integrated Xbox Live product to allow players to play video games online.

303. When it was released in 2002, Xbox Live required a subscription for use but was a wild success due to features, including but not limited to, a "buddy list" and access to popular online video games like Halo 2.

304. Microsoft released Xbox 360 in 2005, and with that release, launched an upgraded Xbox Live product that included, *inter alia*, a limited "Free" or "Silver" tier that allows users to play online video games for free. Microsoft released upgraded and revised versions of its Xbox 360 console, the Xbox 360 S, and Xbox 360 E, which provided hardware and software updates to the product.

305. Microsoft released Xbox One in North America in 2015.

306. In marketing Xbox One, Microsoft emphasized the console's internet-based features, including but not limited to the ability to record and stream gameplay, and the ability to integrate with a set-top box to watch

television.

307.  Microsoft also released upgraded and revised versions of Xbox One, known as Xbox One S and Xbox One X, which provided hardware and software upgrades to the product.

308.  Microsoft released its fourth generation of Xbox consoles—Xbox Series X and Xbox Series S—in North America in 2020, with each model designed to be family playable.

309.  Both the Xbox Series X and Xbox Series S (collectively, "Xbox Series X/S") consoles are fully compatible with all Xbox One games and most hardware, backwards compatible with games playable on Xbox One from the Xbox 360 and original Xbox console.

310.  To help transition Xbox One users to the newer Xbox Series X/S consoles, Microsoft designed and introduced a Smart Delivery system—a product that provides automatic free updates to Xbox One versions of games to the Xbox Series X/S versions for most of Microsoft's first-party games and several of its third-party games.

311.  Each Xbox console provides users the ability to play video games, using a hard copy of the video game, a digital copy downloaded from Microsoft Store (also known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live) and/or using Xbox Game Pass Cloud Gaming.

312. Microsoft developed and maintains the Xbox Store— a online gaming product through which users can purchase and/or access thousands of video games to be stored and used on their Xbox consoles, personal computer through digital download—as part of its Xbox Network:



19

313. Xbox Network is an online multiplayer gaming product created and operated by Microsoft for use with its Xbox consoles and personal computers operating Microsoft Windows. It includes the Xbox Store and Xbox Game Pass Cloud Gaming.

314. Xbox Network is available as a free and a paid-subscription based product, known as Xbox Game Pass. Xbox Game Pass Core, formerly Xbox Live Gold, is a paid tiered subscription service offered by Microsoft that provides users access to online games, multiplayer abilities, and other features. Xbox Game Pass Ultimate, the highest tier of paid subscriptions a, provides product

---

[19] https://www.xbox.com/en-US/browse/games

users the same benefits as the other tiers, but also provides users access to Xbox Game Pass Cloud Gaming (hereinafter "Xbox Cloud Gaming").

315. Xbox Cloud Gaming was initially released in beta testing in November of 2019, and launched for Xbox Game Pass Ultimate subscribers on September 15, 2020.

316. The products available for use on Xbox consoles through the Xbox Cloud Gaming library are extensive and ever-changing, which keeps players coming back to either finish a game before it disappears or check for new and exciting game options to play.

317. Xbox Cloud Gaming operates by linking the device to a remote server in the cloud, and gameplay is saved in the cloud so that it can be accessed and played from numerous devices at any given location.

318. When a user purchases and downloads a product from Xbox Store or Xbox Network, regardless of whether that is a first-party video game or third-party video game, all design elements and downloadable products for said games is stored on the users' computer and, if connected to the Internet, will receive product updates released by the game developer.

319. Once a game is downloaded, Microsoft provides a framework to initiate and process in-game purchases and microtransactions through the Xbox Store and/or Xbox Network. This framework enables game developers to sell microtransactions and/or loot boxes through Microsoft's Xbox products,

114

described herein. In exchange, Microsoft keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

320.   Microsoft specifically designed Xbox Network to attract users to purchase games and in-game products therein—regardless of the content such games may include.

321.   Xbox Game Pass Ultimate also offers users daily, weekly, and monthly "quests" that can be completed for varying amounts of Microsoft Reward points:

**How it works**

Xbox Game Pass Ultimate and Console plan members can earn Microsoft Rewards points by playing games from the Xbox Game Pass library. Here's how to get started.

**1.**

Browse current Quests

Check out current Quests on your Xbox console in the Xbox Game Pass section or on your Xbox Game Pass mobile app. New Quests are added every day.

**2.**

Participate in Quests

Find the list of Quests in the Xbox Game Pass membership area on your Xbox console or on the Xbox Game Pass mobile app. You will receive an instant notification when your Quest is ready to be turned in.

**3.**

Claim and track your points

Go to the Xbox Game Pass area on your Xbox console or on your Xbox Game Pass mobile app to claim and track your points.

**4.**

Redeem points

Head to the Microsoft Rewards app to spend your points! Redeem points for Xbox gift cards and use for in-game content, games, devices, movies, apps accessories and more. [20]

The ease of access, quest challenges, and constantly evolving game library draws players in, and keeps them coming back.

---

[20] https://www.xbox.com/en-US/xbox-game-pass/quests

115

322. Xbox Network, and specifically Xbox Cloud Gaming, allows these users to connect with each other by including a feature to add and interact with friends, called "Xbox Social." This social media-akin feature permits users to add friends to a Friends list and then see what games your friends are using and/or invite them to join your game.

323. Xbox Network, including but not limited to Xbox Cloud Gaming, is designed to allow Xbox Network users to chat with each other individually or in groups. To find friends, users are encouraged to link to other social media accounts with their Xbox subscription. Minors are, therefore, encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

324. Upon information and belief, Microsoft hires behavioral psychologists and neuroscientists to design its Xbox consoles and Xbox Network (and all products and features thereof), its video games, and marketing in the best way possible to attract users, especially minors.

325. Microsoft designed Xbox Network and the Xbox Products identified herein with addictive features and for use with addictive video game products, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, to take advantage of the chemical reward system of users' brains, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to

116

ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users.

326. Microsoft designed Xbox Network and the other Xbox Products described herein, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products.

327. Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

328. Microsoft designed its Xbox Network, and including Xbox Store, Xbox Game Pass Core, Xbox Game Pass Ultimate, Xbox Cloud Gaming, and other Xbox Products by employing and/or with the help of and/or in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor users continually purchase and use addictive Products.

329. Microsoft is aware that several of the video games available for play on the Xbox and made available through Microsoft Windows, and available for download in the Xbox Store and Xbox Cloud Streaming, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors.

117

330. Microsoft designed its Xbox consoles, Xbox Network, Xbox Store, Xbox Game Pass Ultimate, and Xbox Cloud Gaming as products to play and to house addictive gaming products—and pushed users to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent users, including K.C. can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm.

331. Microsoft does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon--were designed to addict and harm users.

332. Microsoft failed to disclose that it designed its Xbox Network and Xbox products at issue herein with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

333. Microsoft knew that its Xbox products contained an inherent risk of abuse, addiction, and compulsive use by minors and neurodivergent users— and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its products for play by such users.

118

334.   Microsoft markets Xbox, and specifically Xbox Store, as "safer for the whole family" to use.[21]

335.   Microsoft markets its own video game products and video game products manufactured, designed, and developed by third-parties, including the sale of virtual currencies and product upgrades for those products; to wit, Microsoft markets and sells Xbox/Fortnite and Xbox/Minecraft "bundle" consoles; V-Bucks, Robux, and Minecoins are marketed and sold in both digital and physical gift card forms to be used on and with Xbox products.

336.   Microsoft misrepresented that its Xbox Products and the video gaming products made available for use thereon, including those used by K.C. were safe for use by minors, while knowing that it was designed and developed with addictive features to keep such users using Microsoft's Xbox products, playing video games, and purchasing addictive video gaming products, and while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, such that Microsoft's Xbox products pose significant risk of harm to K.C. and other minors using those Products.

337.   Microsoft knew that Xbox Network, as well as Minecraft, Fortnite, Roblox, and Rec Room, contained an inherent risk of abuse, addiction, and compulsive use by minors, and the harms that arise therefrom, but

---

[21] https://www.xbox.com/en-US/microsoft-store

119

intentionally marketed its products for use by such individuals and directed its misstatements towards users of those games and other games designed, developed and utilizing the patents and technology described herein.

338. Microsoft did not inform the public that it designed its Xbox Products with addictive features, or that these products could be used to download addictive Products, despite knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury and those products were designed to cause addictive and compulsive use.

339. Microsoft, in connection with Xbox Network and Xbox Products, engaged and/or engages in the following conduct: (a) Collecting personal information from minors who signed up to its Xbox Network without notifying their parents or obtaining their parents' consent, and by illegally retaining minors' personal information; (b) Allowing minors to create an Xbox account without confirming parental consent and, after the minors created an Xbox account, allowing minors to create a profile that will include their "gamertag," and allowing them to upload a picture or include an avatar, which is a figure or image that represents the user, which Microsoft then combines with a unique persistent identifier it creates for each account holder, even minors, to share with third-party game and app developers; (c) Allowing—by default—all users, including minors to play third-party games and apps while using Xbox Game Pass, requiring parents to take additional steps to opt out if they do not

120

want their minors to access them; and (d) Using the data collected on minors less than 13 years old to use a patented system of analyzing gamer behavior, tracking said minors with their respective gamer tag, and using a deceptive marketing of in-game purchases or prepaid cards to ensure minors remained engaged in the games which proximately caused the addiction and/or internet gaming disorder.

340. Microsoft has independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick users, like K.C. into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *Oculus Quest, MetaQuest+, and Meta Store: Meta and Google*

341. VR gaming headsets, like Meta's Oculus Quest, are head-mounted displays or "goggles" that completely cover the eyes for an immersive 3D experience and pair with two touch controllers to control gameplay.

342. The Oculus Rift prototype, developed by Oculus VR, was first demonstrated at a tech convention in June 2012. Before the Oculus headset was released to consumers, Oculus VR was acquired by Meta for $2 billion and became a division of Meta called Reality Labs.

121

343. Since 2016, seven versions of the Oculus Quest gaming headset have been released for consumers to purchase.

344. The first consumer version of Oculus Rift, the Oculus Rift CV1, was released in March 2016. The Oculus Rift was the first virtual reality headset to provide a realistic experience at an accessible price.

345. Its successor, the Oculus Rift S was released in May 2019. The Rift S was manufactured by Xiaomi Corporation:



346. The Rift S tracks the position of itself and its controllers in 3D space using a system known as Oculus Insight, which uses the 5 cameras on the head-mounted display to track points in the environment and infrared LEDs on the controllers, information from accelerometers in both the display and the controllers, and computer vision to predict what path the display and controllers are most likely to take.

347. Both Oculus Rift brand headsets require a personal computer to

---

[22] https://www.wired.com/review/oculus-rift-s-review/

operate.

348.  The Oculus Go, released May 1, 2018, was the first generation of Meta's VR headsets and the first standalone VR headset.  The Oculus Go was manufactured by Lenovo Group Ltd..

349.  Because the Oculus Go is an all-in-one headset, it contains all the necessary components to provide virtual reality experiences and does not need to be tethered to an external device to use.

350.  On May 21, 2019, the Oculus Quest was released, followed by the release of the Oculus Quest 2 on October 13, 2020:



23

351.  The Oculus Quest 2 was rebranded as the Meta Quest 2 in 2022. That same year, the Meta Quest Pro was also released.  The Meta Quest 3 followed in October 2023.

352.  Each of the seven Oculus Quest gaming headset versions was

---

23 https://en.wikipedia.org/wiki/File:Oculus_Quest_2_-_2.jpg

designed and developed by Reality Labs.

353. The standalone VR headsets—the Oculus Go, Quest, Quest 2, and Quest Pro—are operated with an Android operating system. Google is the developer and owner of the Android operating system.

354. While the Oculus Go uses the Android mobile operating system, it also requires the Oculus application to be downloaded on a mobile phone running iOS or Android. The Oculus Go provides a field of view of about 101 degrees and 12.67 pixels per degree. Input is provided with a wireless controller that functions much like a laser pointer.

355. The headset and controller of the Oculus Go utilize non-positional 3-degrees-of-freedom tracking, making it capable of seated or static-standing activities but unsuitable for room scale applications.

356. The Oculus Quest supports positional tracking with six degrees of freedom, using internal sensors and an array of cameras in the front of the headset rather than external sensors.

357. Oculus Quest utilizes an "inside-out" tracking system known as "Oculus Insight." Based on the concept of simultaneous localization and mapping ("SLAM"), infrared diodes on the Oculus Touch controllers are tracked via four wide-angle cameras built into the front of the headset. This is combined with accelerometer input from the controllers and headset, as well as AI algorithms to predict the path of motion when the controllers are outside

124

of the cameras' fields of view.

358. While the Oculus Quest can run as a standalone headset through its internal Android operating system, it can also operate through "Oculus Link" software, which allows the Quest to be connected to a computer via USB, enabling use with Oculus Rift-compatible software, games, and products.

359. The Quest 2 (first released as the Oculus Quest 2 in 2020, and later rebranded as the Meta Quest 2 in 2022), is an evolution of the original Oculus Quest with a similar design, but with a lighter weight, updated internal specifications, a display with a higher refresh rate, and per-eye resolution, and updated Oculus Touch controllers with improved battery life:



24

---

[24]https://www.meta.com/quest/products/quest2/?utm_source=gg&utm_medium=pla&utm_campaign=

360.   Like the Oculus Quest, the Quest 2 can operate as a standalone VR device, but can also run on a PC with Oculus Rift-compatible software.

361.   The Meta Quest Pro is a mixed reality headset differentiated from the Quest 2 by thinner lenses, high resolution cameras for mixed reality, integrated face and eye tracking, and updated controllers with on-board motion tracking.

362.   Mixed reality is a blend of physical and digital worlds, going beyond screen-bound experiences by offering instinctual interactions with data in our living spaces.  One example of mixed reality are augmented reality filters used on Instagram or other social media sites that transform faces with different effects.

363.   For its mixed reality functions, the Meta Quest Pro uses high-resolution color cameras, as opposed to the lower-resolution, grayscale cameras on the Quest.  The headset, which is more visor-like than other Quest headsets, also contains internal sensors that are used for eye and face tracking, primarily for use by avatars.

---

19822518373&utm_term=&utm_content=&utm_ad=&utm_location=9022636&utm_location2=&utm_placement=&utm_device=c&utm_matchtype=&utm_feed=&utm_adposition=&utm_product=899-0045101&gad_source=1&gclid=CjwKCAjw17qvBhBrEiwA1rU9w0ZrvSGb5y_uLMt274OzmS9_3apbtFrkvVTGd_XzAozkYed9LtLq5RoCCDUQAvD_BwE&gclsrc=aw.ds



25

364.   The latest Meta headset release, the Quest 3, is an evolution of the Quest 2, combined with elements of the Meta Quest Pro.  It uses thinner lenses, similar to the Quest Pro, and the face of the headset is adorned with three "pills" containing sensors and cameras.  The two outer pills each contain a monochrome camera used for positional tracking, and a color camera used for mixed reality passthrough.  The center pill contains a depth sensor, which is used in combination with other sensors to sense the user's surroundings for boundaries and mixed reality experiences.

