# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

CAREY COURTRIGHT, individually and on
behalf of K.C., a Minor,

    Plaintiff,

  v.

EPIC GAMES, INC., ROBLOX
CORPORATION, MOJANG AB,
MICROSOFT CORPORATION, META
PLATFORMS, INC., GOOGLE LLC,
ANOTHER AXIOM, INC., REC ROOM, INC.,
VRCHAT INC., BANANA ANALYTICS,
LLC, and JANE & JOHN DOE I-XX,

  Defendants.

Case No.: 2:24-cv-4055

Hon. Brian C. Wimes

## DEVELOPER DEFENDANTS' SUGGESTIONS IN SUPPORT OF MOTION
## TO DISMISS PLAINTIFF'S FIRST AMENDED AND SUPPLEMENTAL COMPLAINT

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 4

    A.    Video Games Are Expressive Media ..................................................... 4

    B.    Developer Defendants' Games .............................................................. 5

    C.    Plaintiff's Claimed Injuries ................................................................ 10

LEGAL STANDARD ......................................................................................................... 11

ARGUMENT ...................................................................................................................... 11

I.    The First Amendment Bars Plaintiff's Claims .............................................. 11

    A.    Plaintiff's Claims Are Barred Because They Target Protected Expression ......... 12

    B.    Plaintiff's Attempts to Evade the First Amendment Fail ...................... 18

II.    Plaintiff's Claims Fail for Independent Reasons ........................................... 24

    A.    Plaintiff Fails to Allege Developer Defendants Proximately Caused the Alleged Injuries ......... 24

    B.    Plaintiff Fails to State a Claim for Product Liability ........................... 27

    C.    Plaintiff Fails to Allege a Legal Duty Actionable in Negligence ........ 30

    D.    Plaintiff's COPPA Claim Is Preempted .............................................. 31

    E.    Plaintiff Has Not Adequately Pleaded Her Fraud-Based Claims ........ 33

        1.    Plaintiff Fails to Satisfy Rule 9(b) ........................................... 33

        2.    Plaintiff Fails to State Claims for Fraudulent Omission or Concealment ......... 35

    F.    Plaintiff Fails to Plausibly Allege Intentional Infliction of Emotional Distress ......... 37

    G.    Plaintiff's Loss-of-Consortium Claim Is Not Recognized in Missouri ............... 38

    H.    Plaintiff's Civil Conspiracy and In-Concert Liability Claims Fail ...................... 39

i

**CONCLUSION** ................................................................................................................ 40

Case 2:24-cv-04055-BCW    Document 147    Filed 10/08/24    Page 3 of 56

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ................................................................................ 12, 19

*ACLU of Ill. v. Alvarez,*
679 F.3d 583 (7th Cir. 2012) ................................................................ 21

*Am. Amusement Mach. Ass'n v. Kendrick,*
244 F.3d 572 (7th Cir. 2001) ................................................................ 12, 17

*Am. Booksellers Ass'n, Inc. v. Hudnut,*
771 F.2d 323 (7th Cir. 1985) ................................................................ 16

*Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC,*
949 F.3d 417 (8th Cir. 2020) ................................................................ 35

*Anderson v. City of Hermosa Beach,*
621 F.3d 1051 (9th Cir. 2010) .............................................................. 21

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .............................................................................. 11

*Barbera v. Brod-Dugan Co.,*
770 S.W.2d 318 (Mo. Ct. App. 1989) .................................................. 38

*Batek v. Curators of Univ. of Missouri,*
920 S.W.2d 895 (Mo. 1996) ................................................................ 36

*Bill v. Super. Ct.,*
137 Cal. App. 3d 1002 (1982) .............................................................. 19, 22

*Blake v. Career Educ. Corp.,*
2009 WL 140742 (E.D. Mo. Jan. 20, 2009) ......................................... 33

*Brown v. Entertainment Merchants Association,*
564 U.S. 786 (2011) ............................................................................ Passim

*Buckley v. Valeo,*
424 U.S. 1 (1976) ................................................................................ 21

*Burghart v. S. Corr. Entity,*
2023 WL 1766258 (W.D. Wash. Feb. 3, 2023) .................................... 29

*Butler v. Michigan,*
352 U.S. 380 (1957) ............................................................................ 23

iii

*C. Pepper Logistics, LLC v. Lanter Delivery Sys., LLC*,
2021 WL 3725680 (E.D. Mo. Aug. 23, 2021) ....................................................... 25

*Cardozo v. True*,
342 So. 2d 1053 (Fla. Dist. Ct. App. 1977) ........................................................ 27

*CGB Diversified Servs., Inc. v. Baumgart*,
504 F. Supp. 3d 1006 (E.D. Mo. 2020) ............................................................... 39

*Clark v. Olson*,
726 S.W.2d 718 (Mo. 1987) ................................................................................ 34

*Computer & Commc'ns Indus. Ass'n v. Paxton*,
2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ................................................... 18

*Custom Hardware Eng'g & Consulting, Inc. v. Dowell*,
918 F. Supp. 2d 916 (E.D. Mo. 2013) ................................................................. 24

*Dancin Dev., L.L.C. v. NRT Missouri, Inc.*,
291 S.W.3d 739 (Mo. Ct. App. 2009) ................................................................. 33

*Diehl v. Fred Weber, Inc.*,
309 S.W.3d 309 (Mo. Ct. App. 2010) ............................................................. 37, 38

*Eknes-Tucker v. Governor of Alabama*,
80 F.4th 1205 (11th Cir. 2023) ............................................................................ 26

*Ent. Software Ass'n v. Blagojevich*,
404 F. Supp. 2d 1051 (N.D. Ill. 2005) .............................................................. 2, 18

*Ent. Software Ass'n v. Granholm*,
426 F. Supp. 2d 646 (E.D. Mich. 2006) .............................................................. 13

*Ent. Software Ass'n v. Swanson*,
519 F.3d 768 (8th Cir. 2008) ............................................................................ 1, 12

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ............................................................................................ 18

*Estate of B.H. v. Netflix, Inc.*,
2022 WL 551701 (N.D. Cal. Jan. 12, 2022) .......................................... 19, 20, 27

*Freitas v. Wells Fargo Home Mortg., Inc.*,
703 F.3d 436 (8th Cir. 2013) .............................................................................. 33

*Gettings v. Farr*,
41 S.W.3d 539 (Mo. Ct. App. 2001) ................................................................... 40

*Gibson v. Brewer*,
    952 S.W.2d 239 (Mo. 1997) ......................................................................... 37

*Gillis v. Principia* Corp.,
    111 F. Supp. 3d 978 (E.D. Mo. 2015)........................................................... 37

*Goldman v. Tapestry, Inc.*,
    501 F. Supp. 3d 662 (E.D. Mo. 2020)........................................................... 34

*Gorran v. Atkins Nutritionals, Inc.*,
    464 F. Supp. 2d 315 (S.D.N.Y. 2006)..................................................... 28, 29

*Hagen v. Celotex Corp.*,
    816 S.W.2d 667 (Mo. 1991) ......................................................................... 24

*Hays Cnty. Guardian v. Supple*,
    969 F.2d 111 (5th Cir. 1992) ....................................................................... 21

*Heffernan v. Reinhold*,
    73 S.W.3d 659 (Mo. Ct. App. 2002)............................................................ 24

*Hennessey v. Gap, Inc.*,
    86 F.4th 823 (8th Cir. 2023) ....................................................................... 34

*Herceg v. Hustler Mag., Inc.*,
    565 F. Supp. 802 (S.D. Tex. 1983) .............................................................. 30

*Herceg v. Hustler Mag., Inc.*,
    814 F.2d 1017 (5th Cir. 1987) ..................................................................... 23

*Hobbs v. Boy Scouts of Am., Inc.*,
    152 S.W.3d 367 (Mo. Ct. App. 2004)..................................................... 27, 29

*Honeyfund.com Inc. v. Governor*,
    94 F.4th 1272 (11th Cir. 2024) ................................................................... 20

*Howard v. Kysor Indus. Corp.*,
    729 S.W.2d 603 (Mo. Ct. App. 1987)........................................................... 24

*Hustler Mag., Inc. v. Falwell*,
    485 U.S. 46 (1988)....................................................................................... 19

*In re Bisphenol-A (BPA) Polycarbonate Plastic Prod. Liab. Litig.*,
    687 F. Supp. 2d 897 (W.D. Mo. 2009) ....................................................... 33

*In re Blackbaud, Inc., Customer Data Breach Litig.*,
    567 F. Supp. 3d 667 (D.S.C. 2021).............................................................. 32

*In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*,
  966 F. Supp. 1525 (E.D. Mo. 1997) ............................................................... 23, 33, 36

*Interactive Digital Software Ass'n v. St. Louis Cnty., Mo.*,
  329 F.3d 954 (8th Cir. 2003) ...................................................................... 12, 20, 27

*Irby v. St. Louis Cnty. Cab Co.*,
  560 S.W.2d 392 (Mo. App. 1977) ...................................................................... 30

*Jackson v. Airbnb, Inc.*,
  639 F. Supp. 3d 994 (C.D. Cal. 2022) ................................................................ 29

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) .................................................................... Passim

*Jones v. Google LLC*,
  73 F.4th 636 (9th Cir. 2023) ............................................................................. 32

*Jones v. J.B. Lippincott Co.*,
  694 F. Supp. 1216 (D. Md. 1988) ...................................................................... 28

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ................................................................................... 21, 23

*King v. Ellis*,
  359 S.W.2d 685 (Mo. 1962) .............................................................................. 24

*Kirsten v. Cape Royale at Ski Harbor Condo. Owners Ass'n Inc.*,
  2022 WL 7108312 (W.D. Mo. Oct. 12, 2022) ...................................................... 38

*Knowles v. TD Ameritrade Holding Corp.*,
  2 F.4th 751 (8th Cir. 2021) .............................................................................. 40

*Lopez v. Three Rivers Elec. Co-op., Inc.*,
  26 S.W.3d 151 (Mo. 2000) ............................................................................... 30

*Lowdermilk v. Vescovo Bldg. & Realty Co.*,
  91 S.W.3d 617 (Mo. Ct. App. 2002) .................................................................. 32

*Lowe v. S.E.C.*,
  472 U.S. 181 (1985) ....................................................................................... 23

*M.B. v. Live Nation Worldwide, Inc.*,
  661 S.W.3d 342 (Mo. Ct. App. 2022) ................................................................ 30

*Manigault-Johnson v. Google, LLC*,
  2019 WL 3006646 (D.S.C. 2019) ...................................................................... 31

vi

*McCollum v. CBS, Inc.*,
  202 Cal. App. 3d 989 (1988) ........................................................................... 31

*Miller v. Wackenhut Servs., Inc.*,
  808 F. Supp. 697 (W.D. Mo. 1992) ................................................................. 37

*Minn. Comm'r of Rev.*,
  460 U.S. 575 (1983) ........................................................................................ 21

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024) ............................................................................. 20, 22

*Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*,
  406 F.3d 1052 (8th Cir. 2005) ........................................................................ 35

*Near v. Minnesota*,
  283 U.S. 697 (1931) ........................................................................................ 20

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ......................................... 16, 18

*NetChoice, LLC v. Reyes*,
  2024 WL 4135626 (D. Utah Sept. 10, 2024) ................................................... 18

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ........................................................................... 12, 16, 17

*Nigro v. Rsch. Coll. of Nursing*,
  876 S.W.2d 681 (Mo. Ct. App. 1994) ............................................................. 36

*Norris v. Norris*,
  731 S.W.2d 844 (Mo. 1987) ........................................................................... 27

*Olivia N. v. N.B.C.*,
  126 Cal. App. 3d 488 (1981) .......................................................................... 22

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) .......................................................................... 23

*Parham v. J.R.*,
  442 U.S. 584 (1979) ........................................................................................ 26

*Pelman v. McDonald's Corp.*,
  237 F. Supp. 2d 512 (S.D.N.Y. 2003) ............................................................ 26

*Powell v. Am. Motors Corp.*,
  834 S.W.2d 184 (Mo. 1992) ........................................................................... 38

*Pro Serv. Auto., L.L.C., v. Lenan Corp.*,
  469 F.3d 1210 (8th Cir. 2006) ............................................... 25

