IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| CAREY COURTRIGHT,<br>*Individually and on behalf of K.C., a Minor*,<br><br>                Plaintiff,<br><br>v.<br><br>EPIC GAMES, INC., et al.,<br><br>                Defendants. | Case No. 2:24-CV-04055-BCW |

## ORDER

Before the Court are Defendants Another Axiom Inc. and Banana Analytics, LLC's (the "Developer Defendants") motion to dismiss (Doc. #146), Defendant VRChat Inc.'s motion to dismiss (Doc. #148), and Defendants Google LLC and Roblox Corporation's (the "Platform Defendants") motion to dismiss (Doc. #149). The Court, being duly advised of the premises and having heard argument on the motions on April 22, 2025, grants said motions without prejudice.

## BACKGROUND

Plaintiff Carey Courtright ("Plaintiff") is the mother of K.C.,[1] a minor who was twelve years old at the time this suit was filed. (Doc. #1). Plaintiff alleges that video games are designed, marketed, and sold in a way that creates and sustains addiction in users. Plaintiff brought this action individually, and on behalf of K.C., against Defendants Epic Games, Inc., Roblox Corporation, Mojang Studios, Microsoft Corp., Meta Platforms, Inc., Google LLC, Another Axiom, Inc., Rec Room, Inc., VRChat Inc., Banana Analytics, LLC, InnerSloth, LLC, PlayEveryWare, Inc., and

---

[1] Due to K.C.'s minority status, this Order refers to K.C. by their initials and uses plural pronouns to conceal their gender.

Jane & John Doe I-XX. (Doc. #1).[2] In her 260-page amended complaint, Plaintiff alleges the following claims:

> Count I: Strict Liability – Defective Design
> Count II: Strict Liability – Failure to Warn
> Count III: Negligence – Negligent Design
> Count IV: Negligence – Negligent Failure to Warn
> Count V: Negligence – Ordinary Negligence and Negligence Per Se
> Count VI: Intentional Infliction of Emotional Distress
> Count VII: Violation of Missouri Merchandising Practices Act
> Count VIII: Deceit – Fraudulent Misrepresentation, Fraudulent Omission and Nondisclosure, and Fraudulent Concealment
> Count IX: Negligent Misrepresentation
> Count X: Civil Conspiracy
> Count XI: In-Concert Liability
> Count XII: Loss of Consortium

(Doc. #138 at 184–256).

Plaintiff's amended complaint begins with an introduction that alleges that there is a global epidemic of minors suffering from an addiction or disordered compulsion to use video games, called "internet gaming disorder" or video game addiction. Id. at 2–8. Plaintiff details the common symptoms of video game addiction. Id. Plaintiff then alleges that video games are designed by Defendants to cause intense dopamine releases to hook users, especially minors whose brains are still developing. Id. at 8–12. Plaintiff alleges Defendants' products are intentionally designed to be addictive by including microtransactions, game theory tactics, operant conditioning, reward systems, and more. Id.

Plaintiff's "General Allegations" span 146 pages, broadly describing the video gaming industry, describing each of Defendant's products, explaining monetization schemes in video

---

[2] Plaintiff subsequently filed three notices of voluntary dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i), dismissing without prejudice Defendants PlayEveryWare, Inc., InnerSloth, LLC, Microsoft Corp., and Mojang Studios from the above-captioned action. (Docs. #104, #137, #165).

games, and laying out the use of patented technologies. Id. at 36–182. Plaintiff alleges Defendants have patented designs with addictive features and have acted in concert by entering into licensing agreements to use each other's patented systems. Id. at 52–69. On page 171, Plaintiff begins to provide information about K.C.'s specific video game use. Id. at 171–78. On page 178, Plaintiff describes her own alleged injuries. Id. at 178–80. Then, Plaintiff's claims begin on page 182, and each claim realleges and incorporates by reference all of the foregoing allegations. Id. at 182–256.

On October 8, 2024, Defendants filed the above-listed motions to dismiss. (Docs. #146, #148, #149). On October 29, 2024, Plaintiff filed opposing suggestions in response to both motions. (Doc. #160). On November 19, 2024, Defendants filed reply suggestions. (Docs. #171, #172).