365.   The Quest 3 includes "Touch Plus" controllers, similar in design to the Quest Pro "Touch Pro" controllers, and replace the infrared sensor ring with infrared sensors in the body of the controller, augmented by internal sensors and input from the headset's hand tracking.

366.   The Quest 3 is backward compatible with all Quest 2 software, and

---

[25] https://www.meta.com/quest/quest-pro/

127

can also use the "Quest Link" feature to function as a VR headset for a personal computer, connected via cable or wirelessly via "Air Link."

367.   Regardless of the version of headset used, the VR technologies in Oculus Quest headsets are highly addicting to users.

368.   Each Oculus Quest headset has been designed specifically to allow users to escape reality for hours at a time in Meta's virtual metaverse.

369.   Upon information and belief, Meta and Google hire behavioral psychologists and neuroscientists to design its VR headsets and market its products in the best way possible to attract users, especially minors.

370.   Through the Meta Store (formerly the Oculus Store), users of any Oculus or Meta Quest headset are able to obtain a number of immersive games—many of which are free to play but involve numerous microtransactions and other in-game purchases:



[26] https://www.meta.com/experiences/section/866029525057219

128

371. Meta also designed, developed, supplies, and sells a Meta Quest+ subscription-based product for use with Oculus Quest, which gives users two VR products pre-selected by Meta each month. Once claimed, these products are available in a user's Meta Quest+ App Library as long as they are subscribed to Meta Quest+.

372. Meta charges users $8 per month (or $5 per month if paid annually) for its Meta Quest+ product.

373. Once a game is downloaded, Meta provides a framework for "in-app billing" to initiate and process transactions for in-game purchases.

374. Meta requires video game developers to use Meta's In-App Purchase Integration system for in-game purchases and to comply with Meta's Developer App Policies.

375. Meta takes a 30% cut of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions related to using VR gaming products like Rec Room, VR Chat, Gorilla Tag, and Capuchin.

376. This product-monetization framework enables Meta to profit from video game developers and publishers' use of addictive designs and psychological tactics—in addition to the addictive properties of the headsets themselves.

377. Meta and Google designed the Oculus Quest with psychologically addictive features, including but not limited to immersive VR experiences that

129

provide intense psychological rewards.

378.  Meta and Google designed the Oculus Quest in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors and that users continually purchase addictive video game products for play on Oculus Quest.

379.  Meta and Google designed the Oculus Quest headsets to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement and pushed users to make purchases through the Meta Store, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

380.  Meta and Google are aware that Oculus Quest headsets and the products available thereon contain addictive designs that pose an unreasonable risk of harm to users (particularly minors); yet, Meta and Google market the headsets to users and continues to profit from each sale.

381.  Neither Meta nor Google adequately inform users of the inherent risks involved with using the Oculus Quest headsets or that the headsets and the Meta Store—along with the products available thereon—were designed to addict and harm users.

382.  Meta and Google designed the Oculus Quest headsets to take

130

advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement and pushed users to make purchases through the Meta Store, while knowing that abuse, addiction, and compulsive use by foreseeable users, e.g. minors, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

383.  Meta and Google designed Oculus Quest with addictive features, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm.

384.  Meta and Google knew that the Oculus Quest headsets contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Meta and Google marketed the Oculus Quest to minors.

385.  Meta and Google each knew that its Oculus Quest headsets contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its products for play by minors.

386.  Meta and Google failed to disclose that it designed the Oculus Quest headsets to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement and pushed users to

131

advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement and pushed users to make purchases through the Meta Store, while knowing that abuse, addiction, and compulsive use by foreseeable users, e.g. minors, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

383.  Meta and Google designed Oculus Quest with addictive features, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its products pose significant risk of harm.

384.  Meta and Google knew that the Oculus Quest headsets contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Meta and Google marketed the Oculus Quest to minors.

385.  Meta and Google each knew that its Oculus Quest headsets contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its products for play by minors.

386.  Meta and Google failed to disclose that it designed the Oculus Quest headsets to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement and pushed users to

make purchases through the Meta Store, while knowing that abuse, addiction, and compulsive use by foreseeable users, e.g., minors, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

387. Meta and Google misrepresented Oculus Quest as safe for use by minors, including K.C., while knowing that abuse, addiction, and compulsive use by minors can lead to injury, and knowing that it had designed and developed the Oculus Quest to create addictive engagement and compulsive use.

388. Meta and Google marketed Oculus Quest to minors, despite knowing that Oculus Quest contained an inherent risk of brain damage, abuse, addiction, and compulsive use by minors, and the harms that arise therefrom and that have been experienced by K.C..

389. Meta and Google marketed Oculus Quest to consumers, and particularly to minors and their families, while misrepresenting Oculus Quest as safe for use by everyone including minors, despite knowing that, due to the Oculus Quest design, the products contained an inherent risk of abuse, addiction, and compulsive use by minors that can lead to brain damage, cognitive impairment and delayed emotional development, and other injury.

390. Meta and Google did not inform the public, users, or parents, including Plaintiffs, that Oculus Quest poses significant risk of harm due to

132

Meta and Google's decision to design Oculus Quest headsets to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors can and would more likely than not cause harm to minors using the product in such a way.

391. Meta and Google designed the Oculus Quest headsets with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor) and to be as addictive as possible—but concealed this information from the public and product users, including Plaintiffs.

392. Meta and Google, in connection with Oculus Quest and the Android operating system built therein, engaged and/or engage in the following conduct: (a) Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, web and app browsing activity, device usage, profile inferences, and precise location; (b) Collecting and maintaining biometric material, including photographs, audio recordings, and video footage; (c) Failing to provide notice and obtain verifiable parental consent before collecting personal information from children; (d) Collecting minors' information from third-party accounts; (e) Automatically collecting minors' information through tracking technologies; (f) Sharing minors' information with third parties and business partners; and (g) Failing to provide

133

through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to minors' personal information and instead hiding links containing information related to the collection of minors' personal information in fine print of privacy policies.

393. Meta and Google's conduct harmed and damaged Plaintiffs because, inter alia, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using patented systems and other dark patterns.

### *VR Chat: VRChat, Inc.*

394. VRChat is an online virtual world product designed, developed, published, sold, and otherwise made available by VRChat Inc. for play and use to Missouri citizens, including Plaintiffs.

395. VRChat is primarily designed for use with virtual reality ("VR") headsets, but is usable without VR in a "desktop" mode or in an Android app for touchscreen devices.

396. VRChat was first released as a prototype on January 16, 2014, and was later released to Steam on February 1, 2017. VRChat was released to Oculus Quest in December of 2018 and to Android in August of 2023.

397. VRChat has an estimated 71,000 daily players and an estimated

134

8.2 million total users.

398.   VRChat allows users to create 3D avatars and interact with other user-created 3D avatars and worlds, and/or create their own avatars and worlds:



**Getting Started**
For new and experienced creators.

**Worlds**
Build simple to complex experiences and hangouts.

**Avatars**
Express yourself with a wide range of customization.                  27

399.   Both the avatars and worlds are created and uploaded by the users using a software development kit released alongside the game.

400.   The gameplay of VRChat is made up of thousands of connected worlds in which players can interact with each other through virtual avatars.

401.   Per its website, "VRChat offers an endless collection of social VR experiences by giving the power of creation to its community":

---

27 https://creators.vrchat.com/

135



28

402.   VRChat touts itself as a beneficial game that allows users to learn, make friends, and enjoy varied means of expression:

# Why You Should Join VRChat

- Interact with people all over the world
- Experiment with identity by trying new avatars
- Many users report that VRChat has helped overcome social anxiety
- Create long lasting friendships
- Express yourself
- Build worlds and invite people to them
- Play and have fun      [29]

403.   While playing VRChat, users can view the number of people in a world when choosing where to go within the game.  Once in a room, users can then use their microphones to speak with other users.

404.   VRChat hosts a number of events and conventions in its virtual world. Some of these events, like the Sanrio Virtual Festival 2024, are in conjunction with licensed brands to attract more users:

---

[28] https://hello.vrchat.com/
[29] https://hello.vrchat.com/



30

405. VRChat also offers a recurring subscription product, called VRChat Plus, which provides users with an "enhanced" or upgraded version of VRChat for a monthly or annual fee. Currently, VRChat Plus is $9.99 per month or $99.99 per year. VRChat Plus users receive custom user icons, increased storage slots for avatars, "increased trust" from VRChat, a "supporter" badge to display on their profile, and enhanced invite messages allowing users to send invitations to others that include photos.

406. Users can also purchase VRChat credits, which can be used in the VRChat Marketplace to purchase avatars and other products created by users with developer tools provided by VRChat .

407. VRChat allows users to monetize their in-game creations through the "Creator Economy," which provides users with Earned Credits when another user purchases products developed by the "creator."

---

[30] https://v-fes.sanrio.co.jp/

137

408. VRChat charges transaction fees of approximately 15.3% of any sale of user-generated products.

409. Creators who are part of the Creator Economy are eligible to request a payout of Earned Credits to real-world funds, at a rate of $0.005 U.S. Dollars per Earned Credit. Payout requests can take up to 30 days to process. VRChat may also charge a payout transaction fee depending on payout method chosen.

410. VRChat Inc. is aware that VRChat includes significant psychological aspects to encourage continuous game play and eventually lead to addiction—especially of minors.

411. Upon information and belief, VRChat Inc. specifically designed VRChat in concert with psychologists and neuroscientists to discover the best addictive aspects to include in their games.

412. Upon information and belief, VRChat Inc. has also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in VRChat.

413. VRChat Inc. designed VRChat in conjunction with psychologists, neuroscientists, and other behavioral experts—and with designers and developers of other addictive video game products—to ensure the addiction of minors.

414. VRChat Inc. designed VRChat with psychologically addictive

138

features, including but not limited to varied gameplay, microtransactions, expressive cosmetic items, social interaction, and opportunities to monetize creations.

415. VRChat Inc. designed VRChat to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, e.g. minors, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm in those users.

416. VRChat Inc. designed VRChat to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent individual) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

417. VRChat Inc. knew that VRChat contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, VRChat Inc. marketed VRChat as safe for play and without warning of the addictive design and risk of injury associated with the products.

418. VRChat Inc. designed VRChat with numerous psychological tricks

to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, but failed to inform the public, users, or parents of minor users, including Plaintiffs, that its products pose significant risk of harm.

419. VRChat Inc. knows of the addictive features and technology included in its products, but it does not inform consumers of the risks inherent with using this product, nor does VRChat Inc. adequately inform users that the product is designed to be addictive and harm users or of the inherent risks involved with using and playing VRChat.

420. VRChat Inc. marketed VRChat as safe for play and without warning of the addictive design and risk of injury associated with the products, despite knowing that VRChat contained an inherent risk of abuse, addiction, and compulsive use by foreseeable users and the harms that arise therefrom, and that have been experienced by K.C..

421. VRChat Inc. failed to disclose that they designed VRChat to take advantage of the chemical reward system of a user's brain (especially that of a minor) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users (e.g. minors) can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

422. VRChat Inc. misrepresented VRChat as safe for use by minors,

including K.C., while knowing that abuse, addiction, and compulsive use by such foreseeable users can lead to injury, and knowing that they had designed and developed their products to be as addictive as possible.

423. VRChat Inc. did not inform the public, users, or parents of minor users, including Plaintiffs, that VRChat pose significant risk of harm due to VRChat Inc.'s decision to design their products to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury.

424. VRChat Inc. designed VRChat with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (and specifically a minor's still-developing brain) and to create addictive use of the product—while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury—but concealed this information from the public and product users, including Plaintiffs.

425. VRChat Inc., in connection with VRChat engaged and/or engages in the following conduct: (a) Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, usage information, profile inferences, in-game communications, and precise location; (b) Failing to provide notice and obtain verifiable parental consent before collecting personal information from children; (c) Collecting and maintaining biometric material,

141

including photographs, audio recordings, movement information, eye tracking, and video footage; (d) Collecting minors' information from third-party accounts; (e) Automatically collecting minors' information through tracking technologies; (f) Sharing minors' information with third parties and business partners; (g) Utilizing a deficient post-collection notice and verifiable parental consent process; (h) Collecting personal information from the child user and then suggesting that parents concerned with the collection of their children's information should contact them via their website; (i) Collecting and releasing information about minors to third parties, as well as third party vendors, agents, employees, developers, agents and/or representatives without parental consent; (j) Failing to include the information required by 16 C.F.R. § 312.4(b); (k) Failing to describe VRChat Inc.'s collection and use practices with regard to personal information collected from children; (l) Not disclosing to parents that Defendants intended to collect such personal information as images that could contain a child's likeness; and (m) Failing to include a required disclosure in VRChat Inc.'s Privacy Policy explaining what personal information was collected from children or explaining VRChat Inc.'s use of and disclosure practices for personal information collected from children as required—and instead generically discussing information practices regarding VRChat Inc.'s products using vague and ambiguous language.

426. VRChat Inc.'s conduct harmed and damaged Plaintiffs because,

142

inter alia, wrongfully obtained information and other fruits of VRChat Inc.'s misconduct were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *Gorilla Tag: Another Axiom*

427. Gorilla Tag is a VR product playable on Oculus Quest that is designed, developed, marketed, supplied, and sold by Axiom:



428. Axiom designed Gorilla Tag to be used with Oculus Quest gaming headsets, which allows Gorilla Tag users to run, jump, and climb around the game worlds using their hand-held controllers.

429. Gorilla Tag attracts users with its clean movements, simple controls, and easy-to-understand gameplay, all of which are combined to make the game fun for players and easy to master.

430. Gorilla Tag has four primary game modes and three match-making

---

[31] https://www.meta.com/experiences/4979055762136823/

game queues for default, minigames, and competitive play, all of which use similar interactive game designs, mechanisms, technologies, and addictive features.

431. The default game mode in Gorilla Tag is called "Infection"; this mode is similar to a game of tag and anyone tagged by an infected gorilla also becomes infected. Depending on a user's skill level, the time it takes to complete a game of tag varies for each user but is controlled, in part, by Axiom's use of patented matchmaking technologies and other deceptive practices designed to pair certain users against one another.

432. The "Casual" game mode is primarily for socializing or private lobbies for players to congregate, and users often spend countless hours socializing in Gorilla Tag's virtual lobby.

433. Another game mode, called "Hunt," involves players tracking their secret target using a special hunt watch, while at the same time avoiding being hunted. The final game mode, "Paint Brawl," involves two teams, each trying to eliminate all players on the other team by bursting balloons with slingshots. Both of these Gorilla Tag modes utilize algorithms, AI, and other patented technologies to unknowingly match users against other users based on their personal data, demographics, and/or location.

434. Gorilla Tag also features limited-time items for purchase, as well as season events to play during limited times:



[32]

435. While Gorilla Tag is free-to-play, it is designed to profit off microtransactions and the sale of in-game product upgrades.

436. Between the game's release in March 2021 through January 2023, Gorilla Tag earned Axiom $26 million in revenue. As of June 2024, Gorilla Tag had topped $100 million in revenue and is one of the most profitable VR products on the market.