*Pub. Utilities Comm'n of California*,
  475 U.S. 1 (1986) .................................................................. 22

*Ramos v. Town of Vernon*,
  353 F.3d 171 (2d Cir. 2003) ................................................. 26

*Reddick v. Spring Lake Ests. Homeowner's Ass'n*,
  648 S.W.3d 765 (Mo. Ct. App. 2022) ................................... 30

*Richardson v. Holland*,
  741 S.W.2d 751 (Mo. Ct. App. 1987) ................................... 27

*Rodgers v. Christie*,
  795 F. App'x 878 (3d Cir. 2020) .......................................... 28

*Rolf v. Conagra Foods, Inc.*,
  2010 WL 4643219 (W.D. Mo. Nov. 9, 2010) ........................ 25

*Rosemann v. Sigillito*,
  2011 WL 13248373 (E.D. Mo. Oct. 31, 2011) ...................... 25

*Sanders v. Acclaim Ent., Inc.*,
  188 F. Supp. 2d 1264 (D. Colo. 2002) .......................... Passim

*Schaller Tel. Co. v. Golden Sky Sys., Inc.*,
  298 F.3d 736 (8th Cir. 2002) ......................................... 11, 34

*Schneider v. BJC Healthcare Sys.*,
  2009 WL 1176273 (E.D. Mo. May 1, 2009) ......................... 25

*Shervin v. Huntleigh Sec. Corp.*,
  85 S.W.3d 737 (Mo. Ct. App. 2002) ..................................... 36

*Siegel v. Deutsche Bank Nat. Tr. Co.*,
  409 F. App'x 975 (8th Cir. 2011) ......................................... 39

*Siepel v. Bank of Am., N.A.*,
  239 F.R.D. 558 (E.D. Mo. 2006) .......................................... 40

*Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*,
  502 U.S. 105 (1991) .............................................................. 21

*Smith v. Bacon*,
  699 F.2d 434 (8th Cir. 1983) ............................................... 39

viii

*Snyder v. Phelps*,
   562 U.S. 443 (2011)....................................................................................... 11, 19

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)..................................................................................... 2, 16, 19

*Stein v. Novus Equities Co.*,
   284 S.W.3d 597 (Mo. Ct. App. 2009)................................................................. 35

*Stevens v. Durbin-Durco, Inc.*,
   377 S.W.2d 343 (Mo. 1964) ............................................................................... 30

*T.K. ex rel. Leshore v. Bytedance Tech. Co.*,
   2022 WL 888943 (N.D. Ill. Mar. 25, 2022)........................................................ 31

*Telescope Media Grp. v. Lucero*,
   936 F.3d 740 (8th Cir. 2019) .............................................................................. 20

*Thornburg v. Fed. Express Corp.*,
   62 S.W.3d 421 (Mo. Ct. App. 2001)................................................................ 24, 37

*Troxel v. Granville*,
   530 U.S. 57 (2000).............................................................................................. 26

*Tucker v. Gen. Motors LLC*,
   58 F.4th 392 (8th Cir. 2023) .............................................................................. 34

*U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*,
   441 F.3d 552 (8th Cir. 2006) .......................................................................... 11, 34

*U.S. ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*,
   690 F.3d 951 (8th Cir. 2012) .............................................................................. 11

*Verni v. Cleveland Chiropractic Coll.*,
   212 S.W.3d 150 (Mo. 2007) ............................................................................... 24

*Video Software Dealers Ass'n v. Schwarzenegger*,
   556 F.3d 950 (9th Cir. 2009) .............................................................................. 12

*VIRAG, S.R.L. v. Sony Computer Ent. Am. LLC*,
   699 F. App'x 667 (9th Cir. 2017) ....................................................................... 21

*Waller v. Osbourne*,
   763 F. Supp. 1144 (M.D. Ga. 1991) ................................................................... 23

*Watters v. TSR, Inc.*,
   715 F. Supp. 819 (W.D. Ky. 1989).............................................................. Passim

ix

*White v. Walsh,*
    649 F.2d 560 (8th Cir. 1981) ............................................................................ 40

*Wieland v. Owner-Operator Servs., Inc.,*
    540 S.W.3d 845 (Mo. 2018) ............................................................................. 30

*Willard v. Bic Corp.,*
    788 F. Supp. 1059 (W.D. Mo. 1991) ................................................................ 24

*Williston v. Vasterling,*
    536 S.W.3d 321 (Mo. Ct. App. 2017) ............................................................. 39

*Wilson v. Midway Games, Inc.,*
    198 F. Supp. 2d 167 (D. Conn. 2002) ........................................... 16, 17, 19, 28

*Winter v. G.P. Putnam's Sons,*
    938 F.2d 1033 (9th Cir. 1991) .......................................................................... 28

*Wivell v. Wells Fargo Bank, N.A.,*
    773 F.3d 887 (8th Cir. 2014) ............................................................................ 35

*Wright v. Barr,*
    62 S.W.3d 509 (Mo. Ct. App. 2001) .......................................................... 38, 39

*X Corp. v. Bonta,*
    2024 WL 4033063 (9th Cir. Sept. 4, 2024) ..................................................... 22

*Zamora v. C.B.S.,*
    480 F. Supp. 199 (S.D. Fla. 1979) ................................................ 17, 19, 23, 30

*Zean v. Fairview Health Servs.,*
    858 F.3d 520 (8th Cir. 2017) ............................................................................ 11

*ZL Techs., Inc. v. Gartner, Inc.,*
    709 F. Supp. 2d 789 (N.D. Cal. 2010) ............................................................. 40

*Zubres Radiology v. Providers Ins. Consultants,*
    276 S.W.3d 335 (Mo. Ct. App. 2009) ............................................................. 35

**Statutes**

15 U.S.C. § 6501, *et seq.* .......................................................................................... 31

Mo. Ann. Stat. § 407.020 .......................................................................................... 33

Mo. Ann. Stat. § 537.760 .......................................................................................... 27

Defendants Epic Games, Inc. ("Epic"); Mojang AB and Microsoft Corporation (together, "Microsoft Defendants"); Another Axiom Inc.; Rec Room Inc.; Banana Analytics, LLC; and VRChat Inc. (collectively, "Developer Defendants") file this Motion to Dismiss Plaintiff's Amended Complaint with Supporting Suggestions.[1]

## INTRODUCTION

This case is an attack on the First Amendment rights of video game creators. Less than 15 years ago, the Supreme Court held that the First Amendment protects video games because they are complex, creative works that "communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world)." *Brown v. Entertainment Merchants Association*, 564 U.S. 786, 790 (2011). Consequently, *Brown* held the First Amendment forbids the censorship of video games "solely to protect the young from ideas or images" that some consider "unsuitable[.]" *Id.* at 795. The Eighth Circuit similarly held that "video games are protected free speech." *Ent. Software Ass'n v. Swanson*, 519 F.3d 768, 771 (8th Cir. 2008).

Plaintiff seeks to impose the very sort of restrictions *Brown* rejected, this time on the basis that video games are "addictive." But the First Amendment prohibits this attempted assault on protected expression. "If controlling access to allegedly 'dangerous' speech is important in

---

[1] Epic, the Microsoft Defendants, Rec Room, and VRChat have also filed motions to enforce their respective arbitration agreements. They join this brief in the alternative. All defendants moving to compel arbitration do not waive, and specifically assert, their rights under their respective arbitration agreements, including any appellate rights to have the proper forum resolved before proceeding on the merits in court.

Consistent with the Consent Motion to Set Consolidated Briefing Schedule and Extend Page Limits and subsequent Order by the Court, ECF Nos. 143, 145, Microsoft addresses the claims against it relating to *Minecraft* in this brief and addresses the claims against it relating to its Xbox services in the separate motion titled "Motion to Dismiss Amended Complaint of Google LLC, Microsoft Corporation, Meta Platforms, Inc., and Roblox Corporation." Pursuant to Fed. R. Civ. P. 10(c), Microsoft adopts all arguments made in that motion and supporting brief.

promoting the positive psychological development of children, in our society that role is properly accorded to parents and families, not the State." *Ent. Software Ass'n v. Blagojevich*, 404 F. Supp. 2d 1051, 1075 (N.D. Ill. 2005), *aff'd*, 469 F.3d 641 (7th Cir. 2006). Plaintiff's lawsuit, one of more than a dozen filed by the same attorneys across the country, is barred for several reasons:

*First*, the First Amendment forecloses this suit. Each of Developer Defendants' games— *Fortnite*, *Minecraft*, *Gorilla Tag*, *Rec Room*, *VRChat*, and *Capuchin*—achieved critical success because of its unique and innovative art style, mechanics, game modes, and content. These games are a place for people to build worlds, hone skills, socialize, compete, and more. They are "as much entitled to the protection of free speech as the best of literature." *Brown*, 564 U.S. at 796 n.4.

Plaintiff cannot escape this conclusion by pointing to the purported psychological effects of video games on children, *see* Amended Complaint ("Am. Compl.") ¶¶ 509-530, or by targeting specific game features. The video game laws of the early 2000s—what the Supreme Court rejected in *Brown*—involved claims and studies about child psychology materially indistinguishable from those Plaintiff brings here. And the features Plaintiff complains about, which she admits are "expressive" and "creative," make these games more personalized and evocative. *Id.* ¶¶ 90, 414. That Plaintiff finds expression in games "too persuasive" or "catchy"—i.e., too entertaining— "does not permit [her] to quiet the speech or to burden its messengers." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 578 (2011).

*Second,* the Amended Complaint is devoid of allegations suggesting that Developer Defendants' video games proximately caused K.C. any harm. Plaintiff fails to allege even basic— and necessary—facts like when K.C. allegedly became addicted to each game or what features supposedly harmed K.C. This, too, bars Plaintiff's suit.

2

*Third*, the product liability claims fail because video games are intangible, expressive works to which product liability law does not apply.

*Fourth*, the negligence claims fail because Plaintiff cannot plausibly allege facts establishing that Developer Defendants owed her a duty. Content creators have no legal duty in tort to safeguard their audiences from harms allegedly caused by consuming their content. A different rule would stifle protected expression.

*Fifth*, the negligence per se claim predicated on the Children's Online Privacy Protection Act ("COPPA") fails because COPPA expressly preempts it.

*Sixth*, the fraud claims are not pleaded with particularity, as Rule 9(b) requires. The Amended Complaint lacks *any* non-conclusory allegations identifying the statements Plaintiff claims are false, much less how they are false or that Developer Defendants knew they were false. Nor does Plaintiff allege facts sufficient to show these defendants concealed the alleged "psychological tricks" in their games. *E.g.*, Am. Compl. ¶ 222. And even the alleged misrepresentations Plaintiff vaguely identifies—that *Fortnite* and *Minecraft* are "educational"— are non-actionable statements of opinion. *Id.* ¶ 775.

*Seventh*, the remaining claims for intentional infliction of emotional distress, loss of consortium, civil conspiracy, and in-concert liability fail. The Amended Complaint does not plausibly allege that Developer Defendants intended to cause distress or that their creation and dissemination of games was so "outrageous in character" that it is "utterly intolerable in a civilized community." Missouri courts do not recognize loss-of-consortium claims in the context of the parent-child relationship. And Plaintiff pleads no facts to show any coordination between Developer Defendants to support a conspiratorial scheme.

Plaintiff's lawsuit is just one in a long line of failed efforts to hold creators liable for the purported effect of protected expression on children. These efforts have touched almost every conceivable form of speech. And they have uniformly failed. Permitting Plaintiff to proceed would contravene decades of First Amendment jurisprudence and raise the chilling specter of liability for any expressive medium that poses some theoretical risks from overconsumption—whether that be "binge watching" Netflix, spending late nights immersed in a Harry Potter book, or playing Taylor Swift on repeat. The Court should dismiss Plaintiff's claims with prejudice.

## STATEMENT OF FACTS

### A. Video Games Are Expressive Media.

Millions of Americans play video games. *See* Am. Compl. ¶¶ 24, 185, 275, 397, 437. Developments in technology have enabled the creation of games with "continuously updated . . . content" and incredible complexity, from games that provide "players [with] extensive freedom [to] explor[e] virtually infinite terrain" to those where players are given "complete freedom to . . . create" "worlds" of their choosing. *Id.* ¶¶ 191, 276. Developers "continuously update[]" their games to keep players "challenge[d] throughout" a game, *id.* ¶¶ 165, 269, publishing "engaging and fresh features" like "new maps" and other design elements, *id.* ¶ 214.