On February 13, 2025, the Court granted Defendants Epic Games, Inc., VRChat, Inc., Meta Platforms, Inc., and Rec Room, Inc.'s motions to compel arbitration and ordered a stay of all proceedings related to the claims against those Defendants pending the outcomes of arbitration. (Doc. #189). Therefore, as to Epic Games, Inc., VRChat, Inc., Meta Platforms, Inc., and Rec Room, Inc. the Court denies the motions to dismiss without prejudice with leave to re-file after the stay is lifted. The Court considers the Developer Defendants' motion (Doc. #146) as it pertains to Defendants Another Axiom Inc. and Banana Analytics, LLC only. The Court considers the Platform Defendants' motion (Doc. #149) as it pertains to Defendants Google LLC and Roblox Corporation only.

As alleged in this action, Another Axiom Inc. developed the video game "Gorilla Tag" and Banana Analytics, LLC developed the video game "Capuchin." (Doc. #138 at 28, 29). Google LLC operates the online platform "Google Play," which allows users to download games and other

3

apps. Roblox Corporation operates an online platform "Roblox," which is a game creation system that allows users to design their own games. (Doc. #138 at 22, 31).

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Fed. R. Civ. P. 12(b)(6)). Factual allegations in the complaint must be sufficiently alleged to raise a right to relief above the speculative level. Bell Atlantic Corp., et al. v. Twombly, 550 U.S. 544, 554-55 (2007). When ruling on a motion to dismiss, the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the [nonmoving party]" and must also draw all reasonable inferences in favor of the nonmoving party. Stodghill v. Wellston Sch. Dist., 512 F.3d 472, 476 (8th Cir. 2008) (citations omitted). However, the Court need not accept as true legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678.

## ANALYSIS

The Developer Defendants, Another Axiom Inc. and Banana Analytics, LLC, and the Platform Defendants, Google LLC and Roblox Corporation, raise a plethora of arguments for dismissal. The Court addresses only those arguments necessary for the disposition of the pending motions, and the Court stresses that its conclusions are specific to these parties and this complaint.

As a preliminary matter, the Court must determine whether Defendant Roblox Corp. should be considered a video game developer (Developer Defendant) or a platform provider (Platform Defendant). Plaintiff argues Roblox Corp. should be treated as a developer, not a platform, because the system it operates (also named Roblox) is an online video game. (Doc. #160). Roblox Corp. argues its system is a platform that provides users with tools to create their own video games but

is not a ready-to-play video game itself, so it should be considered a platform provider. See (Doc. #150 at 23).

Roblox Corp. is appropriately categorized as a Platform Defendant based on Plaintiff's own description and treatment of Roblox in her amended complaint. Plaintiff describes Roblox as a game creation system that allows users to create their own video games which are then available for other users to play. See (Doc. #138 at 84–87). Plaintiff alleges Roblox Corp. provides tutorials and instructions on how to use its tools, then profits from those user-created games. Id. Roblox is a unique Platform that allows users to create games, then makes those games accessible to others; this is the function of a platform, not a video game. It is therefore appropriate to consider the arguments raised in the Platform Defendants' motion to dismiss with respect to Roblox. Corp.[3]

**I.     All Claims Against the Platform Defendants are Barred by Section 230.**

The Platform Defendants argue Section 230 of the Communications Decency Act ("CDA") requires dismissal of all claims against them because the CDA prohibits holding online service providers, like the Platform Defendants, legally responsible for publishing content created by third parties. (Doc. #150). In opposition, Plaintiff argues Section 230 is inapplicable because she does not seek to hold the Platform Defendants liable for publishing third-party content but for their own allegedly tortious conduct. (Doc. #160). Plaintiff also argues Section 230 cannot be the basis for a Rule 12(b)(6) dismissal unless it is established by the face of the complaint, because it is an affirmative defense. Id. at 42.

The CDA bars plaintiffs from holding providers of an "interactive computer service" liable for information that a third party "information content provider" created and developed. 47 U.S.C. § 230; Johnson v. Arden, 614 F.3d 785, 791 (8th Cir. 2010). As used in the CDA, "[t]he term

---

[3] To the extent Roblox Corp. could be considered a video game developer, the Court's analysis below with respect to the Developer Defendants applies equally to Roblox.

'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server[.]" 47 U.S.C. § 230(f)(2). "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

When considering alleged conduct with respect to Section 230, "what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1102 (9th Cir. 2009), as amended (Sept. 28, 2009). Here, for the reasons explained below, the Court would have to treat the Platform Defendants as publishers or speakers of content created by third parties in order to hold them liable on any of Plaintiff's claims.