437. Gorilla Tag has 5 million players worldwide; in fact, it had over 21,000 players in the first week of the game's launch. On average, users play Gorilla Tag for almost sixty (60) minutes each time the product is used.[33]

438. Gorilla Tag's market success is no surprise, considering Axiom designed Gorilla Tag to create compulsive, addictive, and disordered use and video games are 44% more addictive when used via a VR gaming headset when

[32] https://www.gorillatagvr.com/blog
[33] https://www.roadtovr.com/gorilla-tag-revenue-vr-success-another-axiom/

the product design includes multi-user social aspects, microtransactions, and other addictive features like Gorilla Tag does.

439. Gorilla Tag's immersive VR experiences provide intense psychological rewards to users that keep them coming back to the game; to wit, Gorilla Tag was designed specifically to allow users to escape reality for hours at a time.

440. Gorilla Tag is also designed to work with and employs the same addictive mechanisms as VRChat.

441. Axiom designed Gorilla Tag with psychologically addictive features, including but not limited to multiple game modes, multiplayer engagement, microtransactions, and immersive VR systems that provide intense psychological rewards and cause compulsive use.

442. Upon information and belief, Axiom hired behavioral psychologists and neuroscientists to design Gorilla Tag game and market its products in the best way possible to encourage longer periods of play and higher amounts of spending.

443. Upon information and belief, Axiom designed Gorilla Tag in conjunction with psychologists, neuroscientists, and other behavioral experts, and/or with other video gaming product developers, to ensure the addiction of minors.

444. Axiom designed Gorilla Tag to take advantage of the chemical

146

reward system of a user's brain (especially a minor) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

445. Axiom designed Gorilla Tag with addictive features, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, but failed to inform the public, users, or parents, including Plaintiffs, that its product pose significant risk of harm

446. Axiom is aware that its Gorilla Tag game contains addictive designs that pose an unreasonable risk of harm to users (particularly minors); yet Axiom markets the game and its microtransactions to users and continues to profit from each sale.

447. Axiom does not adequately inform users of the inherent risks involved with playing Gorilla Tag game or that Gorilla Tag was designed to addict and harm users.

448. Axiom, in connection with Gorilla Tag, engaged and/or engages in the following conduct: (a) Collecting and maintaining personal information from minors without parental consent, including minors' names, usernames, email addresses, physical addresses; IP addresses, web and app browsing activity, device usage, profile inferences, and precise location; (b) Collecting

147

and maintaining biometric material, including photographs, audio recordings, and video footage; (c) Failing to provide notice and obtain verifiable parental consent before collecting personal information from children; (d) Automatically collecting minors' information through tracking technologies; (e) Sharing minors' information with third parties and business partners; and (f) Failing to provide through their respective websites and apps a clear, understandable, and complete Privacy Policy describing the collection, use, and distribution practices in regard to minors' personal information.

449. Axiom's conduct harmed and damaged Plaintiffs because, inter alia, the information and data illegally obtained was used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minors into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns

450. Axiom designed Gorilla Tag to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

451. Axiom knew that Gorilla Tag contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom,

148

but instead of disclosing such harms, Axiom marketed Gorilla Tag to minors.

452. Axiom knew Gorilla Tag contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games for play by minors.

453. Axiom failed to disclose that it designed Gorilla Tag to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, *e.g.*, minors, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the product pose significant risk of harm.

454. Axiom misrepresented Gorilla Tag as safe for use by everyone, including K.C., while knowing that abuse, addiction, and compulsive use by minors can lead to injury, and knowing that it had designed and developed Gorilla Tag to be as addictive as possible.

455. Axiom marketed Gorilla Tag to minors, despite knowing that Gorilla Tag contained an inherent risk of brain damage, abuse, addiction, and compulsive use, and the harms that arise therefrom and that have been experienced by K.C. when Gorilla Tag is used as intended.

456. Axiom did not inform the public, including Plaintiffs, that Gorilla Tag poses significant risk of harm due to Axiom's decision to design Gorilla Tag

149

to be as addictive, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and other injury.

457.   Axiom designed Gorilla Tag with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury—but concealed this information from the public and product users, including Plaintiffs.

### ***Capuchin: Banana Analytics***

458.   Capuchin is an online virtual world product designed, developed, published, sold, and otherwise made available by Banana Analytics for play and use by Missouri citizens, including K.C., for use with Oculus Quest.

459.   Capuchin is an immersive VR product that draws inspiration from and uses the same design mechanisms and features as "Gorilla Tag":



---

[34] https://www.meta.com/experiences/5409297455797322/#?

460. Capuchin uses thrilling and social VR interactions, combined with microtransactions and daily rewards, to create addictive engagement and compulsive use in users and particularly in minors.

461. In Capuchin, players embody monkey avatars and navigate diverse maps using their arms and hand movements or gestures. This distinctive method of movement enhances the immersive nature of the game.

462. Capuchin emphasizes social connection and allows players to engage with fellow players through chat and interaction in real time.

463. Banana Analytics designed Capuchin to provide users daily rewards simply for using the Product; to wit, each user is given 100-200 "free bananas" to use in the Capuchin Virtual Shop each day to purchase cosmetic product upgrades for a user's avatar in the Shop and for other microtransaction purchases within Capuchin.

464. The daily "free bananas" are often insufficient to cover the full price of a Capuchin Virtual Shop purchase, so users are encouraged and deceptively targeted to earn additional bananas through gameplay and to purchase bananas at the "ATM" located within the Shop.

465. The ability to personalize a user's in-game character allows for a diverse and visually appealing community, while also contributing to user's becoming addicted to obtaining bananas, keeps users engaged in and coming back to play Capuchin.

466. Capuchin includes a challenge aspect to the game, where players have to avoid being eaten by monster capuchins at each level. This design feature takes advantage of the user's immersion in the virtual world to target and addict users in a way that results in a profit for Banana Analytics.

467. Banana Analytics designed Capuchin with psychologically addictive features, including but not limited to enhanced social aspects, exciting challenges, microtransactions, daily rewards, and ability to customize user avatars through ever-changing, in-game product upgrades.

468. Upon information and belief, Banana Analytics designed Capuchin with addictive mechanisms and operant conditioning features, and/or based their product design on that of another Defendant or alternate entity that included features designed in concert with psychologists, neuroscientists, and behavioral experts to be as addictive as possible.

469. Upon information and belief, Banana Analytics has also licensed patented addictive technologies from other video game developers and publishers to include in the design of Capuchin.

470. Capuchin's game design takes advantage of the chemical reward system of a user's brain so as to create addictive engagement, even though such use can lead to brain damage, abuse, compulsive use, addiction, and other injury in foreseeable users, and, as such, the products pose significant risk of harm.

152

471. Banana Analytics designed Capuchin to take advantage of the chemical reward system of a user's brain, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

472. Banana Analytics is aware that Capuchin includes significant psychological aspects to encourage continuous game play and eventually lead to addiction and compulsive use—especially in minors.

473. Though Banana Analytics knows of the addictive features and technology included in Capuchin, it does not inform their users of the risks inherent with playing this game, nor does it adequately inform users of the inherent risks involved with using and playing Capuchin or that the game is designed to be addictive and harm users.

474. Banana Analytics knew that Capuchin contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms, Banana Analytics marketed Capuchin as safe for play and without warning of the addictive design and risk of injury associated with the products.

106. Banana Analytics, in connection with Capuchin, engaged and/or engages in the following conduct: (a) Collecting and maintaining personal information from minors without parental consent, including minors' names,

usernames, email addresses, physical addresses; IP addresses, usage information, profile inferences, in-game communications, and precise location; (b) Failing to provide notice and obtain verifiable parental consent before collecting personal information from children; (c) Collecting and maintaining biometric material, including photographs, audio recordings, movement information, eye tracking, and video footage; (d) Collecting minors' information from third-party accounts; (e) Automatically collecting minors' information through tracking technologies; (f) Sharing minors' information with third parties and business partners; (g) Utilizing a deficient post-collection notice and verifiable parental consent process; (h) Collecting personal information from minor users and not providing a clear method for the removal of such information; (i) Collecting and releasing information about minors to third parties, as well as third party vendors, agents, employees, developers, agents and/or representatives without parental consent; (j) Failing to include the information required by 16 C.F.R. § 312.4(b); (k) Failing to describe Defendants' collection and use practices with regard to personal information collected from children; and (l) Failing to include a required disclosure in Banana Analytics' Privacy Policy explaining what personal information was collected from children or explaining Banana Analytics' use and disclosure practices for personal information collected from children as required—and instead generically disclaiming the collection of children's personal

154

information.

107.   Banana Analytics' misconduct harmed and damaged Plaintiffs
because, inter alia, the information and data wrongfully and illegally obtained
from minors, including K.C., was used to analyze the gaming and purchasing
behavior of minors and design game releases tailored to prey on the minors to
trick minors into buying microtransactions or unknowingly make in-game
purchases using the game patents and other illegal dark patterns.

475. Banana    Analytics    designed    Capuchin    with    numerous
psychological tricks to create addictive engagement with its product despite
knowing that abuse, addiction, and compulsive use by minors can lead to
injury, but failed to inform the public, users, or parents of minor users,
including Plaintiffs, that its products pose significant risk of harm.

476.   Banana Analytics failed to disclose that they designed Capuchin to
take advantage of the chemical reward system of a user's brain and to create
addictive engagement, and, as such, the products pose significant risk of harm.

477.   Banana Analytics misrepresented Capuchin as safe for use by
minors, including K.C., while knowing that abuse, addiction, and compulsive
use by such foreseeable users can lead to injury, and knowing that Capuchin
contained addictive design features.

478.   Banana Analytics marketed Capuchin as safe for play and without
warning of the addictive design and risk of injury associated with the products,

155

despite knowing that Capuchin contained an inherent risk of abuse, addiction, and compulsive use by foreseeable users, the harms that arise therefrom, and that have been experienced by K.C..

479. Banana Analytics did not inform the public, users, or parents of minor users, including Plaintiffs, that Capuchin pose significant risk of harm due to Banana Analytics' decision to design their products to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury.

480. Banana Analytics designed Capuchin with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by minor can lead to brain damage and injury—but concealed this information from the public and product users, including Plaintiffs.

### *Google Play: Google*

481. Google designed, developed, published, markets, and supplies Google Play, also known as the Google Play Store or Play Store and formerly Android Market, to consumers throughout the world, including in Missouri.

482. Google Play was launched on March 6, 2012.

483. Google Play serves as a digital products store and makes applications, including Fortnite, Roblox, Rec Room, and Xbox Game Pass,

156

available for to consumers for download either for free or at a cost

484.   Through Google Play, Google provides a product-mechanism for users to download video gaming products and use them on Android-based smartphones, and tablets, as well as personal computers. For example,



35



36

---

35 https://play.google.com/store/search?q=roblox&c=apps
36 https://play.google.com/store/apps/details?id=com.AgainstGravity.RecRoom&hl=en-US

157

485.  Google makes other Products available to consumers for download and use through Google Play, including Xbox Game Pass.

486.  Once a game product (e.g., Roblox, Fortnite,[37] Rec Room, Xbox Game Pass) is downloaded to the user's device, Google supplies the video gaming product and provides a framework for "in-app billing" to initiate and process transactions.

487.  To encourage developers to make video games available to consumers on Google Play, Google markets Google Play to game developers as a video game store that supports a variety of monetization strategies, including paid distribution, in-app products, subscriptions, and ad-based models.

488.  Google requires video game developers to use Google Play's payment system for in-game purchases and to comply with Google's Developer Policies.

489.  Google takes a percentage of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions.  More specifically, from 2012-2016, Google took 30% of all revenue generated by in-game microtransactions, in-app purchases, and subscriptions.  From 2016 to the present, Google takes 15% of all such revenue.

---

[37] Epic Sues Google Over Fortnite's Removal From Play Store | TechRaptor (Fortnite was temporarily removed from the Google Play Store but is now available for use after Epic sued Google over a profit-sharing dispute.)

158

490. This app-monetization framework enables Google to profit from video game developers and publishers use of addictive designs and psychological tactics, including but not limited to the sale of microtransactions, loot boxes, and/or in-app subscription services in games available through Google Play.

491. Upon information and belief, Google utilizes the patented addictive technologies, systems, and mechanisms identified herein and other improper means to collect user's data and market their Products to consumers, including Plaintiffs. Further, once a game or other video gaming product is downloaded via Google Play to a user's device, the user is exposed to all features of that product (including all addictive mechanisms and systems included therein).

492. Upon information and belief, Google provides video game developers (e.g. Roblox Corp., Epic Games, RRI) a framework to initiate and process in-game purchases and microtransactions through Google Play. This framework enables game developers to sell microtransactions and/or loot boxes through Google Play, and while the consumer is playing the video game on their device. In exchange, Google keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

493. Google specifically designed Google Play to attract users to purchase games and spend money on in-game microtransactions—regardless

159

of the content or subject matter of the video game.

494. Upon information and belief, Google hires behavioral psychologists and neuroscientists to design Google Play and market its product in the best way possible to attract users, especially minors.

495. Google is aware that several of the games on available on Google Play contain addictive designs that pose an unreasonable risk of harm to users (particularly minors), yet Google markets these games to and profits from the download by the same users.

496. Google does not adequately inform users of the inherent risks involved with using Google Play or that Google Play—along with the games being played thereon—were designed to addict and harm users.

497. Google receive revenue for in-game purchases made on games downloaded through Google Play, including Roblox, Fortnite, and Rec Room.

498. Google designed Google Play to house addictive gaming products and take advantage of the chemical reward system in users' brains in order to profit from users' download and purchases of addictive materials on Google Play.

499. Google designed Google Play in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure minor users continually purchase addictive video game products.

500. Google designed, developed, published, marketed, and supplied

160

Google Play to consumers as a product to purchase, download, and house addictive gaming products and pushed users to make purchases through Google Play, while knowing that abuse, addiction, and compulsive use by minors can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

501. Google designed Google Play as a product for consumers to buy, download, and house addictive Products and to take advantage of the chemical reward system of a user's brain to push users to make purchases through Google Play, and Google targeted video game developers to put their addictive gaming products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors.

502. Google knew that Google Play contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom from playing video games available on Google Play, as described herein, but instead of disclosing such harms, Google targeted video game developers to put their products on Google Play and marketed those products on Google Play as safe for use and without warning of risk of harm, and market Google Play as safe for use by all, including minors.

503. Google knew that Google Play, as well as the video game products

161

(e.g., Roblox, Fortnite, Rec Room) that it made or makes available to Google Play users, contained an inherent risk of abuse, addiction, and compulsive use by minors, and the harms that arise therefrom—but intentionally marketed Google Play for use by the general public, including minors, and directed its misstatements towards users of Roblox, Fortnite, Rec Room, and other products designed, developed and utilizing the patents and technology described herein;

504. Google failed to disclose that it designed Google Play as a product for consumers to buy, download, and house addictive video gaming products and, in conjunction therewith, push addictive video gaming products to users, including Roblox, Fortnite, Rec Room, and Xbox Game Pass, while knowing that abuse, addiction, and compulsive use by foreseeable users, *i.e.*, minors, can lead to injury and, as such, the products pose significant risk of harm.

505. Google misrepresented that Google Play was safe for use by minors, while knowing that it was designed and developed with addictive features to keep users purchasing addictive purchase addictive video game products, and while knowing that abuse, addiction, and compulsive use by minors can lead to injury, such that its products pose significant risk of harm to users, like K.C..