Just as parents may supervise their children's consumption of books, movies, and television, parents have tools to manage the video games their kids play. For example, the Entertainment Software Rating Board ("ESRB") assigns age and content ratings to video games, creating a rating system under which "the video game industry outpaces the movie and music industries," ensuring "that parents who care about the matter can readily evaluate the games their children" play. *Brown*, 564 U.S. at 803.

B.     **Developer Defendants' Games.**

Plaintiff claims K.C. played the following games, Am. Compl. ¶ 532:

***Fortnite*.** Published in 2017 and developed by Epic, *Fortnite* has several game modes, including six Plaintiff has identified. *Fortnite: Battle Royale* is a "free game" in which a player "playing alone, in a duo, or in a 3-4 player squad—fights against up to 100 other players to be the last person (or team) alive," and must "scavenge for weapons, items, resources, and vehicles" to survive. *Id.* ¶ 189-190. *Fortnite: Save the World* is a "cooperative hybrid tower defense-shooter and survival game in which up to four players collaborate [to] fight off zombie-like creatures and defend objects with traps and fortifications they can build." *Id.* ¶ 187. *Fortnite Creative* gives players "complete freedom to . . . create any item" of their own choosing. *Id.* ¶ 191. *Lego Fortnite* is also a "survival sandbox game" where players can "play as Lego Minifig versions of characters as they . . . craft various weapons and tools, and fight monsters," *id.* ¶ 192, and in *Rocket Racing* players "race vehicles . . . while avoiding obstacles on the course." *Id.* ¶ 193. Finally, *Fortnite Festival* is a "rhythm game" in which players play on either "the 'Main Stage' [by] hitting notes in a rhythm as either Lead, Guitar/Bass, Drums, or Vocals," or "the 'Jam Stage' [by] cooperating with other players to make remixes using any part of any song built into the game design." *Id.* ¶ 194.

*Fortnite* has a captivating design that features attention-grabbing "bright and vibrant colors" and "cartoonish" animation. *Id.* ¶ 212. To avoid creating a "bleak multiplayer" game, *Fortnite*'s storyline is "inject[ed]" with "elements of variety." *Id.* ¶ 212-213. That includes encouraging players "to find ideal hiding spots" and "loot drops," to "explore the entire [game's] map," and to "us[e] resources" to "build towers," "forts," and any other structure a player can imagine. *Id.* ¶ 213. And, since Epic innovates continuously, it routinely "rolls out updates" to

5

*Fortnite*, introducing "engaging [] fresh features, new maps, live events, and the latest trends." *Id.* ¶ 214. Adding to *Fortnite*'s creativity are V-bucks—an "in-game currency" that players use to buy a variety of items that make the in-game universe more visually exciting. *Id.* ¶ 202. Players can "purchase[]" V-bucks with "real-world funds," but do not have to. *Id.* Many "earn[]" V-bucks by "completing missions and other achievements." *Id.*

Building a world of *Fortnite*'s intricacy required an intense, yearslong collaboration among visual artists, writers, actors, musicians, programmers, developers, "statisticians, analysts," production "coordinators" and many more. *Id.* ¶ 208. The creativity and effort Epic applied to achieve that goal have led to wild success: as of the commencement of this action, "*Fortnite* has 239 million monthly [players]" and "approximately 15 million players in a day." *Id.* ¶ 185.

**Gorilla Tag.** Another Axiom released *Gorilla Tag* in March 2021. *Id.* ¶ 436. Gorilla Tag is a virtual reality ("VR") game in which players can "run, jump, and climb around [] game worlds using their hand-held controllers" and VR headsets. *Id.* ¶ 428. "Gorilla Tag has four primary game modes," which allow players to play games of tag, burst balloons with slingshots, and socialize with other players. *Id.* ¶¶ 430-433. "While Gorilla Tag is free-to-play," players can purchase cosmetic items, including new clothing for their in-game avatars, and seasonal game updates, including, for example, new level designs with snowy mountains in winter. *Id.* ¶¶ 434, 435. *Gorilla Tag* has millions of players worldwide who are attracted to "its clean movements, simple controls, and easy-to-understand gameplay, all of which are combined to make the game fun for players and easy to master." *Id.* ¶¶ 429, 437.

**Rec Room.** Rec Room Inc. developed and published Rec Room, which it released in 2016. *Id.* at 102 ¶ 71.[2] "Rec Room is a . . . multiplayer online game" that "can be played on mobile

---

[2] The Amended Complaint skips from ¶ 298 to ¶ 71 on page 102, and then from ¶ 105 to ¶ 299 on page 110. To

devices, personal computers, gaming consoles and VR gaming headsets," which use "full 3D motion" and "motion controllers" that allow players "to pick up and handle objects in the game world." *Id*. at 102 ¶ 71, 103 ¶ 72. Rec Room has tens of millions of users "from across the globe." *Id*. at 103 ¶ 73.

"Rec Room consists of a hub room, called the 'Rec Center,' with doors that lead to various games." *Id*. at 103 ¶ 74. Some of these games are "Rec Room Originals" developed by Rec Room, including "first-person shooter games, a battle royale game, a cooperative action-adventure game, various action-based quests, and various sports games." *Id*. at 103 ¶ 75. In addition to the games created by Rec Room, players can create their own rooms, games, and other content using a tool called the "Maker Pen," or write code themselves in "Circuits," Rec Room's "visual programming language." *Id*. at 103 ¶¶ 76-77. There are "millions of user-generated rooms" for players to explore. *Id*. at 103 ¶ 74. Players can "sell user-generated" content for "'tokens,' Rec Room's in-game currency," which can "be used to purchase cosmetic items, consumables, and other [] upgrades" to "customize and dress their Rec Room avatar in various ways." *Id*. at 104 ¶¶ 78-81. Players can even "create their own 'Room Currency.'"[3] *Id*. at 104 ¶ 82.

***Capuchin***. Banana Analytics designed, developed, and published Capuchin, "an immersive VR" game that includes "thrilling and social VR interactions" for users to experience

---

avoid confusion, page numbers are cited for this section.

[3] Plaintiff's Amended Complaint fails to allege whether K.C. plays games created by Rec Room or games created by other Rec Room players. To the extent K.C. plays or is purportedly "addicted" to games or content created by other Rec Room players (which comprise the vast majority of Rec Room games/content), Plaintiff's claims against Rec Room should be dismissed for the additional reasons set forth in the separate motion titled "Motion to Dismiss Amended Complaint of Google LLC, Microsoft Corporation, Meta Platforms, Inc., and Roblox Corporation." Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, Rec Room adopts all arguments made in that motion and supporting brief. In particular, Section 230 of the Communications Decency Act is a defense to all of Plaintiff's claims to the extent they would hold Rec Room liable for information that third parties created and developed.

while playing the game.[4] *Id.* at ¶¶ 459-60. It is a horror-themed multiplayer social game where players "embody monkey avatars and navigate diverse maps using their arms and hand movements or gestures" and attempt to escape each level. *Id.* at ¶ 461. The game can be played with one to eight people across four different levels, each with their own monsters chasing the players. *Id.* at ¶ 466.

*VRChat.* VRChat Inc. designs, publishes, and develops VRChat—"an online virtual world" platform that "allows users to create 3D avatars and interact with other user created 3D avatars and worlds." *Id.* ¶¶ 394, 398. Launched in 2014, VRChat was initially designed for use with virtual reality ("VR") headsets, such as those produced by Meta and HTC, but has since been adapted for use on Android devices and in "desktop" mode. *Id.* ¶¶ 395-98. "VRChat offers an endless collection of social VR experiences," which provides for player interaction using "virtual avatars" and "thousands of connected worlds." *Id.* ¶¶ 400-01. VRChat is designed to captivate users by offering "varied gameplay," "expressive cosmetic items, social interaction, and opportunities to monetize creations." *Id.* ¶ 414. By allowing users to interact in a virtual environment, VRChat facilitates friendship-building, creativity, and has even helped users overcome social anxiety. *See id.* ¶ 402.

While the main VRChat interface is free to play, VRChat also offers a subscription-based option—VRChat Plus—which offers users certain enhanced features. *Id.* ¶ 405. VRChat Plus features include "custom user icons, increased storage slots for avatars, . . . a 'supporter' badge to display on their profile, and enhanced invite messages allowing users to send invitations to others

---

[4] Of note, the design and development of Capuchin at Banana Analytics was spearheaded by a minor approximately the same age as K.C. *See* "How the 14-year-old Capuchin developer got caught up in a video game addiction lawsuit," *available at* https://www.polygon.com/features/ 450436/ capuchin-vr-video-game-addiction-lawsuit.

that include photos." *Id*. VRChat also sells VRChat Credits, which can be purchased and used to further enhance user experience. *Id*. ¶ 406. Purchase of VR Chat Credits is completely optional, and not required to play the game.

**Minecraft.** The Microsoft Defendants publish and develop aspects of *Minecraft*. A creative game made up of blocks, creatures, and community, *Minecraft* allows players to explore terrain, build fantastical creations, battle or befriend creatures, and experience epic adventures alone or with friends. *See* Am. Compl. ¶¶ 267-68. The game presents a virtual universe that yields a unique, self-guided experience for every player, and its inventive design inspires players to tinker, explore, and develop skills. Players can do so through several modes of play. In survival mode, they "can discover and extract raw materials, craft tools and items, and build structures and machines" as they "acquire resources to build in the world and maintain health." *Id*. ¶¶ 278-79. In creative mode, players can put their imaginations to work without worrying about gathering resources to build their worlds, and they have immediate "access to flight." *Id*. ¶ 279. *Minecraft* also offers multiplayer options where players can collaborate with friends, family, and others in private realms or in the interconnected *Minecraft* online community. *Id*. ¶ 281. *Minecraft* ranks among the most popular games in the world today: Plaintiff alleges the game has sold over 300 million copies and has over 163 million active users every month. *Id*. ¶ 275.

*Minecraft* is more than simply a game. It also serves as a teaching resource used by educators in classrooms, summer camps, and other learning environments around the world to teach subjects including mathematics, computer coding, and geography, as well as important life skills such as leadership and collaboration. *Id*. ¶¶ 285-86; *Minecraft Education*, Minecraft, https://education.minecraft.net/en-us (accessed July 18, 2024) (cited at Am. Compl. ¶ 285 n.15). For this reason, the Microsoft Defendants have developed "an educational learning tool." Am.

Compl. ¶ 286; *see also id.* ¶ 285 (describing *Minecraft Education* as "a game-based platform that inspires creative, inclusive learning through play").

### C. Plaintiff's Claimed Injuries.

Plaintiff contends K.C. is addicted to video games, *see, e.g., id.* ¶ 535, and that Developer Defendants are responsible based on expressive aspects of the games, including, for example:

- "[M]aintaining a consistent level of challenge throughout" a game, *id.* ¶ 165.

- "[R]ewards, bright and vibrant colors, and continual gameplay variety," *id.* ¶ 223.

- "[C]ontinuously add[ing] new in-game" content. *Id.* ¶ 164.

- "[E]ngaging and fresh features, new maps, live events, and the latest trends." *Id.* ¶ 214.

- "[V]aried gameplay," "expressive cosmetic items, [and] social interaction." *Id.* ¶ 414.

Plaintiff also claims K.C. suffers from "gaming disorder," depression, anxiety, and other ailments, and "chronically spend[s] their money" on unidentified in-game transactions and downloadable content. *Id.* ¶¶ 539, 544. Plaintiff further alleges that K.C.'s gaming has caused her "mental anguish, emotional distress, pain, and suffering," "financial loss and other economic injuries." *Id.* ¶ 551.

Plaintiff asserts claims in strict product liability for defective design and failure to warn (Counts I, II); negligence and negligence per se premised on violations of COPPA and the Missouri Merchandising Practices Act ("MMPA") (Counts III, IV, V); intentional infliction of emotional distress (Count VI); violations of the MMPA (Count VII); fraudulent misrepresentation, fraudulent omission, and fraudulent concealment (Count VIII); negligent misrepresentation (Count IX), civil conspiracy (X); in-concert liability (Count XI); and loss of consortium (Count XII). *See id.* ¶¶ 572-825.