The Platform Defendants—who each maintain online systems that host millions of daily users—are providers of interactive computer services. However, Plaintiff argues she does not seek to hold the Platform Defendants liable for any conduct they performed in that role but only for conduct that is not protected by Section 230. (Doc. #160 at 43–48). Though Plaintiff makes this argument, the factual allegations of the amended complaint run contrary to this assertion.

The amended complaint generally alleges that Defendants intentionally made their video games with addictive features, which caused K.C. to develop video game addiction and other resulting harms. See (Doc. #138). Yet, the allegedly addictive features Plaintiff identifies are not attributable to the Platform Defendants. The allegedly addictive features identified by Plaintiff include "microtransactions and other in-game monetization systems," "near miss[es]," "exciting animations," "chasing," "[f]ear of missing out," "exclusivity" of prizes, "entrapment," "sunk cost effect," "loot boxes," "rubber-banding," "pay-to-win models," "reward systems," "artificial

6

intelligence and bots," and "dark patterns." (Doc. #138 at 43–47). Those features constitute facets of ready-to-play video games that the Platform Defendants make available to users through Google Play and Roblox; in other words, the features are created and developed by third-party information content providers, which the Platform Defendants then make available. Section 230 protects the Platform Defendants from theories of liability that seek to hold them accountable for type of conduct. Johnson, 614 F.3d at 791 ("Congress [] established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them." (quoting Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254 (4th Cir.2009)).

Plaintiff's arguments to the contrary are unpersuasive. Plaintiff attempts to tie one of the allegedly addictive features, microtransactions, directly to the Platform Defendants by alleging Google and Roblox Corp. profit from the microtransactions that occur in video games because Google Play and Roblox process the payments and take a percentage of the revenue. (Doc. #138 at 68). But this alleged conduct is done within the Platform Defendants' roles as publishers facilitating the use of third-party content. See Coffee v. Google, LLC, No. 20-CV-03901-BLF, 2022 WL 94986, at *7 (N.D. Cal. Jan. 10, 2022) (finding claims barred by § 230 where the facts alleged "establish[ed] that the game apps and Loot Boxes downloaded by Plaintiffs were created by third parties, and that Google did no more than provide neutral tools to all developers across the Play Store.").

To the extent Roblox offers any of the allegedly addictive features to users to utilize in creating games, they are provided as tools for users—and they do not exist in the form Plaintiff describes until users incorporate them into their games. "[A] service provider does not become liable as a content creator simply because it 'provides neutral tools that a user exploits' to tortious ends." Jaclyn Angelli, individually & on behalf of D.G., a Minor v. Activision Blizzard, Inc., et

7

al., No. 23-CV-16566, 2025 WL 1184247, at *3 (N.D. Ill. Apr. 23, 2025) (quoting Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1099 (9th Cir. 2019)).

Moreover, Roblox's provision of tutorials or manuals that explain how to use its tools is insufficient to render Roblox responsible for user-generated games. "Providing neutral tools for navigating websites is fully protected by CDA immunity, absent substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful purposes." Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC, 521 F.3d 1157, 1174 n.37 (9th Cir. 2008). Simply providing explanatory tutorials so users understand how to operate a tool does not rise to the level of qualifying as substantial affirmative conduct.

Finally, Plaintiff alleges Roblox has a "social-gaming" component that allows "users to interact with friends or other users within the game," which creates a competitive environment allegedly further addicting users. (Doc. #138 at 87, 89). However, allowing users to share content they created with each other also falls within Roblox Corp.'s role as a publisher, including any editorial functions Roblox Corp. exercises when making user-generated games available on its platform. See Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc., 206 F.3d 980, 986 (10th Cir. 2000) ("Congress clearly enacted § 230 to forbid the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions."). Ultimately, Plaintiff does not identify any actions by Roblox that fall outside the scope of CDA immunity.

With respect to Google, Plaintiff alleges it maintained the Android Operating System on which some video games run and made such games available for purchase in the Google Play store. (Doc. #138 at 30–31). Providing an operating system for a third-party to use does not convert the third-party's content into Google's, nor does that alone make Google "responsible, in whole or in part, for the creation or development of information" which is otherwise developed without

Google's input. 47 U.S.C. § 230(f)(3); see Roommates.Com, 521 F.3d at 1173–74. Also, making games available for purchase in the Google Play store is precisely the type of publishing activity protected by Section 230. Johnson, 614 F.3d at 791. Therefore, these alleged actions even when accepted as true do not give rise to liability.