506. Google did not inform and concealed from the public, parents, or users, including Plaintiffs, that it designed Google Play with addictive

features, or that this product could be used to download addictive games and products, despite knowing that abuse, addiction, and compulsive use of these games and products by minors can lead to injury

507. Google, in connection with Google Play, engages or engaged in the following conduct: (a) Employing dark patterns in Google Play and in marketing the video gaming products (e.g. Roblox, Fortnite, Rec Room, Xbox Game Pass) supplied by Google to the general public through Google Play, including, but not limited to, tricking minors into paying for goods or services that they did not want or intend to buy, whether the transaction involves single charges or recurring charges; (b) Using dark patterns to entice minors, including K.C., into microtransactions without parental consent or consent of the account holder; (c) Using deceptive and misleading tactics, including operant conditioning and design features, that prompts users and particularly minors to spend real money on microtransactions using fictitious in-product currency (e.g. Robux, V-bucks); (c) Collecting personal information from minors who created a Google account without notifying their parents or obtaining their parents' consent, and by illegally retaining minors' personal information; (d) Automatically collecting and storing information about services used by minors, queries entered by minors, and YouTube videos watched by minors who have used Google Play to download video gaming products; and (e) Collecting and retaining minors' voice and audio information.

163

508. Google, independently and in concert with third-parties, engaged in the aforementioned deceptive, negligent, and intentional privacy violations and used the information garnered therefrom to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on and to trick minors, like Plaintiff K.C., into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

### *Video Gaming Products that Incorporate Addictive Design Features Effect the User's Brain*

509. Video gaming products, like **DEFENDANTS'** Products, incorporate addictive design features that affect the user's brain.

510. The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals which is arguably the explanation why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw upon, minors and neurodivergent users are less able to weigh potential negative consequences

164

and curb potentially harmful behavior like excessive use of video games, which furthers impact frontal lobe development.

511. Research has shown that prolonged use of video gaming products damages the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. Research has concluded that such use of video gaming products, including **DEFENDANTS'** Products, may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders. Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

512. Empirical studies indicate that gaming disorder is associated with detrimental health-related outcomes.

513. Brain imaging studies have shown that use of video gaming products, like **DEFENDANTS'** Products, negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

514. Brain imaging studies have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and

165

grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies show several regions of the brain showed reduction in grey-matter volume in gaming disorder participants:



38

515. Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that gaming pictures or images activate regions of the brain in a way that is similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

516. Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged use of video gaming

---

[38] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

products, including use of **DEFENDANTS'** Products. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are:



517. Brain structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

518. Other studies have shown that disordered and/or excessive use of video gaming products, like **DEFENDANTS'** Products, leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

519. Research has shown that a minor child with a diagnosis of ADHD or autism is at a higher risk of developing video game disorder or addiction

---

[39] *Id.*

which can worsen ability to control impulsivity and result in brain damage. Research has shown that while use of video games may foster creativity in children, such potential benefits are outweighed by the negative aspects of the risk of developing addiction or disordered use of video gaming products, like **DEFENDANTS'** Products, which typically develop swiftly in children who use video gaming products, and particularly **DEFENDANTS'** Products, for extended periods of time.

520.   Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling. The increased dopamine released in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

521.   The use of **DEFENDANTS'** Products were designed to and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by drug use or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between one's nerve cells in the brain, as well as between one's brain and the rest of the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true

168

in minors and particularly true in neurodivergent minors, whose brains are still developing.

522. The repetitive release of dopamine that was designed to and does occur in minors and neurodivergent users who are users of the **DEFENDANTS'** Products, when used as intended, create, reinforce, and strengthen a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the products more and more, first at an increasing rate and then with compulsive desire until the impulse to use the products develops into a disordered use or addiction. Those dysregulated neural pathways trigger addictive, compulsive, and impulsive behaviors and cause life-altering impulsivity and inhibitory control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, and other harmful effects, all to the severe detriment and damage to the minor child, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers, specifically including Plaintiffs.

523. Objective data suggests that VR gaming has a stronger addiction trend versus traditional video gaming alone.

169

524. VR gaming has been shown to be 44% more addictive than gaming alone.

525. When multi-user social factors are introduced in immersive yet controlled VR game design that also employs microtransactions and operant conditioning tactics, the addiction tendency trends even higher.

526. Many behavioral studies believe that immersive VR experiences provide intense psychological rewards that could eventually lead to problematic compulsive product use by users.

527. In fact, VR users tend to alienate from their lives and escape by pursuing a pleasant virtual life.

528. Each Defendant specifically designed its products to addict and prey upon those users' developing brains; therefore, each Defendant is aware that its Products are addictive and proximately cause harm to minors.

529. Due to the psychological and addictive aspects of the games, many of **DEFENDANTS**' products have been banned in other countries to avoid the harm to children that all **DEFENDANTS** are causing daily in the United States; however, no bans are in place here, and **DEFENDANTS** continue their pattern of addicting and harming our Nation's minors and their families, including Plaintiffs.

530. Each Defendant is aware that its Products are addictive and proximately cause harm to minors who use those products.

170

***Plaintiffs' Injuries and Damages Proximately Caused by DEFENDANTS' Misconduct and Defective Products***

531.   Plaintiffs in this matter have each suffered independent personal injuries and sequela thereto as a result of **DEFENDANTS'** deception and as a result of K.C.'s use of the **DEFENDANTS'** defectively designed Products for their intended purpose and in a reasonably foreseeable manner.

532.   K.C. began playing video games and using the **DEFENDANTS'** Products at approximately six (6) years old, and has continued to use the products at an increasing, uncontrollable, compulsive, and addictive pace since that time. More specifically, K.C. began playing Minecraft and Roblox using an Xbox One at approximately six (6) years old and continues to use those products via an Xbox One or an Xbox Series S; began playing Fortnite and Rec Room around age eight (8) and continues to use Fortnite and Rec Room via an Xbox One and/or Xbox Series S console; began playing Minecraft and Roblox at approximately six (6) years old and Fortnite and Rec Room at approximately eight (8) years old on a smartphone using Google Play and continues to use play those games via smartphone; and began using VRChat, Rec Room, Gorilla Tag, and Campuchin via an Oculus Quest at approximately ten (10) years of age.

533.   K.C. was provided free subscriptions to Xbox Game Pass with their Xbox consoles and to MetaQuest+ with Oculus Quest, has used and/or paid for

subscription-based products like Fortnite Battle Pass, Xbox Game Pass Core, Xbox Game Pass Ultimate, and MetaQuest+, each of which work with the namesake product to provide access to product upgrades, new products, cloud gaming, and a host of other features built into or designed to work with the namesake product. K.C. has purchased and/or downloaded video gaming products, including Minecraft, Fortnite, Roblox, Rec Room, Among Us, VRChat, Gorilla Tag, and Capuchin using Xbox Store, Google Play, and/or Meta Store.

534. K.C.'s introduction to the **DEFENDANTS'** Products was a direct result of **DEFENDANTS'** marketing of those Products to and for use by minors.

535. Since K.C. was introduced to and began using **DEFENDANTS'** Products, K.C. has developed an uncontrollable desire and addiction to using **DEFENDANTS'** Products and playing video games. For instance, as a result of the video game addiction caused by K.C.'s use of **DEFENDANTS'** Products, K.C. has kept their Product usage hidden from Carey Courtright, K.C. will secretly and/or sneakily obtain access to the Products and use the Products in the middle of the night while Carey Courtright is sleeping, K.C. steals money and gift cards to purchase in-game currency for use with the Products, and K.C. downloads and plays video games without Carey Courtright's permission or prior knowledge using Xbox Network, Google Play, and Meta Store despite

172

Carey Courtright's attempts to restrict K.C.'s access to **DEFENDANTS'** Products.

536.   K.C.'s use of **DEFENDANTS'** Products for their intended purpose and in a reasonably foreseeable manner that were negligently and intentionally designed to create disordered and addictive overuse in users, did so create in them a disordered, compulsive, and addictive desire and need to play with and use **DEFENDANTS'** Products at an increasing rate, to K.C.'s extreme detriment and to the exclusion of all other activities that K.C. had previously engaged as a minor child.

537.   K.C. rapidly became addicted to using **DEFENDANTS'** Products and said use was a substantial factor in causing their video game addiction; obsession with gameplay; increased need to use **DEFENDANTS'** Products and play video games; loss of interest of other activities; being deceitful in hiding Product usage, gameplay time, and/or in-game spending; playing video games to escape life; disruption of cognitive development and emotional growth; loss of friendships; withdrawal from educational or social activities, as well as other injuries, including severe withdrawal symptoms, sleep deprivation, impulse issues, cognitive and learning problems, and gamer's rage/aggression.

538.   K.C. spends more time using the **DEFENDANTS'** Products than they engage in any other activity, including sleeping, socializing or spending time with their family, physically exercising, receiving educational instruction,

173

or playing sports, and because K.C. is an addict, the only activity K.C. desires to do and needs to do in order to avoid withdrawal symptoms is to use **DEFENDANTS'** Products and play video games.

539. Since beginning to use **DEFENDANTS'** Products, K.C.'s life has changed drastically and K.C. has been diagnosed with gaming disorder. Further, as a result of the video gaming addiction and the sequalae of symptoms, injuries, and harm associated therewith including an inability to control impulsive behavior, compulsive and disordered use of **DEFENDANTS'** Products, loss of cognitive function and delayed executive development, learning and comprehension problems, severe emotional distress, diminished social interactions outside of gaming interactions, loss of friends, impulse issues that cause problems in relationships, drop-in grades, disrespectful and dishonest behavior including stealing, lying, and hiding product usage, poor hygiene, changes in eating habits, and physical pain in hands, eyes, and back caused by K.C.'s use of **DEFENDANTS'** Products, as well as withdrawal symptoms including gamer's rage, anger, depression, anxiety, physical outbursts, and harm to others and oneself when **DEFENDANTS'** Products are taken away or use is restricted, K.C. required and requires medical treatment, behavioral health treatment, outpatient counseling, and specialized educational therapy, including an independent education plan at school.

540. Currently, K.C. uses two or more of **DEFENDANTS'** Products at

least three (3) hours per weekday and the majority of weekend hours using the Products, and has spent hundreds of hours, in total, using **DEFENDANTS**' Products; to wit, K.C. has spent at least 500 hours using **DEFENDANTS'** Products, in total or collectively since beginning to use **DEFENDANTS'** Products at age 6, despite Carey Courtright's extensive efforts, to limit the time K.C. was and is using **DEFENDANTS**' Products.

541.   A combination of several factors rendered and continue to render K.C.'s efforts to restrict their usage of **DEFENDANTS'** Products futile, without medical intervention, in terms of achieving a lifestyle where K.C. is able to stop using the products without severe withdrawal symptoms, and/or for any sustainable period of time or otherwise function as K.C. did prior to when they began using the Products as identified herein. Likewise, despite parental efforts to limit K.C.'s product usage—efforts made astonishingly difficult, if not impossible, by the addictive design of **DEFENDANTS**' Products and the absence of workable or viable parental controls within each **DEFENDANTS**' product—K.C. is unable to control their use of the Products to the detriment of their physical, mental, and social well-being.

542.   Among those factors impeding Plaintiffs' ability to restrict K.C.'s usage of **DEFENDANTS'** Products is the fact that K.C. is and was an "video gaming addict" and thus exhibits compulsive, obsessive, and addictive behavior in their use of the products. K.C.'s video game addiction was and is

175

proximately caused by **DEFENDANTS'** defective and dangerous Product design, the absence of parental controls and time-limit restrictions within the Products, the inclusion of cross-play (the ability to use the same video gaming product on and/or via different mechanisms, devices, or systems), design features that gave the false appearance to that K.C. was using **DEFENDANTS**' Products far less than they actually were, and, finally, the **DEFENDANTS'** deception and resolve to not provide a warning to users or their parents (including K.C. and their parents) so as to disclose the addictive operant conditioning design incorporated into the Products so as to given them a meaningful opportunity to make an informed decision regarding the risks of using the products.

543. K.C.'s addiction to using the **DEFENDANTS'** Products is compulsive and disordered and K.C. is incapable of restraining themselves as are others around K.C. incapable of precluding them from using the products, and any attempt on their part to do so was and is met with severe withdrawal symptoms, depression, anger and rage that is injurious and harmful to K.C..

544. K.C.'s addictive use of the **DEFENDANTS'** Products necessitates their need to chronically spend their money during and throughout the hours K.C. uses the products, and K.C. has spent large sums of their money, money K.C.'s been gifted, earned, and/or stolen, and/or used gift cards on in-game microtransactions and downloadable products that are available in and

176

accessible through the **DEFENDANTS'** Products. These funds do not include K.C.'s expenditures on Minecoins, Robux, VBucks, Xbox Game Pass, Fortnite Battle Pass, and MetaQuest+.

545.  K.C. has received varied forms of treatment for their disordered and addicted use of the **DEFENDANTS'** Products due to their parents' considerable and consistent care and efforts to help K.C., albeit at a significant financial cost. K.C., to that end, has received intensive psychiatric out-patient care to treat the video game addiction and other psychological disorders and conditions proximately caused by K.C.'s use of **DEFENDANTS'** Products.

546.  K.C. suffers physically, mentally, emotionally, and socially from the injuries and harm caused by their use of the **DEFENDANTS'** addictive products.

547.  **DEFENDANTS**' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused damage to K.C.'s brain and impaired K.C.'s emotional and cognitive development, and proximately caused K.C.'s video game addiction and the sequalae of symptoms, injuries, and harm associated therewith including sleep deprivation, an inability to control impulsive behavior, compulsive and disordered use of **DEFENDANTS'** Products, severe emotional distress, diminished social interactions outside of gaming interactions, loss of friends, impulse issues that cause problems in relationships, disrespectful and dishonest behavior

177

including stealing, lying, and hiding product usage, social isolation, change in eating patterns, and a drop-in grades and educational performance. As a result of the addiction caused by K.C.'s use of **DEFENDANTS**' Products, K.C. experiences withdrawal symptoms such as rage, anger, and physical outbursts towards themself and others if those video gaming products are restricted or taken away.

548. As a result of using **DEFENDANTS'** Products and the injuries caused by that use, K.C. has been diagnosed with gaming disorder. K.C. also experiences learning problems and difficulties in school, including requiring an individualized education plan at school, because of the video game addiction, brain injury, and cognitive harm proximately caused by **DEFENDANTS'** Products.

549. As a result of the gaming addiction and harm proximately caused by **DEFENDANTS**' misconduct, as described herein, K.C. requires outpatient mental health counseling, along with abstinence from video gaming and/or using **DEFENDANTS'** Products under the supervision of a medical care provider to control K.C.'s video game addiction and the sequalae of symptoms associated therewith.

550. Carey Courtright is a parent who has lost hope in her ability to control K.C.'s use of **DEFENDANTS'** Products and she worries constantly about K.C.'s mental and physical condition when K.C. is using

178

**DEFENDANTS'** Products and particularly when she tries to restrict K.C.'s use of **DEFENDANTS'** Products.

551. Carey Courtright has been injured and damaged by **DEFENDANTS'** deception and decision to design their Products to be addictive and, therefore, harmful to children like K.C.; to wit, Carey Courtright has experienced her own mental anguish, emotional distress, pain, and suffering, along with actual financial loss and other economic injuries, due to **DEFENDANTS'** intentional, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts with respect to the design, manufacture, distribution, marketing, sale, and supply of **DEFENDANTS'** Products – and Carey Courtright is reasonably likely to continue experiencing those injuries and damages because of the ongoing harm caused by **DEFENDANTS'** Products and deception.