## LEGAL STANDARD

Claims are subject to dismissal under Rule 12(b)(6) if they fail to plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). Courts may consider materials referenced in the complaint without converting a motion to dismiss into one for summary judgment. *See, e.g.*, *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017).

A heightened pleading standard applies to claims that sound in fraud, *see* Fed. R. Civ. P. 9(b); *U.S. ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 954 (8th Cir. 2012), requiring a plaintiff to plead "the 'who, what, where, when, and how' of the alleged fraud," *U.S. ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006). "[C]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy [Rule 9(b)]." *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002).

## ARGUMENT

## I. The First Amendment Bars Plaintiff's Claims.

The First Amendment prohibits imposing civil liability on the creation and dissemination of constitutionally protected speech. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011). This bar is absolute, as courts "cannot adequately exercise [their] responsibilities to evaluate regulations of protected speech, even those designed for the protection of children, that are imposed pursuant to a trial for tort liability." *James v. Meow Media, Inc.*, 300 F.3d 683, 697 (6th Cir. 2002).

Plaintiff seeks to hold Developer Defendants liable for creating and publishing speech—video game content—that the Supreme Court has held is fully protected by the First Amendment. *Brown*, 564 U.S. at 790. Courts have repeatedly dismissed claims against video game makers for

their games' supposed harm to minors. Plaintiff cannot recast her claims as challenging how Developer Defendants "design" or present video game content, as the First Amendment protects such creative choices and game features. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 586-87 (2023); *see also Brown*, 564 U.S. at 790. Nor may Plaintiff hold Developer Defendants liable by repackaging her allegations to sound in fraud, as those claims are still fundamentally premised on expressive choices. The Court should dismiss the claims now and with prejudice, as the "fear of damage awards" in cases targeting speech, *New York Times Co. v. Sullivan*, 376 U.S. 254, 277-78 (1964), can generate a "devastatingly broad chilling effect," *Watters v. TSR, Inc.*, 715 F. Supp. 819, 822 (W.D. Ky. 1989), *aff'd*, 904 F.2d 378 (6th Cir. 1990).

A.    **Plaintiff's Claims Are Barred Because They Target Protected Expression.**

Video games express speech protected by the First Amendment. *Brown*, 564 U.S. at 790. Like other fictional works, games use "scripts and story boards," "storyline," "character development," "narrative," and "dialogue" to propel players through imagined universes. *Interactive Digital Software Ass'n v. St. Louis Cnty., Mo.*, 329 F.3d 954, 957 (8th Cir. 2003). And like other creative expression, games communicate ideas and stir emotions through "pictures, graphic design, concept art, sounds," and "music." *Id.* Video games also communicate through features that enable "interactive play," giving players "control" over content. *Id.* at 957-58. For these reasons, several courts of appeals, and ultimately the Supreme Court, have held video games protected, with the Supreme Court concluding that video games' "interactive" features, which are "distinctive to the medium," are shielded even when they "draw[]" a player in and "invite[]" their attention. *Brown*, 564 U.S. at 790, 798 (quoting *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001)); *see also Ent. Software Ass'n*, 519 F.3d at 772; *Interactive Digital Software Ass'n*, 329 F.3d at 956-58; *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965 (9th Cir. 2009), *aff'd sub nom. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011).

Plaintiff's claims fall neatly within this extensive precedent. They target purported "design strategies" and allegedly "defective features" that are forms of creative expression—including "expressive cosmetic items," "social interaction," and "creative opportunities"—which enable interactive play and are inseparable from a game's content. Am. Compl. ¶¶ 90, 414, 586, 593. Just as a painter may convey meaning with a brushstroke, a filmmaker with a camera angle, or a poet with rhyme or meter, video game developers use "features distinctive to the medium" to communicate a game's ideas, themes, and messages. *Brown*, 564 U.S. at 790.

The Amended Complaint's use of psychological jargon and disparaging labels does not alter the First Amendment analysis. Plaintiff cannot avoid the conclusion that her claims target these interactive features *precisely because of* both their expressive character and the video game content with which they are inextricably intertwined. *See, e.g.*, *Ent. Software Ass'n v. Granholm*, 426 F. Supp. 2d 646, 651 (E.D. Mich. 2006) (video game interactivity "enhance[s] the expressive elements even more than other media"). The Amended Complaint faults Developer Defendants for "continuously updat[ing]" their games with "gameplay-altering mechanics, [and] new . . . content and items," Am. Compl. ¶ 269—"elements of variety" that "ensure[] that [players] never once get bored" in the game, *id.* ¶ 213. Just as screenwriters develop new seasons of television series and novelists write sequels, game designers create "engaging and fresh features" to entertain players. *Id.* ¶ 214.

Plaintiff complains that the games use so-called "rubber banding" and "feedback loops"— that is, they tailor their difficulty to a player's skill. *See* Am. Compl. ¶¶ 144, 164. But a video game's power to "react" to the player's skill and performance, thus providing "a consistently challenging experience," *id.* at ¶¶ 144, 164, is a "feature[] distinctive to the medium," *Brown*, 564

U.S. at 790. When done well, this interactivity makes a game more fun, engaging the player and extending the expressive power of the medium.

The alleged problem, in other words, is that the expression is *too* engaging. Am. Compl. ¶ 214. This interactive content and other design elements—like "a 'near miss' effect . . . random rewards, bright and vibrant colors," the ability to "cooperat[e] with other players," "virtually infinite game world[s]," and "exciting animation," *e.g.*, *id*. ¶¶ 135, 194, 223, 290—reflect literary and artistic choices that contribute to the "characters, dialogue, [and] plot" that in turn "communicate ideas" to the player. *Brown*, 564 U.S. at 790. Like cliffhangers that thrust the reader to the next chapter, or teasers on the front page of a magazine, they are protected expression.

The same is true for what the Amended Complaint derides as "monetization schemes"— like alleged "loot boxes," "microtransactions," and "pay-to-win" features that permit players to buy content such as "shortcuts," "special characters," and "cosmetic or aesthetic items that can be used to customize characters or weapons"—cosmetic items that are, by Plaintiff's own admission, "expressive." Am. Compl. ¶¶ 143, 414. These are aesthetic and competitive aspects of games that can enhance a game's expressive power and make it more fun for players, much like the concertgoer who pays a premium for front-row seats or backstage access. Game designers use the features at issue to invite players to "interact[] with the virtual world." *Brown*, 564 U.S. at 790. A player's power to customize their experience is "distinctive to the medium" of video games, *id.*— and a core part of game design, which fosters imagination and creativity.

In *Fortnite*, for example, players can generate exciting and fantastical matchups—such as an avatar dressed as Iron Man competing against another dressed as Luke Skywalker—which enhances the "bright and vibrant colors and cartoonish representation of the game." Am. Compl. ¶ 212. In *Minecraft*, players can personalize their experience with "new features, skins for avatars,

and new objects" across "multiple game modes." *Id.* ¶¶ 279, 282. In *Gorilla Tag*, players can unlock seasonal cosmetic items and level designs—such as hockey outfits and snowy mountains for winter. *Id.* ¶¶ 434-435. In *Rec Room*, players can acquire "cosmetic items" to "customize and dress their Rec Room avatar in various ways." *Id.* at 104 ¶¶ 81-82. *VRChat* users can enhance their experience with "custom user icons, increased storage slots for avatars, [and] 'increased trust' from VRChat," along with unique modifications to their profile and messaging capabilities. *Id.* ¶ 405. *Capuchin* users can earn or purchase ways "to personalize a user's in-game character," which "allows for a diverse and visually appealing community." *Id.* ¶ 465. These customization options, whether earned or paid for, are creative ways that developers curate a game's theme or atmosphere.

Not only are these design choices expressive themselves, but they also are inextricably intertwined with the other expressive content that they deliver and enhance. Simply offering "in-game purchases" generates no interest without attractive content. "Rubber banding," for example, which allegedly shows a player certain content available for purchase that "match[es] the [player's] desire and capacity" to pay, Am. Compl. ¶ 144, is meaningless unless the content is attractive. Plaintiff tries to plead around that fact—and around the First Amendment—by claiming that such game elements are addictive "regardless of the substance of the content of the video game being played." *Id.* ¶ 174. But that conclusory assertion is belied by the Amended Complaint's factual allegations, which make clear that she is specifically targeting content, *see, e.g.*, *id.* ¶ 223 (*Fortnite*'s supposedly addictive features include "loot boxes, random rewards, bright and vibrant colors, and continual gameplay variety"); *id.* ¶ 290 (*Minecraft*'s supposedly addictive features include its "virtually infinite game world, multiple game modes and difficulty levels, short-term rewards, and options for new features, skins, and objects); *id.* ¶ 414 (*VRChat*'s supposedly addictive features include "varied gameplay . . . expressive cosmetic items, [and] social

interaction"). Thus, Plaintiff's claims that in-game content and particular gameplay elements make the games addictive attack the very expressive, artistic, and literary decisions that the First Amendment protects.

The First Amendment protects this expression no less than it protects the publication and "targeted" "dissemination" of other "catchy" media, *Sorrell*, 564 U.S. at 570, 578, from page-turner novels to binge-worthy television, *see Brown*, 564 U.S. at 798. "[A]ll literature is interactive" and "the better it is, the more interactive" and engaging it becomes. *Id.*; *see also id.* at 790 (First Amendment applies "whatever the challenges of applying the Constitution to ever-advancing technology" and irrespective of "esthetic" tastes). The claim that features designed to promote engagement lead to "too much" speech is incompatible with the First Amendment's aim to "secure the widest possible dissemination of information from diverse and antagonistic sources." *N.Y. Times Co.*, 376 U.S. at 266 (internal quotation marks omitted). Under the system of free expression our Constitution commands, "an idea is as powerful as the audience allows it to be." *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 327-28 (7th Cir. 1985), *aff'd,* 475 U.S. 1001 (1986) (state could not ban pornography simply because of its "power" "as speech").

The threat of tort liability poses an even greater threat to speech than does the statutory liability considered in *Brown*, as game developers will, facing uncertainty in the law, become even more speech restrictive. *See James*, 300 F.3d at 697; *cf. NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *15 (W.D. Ark. Aug. 31, 2023) ("companies will err on the side of caution," which may "unnecessarily burden minors' access to constitutionally protected speech"). Recognizing these principles, courts have rejected attempts to hold creators liable in tort for allegedly "addictive" expression. In *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002), for example, the court dismissed claims that a teenager attacked the plaintiff's son because the

game *Mortal Kombat* was "designed" to "cause the user to believe and physically feel" that he was "actually participating" in "violent battles." *Id.* at 169-71, 181-82 (dismissing product liability, negligence, and unfair trade practices claims). The features that allegedly gave the game its "addictive power," *id.* at 182, "enhance[d]" the game's "expressive and artistic" experience. *Id.* at 181; *see also, e.g.*, *Am. Amusement Machine Ass'n*, 244 F.3d at 577 (interactive nature of video games does not strip them of protection).

Likewise, in *Watters*, a court dismissed claims that a board game publisher negligently caused the plaintiff's son's suicide after the son became "totally absorbed by and consumed with the game to the point that he was incapable of separating the fantasies played out in the game from reality." 715 F. Supp. at 820. Because the "essence" of the plaintiff's suit sought to impose liability for "the content of the game," the First Amendment barred relief. *Id.* at 821-24. *See also Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) (dismissing claims by school shooting victims against video game publishers).

And in *Zamora v. C.B.S.*, 480 F. Supp. 199 (S.D. Fla. 1979), the First Amendment barred a plaintiff's attempt to hold a television network liable for causing a minor to become "addicted to and completely subliminally intoxicated by extensive viewing of television violence." *Id.* at 200. The programming was protected speech, and the minor's "alleged response" could not be a basis to punish and thus "inhibit" (through civil liability) the network's expression or the public's right to receive it. *Id.* at 204, 205-06.

The same result should follow here. Plaintiff's effort, if successful, would create "hazards to protected freedoms" as great, if not "greater," "than those that attend" government regulation. *N.Y. Times*, 376 U.S. at 278. The Court should dismiss Plaintiff's claims with prejudice.