Plaintiff fails to plead facts demonstrating conduct by the Platform Defendants that falls beyond the scope of protection offered by Section 230. Plaintiff's remaining allegations, including that the Platform Defendants conspired with video game developers to "design, develop, distribute, market, supply, and/or sell" allegedly addictive games, are conclusory and unsupported by specific factual allegations. (Doc. #138 at 22, 31). The conduct alleged in the amended complaint targets the Platform Defendants precisely for the role they play in making third-party created video games available to users through their platforms. Section 230 forecloses liability for this type of conduct, and it is apparent on the face of the amended complaint that all claims against the Platform Defendants must be dismissed on this basis. The Platform Defendant's motion to dismiss (Doc. #149) is therefore granted.

**II.     All Claims Against the Developer Defendants are Barred by the First Amendment.**

The Developer Defendants argue the First Amendment forecloses this action and requires dismissal of all claims alleged against them. (Docs. #147). The Developer Defendants argue that the design process of creating the video games and the design features of in-game play are protected expressive conduct.

Plaintiff argues she does not seek to regulate content, expression, or speech, and her claims are not barred by the First Amendment. (Doc. #160). Plaintiff argues this suit targets conduct not content, and each claim is based on specific non-expressive conduct by each Defendant that is not protected by the First Amendment.

9

The First Amendment to the United States Constitution limits the scope of tort liability by preventing recovery in cases where plaintiffs seek to hold defendants liable for protected conduct. See New York Times Co. v. Sullivan, 376 U.S. 254 (1964) (holding the right to free speech is a defense to defamation); N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886 (1982) (holding the right to freely associate is a defense to conspiracy-based torts); Hustler Mag., Inc. v. Falwell, 485 U.S. 46 (1988) (holding the right to free speech is a defense to intentional infliction of emotional distress); Snyder v. Phelps, 562 U.S. 443 (2011) (holding the right to free speech is a defense to intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy).

The Free Speech Clause of the First Amendment guarantees the freedom of speech to all persons. U.S. Const. amend. I. "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. Am. C.L. Union, 535 U.S. 564, 573 (2002) (internal quotation marks omitted). Speech additionally receives the same level of protection whether the speaker seeks financial profit or not. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 761 (1976); City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 756 n.5 (1988) ("Of course, the degree of First Amendment protection is not diminished merely because the . . . speech is sold rather than given away.").

"[V]ideo games qualify for First Amendment protection" because "[l]ike the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world)." Brown v. Ent. Merchants Ass'n, 564 U.S. 786, 790 (2011); Ent. Software Ass'n v. Swanson, 519 F.3d 768, 771 (8th Cir. 2008). The interactive or player-controlled elements of video

games are as equally entitled to protection as the elements generated directly and exclusively by the games' developers. Interactive Digital Software Ass'n v. St. Louis Cnty., Mo., 329 F.3d 954, 957 (8th Cir. 2003). Where a plaintiff seeks to hold a video game developer liable for the content of their products, strict scrutiny applies. Brown, 564 U.S. at 799.

Here, Plaintiff argues her claims target non-expressive *conduct*, and she does not seek to hold Defendants liable for any *content*. (Doc. #160 at 39). In support of her argument, Plaintiff cites In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F. Supp. 3d 809 (N.D. Cal. 2023), in which the district court drew a distinction between alleged defects that do and do not receive First Amendment protections in the context of social media. The district court held that First Amendment protections do not apply when addressing alleged defects "would not require that defendants change how or what speech they disseminate" or when defects qualify as "tools" to create speech but are not themselves speech. Id. at 836–837. Plaintiff argues this case is akin to In re Social Media. The Court disagrees.

Notably, in In re Social Media the defendants operated social media platforms, which provide a forum for speech and sometimes "create expressive products," but do not themselves qualify wholesale as speech. Moody v. NetChoice, LLC, 603 U.S. 707, 716 (2024) (explaining social-media platforms "in at least some situations"—but not all—"include and exclude, organize and prioritize—and in making millions of those decisions each day, produce their own distinctive compilations of expression."). Here, the Developer Defendants create video games, which are entitled to First Amendment protection as a whole, not in a piecemeal manner like social media platforms. Brown, 564 U.S. at 790. Therefore, this case is distinguishable, and the likelihood that speech would be directly affected is higher in this case—though not unequivocal.