552. As a result of K.C.'s use of **DEFENDANTS**' defective Products, Carey Courtright has incurred expenses necessary for treating K.C.'s physical and mental health conditions caused by using **DEFENDANTS'** Products, and is likely to continue to incur such expenses, as well as other financial losses due to **DEFENDANTS**' misconduct, acts, and omissions.

553. As a result of K.C.'s use of **DEFENDANTS'** defective Products and **DEFENDANTS'** deception, K.C. has been injured and become addicted to playing video games—and Carey Courtright has lost the society and

companionship of K.C. and has been forced to witness and experience the devastation of K.C.'s addiction and the sequelae of injuries and symptoms associated with K.C.'s addiction; to wit, Carey Courtright has personally experienced emotional distress, pain, suffering, mental anguish, financial loss, and other damages due to **DEFENDANTS'** deception and decision to put their defective Products into the stream of commerce.

554. Because of **DEFENDANTS'** acts and omissions with respect to their Products, as described herein, Carey Courtright lost her ability to control her child's use of **DEFENDANTS'** Products and other video gaming products, and if she is able to restrict K.C.'s usage, she worries about K.C.'s mental and physical condition – and fears for K.C. and her own well-being – when the Products are taken away and any restrictions must be done under the supervision of K.C.'s medical care providers. Further, because of K.C.'s video game addiction, even when Carey Courtright is successful in restricting Product usage, K.C. will engage in deceptive and furtive actions to obtain access to the Products and play video games.

555. None of the Plaintiffs knew that **DEFENDANTS**' Products were and are designed to be addictive and would likely harm minors if used as intended by **DEFENDANTS**.

556. Plaintiffs never agreed to be harmed or exposed to addictive products.

557. Plaintiffs did not enter into a contract with any of the **DEFENDANTS** and/or to the extent any Defendant claims K.C. attempted to accept terms and conditions contained in an electronic agreement, it is void and unenforceable because K.C., a minor (for the majority of the time K.C. used the Products) suffering from video game addiction and other mental health issues, lacked the capacity to contract and disaffirms any contract K.C. may have made with any **DEFENDANT** or that **DEFENDANTS** claim K.C. made with them before reaching the age of majority, disaffirmance which is demonstrated and secured by the filing of the original Complaint and the instant *Amended and Supplemental Complaint and Demand for Jury Trial*. Likewise, any contractual relationship any **DEFENDANT** claims to exist by virtue of ratification is an unenforceable adhesion contract forced upon an addict subsequent to the **DEFENDANT** causing K.C. to be addicted to using the Product.

558. To the extent any **DEFENDANT** claims a contractual relationship exists between itself and any Plaintiff, no such contractual relationship has ever been formed. Each of the **DEFENDANTS'** terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to requiring signing between and by the parties. Said terms of services and conditions unilaterally hinge the user's access to the Products on accepting the terms and conditions such that failure or refusal by

181

users to accept and to continue to accept any new terms and conditions during the course of using the products results in a loss of access to the purchased products; and any terms to which **DEFENDANTS** claim any Plaintiff may have agreed prior to using any of the **DEFENDANTS'** Products are void and unenforceable.

559.    Further, because the **DEFENDANTS'** products were designed to and did cause K.C. to develop an addiction or disordered compulsion to using the products, which in turn proximately caused their mental and physical injuries and damages as herein alleged, any such terms and conditions and any other purported contract or agreement between the parties to this Action are void as against public policy as an individual cannot consent to harming a minor.

560.    K.C.'s continued use of the **DEFENDANTS'** Products, even after the filing of this action, to the extent there is such use, is compulsive and due to K.C.'s disordered compulsion and addiction to using the products and cannot and does not serve as an affirmation of any contract, however hypothetical, between the Parties.

## PLAINTIFFS' CLAIMS

561.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

562.    Through the exercise of reasonable diligence, Plaintiffs could not

have discovered that **DEFENDANTS**' products proximately caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiffs.

563. Plaintiffs did not suspect and had no reason to suspect **DEFENDANTS**' products proximately caused their injuries until within the last year.

564. Due to the highly technical nature of the **DEFENDANTS**' products, Plaintiffs were unable to independently discover that **DEFENDANTS**' products proximately caused their injuries until within the last year.

565. **DEFENDANTS** had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

566. **DEFENDANTS**' fraudulent concealment tolled the running of any statute of limitations.

567. **DEFENDANTS** had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially minors; yet, **DEFENDANTS** knowingly, affirmatively, and actively concealed from Plaintiffs the risks associated with the defects of their products and that these products caused their injuries.

568. **DEFENDANTS**' tortious and fraudulent acts continue to this day;

183

as of the date of this *Amended and Supplemental Complaint and Demand for Jury Trial*, **DEFENDANTS** have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their Products.

569. Despite their knowledge of the defects and their attendant safety risks, **DEFENDANTS** continue to market their products to minors—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

570. Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of **DEFENDANTS**' acts and omissions.

571. For the foregoing reasons, **DEFENDANTS** are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by **DEFENDANTS**' active concealment with respect to all claims against **DEFENDANTS**.

## COUNT I
## STRICT LIABILITY - DEFECTIVE DESIGN

572. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as though set forth fully herein.

573. At all relevant times, each Defendant placed the Products used by

K.C. into the stream of commerce.

574. The **DEFENDANTS**, at all relevant times, have marketed and advertised the video gaming products at issue herein throughout the United States, including in Missouri, for personal use by end-users/consumers of all ages, including minors, and specifically K.C..

575. The **DEFENDANTS** are, individually and/or in concert with one another, designers, manufacturers, marketers, sellers, developers, licensors, licensees, patent holders, and otherwise participants in placing into the stream of commerce the defective video gaming products, whether in design or in failing to warn about, and each is strictly liable to Plaintiffs for the harm and injuries and damages said products caused.

576. Each Product is designed as, and intended to be used for, video gameplay by end-users/consumers of all ages, including minors, throughout the world, including in Missouri.

577. Each Defendant markets and advertises their Products, in Missouri and throughout the United States, for personal use and video gameplay by end-users/consumers of all ages, including minors.

578. The Products the **DEFENDANTS** placed into the stream of commerce were defectively designed; to wit, designed to cause addictive and compulsive use of the products, including by minors, and which did in fact and proximately cause addictive, disordered use by K.C. and injuries and damages

185

as a result.

579.  Each Defendant defectively designed its Products to addict minors and neurodivergent users who were particularly unable to, and did not, appreciate the risks posed by the products and were particularly susceptible to harm from those products.

580.  The design defects were present in the **DEFENDANTS'** Products when the products left the hands of the **DEFENDANTS** and, as such, were unreasonably dangerous at the time they were released to the general consuming public to be used in their intended and foreseeable manner.

581.  The defects in the design of each Defendant's Products existed prior to the release of these products to Plaintiffs and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to Plaintiffs via download or URL access (in regard to digital game copies and cloud gaming).

582.  K.C. used these products as intended and in a manner reasonably anticipated, and each Defendant knew or, by the exercise of reasonable care, should have known that K.C. would use these products without Plaintiffs inspecting them for and/or being unable to discover their addictive nature.

583.  Each Defendant defectively designed its Products in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the

186

addiction of minor and neurodivergent users, and to take advantage of the chemical reward system of a user's brain (especially that of a minor and/or neurodivergent user) to create and cause addictive engagement, compulsive use, and additional mental and physical harm.

584. Each Defendant's Products are defective in design and unreasonably dangerous when put to a reasonably anticipated use for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

585. Minors, like K.C., are among the ordinary consumers of **DEFENDANTS'** Products.

586. Minors, and their parents and guardians, do not expect: (a) **DEFENDANTS**' Products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its Products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or microtransactions.

187

587.   Each Defendant's Products are likewise defectively designed such that it creates an inherent and unreasonable risk of danger; specifically, a risk of brain damage in and abuse, addiction, and compulsive use by minors leading to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

588.   The **DEFENDANTS'** Products did cause users to develop a disordered, compulsive, and addictive use of those products, including K.C., to their detriment and harm.

589.   The **DEFENDANTS'** Products were defective and unreasonably dangerous when they left the **DEFENDANTS'** possession and control. The defects continued to exist through the products' distribution to and use by consumers, including K.C., who used the products without any substantial change in the products' condition.

590.   Said defective designs of the **DEFENDANTS'** Products was and continues to date to be suppressed and concealed by the **DEFENDANTS** with the purpose and intention of taking advantage of the chemical reward system of the user's brain (especially a minor's brain) to create addictive engagement and compulsive use of the Products, without regard for consequential mental and physical harm. Said series of intentions and conduct of the **DEFENDANTS** resulted in harm and damages to the Plaintiffs.

188

591. The **DEFENDANTS**' products did not perform as safely as an ordinary consumer would have expected, are more dangerous than other Products because they were intentionally designed to be addictive to those using them, and specifically to minor and neurodivergent users, which causes a myriad of potential injuries and harm and damages, and which here did result from K.C.'s use of **DEFENDANTS**' Products.

592. The risks inherent in the design of each Defendant's Products significantly outweigh any benefit of such design.

593. Each Defendant could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including but not limited to: (a) Choosing not to use "addictive" patents identified herein in the game design; (b) Redesigning gaming software to limit rather than promote addictive engagement; (c) Implementing robust age verification; (d) Implementing effective parental controls; (e) Implementing effective parental notifications; (f) Warning of health effects of use and extended use upon sign-up or log-in; (g) Implementing default protective limits to the length and frequency of gaming sessions; (h) Implementing opt-in restrictions to the length and frequency of gaming sessions; (i) Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports; (j) Implementing blocks to use during certain times of

189

day (such as during school hours or late at night); (k) Implementing limits on number of games playable per day; (l) Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer; (m) Implementing limits on minors' in-game purchases, downloadable products, microtransactions, and total in-game spending per day; (n) Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and (o) Others as set forth herein.

594. Alternative designs were available that would reduce neurodivergent users, and minors' addictive and compulsive engagement with each Defendant's Products, and which would have effectively served the same purpose of **DEFENDANTS**' products while reducing the gravity and severity of danger posed by those products' defects.

595. K.C. used the **DEFENDANTS**' products as intended and/or in reasonably foreseeable ways.

596. As a direct and proximate result of their use of the **DEFENDANTS**' defectively designed products, K.C. sustained physical and mental injuries, emotional distress, pain, suffering, mental anguish, and economic injuries and damages.

597. K.C.'s injuries and damages were reasonably foreseeable to each Defendant at the time of their Products' development, design, advertising,

marketing, promotion, and distribution, especially considering each Defendant's conduct—described herein and including, but not limited to, specifically designing their Products to be addictive.

598. The defective design of the **DEFENDANTS'** Products used by K.C. was a substantial factor in causing harm to Plaintiffs.

599. As a direct and proximate result of **DEFENDANTS**' Products' defective design, K.C. became a video game addict and sustained injuries, which include brain damage, loss of cognitive function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain, suffering, and mental anguish.

600. K.C. was injured as a direct and proximate result of the **DEFENDANTS**' defective Products, as described herein, and Plaintiffs suffered economic damages as a result thereof.

601. The defective design of **DEFENDANTS**' Products, as identified and described herein, is a proximate cause of the harm and injuries to Plaintiffs.

602. Plaintiffs' damages, which were proximately caused by **DEFENDANTS**' defective design, are K.C.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; economic loss related to expenses incurred as a result of using **DEFENDANTS**' products; and necessary medical care, treatment, and service (including transportation,

191

lodging, and board) expenses related to K.C.'s physical and mental injuries. K.C.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

603. **DEFENDANTS** are strictly liable due to the defective design of their Products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

604. Each Defendant, in defectively designing their Products, acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors, and neurodivergent users).

605. The injuries of Plaintiffs cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

606. The nature of the intentional and fraudulent acts that created the injuries and harm endured by Plaintiffs are not the type of risks that are immediately apparent from using **DEFENDANTS**' Products.

607. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous. Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of

192

its customers, including Plaintiffs, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT II
## STRICT LIABILITY – FAILURE TO WARN

608. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

609. **DEFENDANTS'** products are designed and intended to be gaming products and are marketed and advertised to the public, in Missouri and throughout the United States, for the personal use of the end-user/consumer.

610. **DEFENDANTS'** Products are also marketed and advertised to minors and their families in Missouri and throughout the United States.

611. At all relevant times, each Defendant placed the Products used by K.C. into the stream of commerce without warning of the risk of addiction and brain injury from intended usage of the Products.

612. None of **DEFENDANTS'** products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors.

613. None of **DEFENDANTS'** products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that their

products pose a higher risk of addiction, worsening of an ability to control impulsivity, brain damage, and impaired cognitive and emotional development.

614. **DEFENDANTS** sold and distributed the Products to Plaintiffs in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to minors as described herein, including a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of harms. Those harms include, but are not limited to, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

615. **DEFENDANTS'** Products are dangerous, to an extent beyond that contemplated by the ordinary user who used **DEFENDANTS**' products, because they cause brain damage and encourage unhealthy, addictive engagement, and compulsive use, and cause a cascade of other harms as described herein.

616. Each Defendant knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to minors and neurodivergent users considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

617. **DEFENDANTS**' Products are defective and unreasonably

194

dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things: (a) **DEFENDANTS**' Products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries; (b) **DEFENDANT'S** Products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries; (c) The feedback loops and strategized patented material in **DEFENDANTS**' Products are designed to promote increasingly stimulative and alarming gameplay to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction; (d) New users of **DEFENDANTS**' Products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians; (e) The likelihood and severity of harms is greater for minors, especially those who are neurodivergent; and (f) The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

618.  Ordinary users could not and/or would not have recognized the potential risks of **DEFENDANTS**' Products when used in a manner

reasonably foreseeable to each **DEFENDANT**.

619. **DEFENDANTS'** Products were defective and unreasonably dangerous when they left the **DEFENDANTS'** possession and control without reasonable warnings and/or instructions regarding the harm outlined herein.

620. Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using **DEFENDANTS'** Products, Plaintiffs would have heeded the warnings and/or instructions.

621. Each Defendant's failure to adequately warn and/or instruct Plaintiffs about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiffs.

622. Each Defendant, in failing to warn and/or instruct consumers and end-users that their Products were addictive and have a risk of harm (including but not limited to brain damage), acted with intent, reckless disregard, and a depraved indifference to the consequences of its conduct on end-users/consumers on the health, safety, and welfare of its customers (including minors and neurodivergent users).

623. Plaintiffs' damages, which were proximately caused by **DEFENDANTS'** defective warning and instructions are K.C.'s physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; economic loss related to expenses incurred as a result of using **DEFENDANTS'** products; and necessary medical care, treatment, and service

196

(including transportation, lodging, and board) expenses related to K.C."s physical and mental injuries. K.C.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

624. As a direct and proximate result of each Defendant's failure to warn, K.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

625. **DEFENDANTS** are strictly liable due to each Defendant's failure to warn and/or instruct of the risks, dangers, and harm posed by their Products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

626. Plaintiffs' injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate. The nature of the fraudulent and unlawful acts that Plaintiffs' injuries and damages are not the type of risks that are immediately apparent from using **DEFENDANTS**' Products. As a proximate result of the **DEFENDANTS**' conduct in making their games addictive, K.C. cannot control or stop using the Products and, therefore, continues to use **DEFENDANTS**' Products despite efforts to stop.