### B. Plaintiff's Attempts to Evade the First Amendment Fail.

Plaintiff cannot circumvent the First Amendment by disguising her claims as ordinary torts. The First Amendment's protections extend to content minors consume, allegedly harmful or addictive expression, actions taken to create expressive works, expression that generates revenue, and the alleged failure to warn that content is supposedly dangerous.

*Minors.* The fact that Plaintiff seeks to protect minors has no effect on the First Amendment analysis. "[T]he values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young" from "unsuitable" "ideas or images." *Brown*, 564 U.S. at 795 (internal quotation marks omitted); *see also NetChoice, LLC*, 2023 WL 5660155, at *15 (state cannot bar minors from seeing "potentially damaging or distressing" speech). There is no "free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citations omitted). Just weeks ago, the District of Utah enjoined the Utah Minor Protection in Social Media Act based on this rule. *NetChoice, LLC v. Reyes*, 2024 WL 4135626, at *12 (D. Utah Sept. 10, 2024). It held the state's interests "in protecting minors from the mental health- and personal privacy-related harms . . . fall short of the First Amendment's demanding standards." *Id.* (citing *Brown*); *see also Computer & Commc'ns Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *14 (W.D. Tex. Aug. 30, 2024) (similar); *accord Blagojevich*, 404 F. Supp. 2d at 1074-75 ("'[T]he priceless heritage of our society is the unrestricted constitutional right of each member to think as he will. Thought control is a copyright of totalitarianism, and we have no claim to it.' . . . These concerns apply to minors just as they apply to adults." (citation omitted)).

***Allegedly Harmful Speech.*** Speech that is allegedly psychologically "harmful" or "addictive" is also no exception. "Speech remains protected even when it . . . 'inflict[s] great pain,'" *Sorrell*, 564 U.S. at 576 (quoting *Snyder*, 562 U.S. at 460-61), "anguish," or "incalculable grief." *303 Creative LLC*, 600 U.S. at 586; *see also Snyder*, 562 U.S. at 456 (no liability for speech that inflicts severe emotional distress); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 55 (1988) (First Amendment protects "outrageous" parody despite "adverse emotional impact"). Courts likewise dismiss claims premised on the attractiveness of content, as those claims, too, seek to punish the content of expression. *See, e.g.*, *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *2 n.3, 3 (N.D. Cal. Jan. 12, 2022) (dismissing claim that algorithms manipulated viewers "into watching content"; "[w]ithout the content, there would be no claim" (internal quotation marks omitted)), *aff'd on other grounds, sub nom. Est. of Herndon v. Netflix, Inc.*, 2024 WL 808797 (9th Cir. Feb. 27, 2024); *Bill v. Super. Ct.*, 137 Cal. App. 3d 1002, 1007 (1982) (barring claim that showing movie "attract[ed] violence" because it sought to "impose liability on the basis of the content of the motion picture"); *Wilson*, 198 F. Supp. 2d at 170, 181-82 (similar); *Watters*, 715 F. Supp. at 821-24 (similar); *Zamora*, 480 F. Supp. at 204-06 (similar).

Ignoring this, Plaintiff effectively "ask[s] this Court to create new categories of unprotected speech"—this time for allegedly "addictive" video game content—"by applying a simple balancing test that weighs the value of a particular category of speech against its social costs and then punishes that category of speech if it fails the test." *Brown*, 564 U.S. at 792 (internal quotation marks omitted); *cf., e.g.*, Am. Compl. ¶ 519 (benefits of video games "are outweighed by the negative aspects of the risk of developing addiction"). The Supreme Court "emphatically rejected" that "startling and dangerous proposition." *Brown*, 564 U.S. at 792. So, too, should this Court.

19

***Producing Expressive Works.*** Plaintiff cannot save her claims by characterizing the games as "products," conduct, or economic activity. *Near v. Minnesota*, 283 U.S. 697, 720 (1931); *see also infra* § II.B. Just recently, the Supreme Court affirmed the core principle that those who "create expressive products . . . receive the First Amendment's protection," and this "principle does not change because the [expression] has gone from the physical to the virtual world." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2393 (2024).

In this same vein, "[s]peech is not conduct just because" someone "says it is." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). In *Interactive Digital Software Association*, the Eighth Circuit rejected a purported distinction between "the expressive parts of the game," such as its "story lines," and the player-controlled, interactive portions of the game. 329 F.3d at 957 ("[T]here is no justification for disqualifying video games as speech simply because they are constructed to be interactive[.]"). More recently, in *Lucero*, the Eighth Circuit rejected an argument that "producing a video" is "conduct," explaining that, even though "producing a video requires several actions that, individually, might be mere conduct . . . what matters . . . is that these activities come together to produce finished videos that are media for the communication of ideas." 936 F.3d at 752 (internal quotation marks omitted); *see also Estate of B.H.*, 2022 WL 551701, at *3 (dismissing claims targeting acts to produce expression because such claims regulated speech not conduct); *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277-78 (11th Cir. 2024) (internal quotation marks omitted) (ban on mandatory employee meetings violated the First Amendment "because the conduct and the speech are so intertwined").

This protection extends to features that enable users to create their own content. *See, e.g.*, *Brown*, 564 U.S. at 798 ("choose-your-own-adventure stories" protected). The First Amendment protects the provision of "integral" inputs that "*facilitate*[]" content creation, just as much as

expression itself. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595-97 (7th Cir. 2012) (citing *Buckley v. Valeo*, 424 U.S. 1, 19 (1976)) (internal quotation omitted). The Supreme Court thus rejected attempts to prevent authors from earning royalties, *Simon & Schuster, Inc. v. N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991), as well as taxes on newsprint and ink, *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 582 (1983); *see also Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) (invalidating law banning tattoo parlors). Plaintiff can no more hold the Developer Defendants liable for providing tools to create video game content than they could hold an art studio liable for providing "brushes and canvas*." Anderson*, 621 F.3d at 1061-62.

**Speech That Generates Revenue.** It also makes no difference that Developer Defendants earn revenue from video games. *Cf.* Am. Compl. ¶ 132. The "[m]icrotransactions" Plaintiff challenges are simply opportunities for players to curate their in-game experience by purchasing more content, such as "cosmetic items" and "new features, skins for avatars, and new objects." *E.g.*, Am. Compl. ¶¶ 204, 282, 406, 434, 463. This does not diminish Developer Defendants' First Amendment rights. Just as the fact that "books, newspapers, and magazines" are published "for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment," video games remain protected even when they generate revenue. *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952) (film choices protected); *see also VIRAG, S.R.L. v. Sony Computer Ent. Am. LLC*, 699 F. App'x 667, 668 (9th Cir. 2017) (video games express noncommercial speech); *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 120 (5th Cir. 1992) (recognizing protection for content "included to finance the publication").

**Failure to Warn.** Plaintiff also cannot save her claims by casting them under the rubric of "failure to warn" or "failure to disclose." In *Bill*, for example, the court affirmed dismissal of a

claim that film producers did not warn filmgoers about the likelihood "that violence might occur at or near theatres." 137 Cal. App. 3d at 1006-07. The First Amendment barred this claim because if the film "tended to attract violence-prone persons to the vicinity of the theater, it is precisely because of the *film's content.*" *Id.* (emphasis added).

Further, requiring Defendants to warn of expressive game content would interfere with their First Amendment right to create and control their "distinctive compilations of expression," *Moody*, 144 S. Ct. at 2388, 2393, 2404, including by forcing Defendants "to carry speech with which [they] disagree[]." *PG&E v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 11 n.7 (1986). The Ninth Circuit recently reaffirmed this principle in *NetChoice v. Bonta* when it upheld an injunction against a California statute requiring businesses to warn of supposed "harmful content" to which children may be exposed online because the requirement "facially violate[d] the First Amendment." 113 F.4th 1101, 1115-16 (9th Cir. 2024); *see also X Corp. v. Bonta*, — F.4th —, 2024 WL 4033063, at *6-9 (9th Cir. Sept. 4, 2024) (requiring online services to publish disclosures describing the content they carry was subject to and failed strict scrutiny).

For these reasons, courts have consistently held the First Amendment to bar claims premised on an alleged failure to warn about expression. *See Watters*, 715 F. Supp. at 822 n.1 (publisher cannot "constitutionally be required to warn its readers of possible consequences of reading or playing the game materials."); *Olivia N. v. N.B.C.*, 126 Cal. App. 3d 488, 492 (1981) (First Amendment barred claims against broadcaster for showing violent film "without proper warning"); *Sanders*, 188 F. Supp. 2d at 1270 (same). This Court should follow suit.

***Opinion Statements.*** Finally, Plaintiff cannot permissibly circumvent the First Amendment by repackaging her claims to sound in fraud (Counts VII-XI). Those claims seek to hold Developer Defendants liable for the same alleged, expressive choices in "design[ing]" their

games, *see*, *e.g.*, Am. Compl. ¶¶ 71, 723-724, 774-775, 787, 788, and making them available to Plaintiff, *see*, *e.g.*, *id.* ¶¶ 74, 718, 785. While the fraud-based claims gesture broadly to unidentified, allegedly misleading statements or omissions, none of these vague assertions take those claims beyond the ambit of the First Amendment. The only alleged Developer Defendant statements identified in the Amended Complaint—that *Fortnite* and *Minecraft* are "educational," *id.* ¶¶ 218, 285—are, at most, "expression[s] of opinion about a commercial product" and thus are "protected by the First Amendment." *Lowe v. S.E.C.*, 472 U.S. 181, 210 n.58 (1985); *see also Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (for-profit educational company's "use of general terms like 'educational content'" non-actionable puffery); *In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*, 966 F. Supp. 1525, 1534 (E.D. Mo. 1997) (dismissing fraud claim centering on car safety advertisements, because such assertions are non-actionable puffery), *aff'd sub nom., Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999).

\*     \*     \*

This lawsuit violates the First Amendment's "most basic" principle: "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91. And it is merely the latest effort to hold publishers liable for the design of allegedly harmful content. But from books, *e.g.*, *Butler v. Michigan*, 352 U.S. 380, 382 (1957), to magazines, *e.g.*, *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017, 1023-24 (5th Cir. 1987), to board games, *e.g.*, *Watters*, 715 F. Supp. at 822, to television shows, *e.g.*, *Zamora*, 480 F. Supp. at 205-06, to movies, *e.g.*, *Burstyn*, 343 U.S. at 502, to rock music, *e.g.*, *Waller v. Osborne*, 763 F. Supp. 1144, 1153 (M.D. Ga. 1991), *aff'd*, 958 F.2d 1084 (11th Cir. 1992)—and even to video games, *Brown*, 564 U.S. at 798-99—courts have rejected these claims. This Court should, too.

## II. Plaintiff's Claims Fail for Independent Reasons.

The First Amendment bars all of Plaintiff's claims, but the claims also should be dismissed because they fail to state a claim under Missouri law.

### A. Plaintiff Fails to Allege Developer Defendants Proximately Caused the Alleged Injuries.

All of Plaintiff's claims must be dismissed because she fails to plead that any Developer Defendant—individually or collectively—proximately caused any of her or K.C.'s alleged injuries.[5]

"A mere possibility of . . . causation is not enough" and causation therefore cannot be based on mere "speculation or conjecture." *Howard v. Kysor Indus. Corp.*, 729 S.W.2d 603, 606 (Mo. Ct. App. 1987) (quoting W. Prosser, The Law of Torts § 41, at 241 (4th edition 1971)). Instead, Plaintiff must plead facts demonstrating "a natural and continuous sequence" of events from the defendant's conduct to the plaintiff's damages, "unbroken by any new cause . . . and without which the event would not have occurred." *King v. Ellis*, 359 S.W.2d 685, 688 (Mo. 1962). Moreover, in cases involving several alleged tortfeasors, Missouri law requires that "the element of causation must be established as to each defendant sought to be held [liable]." *Hagen v. Celotex Corp.*, 816 S.W.2d 667, 671 (Mo. 1991).