11

Plaintiff's argument that this case is about conduct not content is unpersuasive. Plaintiff alleges the Developer Defendants' video games are defective because they have addictive features. (Doc. #138). Plaintiff indiscriminately attributes the following allegedly addictive features to all Defendants and all products:

> 29. [Defendants] intentionally design their Products to be addictive by incorporating and utilizing traditional game theory tactics, operant conditioning (e.g., dark patterns, skinner boxes, feedback loops, rubber-banding), artificial intelligence, and reward systems, along with patented designs containing addictive features, systems, mechanisms, and shared technology, in their video gaming product designs to ensure consumers continue to use and engage in "microtransaction" spending within the [Defendants'] Products.
>
> . . .
>
> 135. The [Defendants] utilize many strategies to enhance and exploit the already predatory monetization tactics incorporated into the Products. Such strategies include: (a) The "near miss": convincing players via exciting animation, for instance, that they were very close to winning; (b) "Chasing": encouraging players to keep playing to get back any money they just lost; (c) "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window; (d) "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately; (e) "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; and (f) The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

(Doc. #138 at 11–12, 44). The alleged defects that Plaintiff identifies in her amended complaint are all elements of the video games at issue. Plaintiff's claims, in essence, seek to hold the Developer Defendants liable because their video games are made too entertaining by these "defective" elements. This is content-based liability that is not permitted. Sorrell v. IMS Health Inc., 564 U.S. 552, 578 (2011) (holding protected speech cannot be quieted or burdened simply because it is too persuasive).

Plaintiff further argues the amended complaint targets conduct, not content, because the remedial measures required would not implicate the First Amendment. (Doc. #160). Plaintiff

asserts that to address the defects in the Developer Defendants' video games she seeks "adequate warnings about the risks of [Defendants'] products, safer features such as time limits and increased parental controls, and for Defendants to eliminate their addictive features." Id. at 39. Plaintiff argues this would not require any change to content, so the Developer Defendants' free speech rights are not implicated. This argument is also unpersuasive.

First, the allegedly defective features, as pled by Plaintiff in this case, are properly considered video game content; they are elements and features of video games. See infra at 12. Requiring the Developer Defendants to remove these allegedly addictive features would force them to change the content of the games to make them less enticing or enjoyable for users.

Second, Plaintiff's argument for parental controls and other safety tools is an attempt to recharacterize the allegations in her amended complaint. Plaintiff references parental controls just six times in an amended complaint that is 260 pages. (Doc. #138). And those mentions are not in the context of describing defects in the video games. See id. at 175–76, 189, 215. When Plaintiff's amended complaint discusses product defects, it focuses on design choices that make the video games addictive, like "microtransactions" and "pay-to-win" elements. Plaintiff also fails to explain what parental controls presently exist in Defendants' products and how they are defective. Therefore, the Court rejects Plaintiff's arguments about parental controls. See Bogard v. TikTok Inc., No. 24-CV-03131-VKD, 2025 WL 604972, at *7 (N.D. Cal. Feb. 24, 2025).

Third, requiring the Developer Defendants to give "adequate warnings about the risks of [their] products" would unconstitutionally force them to warn of potential effects of viewing protected expressive content. A mandate of this kind would violate the Developer Defendants' constitutional free speech rights. See Sorrell, 564 U.S. at 578. Plaintiff acknowledges there is a long history of courts rejecting failure-to-warn claims where plaintiffs seek to hold defendants

liable for failing to warn of dangerous ideas or content contained in protected speech.[4] (Doc. #160 at 40). Plaintiff argues this case is distinguishable from those cases, but the distinction Plaintiff attempts to draw is illusory. Plaintiff argues she seeks warnings about "dangerous product designs," not warnings about "dangerous ideas or content." Id. However, Plaintiff's amended complaint alleges the *content* of video games causes addiction; any warning about a risk of harm from playing video games would be warning about the content. The fact that Plaintiff alleges the video games are designed to create addiction does not transform the conclusion that any warning would ultimately be content-based. This type of claim is therefore covered by the First Amendment and subject to strict scrutiny analysis. Brown, 564 U.S. at 799.