627. The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive,

extreme, and outrageous. Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Plaintiffs, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## NEGLIGENCE – NEGLIGENT DESIGN

628.   Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

629.   Each Defendant knew or, by the exercise of reasonable care, should have known, that its Products were dangerous, harmful, and injurious when used by minors in a reasonably foreseeable manner.

630.   Each Defendant knew or, by the exercise of reasonable care, should have known that its Products posed risks of harm to minors. These risks were known and knowable in light of each Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiffs .

631.   Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of the **DEFENDANTS**' Products.

198

Those risks include brain damage, abuse, addiction, and compulsive use in minors, and which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

632. **DEFENDANTS** knew that minors would use its Products.

633. Despite this knowledge, **DEFENDANTS** designed the Products to create addictive engagement and compulsive use, including spending, in foreseeable users, including K.C..

634. Each Defendant, as video gaming product designer, manufacturer, publisher, importer, distributor, and/or supplier, had a duty to design, manufacture, and supply a product that is reasonably safe for use.

635. Each Defendant had a non-delegable duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

636. Each Defendant owed a duty to design, publish, supply, and sell reasonably safe products to foreseeable users, including K.C..

637. Each Defendant owed these duties to Plaintiffs, and particularly to K.C. as the foreseeable end-users.

638. Each Defendant breached the duties owed to Plaintiffs, and

199

particularly to K.C.. These breaches include, but are not limited to: (a) Utilizing patented designs and technology for purposes of addicting users to the Defendant's Products; (b) Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to minors, who are particularly unable to appreciate the risks posed by the products; (c) Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; (d) Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; (e) Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in minors, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (f) Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and (g) Otherwise failing to use ordinary care in the design of the products.

200

639.  Alternative designs that would reduce the addictive features of **DEFENDANTS**' Products were available, would have effectively served the same purpose as each Defendant's defectively designed products, and would have reduced the gravity and severity of danger **DEFENDANTS**' Products posed minors, including the danger and harm experienced by K.C..

640.  A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

641.  At the time each **DEFENDANTS** put its products into the market in Missouri and throughout the United States, the products were defective as outlined herein, and at the time K.C. received and used each Defendant's products, the products remained defective.

642.  At all relevant times, K.C. used the **DEFENDANTS**' Products in the manner in which they were intended by **DEFENDANTS** to be used.

643.  As a direct and proximate result of each Defendant's breached duties, Plaintiffs were harmed.

644.  The **DEFENDANTS**' design of their Products was a substantial factor in causing the Plaintiffs' harm and injuries, as described herein.

645.  As a direct and proximate result of each Defendant's breached duties, Plaintiffs have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

646.  As a direct and proximate result of each Defendant's breached

duties, Plaintiffs have suffered—and continue to suffer—economic loss and damages, as described herein.

647. **DEFENDANTS** negligently designed their Products, as identified herein, and Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

## COUNT IV
## NEGLIGENCE – NEGLIGENT FAILURE TO WARN

648. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

649. Each Defendant knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by minors.

650. Each Defendant knew or, by the exercise of reasonable care, should have known that the Products posed risks of harm to minors. These risks were known and knowable in light of each Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiffs.

651. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary consumers, and particularly users like K.C., would not have realized the potential risks and dangers of the **DEFENDANTS'**

202

products including a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

652. Each Defendant knew that minors, including K.C., would use its Products.

653. **DEFENDANTS** failed to give appropriate warnings or instructions about the risks of their products. None of **DEFENDANTS'** products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors.

654. None of **DEFENDANTS'** products, as identified herein, contain a warning—nor have **DEFENDANTS** ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage.

655. Had Plaintiffs received proper or adequate warnings or instructions about the risks of **DEFENDANTS'** Products, Plaintiffs would have heeded such warnings and/or instructions.

656. Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably

foresee.

657. Each Defendant had a duty to warn and/or instruct about particular risks of their Products, both before and after leaving the Defendant's possession and being placed into the stream of commerce.

658. Each Defendant owed these duties to users including K.C..

659. Each Defendant breached the duties owed to Plaintiffs, a foreseeable user. These breaches include, but are not limited to: (a) Failing to warn users that **DEFENDANTS**' Products cause brain damage, addiction, compulsive use, and/or other simultaneous physical and mental injuries; (b) Failing to otherwise provide reasonable and adequate warnings to Plaintiffs, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of **DEFENDANTS'** Product; (c) Failing to adequately instruct Plaintiffs regarding the risks of **DEFENDANTS** Products and the need to alter K.C.'s game play and/or product usage to avoid such risks; and (d) Otherwise failing to warn and/or instruct product users, including K.C., of the risk and harm associated with normal, foreseeable, and intended use of **DEFENDANTS**' Products.

660. A reasonable company under the same or similar circumstances as **DEFENDANTS** would have used reasonable care to provide adequate warnings to consumers, including Plaintiffs; yet **DEFENDANTS** did not provide such warning or instruction.

204

661. At all relevant times, each Defendant could have provided adequate warnings and/or instructions to prevent the harm and injuries described herein but failed to do so.

662. Had Plaintiffs received proper or adequate instructions regarding the risks of **DEFENDANTS**' Products and the need to alter their game play and product usage to avoid such risks, Plaintiffs would have heeded such warnings.

663. As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Plaintiffs was harmed and sustained the injuries set forth herein. Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Plaintiffs.

664. Each Defendant negligently failed to warn and/or instruct consumers, including Plaintiffs, of the risks, dangers, and harm posed by their Products, as identified herein, and that negligence proximately caused harm to Plaintiffs; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

<div align="center">

**COUNT V**
**NEGLIGENCE – ORDINARY NEGLIGENCE & NEGLIGENCE PER SE**

</div>

665. Plaintiffs reallege and incorporate by reference all of the foregoing

allegations as if repeated in full here.

666. Each Defendant owed Plaintiffs a duty to act as a reasonably careful company would under the circumstances.

667. Each Defendant has breached the duty owed to Plaintiffs to act as a reasonably careful company would under the circumstances.

668. A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

669. A reasonably careful company would protect Plaintiffs from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

670. A reasonably careful company would not invite, encourage, or facilitate minors, such as K.C., to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

671. A reasonably careful company would disclose that it designed its video gaming product(s) with addictive properties to take advantage of the chemical reward system of a user's brain, to create addictive engagement, and would disclose the serious safety risks presented by its Products; yet each Defendant failed to do so while knowing that abuse, compulsive use, and

206

addiction in minors and neurodivergent people can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects

672.　K.C. was a foreseeable user of the **DEFENDANTS**' Products.

673.　Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of K.C.'s use of **DEFENDANTS**' Products.

674.　Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of the Products was dangerous, harmful, and injurious when used by minors such as K.C. in a reasonably foreseeable manner.

675.　Each Defendant knew this or should have known this because each designed its product with addictive features, while knowing that abuse, addiction, and compulsive use by minors can lead to injury, including but not limited to dissociative behavior, withdrawal symptoms, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

676.　At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that the Products (as developed, setup, managed, maintained, supervised, and operated by **DEFENDANTS**) posed

unreasonable risks of harm to minors such as K.C., which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

677.   Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary minors using the Products, such as K.C., would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

678.   Each Defendant's conduct was closely connected to Plaintiffs' injuries and damages, which were highly certain to occur.

679.   Each Defendant could have avoided Plaintiffs' injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its Products which harmed Plaintiffs.

680.   Each Defendant's failure to act as a reasonable company would under similar circumstances harmed Plaintiffs.

681.   A reasonable company engaged in the manufacture, design, development, and supply of Products to minors would comply with federal and state laws designed to protect minors in online spaces (e.g., 15 U.S.C. § 6501 *et*

208

*seq.*, and the corresponding federal regulations, 16 C.F.R. § 312 *et seq.*,); yet the **DEFENDANTS** did not do that.

682. Each Defendant has improperly and illegally collected or used personal information from children younger than age 13 by, at least: (a) Failing to provide through their video gaming websites and apps a clear, understandable, and complete direct notice to parents or guardians that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information, in violation of 16 C.F.R. § 312.4(a) and (c); (b) Failing to make reasonable efforts, and/or take into account available technology, to ensure parents or guardians received such notice on their websites and applications so that parents or guardians could provide informed consent, in violation of 16 C.F.R. § 312.4(b)-(c); (c) Failing to obtain verifiable parental or guardian consent before any collection, use, or disclosure of personal information from children, in violation of 16 C.F.R. § 312.5(a)(1); (d) Processing the personal information of minors, including K.C., with actual knowledge of and in willful disregard that the processing of that information may result in substantial harm or privacy risk to K.C.; (e) Profiling minors, including K.C., without appropriate safeguards in place to protect children, and without such profiling of minors, including K.C., being necessary for the function of the Products and/or without demonstrating that such profiling does not pose a threat to minors, including K.C.; (f) Collecting, selling, sharing, and

209

retaining personal information of minors, including K.C., that is not necessary to use **DEFENDANTS'** Products; (g) Using the personal information of minors, including K.C., for reasons other than the purpose for which the personal information is collected, including but not limited to selling that information to third-parties and using such information for advertising, marketing, and design purposes; (h) Collecting, selling, and sharing any precise geolocation data of children, including K.C., including but not limited to selling that information to third-parties and using such information for advertising, marketing, design, and matchmaking purposes; (i) Collecting any precise geolocation data of children, including K.C., without providing an obvious sign to the child for the duration of the collection that the precise geolocation is being collected; (j) Using dark patterns that lead or encourage children to provide personal information beyond what personal information would otherwise be reasonable expected to be provided for the use of **DEFENDANTS**" Products, including but not limited to using dark patterns in matchmaking systems, marketing, microtransactions, and other product design features; (k) Using any personal information collected from users, including K.C., to estimate their age or age range for purposes beyond age verification; (l) Retaining personal information collected from users, including minors like K.C., longer than necessary to estimate the user's age; and (m) Otherwise acted in conflict with state and federal law regarding the protection

210

of children in online spaces, which includes **DEFENDANTS**' Products.

683. At all relevant times, each Defendant collected and/or used personal information from minors using **DEFENDANTS**' Products, including K.C., in the ways described above; the **DEFENDANTS'** actions were negligent.

684. Each Defendant has actual knowledge that it collects personal information, including but not limited to avatars generated from a child's image, biometric and health information, and geolocations, directly from users of its respective websites or online services; the **DEFENDANTS**' collection of this information is negligence.

685. Each Defendant utilizes data collected users' personal information to design and develop new products and microtransactions, and also uses the collected personal information with algorithms and other patented technologies to target product users.

686. Each Defendant's negligent acts and omissions in violation of state and federal law harmed and damaged K.C. because, *inter alia*, these privacy violations were used to analyze the gaming and purchasing behavior of minors and design game releases tailored to prey on the minors to trick minor into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns.

687. **DEFENDANTS** have violated statutory and regulatory law, as

211

identified herein, and because K.C. were or have been at all times relevant within the class of persons those statutes and regulations are designed to protect—and K.C.' injuries and damages are the type of harm that these statutes and regulations are intended to prevent—each **DEFENDANT** is *per se* negligent.

688. Each Defendant's actions with respect to their Products at issue fell below that which a reasonable company would do when knowingly designing and marketing toys for children; to wit, reasonable companies would not (as **DEFENDANTS** did here): (a) Profile minors in order to prey on the minors and trick minor into buying microtransactions or unknowingly make in-game purchases using the game patents and other illegal dark patterns and/or to knowingly target minors to addict them to **DEFENDANTS**' products so **DEFENDANTS** can increase profits as much as possible; (b) Process minors' information with a willful disregard for the harms outlined herein; (c) Collect and retain information not necessary to provide an online service, product, or feature with which a child is actively and knowingly engaged posing an unnecessary and unreasonable risk of harm to minors; and (d) sell and/or allow to be sold a minor user's personal information and biometric data.

689. Each Defendant owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using **DEFENDANTS**'

212

Products that were known to each Defendant, or that each Defendant should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks; yet, no Defendant provided any such instruction.

690. Each Defendant has breached its duties of care owed to Plaintiffs through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of Defendants' Products. Those breaches include: (a) Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by minors, including K.C.; (b) Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of minors users, including K.C., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (c) Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by minors, including K.C.; (d) Including features and patented technology in their Products that, as described above, are currently structured and operated in a

213

manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by minors, including K.C.; (e) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of minors users, including K.C., including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; (f) Including features and patented technology in their Products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by minors, including K.C.; (g) Developing, patenting, and licensing unreasonably dangerous features and algorithms for Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of children, like K.C.; (h) Maintaining unreasonably dangerous features and algorithms in their Products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of children, like K.C.; (i) Facilitating use of their Products by minors under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity

214

verification protocols; (j) Failing to implement effective protocols to block users under the age of 13; (k) Failing to implement effective parental controls; (l) Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by minors, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse; (m) Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable products, product upgrades, and/or microtransactions; (n) Failing to implement reasonably available means to limit or deter use of products by minors during ordinary times for school or sleep; (o) Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage minors users; and (p) Otherwise failing to act as a reasonable company would under similar circumstances.

691. Each Defendant further breached the duty owed to recognize the safety risks posed to such users from **DEFENDANTS**' Products.

692. A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of minor users like K.C.; yet **DEFENDANTS** did not do this. This

215

was a breach of duties owed to Plaintiffs.

693. As a direct and proximate result of each Defendant's breach of one or more of its duties, K.C. has been injured and harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, **DEFENDANTS'** products, and a cascade of resulting negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

694. As alleged herein, each Defendant's breach of one or more of its duties is a proximate cause of K.C.'s injuries and damages.

695. As a direct and proximate result of each Defendant's breach of duties, K.C. has and will require more healthcare and services and Plaintiffs did incur medical, health, incidental, and related expenses.

696. Each Defendant was negligent, and Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

697. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

216

698. The **DEFENDANTS'** outrageous, extreme, and reckless conduct, as described herein, caused Plaintiffs to experience extreme emotional distress.

699. Each Defendant intentionally designed its Products to addict minor and neurodivergent users, the type of individuals who were particularly unable to appreciate the risks posed by **DEFENDANTS**' products and were particularly susceptible to harms from those products.

700. Each Defendant intentionally designed its Products to take advantage of the chemical reward system of users' brains (especially minor and neurodivergent users) to create addictive engagement, compulsive use, and additional mental and physical harm.

701. Each Defendant designed its Products in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minor and neurodivergent users.

702. Each Defendant intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors and neurodivergent users, like K.C., to use each **DEFENDANTS**' video gaming product and intended for such users to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of **DEFENDANTS**' conduct and immoral tactics.

217

703. **DEFENDANTS** knew that extended use of video games, *i.e.,* their products, could likely cause addiction, yet each Defendant engaged in the course of conduct and reckless behavior surrounding their Products.

704. Each Defendant intentionally failed to warn users, prospective users, or their parents/guardians of the addictive components of its Products.