The Amended Complaint's allegations about Plaintiff's individual experience—comprising 30 paragraphs of a (misnumbered) 828-paragraph Amended Complaint—boil down to the following: (1) K.C. plays *Fortnite*, *Minecraft*, *Gorilla Tag*, *Rec Room*, *VRChat*, and *Capuchin*;

---

[5] Causation is an "essential element" for all of Plaintiff's claims. *Heffernan v. Reinhold*, 73 S.W.3d 659, 664 (Mo. Ct. App. 2002) (negligence); *Willard v. Bic Corp.*, 788 F. Supp. 1059, 1063 (W.D. Mo. 1991) (products liability); *Verni v. Cleveland Chiropractic Coll.*, 212 S.W.3d 150, 154 (Mo. 2007) (fraud); *see also Custom Hardware Eng'g & Consulting, Inc. v. Dowell*, 918 F. Supp. 2d 916, 939 (E.D. Mo. 2013) (civil conspiracy); *Thornburg v. Fed. Express Corp.*, 62 S.W.3d 421, 427 (Mo. Ct. App. 2001) (IIED).

(2) K.C. has allegedly spent "large sums of their money" on unidentified game content, and (3) K.C. has purportedly developed "gaming disorder" and experienced other health consequences. *See* Am. Compl. ¶¶ 531-60. Plaintiff does not identify when K.C. began suffering each alleged harm or what alleged "design strategies" affected him in what ways. *Cf.* ¶ 586; *see Pro Serv. Auto., L.L.C., v. Lenan Corp.*, 469 F.3d 1210, 1214 (8th Cir. 2006) ("Under Missouri law, the plaintiff in a [product liability] claim must show, inter alia, that the alleged defect caused the claimed damages" (citation omitted)). Because Plaintiff never identifies when K.C. became addicted to each game, which features of each game affected him in what way, or for how long his alleged addiction to each game has lasted, she has failed to adequately allege causation. *See Rolf v. Conagra Foods, Inc.*, 2010 WL 4643219, at *3 (W.D. Mo. Nov. 9, 2010) (dismissing product liability claims because "Plaintiff is unable to establish causation as to Defendant"); *C. Pepper Logistics, LLC v. Lanter Delivery Sys., LLC*, 2021 WL 3725680, at *7 (E.D. Mo. Aug. 23, 2021) (dismissing claims in part because "Plaintiffs lump basically all the Defendants together in each allegation supporting their . . . claims"); *Schneider v. BJC Healthcare Sys.*, 2009 WL 1176273, at *2 (E.D. Mo. May 1, 2009) (dismissal appropriate where plaintiff "repeatedly lumps all Defendants together, without identifying which allegations apply to which Defendant"); *Rosemann v. Sigillito*, 2011 WL 13248373, at *16 (E.D. Mo. Oct. 31, 2011) ("When it is unclear from a complaint which allegations are made against which defendants, the complaint does not satisfy Rule 8's notice pleading requirement.").

Plaintiff's dismissal of the developers of *Among Us* likewise renders proximate cause facially implausible. *See* ECF No. 83. Her initial complaint alleged that the game's supposedly defective features addicted K.C., and that K.C. purportedly played it "for more than three years" for "several hours a day" alongside *Fortnite*, *Gorilla Tag*, *Rec Room*, *VRChat*, *Capuchin*, and

*Minecraft* and suffered injuries as a result. ECF No. 1, Original Compl. ¶ 31. Yet Plaintiff now claims only the latter six games caused his supposed addiction, without any explanation for how his previously alleged addiction to *Among Us* and attendant harms squares with this new causal chain. This abrupt about-face—espousing the same addiction theory as before, but entirely omitting a game Plaintiff previously claimed addicted and harmed K.C.—strains the bounds of plausibility beyond the breaking point.

Finally, proximate cause also cannot be plausibly pleaded here given the intervening and judicially recognized supremacy of parental decision making. "The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions." *Parham v. J.R.*, 442 U.S. 584, 602 (1979). Parents generally are allowed to decide, or at least influence, how much time a minor may spend on games, whether to grant a minor access to a credit card for gaming purchases, and whether to allow video games in the home at all. *See Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1224 (11th Cir. 2023) (analyzing cases recognizing "that there is a fundamental right to make decisions concerning the 'upbringing' and 'care, custody, and control' of one's children."); *Ramos v. Town of Vernon*, 353 F.3d 171, 183 (2d Cir. 2003) ("[W]e cannot sit in judgment of a parental philosophy allowing late night activity, for 'between parents and judges, the parents should be the ones to choose whether to expose their children to certain people or ideas.'" (quoting *Troxel v. Granville*, 530 U.S. 57, 63 (2000)). For that reason, courts dismiss tort claims when parental decisions undermine the plaintiff's causation theory. *See, e.g.*, *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 533 (S.D.N.Y. 2003) (dismissing failure to warn claim because "[p]laintiffs have failed to allege . . . their decisions to eat at McDonalds several times a week were anything but a choice freely made and which now may not be pinned on McDonalds").

26

**B.      Plaintiff Fails to State a Claim for Product Liability.**

"There can be no valid products liability claim without *a product* which has a defect." *Richardson v. Holland*, 741 S.W.2d 751, 754 (Mo. Ct. App. 1987) (emphasis added); *see also* Mo. Ann. Stat. § 537.760 (strict products liability claims require "a product"). A product is "tangible personal property distributed commercially for use or consumption." *Hobbs v. Boy Scouts of Am., Inc.*, 152 S.W.3d 367, 372 (Mo. Ct. App. 2004) (quoting Restatement (Third) of Torts: Prod. Liab. § 19 (1998)). "Tangible personal property is property which may be felt or touched; such property as may be seen, weighed, measured, and estimated by the physical senses." *Norris v. Norris*, 731 S.W.2d 844, 845 (Mo. 1987); *see also Ameer v. Morgan, et al.*, 2222-CC00417, slip op. at 8 (Mo. Cir. Ct. City of St. Louis Jul. 26, 2023) (dismissing product liability claims against Lyft stating that "it is clear from Missouri case law, that a product is something that is tangible and, in this case, the Lyft service application is not something tangible").

Video games, by contrast, are intangible "speech" that communicates "stories, imagery, age-old themes of literature, and messages, even an 'ideology,' just as books and movies do." *Interactive Digital Software Ass'n*, 329 F.3d at 957. Such expressive, communicative content is "not equivalent to commercial products." *Cardozo v. True*, 342 So. 2d 1053, 1056 (Fla. Dist. Ct. App. 1977); *see also Estate of B.H.*, 2022 WL 551701, at *3 ("There is no strict liability for books, movies, or other forms of media."). For that reason, "[w]hen dealing with ideas and images, courts have been willing to separate the sense in which the tangible containers of those ideas are products from their communicative element for purposes of strict liability." *James*, 300 F.3d at 701; *see Cardozo*, 342 So. 2d at 1056 (no failure to warn liability for publisher of cookbook whose recipe failed to warn ingredient was poisonous). Video games therefore do not "constitute products in the sense of their communicative content[.]" *James*, 300 F.3d at 701. It makes no difference that a

video game may be embodied in a physical disc, much as literature may be printed in a book and music recorded onto a CD. *Id.* at 701. Plaintiff's product liability theories are not premised on any attribute of a physical disc, but rather on the experience of interacting with video game content.[6] *See, e.g.*, Am. Compl. ¶¶ 223, 276, 414; *see also supra* § I.A. Although Plaintiff makes the bare claim that the games here are "tangible mechanism[s] for digital, interactive play," *id.* ¶ 181, the game elements Plaintiff claims to be addictive are its "ideas," "images," and "communicative content," not products. *James*, 300 F.3d at 701.

A different result would "raise serious First Amendment concerns." *Rodgers v. Christie*, 795 F. App'x 878, 880 (3d Cir. 2020); *James*, 300 F.3d at 695 (extending "tort liability . . . would raise significant constitutional problems under the First Amendment"); *Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1217-18 (D. Md. 1988) (extending product liability to content in "published material . . . could chill expression and publication"). Recognizing as much, courts across the country have uniformly rejected similar attempts to classify video game expression as "products." *See, e.g.*, *Sanders*, 188 F. Supp. 2d at 1278 ("intangible thoughts, ideas, and expressive content" in video games "not 'products'"). This remains true even when plaintiffs allege that a video game developer "specifically targeted a young audience, intending to addict them to the game." *Wilson*, 198 F. Supp. 2d at 169, 170-73, 181-82 (concluding that "*Mortal Kombat* is not a 'product' within the purview of the [Connecticut Product Liability Act].").

The distinction between "products" and expressive, intangible media like video games is further borne out in the longstanding distinction between "services" and "products." "Courts are

---

[6] For this reason, even if a game disc that caused physical harm—for example, by catching fire—could be subject to product liability law, the game content could not. *See James*, 300 F.3d 683, 695; *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034-35 (9th Cir. 1991) (product liability "do[es] not take into consideration the unique characteristics of ideas and expression"); *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 325 (S.D.N.Y. 2006) (dismissing product liability claims "because the intangible expressions . . . are not products"), *aff'd*, 279 F. App'x 40 (2d Cir. 2008).

unanimous in refusing to categorize commercially provided services as products." Restatement (Third) of Torts: Prod. Liab. § 19 cmt. F (1998). Missouri courts have uniformly recognized as much, holding "[p]roduct liability theories do not apply to services." *Hobbs*, 152 S.W.3d at 372.

The product liability claims therefore fail for the additional, independent reason that Developer Defendants' video games are services, not products. They connect players in online competitive, cooperative, and creative experiences, "allowing players to interact and communicate with each other in the game world." Am. Compl. ¶ 281; *see also, e.g.*, *id.* ¶¶ 432, 438, 400-404, 597, 640. And Developer Defendants "continuously add[] new . . . content," *id.* ¶ 163, such as "fresh features, new maps, live events, and the latest trends," *id.* ¶ 312. The ongoing, interactive, connective, and evolving aspects of these games are hallmarks of a service, not a manufactured "product." *See Jackson v. Airbnb, Inc.*, 639 F. Supp. 3d 994, 1011 (C.D. Cal. 2022) (Airbnb "is more akin to a service than to a product" because it "connects users"); *Burghart v. S. Corr. Entity*, 2023 WL 1766258, at *3 (W.D. Wash. Feb. 3, 2023) (provider of "software-as-service technology" is not a "manufacturer" or "product seller"); *Ameer*, 2222-CC00417, slip op. at 8 (dismissing product liability claims against Lyft in part because Lyft "provides a service and not a product").

Because the Amended Complaint impermissibly seeks to use product liability to inhibit Developer Defendants' "expressions," *Gorran*, 464 F. Supp. 2d at 325, "communicative content," *James*, 300 F.3d at 701, and "thoughts, ideas and messages," *Sanders*, 188 F. Supp. 2d at 1278— and because Developer Defendants' games are more akin to services than products—Plaintiff's product liability claims must be dismissed.

**C.     Plaintiff Fails to Allege a Legal Duty Actionable in Negligence.**

Plaintiff's negligence-based claims cannot stand because the Amended Complaint fails to allege a cognizable duty. "In any action for negligence, a plaintiff must establish the defendant owed a duty of care to the plaintiff." *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848 (Mo. 2018). The existence of a duty is a question of law. *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 156 (Mo. 2000). "[A] finding of no duty precludes a claim of negligence." *M.B. v. Live Nation Worldwide, Inc.*, 661 S.W.3d 342, 353 (Mo. Ct. App. 2022). Missouri courts thus routinely dismiss actions that fail to allege such a duty. *See, e.g.*, *Irby v. St. Louis Cnty. Cab Co.*, 560 S.W.2d 392, 395 (Mo. App. 1977) (affirming dismissal of negligence claim for lack of duty); *Reddick v. Spring Lake Ests. Homeowner's Ass'n*, 648 S.W.3d 765, 781 (Mo. Ct. App. 2022) (same). In the context of product liability-based negligence claims specifically, there is "no duty so to design his product as to render it wholly incapable of producing injury." *Stevens v. Durbin-Durco, Inc.*, 377 S.W.2d 343, 347 (Mo. 1964)."