It is evident on the face of the complaint that Plaintiff's claims against the Developer Defendants fail the strict scrutiny test. Plaintiff has an interest in receiving compensation for alleged harms and in preventing video game addiction in children. Preventing future addiction in children is compelling, yet the changes that are requested would apply to all users of the games and is therefore not narrowly tailored for children. Reno v. Am. C.L. Union, 521 U.S. 844, 875 (1997); Sanders v. Acclaim Ent., Inc., 188 F. Supp. 2d 1264, 1281 (D. Colo. 2002). Additionally, the features Plaintiff identifies as addictive, stated generally as "the innovative video game monetization inventions and ideas intended to lure and addict users," is a very broad category of

---

[4] Plaintiff cites the following cases in her suggestions:
"See Bill v. Superior Court, 137 Cal. App. 3d 1002, 1006-07 (1982) (refusing to hold film producers liable for failing to warn filmgoers that the violent "content" of their film might attract people prone to violence); Moody [v. NetChoice, LLC], 144 S. Ct. 2383 (remanding a case where plaintiffs sought to impose controls on whether and how third-party content is presented to users on social media platforms); Miami Herald Pub. Co. v. Tornillo, 418 U.S. 241, 258 (1974) (striking down a statute which compelled newspapers to allow political candidates to print a reply to criticism in their paper); Watters v. TSR, Inc., 715 F. Supp. at 821- 22 (refusing to hold game creator liable for failing to warn players about the "content of the game" and the "ideas expressed" therein); Olivia N. v. N.B.C., 126 Cal. App. 3d 488, 492 (1981) (refusing to hold broadcaster liable for failing to warn viewers before televising a film that contained an "artificial rape" scene); Sanders v. Acclaim Entm't, Inc., 188 F. Supp. 2d at 1270 (refusing to hold video game producers liable for failing to warn users that their products "made violence pleasurable and attractive and disconnected the violence from the natural consequences thereof")."
(Doc. #160 at 40).

content that may be addictive for some individuals but not others. (Doc. #138 at 57). To prohibit such a broad category of video game features would strongly stifle development as game developers would fear that any new game feature that users find attractive could result in significant financial liability. The chilling effect on protected expression would be broad, even for minors. Erznoznik v. City of Jacksonville, 422 U.S. 205, 212 (1975) ("[M]inors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them."); Watters v. TSR, Inc., 715 F. Supp. 819, 822 (W.D. Ky. 1989), aff'd, 904 F.2d 378 (6th Cir. 1990) (prohibiting liability based on the content of the game "Dungeons and Dragons"); Sanders v. Acclaim Ent., Inc., 188 F. Supp. 2d 1264, 1281 (D. Colo. 2002) (finding tort liability based on the content of video games is not narrowly tailored to serve the interest of protecting minors).

In the end, "speech cannot be restricted simply because it is upsetting or arouses contempt," or where its content causes significant emotional distress. Snyder, 562 U.S. at 548. Here, all of Plaintiff's claims run afoul of the First Amendment. The theories of liability brought against the Developer Defendants would have powerful chilling effects and are far from narrowly tailored. Plaintiff's claims, as alleged, are barred on the face of the complaint, and the Developer Defendants' motion is therefore granted.

Since the Court's conclusions are based specifically on the facts as alleged in Plaintiff's amended complaint, and "dismissals *without* prejudice are favored in this Circuit," the Court will dismiss all claims against these Defendants without prejudice. Harris v. Medtronic Inc., 729 F. Supp. 3d 869, 883 (D. Minn. 2024) (citing Michaelis v. Nebraska State Bar Ass'n, 717 F.2d 437, 438 (8th Cir. 1983)). Accordingly, it is hereby

ORDERED Defendants Another Axiom Inc. and Banana Analytics, LLC's motion to dismiss (Doc. #146) is GRANTED and all claims against Another Axiom Inc. and Banana Analytics, LLC are DISMISSED WITHOUT PREJUDICE from the above-captioned action. It is further

ORDERED Defendants Google LLC and Roblox Corporation's motion to dismiss (Doc. #149) is GRANTED and all claims against Google LLC and Roblox Corporation are DISMISSED WITHOUT PREJUDICE from the above-captioned action. It is further

ORDERED VRChat Inc.'s motion to dismiss (Doc. #148) is DENIED WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: August 11, 2025              /s/ Brian C. Wimes
                JUDGE BRIAN C. WIMES
                UNITED STATES DISTRICT COURT