705. Each Defendant displayed flagrant disregard and an entire want of care to the consequences of their conduct, including to the health, safety, and welfare of their customers.

706. Each Defendant's conduct in designing and developing its products to knowingly and purposefully addict and harm users—especially minors—was intentional, reckless, extreme, and outrageous, and was beyond all possible bounds of decency, and was to be regarded as atrocious and utterly intolerable in a civilized community.

707. Each Defendant knew users, like K.C., would likely become addicted to **DEFENDANTS**' Products because each Defendant designed and developed their Products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so **DEFENDANTS** can continue to profit off users, including K.C., after initial purchase or download.

708. Each Defendant knew that when users, like K.C., became addicted to **DEFENDANTS**' Products due to the addictive and defective qualities thereof, that users, parents and families would be forced to deal with an

218

uncontrollable video game addiction in the product user and the harmful effects of such addiction.

709. Each Defendant intended to inflict emotional distress *(e.g.*, causing addiction) on users, like K.C., and should have known product users and their families, would suffer emotional distress as a result of **DEFENDANTS'** conduct.

710. Plaintiffs have sustained severe emotional distress beyond what a reasonable person should be expected to endure because of **DEFENDANTS'** conduct.

711. **DEFENDANTS'** conduct—individually and collectively— including their decision to intentionally create and market products that addict and abuse children and cause them severe mental and physical harm and distress—is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

712. No reasonable person would be expected to endure such severe emotional distress as each Defendant has caused Plaintiffs.

713. As a direct and proximate result of each Defendant's outrageous conduct and infliction of emotional distress, Plaintiffs have experienced extreme emotional distress and will require additional treatment for their mental health conditions proximately caused by **DEFENDANTS'** outrageous behavior.

714.  As a direct and proximate result of each Defendant's intentional infliction of emotional distress, Plaintiffs have been damaged; to wit, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiffs' severe emotional distress and injuries; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

715.  The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous. Each Defendant acted with flagrant disregard, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Plaintiffs, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT VII
## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT, MO. REV. STAT § 407.010 *et seq.*

716.  At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the Products used by K.C..

220

71.     Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

72.     Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

73.     It is unlawful for any Defendant to engage in methods, acts, or practices that involve deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in or from the state of Missouri, as these are unlawful practices under the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. 407.010 et seq.

74.     Each Defendant engaged in deceptive, unfair, and unlawful trade practices in connection with the sale and advertisements of the Products. Those violations include but are not limited to the following: (a) Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services; (b) Advertising the Products with the intent not to sell them as advertised; (c) Employing bait-and-switch advertising consisting of an attractive but insincere offer to sell a product or service which the seller in truth does not intend or desire to sell; (d) Knowingly

221

taking advantage of consumers who is reasonably unable to protect their interest because of their age; (e) Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product; (f) Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, like Plaintiffs, rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services; (g) Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products; (h) Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to minors; (i) Using dark patterns and other unfair and deceptive practices to entice minors, including K.C., into in-game purchases and microtransactions, as described herein; (j) Using dark patterns and other unfair and deceptive practices that allow or allowed minors and young adults to make in-game purchases and microtransactions without parental consent or account holder consent; (k) Knowingly making a false representation as to the characteristics, components, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services as safe for their intended use, while knowing that those products and services had been designed to be addictive; (l) Advertising their goods or services as safe for

222

use by minors with the intent to sell them with addictive features built in; (m) Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product; (n) Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, including Plaintiffs, rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services; (o) Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to minors; and (p) Otherwise failing to disclose the use of addictive-patented technology and unlawful gaming tactics or devices within the Products.

75.    Each Defendant engaged in the aforementioned unlawful or deceptive trade practices in the in the course of business and in connection with the sale of goods or services to Missouri consumers, including Plaintiffs.

76.    Each Defendant also violated the MMPA by offering misleading or deceptive prize promotions, including but not limited to: (a) Representing directly or by implication that players, including K.C., will have an increased chance of receiving a prize by making multiple or duplicate purchases, payments, or donations, or by entering a game, drawing, sweepstakes, or other contest more than one time, unless the representation is true; (b) Representing directly or by implication that users, like K.C., are being notified a second or

223

final time of the opportunity to receive or compete for a prize unless the representation is true; (c) Representing directly or by implication that a prize notice is urgent, or otherwise convey an impression of the urgency by use of description, narrative copy, phrasing on an envelope, or similar method unless there is a limited time period in which the recipient must take some action to claim or be eligible to receive a prize, and the date by which such action is required appears in immediate proximity to each representation of urgency and in the same type size and boldness as each representation of urgency; and (d) Offering misleading or deceptive prize promotions through its respective games, including but not limited to, timed quests, battle passes or packs, and loot boxes, that encourage users like K.C. to continually keep making in-game purchases.

77.    Defendants' actions detailed herein constitute deceptive, unfair and unlawful acts and trade practices in violation of the MMPA and are actions that would mislead a reasonable consumer.

78.    Plaintiffs acted as reasonable consumers would in light of all of the circumstances, purchasing and using the Defendants' products in the ways reasonably anticipated and expected by Defendants.

79.    Defendants' deceptive, unfair and unlawful acts as alleged herein are of the kind and nature that would cause a reasonable person to enter into the transactions that resulted in damages to Plaintiff.

224

80.     Plaintiffs relied to their detriment on Defendant's deceptive and unconscionable acts, including Defendants' respective misrepresentations and deceptions, in deciding to use and how to use Defendants' gaming products.

81.     As a proximate result of each Defendant's deceptive, unfair and unlawful trade practices, described above, Plaintiffs suffered actual and ascertainable financial loss. This loss includes but is not limited to, money spent on microtransactions and Plaintiffs have unnecessarily paid and/or have become liable to pay and will continue to pay and/or be liable to pay for medical aid, medical treatment, and medications.

82.     Had each Defendant not engaged in the respective unfair, deceptive, and abusive conduct described herein, Plaintiffs would not have used each Defendant's respective products and would not have suffered financial loss.

83.     Each Defendant violated the MMPA in the manner described herein and, as a result of Defendants' countless violations of the MMPA, Plaintiffs are entitled to damages in an amount to be proven at trial as compensation for their actual and ascertainable financial loss and reasonable attorney's fees incurred in connection with prosecuting this claim.

84.     Each Defendant engaged in unconscionable and deceptive trade practices, as described above, which was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, outrageous, unlawful, and

displayed a flagrant disregard of, and an entire want of care and conscious and depraved indifference to, the consequences of its conduct, including to the health, safety, and welfare of its customers. This misconduct warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT VIII
## DECEIT – FRAUDULENT MISREPRESENTATION, FRAUDULENT OMISSION AND NONDISCLOSURE, AND FRAUDULENT CONCEALMENT

717.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

718.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the Products used by K.C..

719.    As detailed herein, each Defendant knew about the defective conditions of its Products and that the products posed serious health risks to users, particularly minors.

720.    Each Defendant knew their Products posed risk to minors and neurodivergent users, like K.C., based on internal research and external studies known in the industry and to each Defendant; yet each Defendant

226

misrepresented the safety and value of their games for the purpose of inducing such users, including K.C., to purchase/download the product and to continue using **DEFENDANTS**' products to the addiction knowingly caused by **DEFENDANTS**' products.

721.  Each Defendant could have disclosed the defective condition of their Products to the public and could have advised that the products posed serious health risks to users, particularly minors. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

722.  Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its Products.

723.  Each Defendant intentionally omitted or knowingly did not disclose material facts about their Products, or their collective use of patents designed to addict players to **DEFENDANTS**' products.

724.  Each Defendant concealed the serious safety risks presented by its Products, including **DEFENDANTS**' concealment from the public, including K.C., that each Defendant designed its Products with addictive psychological features to take advantage of the chemical reward system of users' brains, to trick and induce users into purchasing addictive Products, and to keep users playing more often and for longer periods of time, despite **DEFENDANTS**' knowledge that abuse, addiction, and compulsive use of **DEFENDANTS**'

227

Products by minors and neurodivergent people can lead to brain damage, addiction, and other injuries.

725. Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings in order to induce minors and neurodivergent users, including K.C., to continue using its Products and avoid losing users and revenue.

726. Each Defendant knew that its concealment was material.

727. Each Defendant intended its concealment to induce the public and users, including K.C., to purchase, download, play, continue to use, and/or purchase downloadable game products or in-game product transactions in each Defendant's product.

728. In addition to hiding and concealing the dangers of their Products, each Defendant made material misrepresentations (and others) about their Products while knowing or believing those representations to be false *and* with the intent that Plaintiffs (and the public) rely on those misrepresentations.

729. **DEFENDANTS**' false representations involve, but are not limited to, material misstatements about the safety of **DEFENDANTS**' Products, and other misstatements identified herein and made directly to consumers, including Plaintiffs.

730. Each Defendant also knowingly and recklessly misled the public—

228

particularly product users, and their parents, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

731. Each Defendant knew that its acts of concealment and omissions, nondisclosures, and misrepresentations involved material information.

732. **DEFENDANTS**' deception, omission, nondisclosures, and misrepresentations were material because a reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of **DEFENDANTS**' products—to be important when deciding whether to use, or continue to use, those products.

733. If **DEFENDANTS** had not concealed, omitted, and misrepresented material facts regarding the safety of their products, Carey Courtright would not have allowed K.C. to use **DEFENDANTS'** Products, K.C. would not have used **DEFENDANTS**' Products, K.C. would not have purchased, downloaded, played, continued to use, and/or purchased downloadable product upgrades or in-game transactions in each Defendant's product, K.C. would not have become a video game addict , would not have sustained injury to K.C.'s brain and cognitive development, or suffered from the sequalae of symptoms associated with addiction and gaming disorder, and Carey Courtright would not have been forced to endure the pain and suffering of watching her child suffer from a debilitating and devasting disease.

229

734. As a direct and proximate result of each Defendant's material omissions, intentional nondisclosures, affirmative misrepresentations, and active concealment of the dangers posed by the Products, Plaintiffs had no reason to believe that **DEFENDANTS'** products were unsafe for minors to use.

735. As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

736. As a direct and proximate result of each Defendant's concealment, omission, nondisclosures, and misrepresentation of material information, Plaintiffs has been injured and has sustained damages, as described herein.

737. Each Defendant took affirmative steps to conceal the true nature and risk posed by their Products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore, an award of punitive damages in an amount— imposed by the jury at trial—sufficient to punish the **DEFENDANTS** and deter others from like conduct is warranted.

738. The **DEFENDANTS**' fraudulent concealment tolls any applicable

statute of limitations.

739. At all relevant times, within **DEFENDANTS**' Products, each Defendant included the ability for users, including K.C., to purchase in-game downloadable products or microtransactions; yet each Defendant hid the risk of harm posed by those products and that each Defendant used patented technologies and psychological features to target users based on their use of the product and other interactions with **DEFENDANTS**' products.

740. Users of **DEFENDANTS**' products, including minors such as K.C., were deceived by each Defendant in connection with these microtransactions through false representations and material misstatements built into each Defendant's products.

741. **DEFENDANTS**' methods of deceit include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, artificial intelligence, avatars or "friends" to encourage purchase, and disguised features of the **DEFENDANTS**' products, which misrepresent to users, like K.C., that game-selected purchases would help them advance in the game or complete necessary missions.

742. **DEFENDANTS** made these false representations and material nondisclosures with intent that product users, like K.C., spend money on

microtransactions.

743.   At the time each Defendant utilized these technologies to deceive Plaintiffs, and each Defendant knew that the representations made through the game were false and existed only to entice K.C. to continue spending and using the Products.

744.  Each      Defendant     intended      its     fraudulent     in-game microtransactions and psychological tactics to take advantage of users like K.C..

745.   At the same time, each Defendant knew that misrepresentations served only to increase users'—including K.C.'s—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by minors which can lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

746.  Plaintiffs      reasonably      relied      on      **DEFENDANTS**' misrepresentations within each Defendant's product to make several in-game purchases that actually had little to no value to Plaintiffs.

747.   Had Plaintiffs known that the representations in each Defendant's Products regarding in-game purchases were false and fraudulent, and the result of **DEFENDANTS**' use of patented technologies, Plaintiffs never would have used **DEFENDANTS'** Products and Plaintiffs never would have

232

purchased **DEFENDANTS**' Products or spent money on additional in-game downloadable product upgrades, events, and/or microtransactions built into the product design.

748. Furthermore, as detailed herein, each Defendant knew about the defective conditions of its Products and that the products posed serious health risks to users but did not tell Plaintiffs and actively misrepresented otherwise.

749. Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly misrepresented those findings to avoid losing revenue so that product users, like K.C., would continue using **DEFENDANTS'** Products.

750. Each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing their Products were safe or even beneficial for children to use.

751. Each Defendant intended its misrepresentations, concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase the Products.

752. By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its Products, and reassuring the public, users, and parents, including Plaintiffs, that its products were safe,

233

each Defendant did fraudulently induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase the Products.

753. Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like K.C., would be induced into spending money that they would not spend on **DEFENDANTS**' products if they knew the truth.

754. A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of **DEFENDANTS**' products—to be important when deciding whether to use, or continue to use, those products. Thus, Plaintiffs justifiably relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing the Products.

755. As a direct and proximate result of each Defendant's fraudulent misrepresentations, omissions, and concealment, Plaintiffs were not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's Products, and/or purchasing in-game product transactions in each Defendant's product.

234

756. Each Defendant's silence and nondisclosures of material information about the risks associated with their products was made under facts and circumstances where each Defendant was under a duty to speak about those risks to Plaintiff and others, because Defendants had superior knowledge or information about their products and the risks of their products that was not reasonably available to Plaintiff or other consumers, because such information was kept or considered confidential by each Defendant.

757. Each Defendant intended its misrepresentations, omissions, and concealment to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

758. A reasonable person, including Plaintiffs, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

759. Plaintiffs used ordinary diligence in purchasing and using Defendants' products, but they could not, through ordinary diligence, have discovered the true facts known only to Defendants about the deceptive features of their products and the risks of using such products to Plaintiff.

760. If Defendants had not concealed material facts about the safety of their respective products, including but not limited to concealing that the

235

products had been designed to be addictive, then Plaintiffs would not have purchased, downloaded played, continued to use, and/or purchased downloadable game content or in-game product transactions in each Defendant's product.

761.  As a direct and proximate result of each Defendant's concealment of material information, Plaintiffs have been financially and otherwise harmed through each Defendant's inducements to utilize their products, download and play their games, and/or continuously spend funds through its products.

762.  By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its Products, and affirmative representations to the public, users, and parents, including Plaintiffs, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiffs, into believing its products were safe for children to use.

763. Each Defendant knew that its misstatements and false representations, as identified herein, were material.

764.  The misrepresentations described herein were made to Plaintiffs—particularly to K.C. —prior to their purchase and/or download of each Defendant's product and to K.C. while each of them was using **DEFENDANTS**' products as intended.

765.  Each Defendant intended its material misstatements and false

representations to induce the public, users, and parents, including Plaintiffs, to purchase, download, play, continue to use, and/or purchase the Products.

766. Plaintiffs relied on **DEFENDANTS**' material misstatements and false representations in deciding whether to use, or continue to use, **DEFENDANTS**' products, including **DEFENDANTS'** material misstatements and false representations about Minecraft (including Minecraft Education), Xbox Network (including Xbox Live, Xbox Game Pass, Xbox Cloud Gaming, and Xbox Store), Latitude 3190 laptops, Roblox, and iPhone (including App Store) regarding the safety and educational benefit of those products when used by minors.