The Amended Complaint conclusorily alleges that Developer Defendants owed Plaintiff and K.C. a host of duties. *See, e.g.*, Am. Compl. ¶¶ 567, 634-635, 656. Courts regularly hold that content creators do not owe their audience duties in tort. For example, courts have found no duties on television broadcasters not to air content that "impermissibly stimulated, incited and instigated" a child to replicate the atrocities he viewed on television, *Zamora*, 480 F. Supp. at 200; on board game makers not to publish a game that allegedly causes children "psychological harm," *Watters*, 904 F.2d at 379; on magazines not to publish a description of a practice that allegedly prompted a reader to asphyxiate himself, *Herceg v. Hustler Mag., Inc.*, 565 F. Supp. 802, 803-04 (S.D. Tex. 1983); or on video game publishers to prevent injuries allegedly caused by interacting with game content, *Sanders*, 188 F. Supp. 2d at 1272. As one court explained, "it is simply not acceptable to

a free and democratic society to impose a duty . . . to limit and restrict [] creativity in order to avoid the dissemination of ideas in" "speech which may adversely affect" some parts of its audience. *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1005-06 (1988). No such duty exists.

And if it did, such a duty would be anathema to our constitutional tradition. Plaintiff's negligence theories—which would require publishers to censor content that might (in Plaintiff's view) cause harm—would stifle the creation and dissemination of protected expression across media, *see supra* § I, creating "serious[]" "constitutional concerns." *Watters,* 904 F.2d at 382-83 (citing cases). This proposal should be rejected.

### D. Plaintiff's COPPA Claim Is Preempted.

Plaintiff has failed to state a claim under COPPA, 15 U.S.C. § 6501 *et seq. See* Am. Compl. ¶¶ 681-87 (Count V). She asserts that COPPA violations underlie her claims for negligence per se. *See*, *e.g.*, *id*. ¶ 687. But Plaintiff's COPPA-related claims fail as a matter of law because there is no private right of action under COPPA. To the contrary, COPPA contains an express preemption provision that prohibits Plaintiff from bringing tort claims based on COPPA:

> No State or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this chapter that is inconsistent with the treatment of those activities or actions under this section.

15 U.S.C. § 6502(d). Only state attorneys general and the Federal Trade Commission may enforce COPPA. *Id.* §§ 6504, 6505. There is no private right of action. *Id.*

Courts construe COPPA's preemption language strictly, rejecting state law claims that seek to enforce COPPA. *See Manigault-Johnson v. Google, LLC*, 2019 WL 3006646, at *6 (D.S.C. 2019) (Congress "clearly intended to preclude" use of "state law to privately enforce" COPPA); *T.K. ex rel. Leshore v. Bytedance Tech. Co.*, 2022 WL 888943, at *25 (N.D. Ill. Mar. 25, 2022) (COPPA "does not provide for a private right of action."). The Ninth Circuit has allowed a private

cause of action to enforce COPPA, but only in the narrow circumstance where the claim is "*brought as fully stand-alone causes of action* under state law . . . [that] involve conduct that *also* violates COPPA." *Jones v. Google LLC*, 73 F.4th 636, 643-44 (9th Cir. 2023). The Eighth Circuit has never adopted such a private cause of action, and it would not apply here anyway. Far from asserting a "stand-alone" claim that incidentally forbids the same conduct as COPPA, the Amended Complaint directly grounds its negligence per se claim on alleged COPPA violations. *See In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667 (D.S.C. 2021) (negligence per se claim based on alleged COPPA violation is preempted). This cause of action also fails for the same reasons under Missouri law: "The test to determine whether a violation of a statute may constitute negligence per se depends on legislative intent." *Lowdermilk v. Vescovo Bldg. & Realty Co.*, 91 S.W.3d 617, 629 (Mo. Ct. App. 2002). COPPA's preemption clause makes clear that Congress did not intend for these rights to be privately enforceable.

Finally, while Plaintiff now claims K.C. was under 13 years old when K.C. accessed Developer Defendants' games, she fails to allege that K.C. disclosed this information to Developer Defendants when K.C. accessed their games. *See* COPPA FAQs A.12 ("an operator of a general audience site or service that chooses to screen its users for age in a neutral fashion may rely on the age information its users enter, even if that age information is not accurate"). The Amended Complaint also contains no factual allegations as to Developer Defendants' sign-up or parental consent processes to support its rote recitation of the various requirements of COPPA—a particularly problematic deficiency given that some games like VRChat restrict access to children under 13, meaning K.C. could have only gained access by misrepresenting their age.[7] Plaintiff's conclusory allegations fail to state a claim.

---

[7] VRChat is only available for use by individuals who are 13 years of age or older and requires parental consent for

### E. Plaintiff Has Not Adequately Pleaded Her Fraud-Based Claims.

Each of Plaintiff's fraud-based claims (Counts VII-XI) is subject to and fails to satisfy Rule 9(b)'s pleading requirements. *See Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (8th Cir. 2013) (misrepresentation); *Blake v. Career Educ. Corp.*, 2009 WL 140742, at *2 (E.D. Mo. Jan. 20, 2009) (the MMPA); *In re Bisphenol-A (BPA) Polycarbonate Plastic Prod. Liab. Litig.*, 687 F. Supp. 2d 897, 907 (W.D. Mo. 2009) (omission); *In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*, 966 F. Supp. 1525, 1535 (E.D. Mo. 1997), *aff'd sub nom. Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999) (concealment).

### 1. Plaintiff Fails to Satisfy Rule 9(b).

The elements of a fraudulent misrepresentation claim are: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." *Freitas*, 703 F.3d at 438–39. A claim for negligent misrepresentation differs only in that it requires "the information [be] false" "because of the speaker's failure to exercise reasonable care." *Dancin Dev., L.L.C. v. NRT Missouri, Inc.*, 291 S.W.3d 739, 744 (Mo. Ct. App. 2009). The Missouri Merchandising Practices Act ("MMPA") similarly declares "fraud," "deception," "misrepresentation," "or the concealment . . . or omission of any material fact in connection with the sale or advertisement of any merchandise" to be unlawful. Mo. Ann. Stat.

---

users between the ages of 13 and 18. VRChat prevents access to users who enter a birthdate indicating that they are *under* 13 years of age, by generating an error message and blocking such users from attempting to create an account again for 24 hours. Assuming K.C. actually signed up to use VRChat, given the allegation in the Amended Complaint that K.C. was only 12 years old at the time of filing the original complaint, Am. Compl. ¶ 99, and was ten years old when he began playing VRChat, Am. Compl. ¶ 532, K.C. must have misrepresented their age.

§ 407.020. To state an MMPA claim, a plaintiff must allege that she "(1) purchased merchandise from the defendant; (2) for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful under the MMPA." *Hennessey v. Gap, Inc.*, 86 F.4th 823, 827 (8th Cir. 2023) (alterations adopted).

For all these claims, Plaintiff must "plead such facts as the time, place, and content of the defendant[s'] false representations, as well as the details of the defendant[s'] fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Joshi*, 441 F.3d at 556. "[E]xpressions of opinion are insufficient to authorize a recovery for fraudulent misrepresentation because such expressions are deemed not to be material to a transaction." *Clark v. Olson*, 726 S.W.2d 718, 720 (Mo. 1987) ("Puffing of wares, sales propaganda, and other expressions of opinion are common, are permitted, and should be expected."); *see also Tucker v. Gen. Motors LLC*, 58 F.4th 392, 396 (8th Cir. 2023) ("it has been repeatedly held that advertising constituting 'mere puffery' cannot form the basis of an MMPA claim"); *supra* § I.B.

Plaintiff falls well short of this standard. Plaintiff vaguely alleges that Developer Defendants misrepresented that their games are "safe" but fails to identify the statements, where they were made, when they were made, and by whom—whether in connection with their common law claims for misrepresentation or under the MMPA.[8] *See, e.g.*, Am. Compl. at 223-25 ¶¶ 76, 77, 83; *Goldman v. Tapestry, Inc.*, 501 F. Supp. 3d 662, 666 (E.D. Mo. 2020) (quoting *Schaller Tel. Co.*, 298 F.3d at 746) ("conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy [Rule 9(b)]."). For the two statements Plaintiff identified as to Developer Defendants—that Epic and the Microsoft Defendants claimed that their games are

---

[8] The Amended Complaint skips from ¶ 716 to ¶ 71 on pages 220-221, and then from ¶ 84 to ¶ 717 on pages 225-226. To avoid confusion, page numbers are cited for references to that section of the Amended Complaint.

"educational," Am. Compl. ¶¶ 218, 285, 775—Plaintiff does not explain why they are false, nor could she, as they are protected statements of opinion. *See supra* § I.B. Nor does Plaintiff allege Epic or the Microsoft Defendants had knowledge of their purported falsity. *Wivell v. Wells Fargo Bank, N.A.*, 773 F.3d 887, 898 (8th Cir. 2014) (to survive a motion to dismiss, "a party must state with particularity the circumstances constituting fraud or mistake").

Finally, Plaintiff fails to allege she or K.C. read or heard any purported misrepresentations, much less relied on them, providing an independent basis for dismissal. *See* Am. Compl. at 225 ¶ 80; *see also id.* ¶¶ 766, 778; *Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC*, 949 F.3d 417, 423 (8th Cir. 2020) ("Parties alleging fraud must plead reliance with sufficient particularity to state a plausible claim of justifiable reliance." (internal quotation marks omitted)); *Stein v. Novus Equities Co.*, 284 S.W.3d 597, 603 (Mo. Ct. App. 2009) (affirming dismissal of fraudulent and negligent misrepresentation claims where "[p]laintiffs' petition failed to set forth any set of facts which, if proven, would establish that they relied on [d]efendants' alleged misrepresentations.").

### 2. Plaintiff Fails to State Claims for Fraudulent Omission or Concealment.

Claims for fraudulent omission and concealment require that the plaintiff satisfy the same elements as a fraudulent misrepresentation claim. *Zubres Radiology v. Providers Ins. Consultants*, 276 S.W.3d 335, 340 (Mo. Ct. App. 2009) ("The same nine elements required to establish fraud by an affirmative misrepresentation must be proven in a fraud by silence claim."). "Silence may amount to a representation, constituting the first element of fraudulent misrepresentation, if the party sought to be held accountable for fraud (1) conceals material facts and (2) has a legal duty to disclose such facts." *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1064 (8th Cir. 2005). "However, before silence may add up to misrepresentation, the silent party

must have a duty to speak, and that duty arises when the silent party is a fiduciary or possesses superior knowledge." *Nigro v. Rsch. Coll. of Nursing*, 876 S.W.2d 681, 686 (Mo. Ct. App. 1994).

Plaintiff does not allege that Developer Defendants owed her or K.C. a duty of disclosure. Rather, Plaintiff merely alleges that K.C. plays Developer Defendants' video games, which does not give rise to a fiduciary relationship. *See Shervin v. Huntleigh Sec. Corp.*, 85 S.W.3d 737, 741 (Mo. Ct. App. 2002) ("a fiduciary or confidential relationship exists" only when "trust is reposed with respect to property or business affairs of the other."). Where "there is an arm's length transaction," "mere non-disclosure of material facts is ordinarily not actionable misrepresentation unless some artifice or trick has been employed." *In re Gen. Motors Corp. Anti-Lock Brake Prod. Liab. Litig.*, 966 F. Supp. 1525, 1535–36 (E.D. Mo. 1997), *aff'd sub nom. Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999). Nor could she legally allege any such duty, as compelling the Developer Defendants to opine on the safety or educational value of their games would violate the First Amendment. *See supra* § I.B.

The facts that Plaintiff alleges in the Amended Complaint contradict a conclusion that Developer Defendants employed an artifice or trick to conceal information. Every allegation about the purportedly addictive nature of video games is based on publicly available information. *See* Am. Compl. ¶¶ 512-19 (discussing literature). Where, as here, Plaintiff has reasonable access to the allegedly concealed information, the information cannot have been fraudulently concealed. *See, e.g.*, *In re Gen. Motors Corp.*, 966 F. Supp. at 1535 (requiring plaintiff asserting a claim for fraudulent omission "to show that he exercised due diligence to discover the information."); *Batek v. Curators of Univ. of Missouri*, 920 S.W.2d 895, 900 (Mo. 1996) (dismissing fraudulent concealment claim where plaintiff "does not aver that she exercised due diligence or why due diligence did not lead or could not have le[d] to discovery of facts and the cause of action").