767. Plaintiffs' reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchase the Products was justifiable and reasonable under the circumstances.

768. As a direct and proximate result of each Defendant's material misrepresentations and false statements, *i.e.,* **DEFENDANTS**' deceit, Plaintiffs were not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiffs justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

769. As a direct and proximate result of each Defendant's material

237

misrepresentations and false statements (*e.g.,* **DEFENDANTS**' deceit), Plaintiffs have been damaged. Such damage includes physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; K.C.'s inability to attend school; economic loss related to expenses incurred as a result of using **DEFENDANTS**' products; and the necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to Plaintiffs' physical and mental injuries. Further, K.C.'s injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

770.    Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiffs' injuries and losses; therefore, Plaintiffs are entitled to damages in an amount to be proven at trial and in an amount a jury finds will fairly and justly compensate Plaintiffs for the injuries, loss, and harm described herein.

771.    In conjunction with **DEFENDANTS**' acts of concealment, omission, nondisclosure, and misrepresentation, each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiffs, into believing these products were safe or even beneficial for children to use.

## COUNT IX
## NEGLIGENT MISREPRESENTATION

772. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

773. Each Defendant had a pecuniary interest in the Products used by K.C..

774. Each Defendant—and all designers, developers, manufacturers, publishers, and suppliers of Products having a pecuniary interest in these Products—had a duty to communicate accurate information and to make truthful statements of material fact to the public about their Products. This duty includes but is not limited to telling Plaintiffs the truth about the addictive design and dangerous condition of **DEFENDANTS**' products used by K.C. and that those products posed serious health risks to users, particularly minors.

775. As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its Products pose serious health risks to users, particularly minors and neurodivergent users, including K.C.; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More specifically, each Defendant made numerous partial material

239

representations to the public, users, and their parents, including Plaintiffs, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiffs that its products were safe or even beneficial for children to use.

776. Each Defendant made false statements and misrepresentations with intent to induce Plaintiffs (and the general public) to purchase and use their Products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

777. Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiffs and the public.

778. **DEFENDANTS**' false statements and material misrepresentations downplaying any potential harm associated with its products did, in fact, induce Plaintiffs to purchase and use **DEFENDANTS**' products—and Plaintiffs relied upon **DEFENDANTS**' false statements and misrepresentations in deciding to use **DEFENDANTS**' Products. Likewise, K.C. relied on **DEFENDANTS**' false statements and misrepresentations in conjunction with in-game purchases and **DEFENDANTS**' deceptive microtransaction mechanisms, including the use of fake "friends" to induce

240

K.C. into spending money.

779. Plaintiffs' reliance on **DEFENDANTS**' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

780. Plaintiffs have been damaged because of the false statements of each Defendant and Plaintiffs' reliance on each Defendant's statements. This damage includes the injuries and harms to Plaintiffs, described above, including but not limited to K.C.'s addiction to, or compulsive or excessive use of, **DEFENDANTS**' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their daily life. Further, as a direct and proximate result of each Defendant's material misrepresentations, K.C. has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

781. Plaintiffs would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of **DEFENDANTS**' Products.

## COUNT X
## CIVIL CONSPIRACY

782. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

783. A civil conspiracy occurs when two or more persons with an unlawful objective, after a meeting of the minds, commit at least one act in furtherance of the conspiracy and thereby damage another. Such a conspiracy occurred here.

784. The **DEFENDANTS** conspired and acted in concert to addict users, including K.C., to **DEFENDANTS**' Products.

785. The **DEFENDANTS** conspired and acted in concert to distribute, market, supply, and/or sell defective and dangerous Products to Missouri consumers in a deceptive, furtive, concealed, and/or misleading manner in an effort to increase the **DEFENDANTS'** revenue despite being aware that the Products could and likely would harm minors using their Products.

786. Upon information and belief, licensing agreements exist between **DEFENDANTS** that allow product developers to utilize the same patents, technologies, design features, and developer tools that keep users, including minors like K.C., addicted to **DEFENDANTS**' products. More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting and addicting users, including minors like

242

K.C., and to deceive the general public regarding the safety of the Products in order to maximize profits.

787. The **DEFENDANTS** knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from their harmful Products, and that addicted and harmed Plaintiffs.

788. As described herein and at all times material hereto, **DEFENDANTS** intentionally targeted users, and specifically minors and their parents, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by K.C. and other users.

789. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiffs are not the type of risks that are immediately apparent from using **DEFENDANTS**' products.

790. Epic Games and Microsoft knowingly conspired and otherwise acted in concert to make Fortnite available for use with Xbox consoles and other Xbox products, to place Fortnite into the stream of commerce, and to

243

violate Missouri's products liability and common law, to violate the state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, Epic Games and Microsoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Fortnite video game product, and that caused Plaintiffs' injuries and damages.

791. Epic Games and Google knowingly conspired and otherwise acted in concert to make Fortnite available via Google Play for use on devices using an Android-based operating system, to place Fortnite into the stream of commerce and to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, Epic Games and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance

244

of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Fortnite video game product, and that caused Plaintiffs' injuries and damages.

792. Roblox Corp. and Microsoft knowingly conspired and otherwise acted in concert to make Roblox available for use with Xbox consoles and other Xbox products, to place Roblox into the stream of commerce, to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, Roblox Corp. and Microsoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Roblox video game product, and that caused Plaintiffs' injuries and damages.

793. Roblox Corp. and Google knowingly conspired and otherwise acted in concert to make Roblox available via Google Play for use on devices using an Android-based operating system, to place Fortnite into the stream of

245

commerce, to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, Roblox Corp. and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Fortnite video game product, and that caused Plaintiffs' injuries and damages.

794.    Mojang and Minecraft knowingly conspired and otherwise acted in concert to make Minecraft available for use with Xbox consoles and other Xbox products, to place Minecraft into the stream of commerce, to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, Mojang and Microsoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to

246

fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from Minecraft, and that caused Plaintiffs' injuries and damages.

795. Mojang, Microsoft, and Google knowingly conspired and otherwise acted in concert to make Minecraft available via Google Play for use on devices using an Android-based operating system, to place Minecraft into the stream of commerce, to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, Mojang, Microsoft, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Fortnite video game product, and that caused Plaintiffs' injuries and damages.

796. RRI and Microsoft knowingly conspired and otherwise acted in concert to make Rec Room available for use with Xbox consoles and other Xbox products, to place Rec Room into the stream of commerce, to violate Missouri's

247

products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, RRI and Microsoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Rec Room video game product, and that caused Plaintiffs' injuries and damages.

797. RRI and Google knowingly conspired and otherwise acted in concert to make Rec Room available via Google Play for use on devices using an Android-based operating system, to place Rec Room into the stream of commerce, to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, RRI and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common

248

agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Rec Room video game product, and that caused Plaintiffs' injuries and damages.

798.  RRI, Meta, and Google knowingly conspired and otherwise acted in concert to make Rec Room available for use with Oculus Quest gaming headsets via Meta Store and/or MetaQuest+, to place Rec Room into the stream of commerce, to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, RRI, Meta, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Rec Room video game product, and that caused Plaintiffs' injuries and damages.

799.  VRChat Inc., Meta, and Google knowingly conspired and otherwise acted in concert to make VRChat available for use or use with Oculus Quest

249

gaming headsets via Meta Store and/or MetaQuest+, to place Rec Room into the stream of commerce, to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, VRChat Inc., Meta, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful VRChat video game product, and that caused Plaintiffs' injuries and damages.

800. Axiom, Meta, and Google knowingly conspired and otherwise acted in concert to make Gorilla Tag available for use with Oculus Quest gaming headsets via Meta Store and/or MetaQuest+, to place Gorilla Tag into the stream of commerce, to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including

250

Plaintiffs. In particular, Axiom, Meta, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Gorilla Tag video game product, and that caused Plaintiffs' injuries and damages.

801. Banana Analytics, Meta, and Google knowingly conspired and otherwise acted in concert to make Capuchin available for use with Oculus Quest gaming headsets via Meta Store and/or MetaQuest+, to place Capuchin into the stream of commerce, to violate Missouri's products liability and common law, to violate state and federal law, to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiffs. In particular, Banana Analytics, Meta, and Google knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Capuchin video game product, and that caused

251

Plaintiffs' injuries and damages.

802.   Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its video gaming product to users, including K.C., while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries),

803.  Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including K.C..

804.   These conspiracies allowed **DEFENDANTS** to maximize profits, all while causing significant harm to users, like K.C..

805.   Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies and the underlying torts committed by **DEFENDANTS**, and K.C. continues to suffer injuries and damages as K.C. is unable to stop using **DEFENDANTS**' Products as a result of the addiction caused by those products, **DEFENDANTS**' defective product designs, and **DEFENDANTS**' failure to warn consumers, like Plaintiffs, about the harmful and addictive qualities and components of those Products.

806.   K.C.'s injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

## COUNT XI
## IN-CONCERT LIABILITY

807.    Plaintiffs realleges and incorporates by reference all of the foregoing allegations as if repeated in full here.

808.    In-concert, or shared, liability arises where one party acts in concert with another tortfeasor; in-concert liability exists among **DEFENDANTS.**

809.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors like K.C., with unfair and deceptive trade practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by K.C. and other users.

810.    Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each Defendant to utilize the same patents to keep users, including minor users like K.C., addicted to **DEFENDANTS**' products.

811.    More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors and neurodivergent users like K.C., with unfair and deceptive trade practices in order to maximize profits off of the addictive Products.

253

812.   Each Defendant that licenses harmful patented technology from the creator, designer, and/or developer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

813.   Each Defendant knew of the risk of abuse, addiction, and compulsive use by minors and neurodivergent users, including K.C., arising from the harmful technologies and tactics contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other **DEFENDANTS** to do the same.

814.   Additionally, the **DEFENDANTS** acted in concert with one another to place addictive games and technology in the Products and to encourage the purchase and use of such products by minors.

815.   **DEFENDANTS**  do not place any restrictions on game developers collecting and tracking game playing behavior, game stimulus to trigger purchasing microtransactions, or amount of time a player, who is a minor and/or neurodivergent, can spend playing games, and **DEFENDANTS** acted in concert and/or assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

816.   Such concerted conduct allowed **DEFENDANTS** to maximize profits, all while causing significant harm to users, including K.C..

817.   Plaintiffs sustained injuries and damages, as described herein, as a direct and proximate result of **DEFENDANTS'** concerted conduct.

818. As a proximate result of **DEFENDANTS**' conspiring and acting in concert to make their Products addicting, K.C. continues to suffer injuries and is unable to stop using **DEFENDANTS**' Products as a result of K.C.'s addiction, **DEFENDANTS**' defective design, **DEFENDANTS**' failure to warn consumers, including Plaintiffs, about the addictive qualities and components of those products, and **DEFENDANTS'** deceitful and fraudulent conduct.

819. Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused K.C.'s addiction, injuries, and damages, as described herein.

820. Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused Carey Courtright to lose the comfort, society, affection, and services of K.C. and that proximately caused Carey Courtright's emotional injuries and damages, as described herein.

821. For these reasons, **DEFENDANTS** have shared liability for Plaintiffs' injuries and damages.

## COUNT XII
## LOSS OF CONSORTIUM

822. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

823. Consortium may be generally defined as the comfort, society,

255

affection, services, and other indefinable elements reasonably expected from the injured person, the loss of which is compensable. Such a loss occurred here.

824. **DEFENDANTS'** intentional, negligent, deceptive, fraudulent, careless, reckless, willful, immoral, and unlawful conduct, as described herein, proximately caused K.C.'s video game addiction and other injuries which resulted in Carey Courtright losing the society, love, companionship, and services of K.C. that she once enjoyed.

825. **DEFENDANTS'** conduct has damaged Carey Courtright and caused her great mental anguish and emotional distress—which she continues to endure because of the **DEFENDANTS'** continued wrongful conduct and the permanent injuries K.C. sustained as a result of using **DEFNDANTS'** Products, and Carey Courtright should be compensated for her loss.

## PRAYER FOR RELIEF

826. Plaintiffs reallege and incorporate by reference all of the foregoing allegations as if repeated in full here.

827. Plaintiff Carey Courtright, individually and on behalf of K.C., a minor, respectfully requests judgment in their favor and against each Defendant to the full extent of the law, as follows:

a. For an award of compensatory damages for K.C. in an amount to be determined at trial on the following elements of damage:

i. The nature, extent, duration, and permanency of K.C.'s

256

injuries;

ii.     The reasonable expense of all necessary medical care, treatment, and services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

iii.    The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

iv.     The pain, suffering, and mental anguish experienced in the past;

v.      The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

vi.     Any scars, disfigurement, or visible results of K.C.'s injuries;

vii.    The present value of any loss of ability to earn in the future;

viii.   The reasonable expense of any necessary help in Plaintiffs' home or school which has been required as a result of K.C.'s injuries;

ix.     The present value of any necessary help in Plaintiffs and/or K.C.'s home or school reasonably certain to be required in the future;

257

     x.      K.C.'s inability to attend school;

    xi.      Actual financial loss; and

   xii.      Any other actual pecuniary loss or future financial loss proximately caused by **DEFENDANTS**.

b.      For an award of compensatory damages for Carey Courtright, in an amount to be determined at trial, to fairly compensate her for the pain, suffering, mental anguish, emotional distress, injuries, and actual financial loss proximately caused by **DEFENDANTS**' tortious acts and misconduct described herein; and the reasonable value of any loss of the services, society, companionship, and familial relationship Carey Courtright once enjoyed with K.C.;

c.      For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

d.      For an award of statutory damages to be determined at trial;

e.      For an award of punitive damages in an amount to be proven at trial;

f.      For an award of costs and attorneys' fees, as allowable by law;

g.      For pre-judgment and post-judgment interest, as allowable by law; and

h.      For such other and further relief this Court may deem just and proper.

## JURY DEMAND

828.     Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted this 19th day of September 2024.

by:   **BULLOCK LEGAL GROUP LLC**

*/s/ Breean Walas*
Tina M. Bullock (PHV)
Breean "BW" Walas (PHV)
3350 Riverwood Pkwy, Suite 1900
Atlanta, GA 30339
Office: (833) 853-4258
Fax: (833) 895-2022.
tina@bullocklegalgroup.com
bwalas@bullocklegalgroup.com

**WAGSTAFF & CARTMELL LLP**

Eric D. Barton MO Bar # 53619
Melody R. Dickson MO Bar # 61865
Diane K. Watkins MO Bar #57238
4740 Grand Ave., Ste. 300
Kansas City, MO 64112
Tel.: 816-701-1100
Fax: 816-531-2372
ebarton@wcllp.com
mdickson@wcllp.com
dwatkins@wcllp.com

*Attorneys for Plaintiff Carey Courtright,*
*individually and on behalf of K.C., a minor*

## CERTIFICATE OF SERVICE

I, Breean "BW" Walas, certify that on September 19, 2024, I electronically filed the foregoing *Amended and Supplemental Complaint and Demand for Jury Trial* with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties and counsel of record.

<div align="right">

*Breean Walas*
Breean "BW" Walas

</div>