**F.**     **Plaintiff Fails to Plausibly Allege Intentional Infliction of Emotional Distress.**

A plaintiff alleging intentional infliction of emotional distress must allege facts demonstrating that "(1) the defendant's conduct was extreme and outrageous; (2) the defendant acted intentionally or recklessly; and (3) the defendant's conduct caused extreme emotional distress resulting in bodily harm." *Gillis v. Principia* Corp.*, 111 F. Supp. 3d 978, 986 (E.D. Mo. 2015), *aff'd*, 832 F.3d 865 (8th Cir. 2016). Missouri sets a stringent standard for such claims, requiring that the conduct be "so outrageous in character and so extreme in degree that it is beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community." *Diehl v. Fred Weber, Inc.*, 309 S.W.3d 309, 321 (Mo. Ct. App. 2010). In addition, the "conduct must have been intended *only* to cause extreme emotional distress to the victim." *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997) (emphasis added, internal quotation marks omitted).

Creating and hosting video games does not clear the high bar for outrageous conduct. Conduct is extreme and outrageous only if "an average member of the community upon learning of the facts alleged by the plaintiff would exclaim 'outrageous!'" *Thornburg*, 62 S.W.3d at 428. Courts have dismissed claims across a wide swath of cases, including hostile treatment, harassment, and abuses of power, when the alleged conduct did not meet the extreme and outrageous standard. *See*, *e.g.*, *Gillis*, 111 F. Supp. 3d at 981 (teacher's allegedly openly hostile treatment and exclusion of student not outrageous); *Miller v. Wackenhut Servs., Inc.*, 808 F. Supp. 697, 701 (W.D. Mo. 1992) (employer's insistence that plaintiff take an exam employer knew plaintiff was too physically ill to take not outrageous); *see also Gibson*, 952 S.W.2d at 249 (dismissing intentional infliction of emotional distress claim where a priest allegedly fondled a minor). Far from being "utterly intolerable in a civilized community," as these cases require, the development of creative, engaging, and entertaining video games is celebrated, as reflected by the

fact that video game play is common. *See* Am. Compl. ¶¶ 24, 185, 275, 397, 437 (describing the millions of players of Developer Defendants' games). Developer Defendants' development of *Fortnite*, *Minecraft*, *Gorilla Tag*, *Rec Room*, *VRChat*, and *Capuchin* therefore does not meet the exacting requirements of a properly stated intentional infliction of emotional distress claim.

Plaintiff's intentional infliction of emotional distress claim fails for the additional reason that "where one's conduct amounts to the commission of a traditional tort and was not intended only to cause extreme emotional distress to the victim, the tort of intentional infliction of emotional distress will not lie and recovery must be had under the appropriate traditional tort action." *Diehl*, 309 S.W.3d at 322. Here, the allegations underlying Plaintiff's emotional distress claim—that "each [Developer] Defendant intentionally designed its [games] to addict minor and neurodivergent" players, Am. Compl. ¶ 699—form the basis for all of Plaintiff's other claims. This duplication forecloses Plaintiff's claim for intentional infliction of emotional distress.[9]

### G. Plaintiff's Loss-of-Consortium Claim Is Not Recognized in Missouri.

A loss of consortium claim "encompasses the other spouse's loss of affection, care, companionship, and services, as well as an impairment or destruction of the sexual life of the married couple, due to the conduct of a tortfeasor." *Wright v. Barr*, 62 S.W.3d 509, 537 (Mo. Ct. App. 2001). The Missouri Supreme Court has refused to extend loss-of-consortium claims to reach a parent-child relationship. *Powell v. Am. Motors Corp.*, 834 S.W.2d 184, 189 (Mo. 1992) (calling it "a public policy decision that . . . the legislature is best equipped to make"); *see Barbera v. Brod-Dugan Co.*, 770 S.W.2d 318, 322 (Mo. Ct. App. 1989) ("We conclude . . . that a new cause of action on behalf of a child for the loss of parental consortium should not be recognized."). Because

---

[9] Plaintiff's claim fails for the additional reason that while conditions like "stress and anxiety may be medically diagnosable, they do not on their own constitute the bodily harm the Missouri Supreme Court requires to show IIED." *Kirsten v. Cape Royale at Ski Harbor Condo. Owners Ass'n Inc.*, 2022 WL 7108312, at *3 (W.D. Mo. Oct. 12, 2022).

Plaintiff's claim for "losing the society, love, companionship, and services of K.C. that she once enjoyed," Am. Compl. ¶ 824, is premised entirely on a parent-child relationship, it is not actionable under Missouri law. Moreover, her consortium claim fails for the additional reason that is "derivative" of her other causes of action, none of which state a viable claim for relief. *Wright*, 62 S.W.3d at 537 ("A claim for loss of consortium is derivative of the injured spouse's claim, which means the defendant must be proved to have caused the original injury, which in turn caused the spouse to suffer." (internal quotation marks omitted)).

### H. Plaintiff's Civil Conspiracy and In-Concert Liability Claims Fail.

A claim for civil conspiracy requires: "(1) two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful or overt acts, and (5) resulting damages." *CGB Diversified Servs., Inc. v. Baumgart*, 504 F. Supp. 3d 1006, 1025 (E.D. Mo. 2020). Rule 9(b)'s heightened pleading standard applies to civil conspiracy claims sounding in fraud. *Siegel v. Deutsche Bank Nat. Tr. Co.*, 409 F. App'x 975, 976 (8th Cir. 2011). In Missouri, "a civil conspiracy does not give rise to a civil action unless something is done pursuant to which, *absent the conspiracy*, would create a right of action against one of the defendants, if sued alone." *Williston v. Vasterling*, 536 S.W.3d 321, 335 (Mo. Ct. App. 2017) (emphasis added, internal quotation marks omitted). "Thus, if the underlying wrongful act alleged as part of a civil conspiracy fails to state a cause of action, the civil conspiracy claim fails as well." *Id*. (alterations adopted, internal quotation marks omitted). As no underlying cause of action exists here, Plaintiff's civil conspiracy claim fails.

In addition, civil conspiracy requires that the conspirator understood the unlawful aims of the scheme and conspired to further them. *See Smith v. Bacon*, 699 F.2d 434, 436 (8th Cir. 1983) (quoting *White v. Walsh*, 649 F.2d 560, 561 (8th Cir. 1981)) (A conspiracy plaintiff must allege

"that 'the defendants had directed themselves toward an [unlawful] action by virtue of a mutual understanding'" and "facts 'suggesting such a 'meeting of the minds.'"); *Gettings v. Farr*, 41 S.W.3d 539, 542 (Mo. Ct. App. 2001) (a required element of a conspiracy claim is "a meeting of the minds"). Plaintiff alleges no facts to support a plausible inference that Developer Defendants conspired to achieve an unlawful purpose rather than develop games that are indisputably legal, enjoyed by millions, and protected by the First Amendment. *See* Am. Compl. ¶ *See* Am. Compl. ¶¶ 24, 185, 275, 397, 437; *Brown*, 564 U.S. at 790.

Finally, Missouri does not recognize a cause of action called "in-concert liability." Count XI, in which Plaintiff purports to allege such cause of action, therefore fails.

## CONCLUSION

For the foregoing reasons, the Amended Complaint fails to state a claim upon which relief can be granted, and any amendment would be futile. The Court should therefore dismiss the Amended Complaint with prejudice. *See Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 758 (8th Cir. 2021) ("It is well settled that a district court may dismiss a complaint with prejudice under Rule 12(b)(6) when amendment of a complaint would be futile."); *ZL Techs., Inc. v. Gartner, Inc.*, 709 F. Supp. 2d 789, 801 (N.D. Cal. 2010) (denying leave to amend where there was "no way" additional facts could fall "outside the protections of the First Amendment"), *aff'd sub nom. ZL Techs., Inc. v. Gartner Grp., Inc.*, 433 F. App'x 547 (9th Cir. 2011); *Siepel v. Bank of Am., N.A.*, 239 F.R.D. 558, 571 (E.D. Mo. 2006), *aff'd*, 526 F.3d 1122 (8th Cir. 2008) (denying motion for leave to file a second amended complaint where plaintiffs "failed to show that the proposed Second Amended Complaint [would] cure the deficiencies of the Amended Complaint.").

Dated: October 8, 2024                          Respectfully submitted,

**SWANSON MARTIN & BELL LLP**

*/s/ Adam T. Suroff*
Adam T. Suroff, MO Bar #51355
7501 Nall Avenue
Prairie Village, KS 66802
(314) 242-0915
Email: asuroff@smbtrials.com

- AND -

**HUESTON HENNIGAN LLP**
Moez M. Kaba*
Allison L. Libeu*
Padraic Foran*
523 West 6th St., Suite 400
Los Angeles, California 90014
(213) 788-4340
Email: mkaba@hueston.com
        alibeu@hueston.com
        pforan@hueston.com

Adam Minchew*
1 Little West 12th St.
New York, New York 10014
(646) 930-4046
Email: aminchew@hueston.com

* Admitted *pro hac vice*

*Attorneys for Defendants Epic Games, Inc.*

- AND -

**SHOOK, HARDY & BACON LLP**
Christopher P. Gramling, MO Bar #50218
Cailynn D. Hayter, MO Bar #70110
2555 Grand Blvd.
Kansas City, MO 64108
Telephone: (816) 474-6550
Facsimile: (816) 421-5547
cgramling@shb.com
chayter@shb.com

**DAVIS WRIGHT TREMAINE LLP**
Ambika Kumar (*Pro Hac Vice*)
920 Fifth Avenue, Suite 3300

Seattle, Washington 98104-1610
(206) 757-8030
E-MAIL: ambikakumar@dwt.com

Adam S. Sieff (*Pro Hac Vice*)
865 S. Figueroa St., 24th Floor
Los Angeles, California 90017-2566
(213) 633-8618
E-MAIL: adamsieff@dwt.com

- AND -

**COVINGTON & BURLING LLP**
David Sneed (*Pro Hac Vice*)
Gary M. Rubman (*Pro Hac Vice*)
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
E-MAIL: dsneed@cov.com;
grubman@cov.com

Kathryn Cahoy (*Pro Hac Vice*)
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, California 94306-21121
(650) 632-4735
E-MAIL: kcahoy@cov.com

*Attorneys for Defendants Mojang AB and*
*Microsoft Corporation*

- AND -

**THOMPSON COBURN LLP**
Michael L. Nepple (*Pro Hac Vice*)
Daniel A. Garcia (MO 70071)
One US Bank Plaza
St. Louis, Missouri 63101
(314) 552-6000
E-MAIL: mnepple@thompsoncoburn.com
dgarcia@thompsoncoburn.com

- AND -

**McNAUL EBEL NAWROT &**

**HELGREN PLLC**
Gregory J. Hollon (*Pro Hac Vice*)
Theresa DeMonte (*Pro Hac Vice*)
Michael P. Hatley (*Pro Hac Vice*)
600 University Street, Suite 2700
Seattle, Washington 98101
(206) 467-1816
E-MAIL: ghollon@mcnaul.com
tdemonte@mcnaul.com
mhatley@mcnaul.com

*Attorneys for Defendants Another Axiom Inc., and Rec Room Inc.*

- AND -

**HILGERS GRABEN PLLC**
Jonathan G. Musch (MO 55200)
John Vivian (*Pro Hac Vice*)
6 Cardinal Way, Suite 900
St. Louis Missouri 63102
(314) 464-3391
E-MAIL: jmusch@hilgersgraben.com
jvivian@hilgersgraben.com

*Attorneys for Defendant Banana Analytics, LLC*

- AND -

**SANDBERG PHONEIX & VON GONTARD P.C.**
W. Perry Brandt, MO #28292
4600 Madison Avenue, Suite 1000
Kansas City, Missouri 64112
(816) 305-7377
E-MAIL: pbrandt@sandbergphoenix.com

- AND -

**GOODWIN PROCTER LLP**
Matt Kanny (*Pro Hac Vice*)
520 Broadway, Suite 500
Santa Monica, California 90401
(424) 252-6400
mkanny@goodwinlaw.com

Allyson M. McCain (*Pro Hac Vice*)
Three Embarcadero Center
San Francisco, California  94111
(415) 733-6000
amccain@goodwinlaw.com

*Attorneys for Defendant VRChat Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that he served a copy of the foregoing via electronic filing on all counsel of record this 8th day of October 2024.

By:   */s/  Adam T Suroff*